JENNIFER LIVINGSTON, et al.,

*Plaintiffs*,

v.

THE CITY OF CHICAGO,

*Defendant*.

Case No. 16 cv 10156

Hon. Sara L. Ellis

Magistrate Judge Young B. Kim

**CITY OF CHICAGO'S RESPONSE IN OPPOSITION TO MOTION FOR COMPLIANCE WITH THE COURT-ORDERED ESI PROTOCOL OR, IN THE ALTERNATIVE, FOR ENTRY OF A PROTOCOL FOR TECHNOLOGY ASSISTED REVIEW**

The Court requested this briefing because Plaintiffs have objected to the City's proposed use of Active Learning ("AL"), a specific type of technology-assisted review ("TAR") software, to assist with its attorney review of approximately 190,000 records for responsiveness and privilege. In their motion, Plaintiffs contend that AL should not be used for the City's responsiveness review because: (1) AL is an ESI search/culling tool and the Court-ordered ESI protocol designates keyword searching as the only search method; (2) AL would exclude many responsive documents from the City's responsiveness review; and (3) the City waived its right to a technology-assisted responsiveness review based on its proposed ESI protocol. Alternatively, Plaintiffs request that if the City is allowed to use AL for its responsiveness review, then the Court should allow Plaintiffs to participate in the City's responsiveness review, via a TAR protocol.

Plaintiffs' motion should be denied because: (1) the City did not waive its right to use TAR to conduct its responsiveness review, since the Court permitted the City to conduct a responsiveness review without confining it to any particular review method, and the City's ESI protocol reserved its right to produce only non-privileged, responsive documents; (2) it is undisputed TAR is more efficient and accurate than manual attorney review; (3) the City proposes to use AL, a widely accepted type of TAR 2.0 that comports with the Federal Rules of Civil

Procedure (the "Rules"); (4) Plaintiffs' objections to the City's use of AL are misplaced because they presume the City is using TAR 1.0, which it is not; and (5) case law supports the City's use of AL. Finally, the Court should reject Plaintiffs' proposed TAR protocol because it is both unnecessary and overly burdensome.

## II.     ARGUMENT AND DISCUSSION

### A.     The City did not waive its right to use TAR to conduct its responsiveness review.

Plaintiffs attempt to recast the City's initial ESI proposal (DKT 219-1) as waiving its right to conduct a technology-assisted responsiveness review. Further, Plaintiffs argue the City is bound by its description of a quality control ("QC") process in its brief in support of its proposed ESI protocol. DKT 219, p. 14. Not only do these arguments mischaracterize the preceding 16 months of ESI negotiations, briefing and orders, they also seek to selectively enforce aspects of the City's proposed ESI plan, which Plaintiffs rejected and the Court declined to adopt.

### 1.     The City's ESI protocol expressly reserved its right to produce only non-privileged, responsive documents.

When the City initiated discussions about ESI in March 2019, the City proposed either: (1) collecting custodians' email data unfiltered by search terms but using more limited time frames or (2) collecting email data filtered initially by simplistic search terms using the broad time frames Plaintiffs requested, and then refining the collection using more targeted search parameters. Under either scenario, the City's goal was to reduce burden without sacrificing the search for responsive material by making the amount of data that the City's counsel had to review for responsiveness and privilege more manageable. *See* Dkt. 219, p. 3 (describing the City's two proposals, each of which involved sending data "to counsel for the City for a responsiveness and privilege review").

Plaintiffs elected option (2), leading the parties to negotiate simplistic search terms for the City to apply when collecting e-mail data. When the parties could not agree on search terms and

27442169.4

Plaintiffs belatedly objected to the City collecting its own data internally, each party submitted an ESI proposal to the Court. In the City's proposal, it suggested conducting a QC process to determine how effective the initial *collection* search terms were at identifying potentially responsive documents and sharing a sample set of documents with Plaintiffs as necessary to help the parties develop and agree upon a secondary set of search terms to further cull the data prior to counsel's responsiveness and privilege review. The City proposed this secondary search term process specifically to avoid a burdensome "document-by-document review" of all documents that contained the *initial* search terms (not the secondary search parameters). *See* DKT 219, p. 4.

Contrary to Plaintiffs' assertions, the City never proposed or agreed to produce all records within the secondary search parameters – regardless of whether they were responsive or privileged. Indeed, the City's initial proposed ESI protocol provides that counsel for the City would disseminate only "responsive records to Plaintiffs' counsel and will produce to Plaintiffs' counsel a log identifying records withheld on the basis of privilege." Dkt. 219-1, § B.1.4.v. Further, the City specified that nothing in its ESI proposal "shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity. The Parties do not waive any objections as to the production, discoverability, admissibility or confidentiality of documents or ESI." *Id.*, § F.4. Accordingly, any suggestion that the City waived its right to conduct a responsiveness review in its ESI proposal is misplaced.

2.  <u>This Court's ESI Order permits the City to review documents for responsiveness and privilege before producing them, without confining the City to any particular review method.</u>

Instead of adopting the City's ESI proposal, the Court granted Plaintiffs' proposal that the City engage a vendor to collect the data, denied the City's proposed search terms, and adopted Plaintiffs' search terms. DKT 239, pp. 1-2, 5. Further, the Court rejected Plaintiffs' proposal that

3

the City produce all documents that "hit" on search terms without further review for responsiveness or privilege:

> The parties' second dispute is over Plaintiffs' proposal that once the initial universe of emails has been identified through keyword searches, the City should produce the same without any further review for responsiveness and for privilege. The court agrees with the City that this proposal should be rejected.... As such, the City must be permitted (if it wishes) to review the emails for responsiveness and for privilege before producing them in their native format.

*Id*. at 3. Nothing in the ESI Order limits *how* the City may conduct its ESI responsiveness or privilege review or requires the City to negotiate with Plaintiffs concerning its review method.

The City complied with the ESI Order. It engaged an ESI vendor that collected over 9 million records, processed them, and applied the Court-ordered search terms, resulting in a culled dataset of approximately 1.5 million records (including attachments). The vendor then deNISTed[1] and de-duplicated the culled results and, after pulling in family members, ended up with approximately 190,000 records. Then, on April 28, 2020, despite not being obligated to, the City advised Plaintiffs during a meet and confer that it was planning on using TAR to assist its attorneys with its responsiveness review because of the burden of conducting a manual attorney review. *See* April 28-29, 2020 Emails, Exhibit 1. Specifically, the City informed Plaintiffs that it would use a form of TAR called "Active Learning" in counsel's hosted review platform, Relativity. *See id*. Plaintiffs responded that they (erroneously) interpreted the ESI Order as directing the City to use search terms followed by a "manual" responsiveness review. *See id*.[2] There is simply nothing in

---

[1] DeNISTing is the customary and industry-standard process of removing system files, program files, and other non-user created data from ESI. The National Institute of Standards and Technology ("NIST") is a federal technology agency that maintains a "NIST List" of software application files that do not have user-generated content. These are routinely removed in the culling process to eliminate known application files that are unlikely to contain relevant content. The City provided Plaintiffs with a list of file types that were deNISTed by its vendor during the culling process.

[2] Plaintiffs also falsely claimed that the City declined to meet and confer to narrow the search terms and that the City insisted on proceeding with a CAL responsiveness review. *Id*. The City denied that allegation

27442169.4

the ESI Order dictating the manner in which counsel for the City may review documents for responsiveness or privilege. *See* DKT 239. Therefore, Plaintiffs' argument that the City may not use TAR under the ESI Order should be rejected.

**B.      It is undisputed that TAR is more efficient and accurate than a manual attorney review**.

Though Plaintiffs seek to prevent the City from using TAR, they agree it is far more effective at identifying responsive documents than a manual attorney review. *See* DKT 289, p. 12-13. Indeed, given the low rate by which manual ESI review identifies responsive documents, courts have long held that there is no expectation in an ESI search for a party to review all documents in a set. *See, e.g.*, *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006) ("[T]here is no obligation on the part of a responding party to examine every scrap of paper in its potentially voluminous files in order to comply with its discovery obligations."). The City has a right to conduct a responsiveness review, and it is undisputed that TAR is a more effective method than a manual review, including identifying the highest amount of responsive documents. Plaintiffs' motion should be denied for this reason alone.

**C.      The City proposes to use AL, a widely-accepted type of TAR 2.0.**

This briefing would be unnecessary were it not for Plaintiffs' incorrect assumptions about TAR and AL, including their focus on outdated technology not at-issue (i.e., TAR 1.0), and reliance on antiquated case law and treatises. *See* § II.E.2. *infra*. AL is a TAR application associated with Relativity, the review platform utilized in-house by the City's counsel. TAR applications come in a few different formats, but each version leverages algorithms and other technology to make document reviews more efficient and streamlined than a manual linear review.

---

and reminded Plaintiffs that to the contrary, the City was open to confer further on refinements, and shared refinement ideas during the conference while Plaintiffs had none. *Id*.

27442169.4

TAR 1.0 is an older version of TAR that uses "seed sets" of training documents that need to be updated and cultivated throughout the review by humans in order to train the tool's algorithms on responsiveness. TAR 2.0 or Continuous AL is the more contemporary version of TAR in which the tool's algorithms learn on a continuous document-by-document basis as attorneys review and code without feeding any training documents into the system. Relativity's AL, which the City is proposing to use, is considered by most industry experts as a form of TAR 2.0.

    1.  <u>Plaintiffs characterize AL as a search/culling tool, but it is a review and prioritization tool designed for a post-culling responsiveness review.</u>

AL is not—as Plaintiffs insist—a search/culling tool. Relativity's AL user guide is literally entitled "Assisted *Review* Active Learning Guide." (Assisted Review Active Learning Guide, Exhibit 2, p. 1 (emphasis added). It is designed to "automate the review process while minimizing the time [a] review team would otherwise spend coding irrelevant documents in [the] document set."[3] Using AL for responsiveness review has saved users millions of dollars and tens of thousands of review hours.[4] AL assists attorney-reviewers by prioritizing for their review the documents that are more likely to be responsive. In an AL review, like a manual review, search parameters are used to cull down a collected data set to a review set.[5] That review set is then put into the AL application where the algorithms use data points collected through attorney review of documents

---

[3]  *See*  explanation  of  Relativity  CAL  applications  at https://help.relativity.com/PDFDownloads/9.6_PDF/Relativity%20-%20Assisted%20Review%20Active%20Learning%20Guide%20-%209.6.pdf.

[4] *See* the example published by Relativity, where using its responsiveness review tools, "[a] firm completed th[eir] responsiveness review in 600 hours at a $300,000 cost, saving their client $2.7 million and 25,400 review hours." https://www.relativity.com/customers/steptoe/.

[5] By contrast, in a completely manual ESI review, search terms and other parameters like date ranges are used to cull a review set from the data collected. That review set is then batched out and reviewed in no particular order by attorneys. While certain analytics technologies, like threading, are available to make the review more efficient, attorneys review the random batch of documents without any subject matter focus or other type of organization. This often can lead to greater expense and review time and potentially inconsistent coding decisions.

27442169.4

in order to reorganize the documents in the review queue in a more efficient order. *See* Relativity - Active Learning in Technology-assisted Review, Exhibit 3, p. 6. With each coding decision the attorneys make, the technology continues to learn and prioritizes which documents contain contextually similar content as documents which are coded as responsive. *See id.*; *see also* Ex. 2, p. 20. AL re-prioritizes the documents in the review queue every 20 minutes. Ex. 2, p. 5. The AL tool does not make *any coding* decisions about a document's responsiveness, privilege, confidentiality, or issues. It merely shuffles the order of the documents being reviewed based on the coding decisions made by the attorney review team. *See id.* at 4. All documents marked responsive and ultimately produced are done so by human reviewers. *See id.*

Further, Plaintiffs' statements that the City's use of AL will set aside large portions of the ESI collection is inaccurate and irrelevant. The prioritization queue generated by the application is different in every matter. *See* Ex. 3, p. 8 (discussing variance of prioritization based on number of relevant documents depending on data set). It is possible, for instance, that based on coding decisions, AL will set aside only 1% of the total set as likely unresponsive. *See id.* That depends on the content of the review set, similar to manual review. *See id.* Also, just because documents are categorized as likely unresponsive based on the algorithms, does not mean they never get reviewed. AL ranks each document in the model from 0 to 100, 0 being least likely to be relevant and 100 being most likely to be relevant. *See id*; *see also* Ex. 2 at p. 26. Those rankings change based on the reviewers' coding decisions. No two models are the same; the ranking system will vary based on the unique coding decisions and content of the documents, and thus each individual document is ranked from 0 to 100 based on how it relates to the overall, unique project. *See id.* There is ultimately no way to determine in advance what the prioritization model will look like; therefore, Plaintiffs' explanation of TAR/AL to the Court in absolute terms is misleading.

2. <u>Plaintiffs' objections based on use of a training set are misplaced because they presume the City is using TAR 1.0, which it is not.</u>

Contrary to Plaintiffs' assertions, newer versions of TAR, including the City's AL application in Relativity, have abandoned requiring "training sets" or "seed sets" used by older versions of TAR known as TAR 1.0. The City's AL application starts learning and prioritizing documents "once you have at least five documents coded with the positive [responsive] choice and five coded with the negative [non-responsive] choice." *Id*. at 8. (alterations added). Documents are presented randomly to the reviewer until those first ten documents are coded, alleviating concerns about which documents would be used for "training sets" or "seed sets" as with TAR 1.0. *Id*. Indeed, "training sets" and "seed sets" are not once mentioned in the 33-page AL guide. *See generally, id*. Since they have no relevance whatsoever to the City's TAR application, the Court should disregard all mention of "training set" or "seed set" in Plaintiffs' motion, and deny the motion accordingly. (Training/seed sets are mentioned in the motion as follows: DKT 289, pp. 1, 5, 6, 13; DKT 289-1, pp. 3, 4; DKT 289-4, pp. 4, 9, 12-17, 20-12).

3. <u>AL utilizes effective QC measures to ensure an attorney reviews all potentially responsive documents.</u>

AL within Relativity has several highly effective QC tools built into it that ensure all responsive documents are reviewed by human reviewers, defeating Plaintiffs' suggestion that reviewers may "miss" large volumes of documents when using AL. Newer, more sophisticated applications like the City's AL application are specifically developed for single-party review and QC. This saves both parties significant time and expense, especially in highly disputed cases. The following outlines four of the QC applications the City will employ with its AL review.

- <u>Elusion Testing</u>: Elusion Testing in Relativity is a system-generated review of a random sampling of the remaining unreviewed documents in a review universe. Ex. 2, p. 22. It is typically employed once the reviewers are seeing only non-responsive documents in the review queue and the review appears to be winding down. *See id*. The AL application will randomly pull a certain number of unreviewed documents out of the unreviewed set and

8

present them for review. *See id*. at 24. If the elusion test results in a particularly high number of responsive documents, the reviewers return to the prioritized review queue and continue reviewing. *See id*. at 25. If it results in few or no responsive documents, the review team will know the review is finished, save for any additional QC. *See id*.

- <u>Graphing Results</u>: The AL application in Relativity provides review metrics visually on a graph from 0-100, representing the range of likelihood, from high to low, that the documents plotted on the graph are responsive. *Id*. at 17. The graph color codes whether documents have been reviewed and indicates "Responsive" or "Not Responsive" tags. *See id*. If many unreviewed documents fall around 75 or higher, the review should continue in order to identify further responsive documents. *See id*. at 21.

- <u>Family Reconciliation</u>: Based on the functionality of the AL application, a family reconciliation review must be done towards the conclusion of the review. *See id*. at 29. This ensures that documents coded "Not Responsive" in families with documents coded "Responsive" are reviewed a second time. *See id*.

- <u>Responsiveness based on "cut off score:"</u> The AL application also allows attorneys to search for and QC documents that are coded for Responsiveness inconsistent with the responsiveness score attached to it. For example, attorneys can search for documents coded "Responsive" that fall below a certain percentage of likelihood of being responsive, as well as documents that have been coded "Not Responsive" that fall above a certain percentage of likelihood of being responsive. *See id*. at 18, 22, 29. This allows a QC team to ensure that documents that have been reviewed have been coded correctly. *See id*.

Thus, AL has several effective QC applications the City will use for its responsiveness review. Plaintiffs' objections that AL will miss many responsive documents are therefore unfounded, and their motion should be denied.

## D. Case law supports the City's proposed use of AL

### 1. Courts have endorsed TAR for responsiveness reviews, recognizing that the process comports with the Rules.

In *Winfield v. City of New York*, which Plaintiffs cite, the parties started the ESI culling process with keywords. 2017 WL 5664852, at *4 (S.D.N.Y. Nov. 27, 2017). That resulted in excessive results, so the court actually *ordered* the defendant-municipality to use TAR on the keyword search results to make the process faster and more efficient. *Id*.; *see also Rabin v. PriceWaterHouseCoopers LLP*, 2017 WL 4876780, at *1 (N.D. Cal. Aug. 8, 2017) (with the court's approval, parties culled documents with search terms, then used TAR "for the purposes of identifying responsive documents within that set."). Similarly, in *In re Biomet M2a Magnum Hip*

27442169.4

*Implant Prod. Liab. Litig.*, the defendant first used *unilaterally* chosen keyword searches to cull its data, despite plaintiffs' warnings that keyword culling would exclude many relevant documents. 2013 WL 1729682, at *1 (N.D. Ind. Apr. 18, 2013). Defendant then used TAR to identify responsive documents from the keyword search result set. *Id*. Plaintiffs objected to that process, and asked the defendant to use TAR on the original collection because the keyword search tainted the process since keyword searches have a low rate of identifying responsive documents. *Id*. at *2. The court rejected plaintiffs' arguments:

> The issue before me today isn't whether predictive coding is a better way of doing things than keyword searching prior to predictive coding. I must decide whether Biomet's procedure satisfies its discovery obligations and, if so, whether it must also do what the Steering Committee seeks. What Biomet has done complies fully with the requirements of Federal Rules of Civil Procedure 26(b) and 34(b)(2). I don't see anything inconsistent with the Seventh Circuit Principles Relating to the Discovery of Electronically Stored Information. Principle 1.02 requires cooperation, but I don't read it as requiring counsel from both sides to sit in adjoining seats while rummaging through millions of files that haven't been reviewed for confidentiality or privilege.

*Id*. The court also denied plaintiffs' request to run TAR on the pre-keyword search set based on proportionality. The search would cost the defendant around $1million, in addition to significant funds already expended. *Id*. The court ruled that even if plaintiffs' proposal found additional relevant documents, and despite proportionality considerations including the needs of hundreds of plaintiffs, the very large amount in controversy, and the parties' resources, the extra burden on defendant was unjustified under Rule 26(b)(2)(C). *Id*. at *3. Finally, the court denied plaintiffs' argument that defendant was "estopped from relying on proportionality arguments" since it started the process over plaintiffs' warnings, because defendant had followed the court's ESI orders. *Id*.

*Biomet* is on point. Just like those plaintiffs, Plaintiffs here object that using TAR after a keyword search will lose responsive documents, which is a questionable objection considering that use of Plaintiffs' own keyword list was granted over the City's objections, and they now doubt the

10

effectiveness of their own keywords. Based on that dubious concern, Plaintiffs want to use TAR on the entire set of ~1.5 million unique (deduplicated) emails plus attachments. But as the *Biomet* court properly observed, that will be a significant waste of the producing parties' resources. The City has expended substantial funds developing and negotiating search terms, on search-term disputes, and for the work of its ESI vendor. If the type of backwards process Plaintiffs propose was disproportionate to the needs of a multi-district case with *hundreds of plaintiffs,* like *Biomet,* it certainly is in this 12-plaintiff case. And, just like in *Biomet*, any arguments Plaintiffs may have to undermine the City's proportionality argument should be rejected because the City has complied with all of the Court's ESI orders. Indeed, the City's proposal for an AL responsiveness review is entirely consistent with the ESI Order, which allows a responsiveness review without limitations.

Moreover, as the *Biomet* case recognized, the City's proposal to use TAR for a responsiveness review on a keyword search result is consistent with the Rules and other authority. Other courts have recognized the same. *Brown v. Barnes & Noble, Inc.*, 2019 WL 7168146, at *3 (S.D.N.Y. Dec. 23, 2019) (noting in reference to using TAR "[n]othing in Rule 26(g) obligates counsel to disclose the manner in which documents are collected, reviewed and produced in response to a discovery request."); *Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 127 (S.D.N.Y. 2015) ("[T]he case law has developed to the point that it is now black letter law that where the producing party wants to utilize TAR for document review, courts will permit it.").

2. The remaining case law on which Plaintiffs rely is unavailing.

The remaining decisions on which Plaintiffs rely to argue against keyword culling before TAR review are unavailing. First, the parties jointly engaged in keyword culling as a collection method, so Plaintiffs' reliance on cases criticizing the use of keyword culling as a review method is belated and inexplicable. Second, some of the cases on which Plaintiffs rely support the *City's* TAR proposal, as those courts allowed TAR to be used for a responsiveness review after keyword

27442169.4

culling. In *Bridgestone Americas, Inc. v. Int'l Bus. Machines Corp*., defendant complained that plaintiff was switching to TAR to locate responsive documents after agreeing to and having started its review using keywords. 2014 WL 4923014, at *1 (M.D. Tenn. July 22, 2014). Though the Court allowed plaintiff to switch to TAR with the condition that once plaintiff decided on its seed set, it would share it with defendant, that decision has no bearing on Plaintiffs' Motion because AL does not use seed sets. Further, the City never committed to using keyword searching nor a manual review for its responsiveness review, and is not switching from keyword to TAR responsiveness review midstream. Thus, *Bridgestone* is irrelevant and if anything, supports the City's position since there, the court allowed a TAR responsiveness review after keyword culling.

In another decision cited by Plaintiffs, *Progressive Cas. Ins. Co. v. Delaney*, the court ordered that plaintiff had the option to conduct a *manual* responsiveness review specifically. 2014 WL 3563467, at *2 (D. Nev. July 18, 2014). Plaintiff started a manual review but switched to a TAR review despite court order, without notifying defendant, and otherwise over defendant's objections. *Id*. No such facts are present here. Further, the TAR methods the plaintiff used, including the training set of documents, were inconsistent with the best practices of its own e-discovery expert. *Id*. at *4. It was for these reasons, and not the mere use of TAR after keyword culling, that the court admonished plaintiff's process. *See id*.

Here, the City is not limited to a manual review, voluntarily disclosed its intention to use AL, and has followed court orders. Thus, *Progressive* should not be controlling. The other decisions Plaintiffs rely on to argue against using TAR after keyword culling also are distinguishable or unpersuasive. *See FCA US LLC v. Cummins, Inc.*, 2017 WL 2806896, at *1 (E.D. Mich. Mar. 28, 2017) (court "reluctantly," and without any analysis whatsoever, ruled TAR should be used before keywords, and the type of TAR program  at issue is not disclosed in the

opinion); *Tinto v. Vale*, 2015 WL 4367250, at *1 (S.D.N.Y. July 15, 2015) (without any analysis, finding keyword culling before TAR should not occur "in a perfect world").

**E.**     **The Court should reject Plaintiffs' proposed TAR protocol.**

Consistent with applicable law, the ESI Order permits the City to conduct a responsiveness and privilege review. The Rules impose no obligation on the City to allow Plaintiffs to participate in its responsiveness review or even require it to divulge its responsiveness review process to the opposing party. *Brown*, 2019 WL 7168146, at *3. Despite that, here, the City voluntarily shared with Plaintiffs that it would use AL for its responsiveness review, satisfying any obligation it may have under the Rules to meet and confer with Plaintiffs regarding ESI. Yet, Plaintiffs insist on a burdensome TAR protocol, which would take the parties backward – not forward. Thus, Plaintiffs' proposed TAR protocol should be rejected.

1.     The City shared in good faith how it will use AL for its responsiveness review despite no obligation to do so.

A producing party has no obligation to disclose their review methodology to the receiving party. For example, in *Kaye v. New York City Health & Hosps. Corp.*, plaintiff demanded defendant divulge details of its ESI production process. 2020 WL 283702, at *2 (S.D.N.Y. Jan. 21, 2020). Defendant unilaterally formulated search terms and other collection criteria, but did not divulge its search terms. *Id*. Defendant did, however, disclose the name of its CAL software, shared its CAL review workflow, and disclosed its QC process. *Id*. The court, citing Sedona Principle 6 that the responding party is best situated to evaluate its ESI procedures, methodologies, and technologies, denied defendant's request to learn plaintiff's search terms. *Id*. The court noted: "[w]hen documents are produced in discovery, whether they be produced electronically or otherwise, the Court does not believe that, in the first instance, the receiving party has a right to examine and evaluate the way the production was made or require collaboration in the review

27442169.4

protocol and validation process." *Id*. Similarly, here, the City had no obligation to divulge its responsiveness review process, but it did so regardless.

2. *In re Broiler Chicken Order* does not apply, but even if it did, the City has satisfied all elements of that protocol applicable to AL.

Plaintiffs attach *In re Broiler Chicken Order* (an unpublished and non-binding order) to their motion as an example of the type of TAR protocol that Plaintiffs believe is expected of a producing party that uses TAR as a search/culling application. First and foremost, Plaintiffs' reliance on the *Broiler Chicken Order* is completely misguided because it involves a TAR protocol for a search/culling application, whereas the City intends to use AL to assist attorneys in a responsiveness and privilege review. *See* DKT 289-3, pp. 2-3 (§ II.A. TAR/CAL Search Process).

Moreover, adoption of the *Broiler Chicken Order* protocol in this case is wholly unnecessary, given that the City has already shared with Plaintiffs all of the information detailed in that protocol applicable to AL and the ESI protocol ordered by the Court. For example, the protocol asks the parties to disclose all custodians, search terms, and date ranges for the data set which will go into the TAR software. *Id*. Here, the parties worked together to establish those exact criteria, and the resulting keywords search result is exactly what will go into the City's AL software. Further, the *Broiler Chicken* protocol requires the producing party to (a) name the TAR/CAL software and vendor; (b) provide a general description of how the software will work including how it will train the software; (c) a general description of documents included or excluded from the TAR/CAL process, and (d) what QC measures will be taken. Here, (a) the City has disclosed the name of its software; (b) has via this brief and through meet and confers provided both a general description and significant details about how the software works and is trained; (c) the Plaintiffs know the parameters of the documents included/excluded in the search; and (d) via this brief, the City has provided details of its QC measures. Therefore, even though the City was

27442169.4

not required to disclose its AL protocol, it has voluntarily disclosed significant information regarding its responsiveness review application. No more is required under the Rules.

3. Plaintiffs' proposed TAR protocol is disproportionate to the needs of this case.

To the extent Plaintiffs demand that the City use TAR on 1.5 million documents, unbounded by the court-ordered search parameters, that demand is overly burdensome and unjustified. Though the percentage of total documents in an AL data set a user eventually reviews can vary, the City has calculated cost estimates based upon a review of 70%[6] of the document set as a result of AL's prioritization abilities. In doing so, the City has used parameters including: (1) a discounted rate for contract attorneys who would review the documents at 60/hour; and (2) the hourly rate for the City's counsel who would subsequently review 10% of the resulting document set for QC, at 100 documents/hour. The City approximates an AL review of ~192,000 documents resulting from the keyword search would cost $135,840, while an AL review of ~1.5 million documents would cost $1,062,250. Given that significant difference, and in light of the costs the City has already incurred in the keyword development and search process, Plaintiffs' proposal is unduly burdensome for the City and highly disproportionate to the needs of this case. *See* Rule 26(b)(1). Proportionality dictates that the City should be allowed to use AL on the 192,000 documents resulting from the parties' thoroughly negotiated search terms, and those efforts should not go to waste. Plaintiffs' proposal for a TAR protocol, and their motion, should be denied.

WHEREFORE, Defendant, the City of Chicago, respectfully requests that the Court deny Plaintiffs' Motion for Compliance with the Court-Ordered ESI Protocol or, in the Alternative, for Entry of a Protocol for Technology-Assisted Review.

---

[6] Plaintiffs themselves cite 80-85% as a high range for this figure. DKT 289, p. 7. Thus, 70% is a reasonable approximation of an average figure.

27442169.4

Dated:  June 26, 2020

Respectfully submitted,

MARK A. FLESSNER

Corporation Counsel of the
**CITY OF CHICAGO**

By:

s/Sukrat A. Baber

Special Assistant Corporation Counsel

Allan T. Slagel (ARDC No. 6198470)
aslagel@taftlaw.com
Rachel L. Schaller (ARDC No. 6306921)
rschaller@taftlaw.com
Sukrat A. Baber (ARDC No. 6319022)
sbaber@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive
Suite 2800
Chicago, Illinois 60601
(312) 527-4000

16

27442169.4