## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER LIVINGSTON, *et al.*, | ) | |
| | ) | No. 16 CV 10156 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | August 9, 2021 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Before the court is Plaintiffs' motion to compel production of documents from Defendant City of Chicago's ("the City") outside consultant regarding its work on the Chicago Fire Department's ("CFD") pre-hire physical abilities test. For the following reasons, the motion is granted in part and denied in part:

### Background

In 2016 Plaintiffs filed this employment discrimination lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, claiming that CFD's physical testing requirements for its paramedic candidates had a discriminatory impact on female candidates. Plaintiffs specifically challenged two physical abilities tests used by CFD to test paramedic candidates' physical abilities before allowing them to graduate from the academy: (1) the Step Test; and (2) the Lift and Move Test (together, "the Subject Tests"). (R. 408, Pls.' Mot. at 6; R. 438, Def.'s Resp. at 1.) This lawsuit came during a period of change in how CFD evaluated the physical abilities of its paramedic candidates. In 2014 CFD implemented a new pre-hire physical abilities test ("PPAT") to screen paramedic applicants by measuring

whether they could perform the physical demands of the CFD paramedic job. (R. 408, Pls.' Mot. at 6; R. 438, Def.'s Resp. at 3.) Two years later in 2016 the City introduced and began using a modified version of the PPAT ("Modified PPAT"). (R. 408, Pls.' Mot. at 2.) Although Plaintiffs filed this litigation against the backdrop of these tests, Plaintiffs only challenge the legality of the Subject Tests and do not contest the 2014 PPAT or the 2016 Modified PPAT.

The City's outside consultant Valtera Corporation[1] played a significant role in the development of the PPAT and Modified PPAT. The parties agree that from 2012 to 2014, the City contracted with Valtera to evaluate and validate the PPAT, culminating in Valtera's 2014 PPAT validation report. (Id. at 6; R. 438, Def.'s Resp. at 3.) The parties further agree that the City continued to contract with Valtera after the 2014 PPAT validation report, producing work that resulted in the City's adoption of the Modified PPAT (including a 2017 Modified PPAT validation report) and serving as a litigation consultant in some capacity. (R. 408, Pls.' Mot. at 2, 6-7; R. 438, Def.'s Resp. at 3-4.)

The parties differ in their understanding of the City's relationship with Valtera from 2014 onward. Plaintiffs contend that the City "hired Valtera to review and modify the PPAT to make it harder," and that "[t]his work was performed for operational purposes and not in anticipation of any actual or threatened litigation." (R. 408, Pls.' Mot. at 7.) The City counters that after receiving Plaintiffs' demand

---

[1] Valtera merged with Corporate Executive Board and then SHL, and SHL is the current corporate recipient of the subpoena. (R. 408, Pls.' Mot. at 1 n.1.) The parties refer to these companies as "Valtera" for simplicity and consistency, (id.; R. 438, Def.'s Resp. at 1), and the court continues this practice.

letter on September 15, 2014, Valtera worked as a litigation consultant for the City, not to modify the PPAT as Plaintiffs allege. (R. 438, Def.'s Resp. at 3-4.) The City asserts that "[t]he scope of that consultation [with Valtera] concerned the appropriate physical ability selection tools for CFD paramedics," and that Valtera's ultimate recommendation to modify the PPAT occurred "[a]s a result of those litigation consultation services." (Id. at 4.)

In October 2020 Plaintiffs served Valtera with a third-party subpoena. (R. 408, Pls.' Mot. at 1, 3.) Plaintiffs sought documents relating to Valtera's consulting work for the City on the PPAT and Modified PPAT. (Id.) The City reviewed the requested documents subject to an agreement between the parties and objected that some documents sought were privileged. (Id. at 3.) On March 10, 2021, the City produced about 350 Valtera documents to Plaintiffs, and on March 12, 2021, the City submitted a privilege log indicating that it is withholding about 150 Valtera documents. (Id. at 3-4; see also R. 408-3, Pls.' Mot. Ex. C.) Plaintiffs also sought testimony from Valtera regarding certain topics, and on April 1, 2021, Plaintiffs deposed the industrial organizational psychologist who oversaw Valtera's PPAT and Modified PPAT work for the City, Dr. Nancy Tippins. Plaintiffs asked Dr. Tippins why CFD wanted to change the PPAT in 2016 and to describe conversations with CFD members regarding "training problems" that she referenced in a May 2016 letter. (R. 408, Pls.' Mot. at 14-15.) The City again asserted privilege and instructed Dr. Tippins not to disclose privileged information.

(Id.; R. 408-7, Pls.' Mot. Ex. G at 91, 94-95.) Plaintiffs bring this motion to resolve their disputes over the City's assertions of privilege.

Plaintiffs ask this court to compel production of "(i) City documents about 'modifications to PPAT' that the City logged on its own privilege logs and (ii) Valtera documents regarding the PPAT that the City logged in March 2021 based only on consulting privilege." (R. 408, Pls.' Mot. at 3.) Plaintiffs identify the full list of the disputed documents in Exhibit A to their motion (collectively, the "Disputed Documents") and further divide the documents they seek into five categories:

1. Valtera Documents that are or appear to be the 2017 Valtera validation report of the modified PPAT (or appendices to the report), (R. 408-1, Pls.' Mot. Ex. A at 1-2);
2. City Documents that are or appear to be the 2017 Valtera validation report of the modified PPAT (or appendices to the report), (id. at 3);
3. City Documents re: "modifications to PPAT," (id. at 4-23);
4. Valtera Documents Withheld on Insufficient/Incorrect Claims of Consulting Privilege Only, (id. at 24-31);
5. Valtera Documents Apparently Regarding the City's Engagement of Valtera, (id. at 32-33).

Across these five categories, Plaintiffs dispute 250 withheld documents. (Id.) Plaintiffs also ask the court to order Dr. Tippins to answer the questions described above, which the City prevented her from answering on privilege grounds. (R. 408, Pls.' Mot. at 14-15.)

The City responds that it appropriately withheld the Disputed Documents and information sought from Dr. Tippins because they are protected from disclosure by the attorney-client privilege, work-product doctrine, and Federal Rule of Civil

Procedure 26(b)(4)(D). (R. 438, Def.'s Resp.) The City concedes that documents dealing exclusively with the Modified PPAT are not privileged and represents that it has produced all such documents. (Id. at 2.) The City contends, however, that documents "regarding both Valtera's work on the Modified PPAT and other paramedic physical ability selection tools" are protected because they were created in anticipation of litigation. (Id.) The City also argues that Rule 26(b)(4)(D) bars the continued deposition of Dr. Tippins because she is a non-testifying litigation consultant. (Id. at 14-15.)

Although the number of Disputed Documents is not small, the parties' arguments focus on a single central point—whether the Disputed Documents were created in anticipation of litigation. Because the relevant privilege logs, (R. 408-1, Pls.' Mot. Ex. A (List of Disputed Documents); R. 408-2, Pls.' Mot. Ex. B (City Privilege Log); R. 408-3, Pls.' Mot. Ex. C (Valtera Privilege Log)), include insufficient information to allow the court to evaluate whether the Disputed Documents were created in anticipation of litigation, this court ordered the City to produce the Disputed Documents for *in camera* review. (R. 442; R. 451.) The City submitted such documents under seal on May 25, 2021, and June 7, 2021. (R. 445; R. 453; R. 454.)

The court reviewed the Disputed Documents *in camera*. Although some of the documents are held by Valtera and others by the City, all of the documents relate to a project on which Valtera worked for CFD from 2014 to 2017. The documents refer to this project at its inception as "CFD Paramedic Physical

Abilities Testing and Training Standards Update," (R. 445-1 at 1108-23 (SHL_Temp_00000497)), and at its close as "Paramedic Physical Abilities Study Update," (R. 454-1 at 24-137 (SHL_Temp_00000466)) (together, "the Project"). The Disputed Documents capture the full life span of the Project, including initial discussions and proposals, procurement forms, communications regarding data collection, data provided to Valtera by CFD, surveys and questionnaires used for data collection, documents used in data analysis, and the 2017 Modified PPAT validation report and its appendices.

## Analysis

Plaintiffs seek an order from the court compelling production of the Disputed Documents and requiring Dr. Tippins to answer additional deposition questions. In opposition the City asserts that the requested materials are privileged and protected from disclosure. Because the dispute focuses on whether these materials were generated in anticipation of litigation, the court's analysis focuses on that issue. The court first discusses the sufficiency of the City's privilege logs, then addresses the following: (1) the City's assertion of work-product immunity as to the disputed Valtera and City documents; (2) the City's assertion of attorney-client privilege as to some of the disputed City documents; and (3) whether Dr. Tippins's continued deposition is proper under Rule 26(b)(4)(D). The City bears the burden of establishing the applicability of a privilege or immunity on a document-by-document basis. *See Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 334 F.R.D. 149, 156 (N.D. Ill. 2020). The court construes the City's assertions

narrowly because "evidentiary privileges operate in derogation of the search for the truth and run counter to the public's right to every person's evidence." *Id.*; *see also Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 731 (N.D. Ill. 2014).

## A.    Privilege Logs

The court finds that the City's privilege logs are insufficient to assess its assertions of privilege.  A party withholding discoverable documents must produce a privilege log that "identif[ies] for *each* separate document the following information: the date, the author and all recipients, along with their capacities, the subject matter of the document, the purpose for its production and a specific explanation of why the document is privileged." *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 218 (N.D. Ill. 2013) (emphasis in original) (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 26(b)(5)(A)(ii).  Courts frown on the use of boilerplate or conclusory language in privilege logs.  *See Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, No. 15 CV 3187, 2020 WL 3977944, at *3 (N.D. Ill. July 14, 2020); *Smith-Brown v. Ulta Beauty, Inc.*, No. 18 CV 610, 2019 WL 2644243, at *1 (N.D. Ill. June 27, 2019).  To satisfy the requirements of Rule 26(b)(5)(A), the privilege log must "at least describe the subject matter to which the legal advice was directed." *Washtenaw*, 2020 WL 3977944, at *3.

The City's privilege logs here often fail to satisfy these minimum requirements.  The logs are replete with boilerplate and conclusory language that do not confirm whether the withheld information is in fact subject to a privilege or immunity.  The court's *in camera* review of the Disputed Documents brought these deficiencies into sharper focus.  Descriptions such as "consulting expert analysis

7

regarding the paramedic job in anticipation of litigation" and "consulting expert analysis regarding performance standards in anticipation of litigation" capture a large and diverse range of documents. The City's reliance on such generic and inexact language in its log fails to provide any guide to understanding that diversity—much less evaluating any particular document. The City could have described each document with the precision required by the Rules without jeopardizing the confidentiality of any privileged information. Had the City done so, the parties may have been able to resolve this dispute themselves without court intervention—or, at the very least, allowed this motion to proceed based upon a more targeted *in camera* review. *See Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 WL 3624084, at *1 (N.D. Ill. Aug. 23, 2017).

Having said that, because this motion stems from a fundamental disagreement between the parties as to the role played by Valtera in its consultations with the City, the court declines to grant the motion on the basis of an inadequate privilege log. Nevertheless, the parties are admonished "that a timely and adequate privilege log is required by the federal rules, and that failure to serve an adequate privilege log may result in a waiver of any protection from discovery. Counsel should not expect that the court will substitute its own review for a proper assertion of privilege." *Babych v. Psychiatric Sols., Inc.*, 271 F.R.D. 603, 608 (N.D. Ill. 2010).

## B.    Work-Product Doctrine

The core disagreement between the parties pertains to the role played by Valtera when working with CFD regarding the PPAT. Plaintiffs argue that the

Disputed Documents were generated for operational purposes and that the City never faced any "significant and substantial threat of litigation" regarding the PPAT, thereby negating any claim for work-product protection. (R. 408, Pls.' Mot. at 5-6.) The City counters that the report and other documents relating to the Modified PPAT were generated in anticipation of this and future lawsuits challenging CFD's new pre-hire physical abilities test. (R. 438, Def.'s Resp. at 2.) The City asserts the work-product doctrine on behalf of documents it holds and argues that the 2017 validation report and other related documents Valtera created are protected from disclosure by a "consultant privilege" under Rule 26(b)(4)(D). (Id. at 2, 8; see also R. 408-1, Pls.' Mot. Ex. A.)

The work-product doctrine "protects documents prepared by an attorney or the attorney's agent to analyze and prepare the client's case." *United States v. Smith*, 502 F.3d 680, 689 (7th Cir. 2007). As such, the doctrine protects "party, and not just attorney, preparation" in anticipation of litigation. *Caremark, Inc. v. Affiliated Comput. Servs., Inc.*, 195 F.R.D. 610, 616 (N.D. Ill. 2000). Rule 26(b)(4)(D) extends work-product protection "to an expert's facts or opinions sought through interrogatories or deposition." *IQL-Riggig, LLC v. Kingsbridge Techs.*, No. 19 CV 6155, 2021 WL 1172654, at *5 (N.D. Ill. March 29, 2021) (quoting *Appleton Papers v. EPA*, 702 F.3d 1018, 1024 (7th Cir. 2012)).

As an initial matter, the City erroneously asserts that the Disputed Documents held by Valtera are protected by Rule 26(b)(4)(D). The plain language of the Rule applies only to "interrogatories or deposition[s]," and not to requests for

documents. Fed. R. Civ. P. 26(b)(4)(D); *see also Cnty. of Cook v. Wells Fargo & Co.*, No. 14 CV 9548, 2021 WL 809730, at *1 (N.D. Ill. March 3, 2021) ("Rule 26(b)(4)(D) . . . does not apply where, as here, a party seeks discovery via a request for production."). Protecting requested documents prepared in anticipation of litigation from discovery is properly governed by the work-product doctrine. *See* Fed. R. Civ. P. 26(b)(3)(A) (explicitly extending work-product protections to documents prepared in anticipation of litigation by a party's consultant). Because courts in the Seventh Circuit treat Rule 26(b)(4)(D) as an extension of the work-product doctrine, *see IQL-Riggig*, 2021 WL 1172654, at *5, and both rules apply the same "in anticipation of litigation" standard, this court construes the City's assertions of "consultant privilege" as claims of work-product immunity.

For the City to properly withhold the Disputed Documents as work-product, it must show that each of the documents was created "in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3)(A). Having reviewed the City's submissions, the court concludes that the City has not satisfied this burden. The court focused its examination on documents discussing the purpose of the Project or how this purpose may have shifted from its initiation in 2014 to the completion of the draft validation report in 2017. These documents reveal the primary purpose for the Project—making operational changes to the PPAT and physical abilities tests used by the paramedic academy. Although a few documents include oblique references to "legal" or the background fact of litigation, these references are sparse and

infrequent, and they do not outweigh the abundant evidence showing that the Disputed Documents were not created in anticipation of litigation.

To gain work-product protection, the City "must show that the document was prepared because of the party's subjective anticipation of litigation, as opposed to an ordinary business purpose, and that the subjective anticipation was objectively reasonable." *Smith v. Bd. of Educ. of City of Chi.*, No. 17 CV 7034, 2019 WL 2525890, at *4 (N.D. Ill. June 19, 2019) (citation omitted). The subjective anticipation prong is met when "in light of the factual context the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Logan v. Com. Union Ins. Co.*, 96 F.3d 971, 976-77 (7th Cir. 1996) (internal citation and quotation omitted); *accord Sandra T.E. v. South Berwyn School Dist. 100*, 600 F.3d 612, 622 (7th Cir. 2010). "While litigation need not be imminent, the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation." *Binks Mfg. Co. v. Nat'l Presto Indust.*, 709 F.2d 1109, 1119 (7th Cir. 1983) (internal citation and quotation omitted). A document prepared for non-litigation purposes receives no work-product protection, even if it reflects legal thinking. *See Towne Place Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 284 F. Supp. 3d 889, 899 (N.D. Ill. 2018).

In this case, the City has failed to meet its burden of showing that the Disputed Documents were created in anticipation of litigation. One of the earliest records generated is meeting notes for an August 20, 2014 teleconference between the City and CFD officials, outside counsel, and Valtera. (R. 453-3 at 100-01

11

(DHR_Temp_00000769).)  Although outside counsel is listed as present, the meeting notes record nothing related to litigation or legal strategy.  The notes instead focus solely on operational concerns regarding the PPAT and its relationship with CFD physical performance standards, as well as the potential need to modify the PPAT. (Id.)  The fact that these concerns first arose nearly a month before the City received Plaintiffs' demand letter on September 15, 2014, (see R. 438-1, Def.'s Resp. Ex. 1-6 at 10 (Ex. 2, Pls.' Demand Letter)), indicates that initial motivations for the Project were unrelated to this litigation.  These notes also demonstrate the City's desire to correct a misalignment between the PPAT and training academy physical assessments and downstream operational consequences of that misalignment.  In other words, the Project was conceived in the ordinary course of CFD business.

From this starting place, documents spanning the full duration of the Project consistently show that CFD retained Valtera based on an operational need to update both the PPAT and training academy physical abilities tests.  In letters dated October 1, 2014, Dr. Tippins wrote to Leo Burns and Stefanie Pugliese with initial thoughts regarding the Project.  (See R. 445-1 at 566-71 (SHL_Temp_00000430), 572-74 (SHL_Temp_00000431), 554-60 (SHL_Temp_00000418, undated draft); R. 453-1 at 161-69 (DHR_Temp_000001216, Sept. 30, 2014 draft).)  These letters make clear that Valtera understood its directive at that time as collecting data on the PPAT and academy training to facilitate changes to the PPAT.  (See R. 445-1 at 566-71 (SHL_Temp_00000430), 572

(SHL_Temp_00000431).)   At no point do these letters refer to any litigation, pending or otherwise.

A December 4, 2014 letter from Dr. Tippins to Burns, Pugliese, and Clifford Haimann confirms the non-litigation purpose for the Project.  (See R. 453-3 at 37-50 (DHR_Temp_00000703), 52-65 (DHR_Temp_00000706); R. 454-1 at 187-200 (SHL_Temp_00000501), 175-86 (SHL_Temp_00000500, unsigned draft); see also R. 453-3 at 51 (DHR_Temp_00000705, cover email).)  The letter includes Valtera's formal proposal for the Project and confirms that no legal challenge was pending or imminent.  (See R. 454-1 at 187-200.)  Although the proposal includes a breakdown of estimated costs, Valtera explicitly excluded a cost estimate of "potential litigation support"—qualifying the possible provision of such support with phrases including "as needed," "if required," and "contingent on future legal challenge."  (Id.)

As Valtera's proposal underwent revision and worked its way through the City's procurement process from March to May 2015, the purpose of the Project remained unchanged.  Documents created during this time continue to describe the Project as seeking to modify and validate both the PPAT and the training academy physical assessments, and they likewise continue to exclude "potential litigation support costs" from the proposal's cost estimates as contingent upon future need. (See R. 454-1 at 1-2 (SHL_Temp_00000309), 5-16 (SHL_Temp_00000394), 17-22 (SHL_Temp_00000397), 23 (SHL_Temp_00000451), 149-61 (SHL_Temp_00000498), 162-74 (SHL_Temp_00000499), 201-14 (SHL_Temp_00000502), 215-28 (SHL_Temp_00000503), 229-30 (SHL_Temp_00000504); R. 453-3 at 33-35

(DHR_Temp_00000697), 36 (DHR_Temp_00000702), 68-80 (DHR_Temp_00000713), 92-93 (DHR_Temp_00000722), 94-96 (DHR_Temp_00000724), 97-98 (DHR_Temp_00000725); R. 453-4 at 6-8 (PRIV_0389).))    These documents collectively show that at the time Valtera proposed the Project to the City, it understood itself as undertaking work meant to support CFD operations rather than assisting with any expected or pending litigation.

After receiving permission from procurement to begin the Project, (R. 453-3 at 36 (DHR_Temp_00000702); R. 454-1 at 23 (SHL_Temp_00000451)), Valtera prepared a slideshow dated June 12, 2015, to summarize and explain its workplan, (R. 445-1 at 1108-23 (SHL_Temp_00000497); R. 453-3 at 128-35 (DHR_Temp_00001186)).  This workplan highlights the City's ongoing concern with the misalignment between the PPAT and training academy physical assessments. (R. 445-1 at 1108-23 (SHL_Temp_00000497).)  Although this concern is presented over two slides titled "Concerns of CFD" and "Concerns of DHR & Legal," the content presented does not differ from the operational issues addressed throughout the Project.  (Id.)  No language discussing, referencing, or alluding to this lawsuit or any other appears in the slideshow.   (Id.)  Furthermore, the intended workplan describes a process of modification and validation for both the academy physical ability assessments and the PPAT—a clear indication that the City and Valtera intended the Project to result in operational changes.

As work began in earnest on the Project, documents continue to show a focus on making operational modifications to the PPAT and training academy physical

abilities assessments. Some documents describe proposed modifications to various physical abilities assessments. (See R. 445-1 at 561-64 (SHL_Temp_00000423), 1096-99 (SHL_Temp_00000486), 1100-03 (SHL_Temp_00000487), 1104-07 (SHL_Temp_00000488); R. 445-3 at 765-68 (SHL_Temp_00000486), 769-72 (SHL_Temp_00000487), 773-76 (SHL_Temp_00000488); R. 454-1 at 138-41 (SHL_Temp_00000489), 255-57 (SHL_Temp_00000519), 258 (SHL_Temp_00000520), 259-61 (SHL_Temp_00000521)) Other emails discuss modifications and/or operational changes that resulted from the Project. (See R. 453-4 at 186 (PRIV_0733), 187 (PRIV_0740), 188-89 (PRIV_0798), 190-91 (PRIV_0820).) Still other documents compare various alternative physical abilities testing procedures and the costs and benefits of each approach. (See R. 453-3 at 30-32 (DHR_Temp_00000662); R. 454-1 at 262-267 (SHL_Temp_00000522).) None of these documents includes a discussion of legal strategy, attorney or client thought processes regarding this case, or any other topic that could indicate the documents themselves or the Project as a whole was conducted with an aim toward anything other than operational changes to CFD's physical abilities testing.

Finally, the Disputed Documents include the 2017 draft validation report and its appendices produced by Valtera at the conclusion of the Project. (See R. 445-1 at 808-912 (SHL_Temp_00000467, draft dated March 31, 2017), 913-1029 (SHL_Temp_00000468, draft dated March 31, 2017); R. 453-2 at 5-126 (CHI_00811374, draft dated March 22, 2017); R. 445-2 at 1-122 (CHI_00812087, draft dated March 22, 2017); R. 454-1 at 24-137 (SHL_Temp_00000466, draft dated

March 22, 2017).)  The report explains the purpose of the Project and describes the specific consulting services Valtera agreed to provide.  (See, e.g., R. 445-1 at 810-12 (SHL_Temp_00000467); R. 445-2 at 5-8 (CHI_00812087).)  These narratives do not include any discussions about litigation-related motivations.  (Id.)  Instead, they tell the same story of operational intent that consistently appears throughout the Disputed Documents—concerns about the perceived misalignment between the PPAT and CFD paramedic physical ability standards and the consequences of that misalignment.  The City hired Valtera to study, modify, and validate the PPAT, training academy physical ability tests, and the Paramedic Functional Capacity Evaluation (used to determine return-to-work status for injured paramedics).  (Id.)  The substantive portion of the report then describes how Valtera studied, recommended modifications, and validated resulting changes to these physical ability assessments.  (See R. 445-1 at 808-912 (SHL_Temp_00000467), 913-1029 (SHL_Temp_00000468); R. 453-2 at 5-126 (CHI_00811374); R. 445-2 at 1-122 (CHI_00812087); R. 454-1 at 24-137 (SHL_Temp_00000466).)  By every indication, the March 2017 validation report, the Project as a whole, and the related Disputed Documents were created in the ordinary course of business to correct perceived operational issues with CFD paramedic physical abilities testing—not in anticipation of litigation.

Considering the numerous documents describing the non-litigation purpose of the Project, the City's arguments that the Disputed Documents constitute work-product prepared in anticipation of litigation are unpersuasive and insufficient to

meet the City's burden. Although the City relies on *Zurbriggen v. Twin Hill Acquisition Co.*, No. 17 CV 5648, 2020 WL 4349891 (N.D. Ill. July 29, 2020), that case does not apply here. The City argues that *Zurbriggen* stands for the proposition that any non-litigation work performed by a litigation consultant in the course of its consultation is properly considered work-product. (R. 438, Def.'s Resp. at 8-9.) But the *Zurbriggen* court held only that the defendant had a right to review responsive documents subpoenaed from its outside consultants before their production to plaintiffs and to withhold any documents that may be privileged. 2020 WL 4349891 at *1-4. The court had no opportunity to examine whether specific assertions of work-product immunity satisfied the anticipation of litigation standard, which is the issue presented to this court. *Id.*

The City is no doubt correct that materials created in anticipation of litigation may be protected from disclosure where secondary motivations also informed their creation. *See, e.g.*, *Sandra T.E.*, 600 F.3d at 622. But the record does not support the City's assertions that the Disputed Documents were, in fact, created for litigation preparation. Given that the City bears the burden of proving that the work-product doctrine applies to each document for which it claims the immunity, *see Kelley v. Lempesis*, No. 13 CV 4922, 2015 WL 4720054, at *4 (N.D. Ill. Aug. 7, 2015), the City must demonstrate that *these particular documents* were created in anticipation of litigation. The City has failed to do so here. That Valtera served as a litigation consultant at some point does not prove that the Disputed Documents qualify for work-product—or any other—protection, particularly where,

17

as here, *in camera* review of these documents indicates they were created in the ordinary course of business.

Similarly, a coincidence of timing is insufficient to establish that the documents were created in anticipation of litigation where the Disputed Documents reviewed *in camera* explicitly discuss their operational purpose and include no reference to litigation preparation. *See Logan*, 96 F.3d at 976 ("[T]he mere fact that litigation does eventually ensue does not, by itself, cloak materials with the work product privilege."). This is especially true where, as here, the Disputed Documents begin discussing the operational changes recommended by Valtera and the City in the Project nearly a month before the City received Plaintiffs' demand letter. (R. 453-3 at 100-01 (DHR_Temp_00000769).)

That leaves the City with one remaining piece of evidence—a February 3, 2014 procurement request letter from the City's Department of Human Resources to Procurement Services on behalf of Valtera. (See R. 453-1 ("CHI_00501344"); R. 453-3 at 33-35 (DHR_Temp_00000697); R. 453-4 at 6-8 (PRIV_0389).) The City describes this letter as conclusive evidence that the Disputed Documents were created in anticipation of litigation. (R. 438, Def.'s Resp. at 4 n.1; R. 448, Def.'s Sur-Reply at 2.) But this letter provides further evidence that the Project was conducted in the ordinary course of business for operational needs. The letter tells the same story seen consistently throughout the Disputed Documents—the City was concerned about the misalignment between the PPAT and the training academy physical assessments, so the City wanted to hire Valtera to study this misalignment

and improve CFD's physical abilities tests. (R. 453-1 at 2.) The letter specifically identifies this operational need as the purpose for the procurement request. (Id.) It also emphasizes that delays involved with using a vendor other than Valtera would impact the hiring process—further indicating an operational concern. (Id. at 3.) Although one sentence discussing the need to avoid delays caused by hiring a different vendor possibly alludes to this litigation, the claims in this lawsuit are not otherwise discussed. (Id. at 1-3.)

The court therefore concludes that the letter, by itself, does not show the City sought to retain Valtera because of the claims in this lawsuit. (See R. 438, Def.'s Resp. at 4 n.1.) Instead, the letter puts operational concerns at the forefront. And while the sentence possibly alluding to this litigation could indicate that the City had some litigation preparatory purpose in hiring Valtera for the Project, the City never offered a declaration or other evidence to corroborate its position. From this court's perspective, the sentence could just as plausibly indicate that the threat of this lawsuit created an urgent need for the City to make operational changes lest it remain exposed to litigation. A single ambiguous sentence is not enough to establish that the Disputed Documents were created in anticipation of litigation when numerous documents consistently contradict that claim. Those documents also directly contradict the City's assertions "that there was no intention at [the time the procurement letter was sent] for Valtera to modify the PPAT," (R. 438, Def.'s Resp. at 4 n.1), and "[t]he City never retained Valtera for the specific purpose of modifying the PPAT," (id. at 4). (See, e.g., R. 445-1 at 566-71

(SHL_Temp_00000430), 572 (SHL_Temp_00000431); R. 453-3 at 100-01 (DHR_Temp_00000769); R. 454-1 at 24-137 (SHL_Temp_00000466).) This court is not inclined to give a party's version of events much weight when that version of events is contradicted by *in camera* review of that party's own documents.

With no other evidence supporting its claim that the Disputed Documents were created in anticipation of litigation, the City makes the novel argument that documents related to operational changes enacted as a response to litigation constitute work-product. (R. 448, Def.'s Sur-Reply at 2-3.) The work-product doctrine provides no such protection. "Materials created in the ordinary course of business which may have the incidental effect of being helpful in litigation are not privileged under the work product doctrine." *Urb. 8*, 334 F.R.D. at 161 (internal citations omitted). Documents made for operational reasons—even operational reasons connected to litigation in some manner—are considered created in the ordinary course of business. *See, e.g., id.*; *United States v. Frederick*, 182 F.3d 496, 501-02 (7th Cir. 1999). The City therefore has failed to meet its burden of demonstrating that the Disputed Documents were created in anticipation of litigation. Whatever litigation consultation services Valtera provided the City are not reflected in the documents reviewed by the court. As such, the Disputed Documents are not entitled to work-product protection.

## C. Attorney-Client Privilege

The documents held by the City for which it asserts the attorney-client privilege fare only slightly better. The attorney-client privilege protects a communication held: (1) between a client and attorney; (2) made in confidence; and

(3) for the purposes of seeking legal advice. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 388 (7th Cir. 2008). Because the City provides a separate analysis in its brief for the 2017 Valtera draft validation report and emails attaching the report, the court considers those documents first. (See R. 438, Def.'s Resp. at 12; R. 408-1, Pls.' Mot. Ex. A at 3 (privilege log entries for these documents).) The court then discusses the remaining documents for which the City asserts the attorney-client privilege. (See R. 408-1, Pls.' Mot. Ex. A at 4-23.)

The City has properly withheld CHI_00811370 and CHI_00812086 as privileged. (See R. 453-2 at 1-4, 332.) Both are emails from the City's outside attorneys to City and CFD officials. (Id.) "[C]ommunications from the attorney to the client are privileged if they constitute legal advice or would reveal the substance of a client confidence—directly or indirectly." *BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, 326 F.R.D. 176, 180 (N.D. Ill. 2018). CHI_00811370 certainly falls into this category. (R. 453-2 at 1-4.) While the court has some concern that CHI_00812086 could reflect nonprivileged business advice, (id. at 332), the document nevertheless satisfies all elements of a privilege claim. *See Judson*, 529 F.3d at 388. It is a communication between the City's attorney and the City made in confidence. The City has described the purpose of the email in part as "relating to legal advice re ongoing litigation," (R. 408-1, Pls.' Ex. A at 3), and *in camera* review shows the document could reveal some substance of a client confidence,

21

(R. 453-2 at 332). This is enough to satisfy the City's burden, and the court sustains the privilege claim.

Related to these emails, the City argues that their attachments—drafts of the 2017 Valtera validation report and their appendices, (CHI_00811374; CHI_00811496; CHI_00811595; CHI_00812087; CHI_00812209; CHI_00812308)—are privileged "because they were attached to and part of a confidential email from the City's counsel to top CFD personnel . . . to provide legal advice." (R. 438, Def.'s Resp. at 12.) The City specifically denies that it withheld these drafts out of concern they "might implicitly reveal attorney advice." (Id.) Unfortunately for the City, "attachments need to have their own privileged bases in order for them to be properly withheld under a claim of privilege." *Washtenaw*, 2020 WL 3977944, at *6. But nothing in the attachments themselves suggests they reflect or reveal legal advice, and by denying any other basis for asserting the attorney-client privilege, the City has given the court no grounds on which it could sustain the City's assertions. As such, the Court finds that CHI_00811374, CHI_00811496, CHI_00811595, CHI_00812087, CHI_00812209, and CHI_00812308 are not protected by the attorney-client privilege. (See R. 453-2 at 5-331; R. 445-2 at 1-327.)

Turning to the remaining Disputed Documents for which the City asserts the attorney-client privilege, the City may redact the second full sentence on page three of PRIV_0389, (R. 453-4 at 6-8), which begins with "Representatives from . . . ." PRIV_0389 is the February 3, 2015 letter to Procurement Services discussed above. Although the document focuses on the operational decision to retain Valtera to

conduct the Project, this particular sentence describes legal advice the City received from outside counsel. A communication not authored or received by an attorney may qualify for protection if it "reveal[s], directly or indirectly, the substance of a confidential attorney-client communication." *Washtenaw*, 2020 WL 3977944, at *2 (citation and quotations omitted). Because the sentence at issue directly shares the substance of a confidential attorney-client communication in an internal City document shared between employees, it is privileged. *See id.* at *2, *4. For consistency and to preserve the privilege, the City may also redact this sentence in DHR_Temp_00000697, (R. 453-3 at 33-35), which is the same February 2015 procurement request letter.

The attorney-client privilege does not attach to the other documents the City withheld. Many of these documents are routine logistical emails either between the City and Valtera or among City officials to facilitate and coordinate data collection for the Project. (See R. 453-4 at 9-10 (PRIV_0574), 11 (PRIV_0579), 12-13 (PRIV_0582), 14-16 (PRIV_0584), 17 (PRIV_0587), 18 (PRIV_0588), 19-20 (PRIV_0590), 21-22 (PRIV_0592), 23-25 (PRIV_0600), 26-28 (PRIV_0608), 29 (PRIV_0609), 30-31 (PRIV_0613), 36-37 (PRIV_0616), 38 (PRIV_0633), 87-88 (PRIV_0663), 89-91 (PRIV_0671), 92-93 (PRIV_0672), 94-97 (PRIV_0676), 98-101 (PRIV_0678), 102-05 (PRIV_0679), 106-10 (PRIV_0681), 111-14 (PRIV_0682), 115-18 (PRIV_0687), 119-20 (PRIV_0688), 144-46 (PRIV_0690), 147 (PRIV_0698), 148-50 (PRIV_0704), 151-53 (PRIV_0708), 154-57 (PRIV_0709), 158-62 (PRIV_0710), 163-67 (PRIV_0711), 168-71 (PRIV_0712), 172-76 (PRIV_0713), 177 (PRIV_0714),

178-82 (PRIV_0715), 186 (PRIV_0733), 187 (PRIV_0740).) As no attorneys are recipients of these emails and legal advice is not rendered or discussed, the basic elements of an attorney-client privilege claim are not satisfied. *See Judson*, 529 F.3d at 388.

Similarly, some of the documents withheld by the City are routine logistical emails regarding data collection on which an attorney is copied on some messages in the email chain. (See R. 453-4 at 32-33 (PRIV_0614), 41-45 (PRIV_0638), 46-49 (PRIV_0639), 50-53 (PRIV_0643), 54-58 (PRIV_0645), 59-63 (PRIV_0646), 64-69 (PRIV_0650), 70-75 (PRIV_0654), 76-80 (PRIV_0657), 81-86 (PRIV_0659), 188-89 (PRIV_0798), 190-91 (PRIV_0820).) These documents are not privileged because no one in the chain requests any legal advice from an attorney and no attorney offers any. *See Urb. 8*, 334 F.R.D. at 160-61 (N.D. Ill. 2020) (collecting cases).

Most of the remaining documents either reflect data or are meant to obtain data for the Project, and often appear to have been sent as attachments to the emails described in the preceding paragraphs. (See R. 445-3 at 1-7 (PRIV_0635), 8-14 (PRIV_0644), 15-25 (PRIV_0647), 26-38 (PRIV_0648), 39-67 (PRIV_0649), 68-100 (PRIV_0651), 101-13 (PRIV_0652), 114-40 (PRIV_0653), 141-56 (PRIV_0655), 157-64 (PRIV_0656), 165-80 (PRIV_0658), 181-89 (PRIV_0660), 190 (PRIV_0677), 191-96 (PRIV_0680), 197 (PRIV_0683), 198-204 (PRIV_0686); R. 453-4 at 34-35 (PRIV_0615), 39-40 (PRIV_0634), 121-43 (PRIV_0689), 183-84 (PRIV_0716).) As discussed above, attachments must "have their own privileged bases" to receive protection under the attorney-client privilege. *Washtenaw*, 2020 WL 3977944, at

24

*6.  None of these documents reflects confidential attorney-client communications, and therefore none satisfies the basic elements for the privilege to apply.  *See Judson*, 529 F.3d at 388.

A few documents remain that do not easily fit into the categories analyzed above.  The court describes its reasons for rejecting the City's assertions of attorney-client privilege as to these documents in the table below:

| Document ID | Analysis |
|---|---|
| DHR_Temp_00001184 (R. 453-3 at 126-27) | This document is described as "notes on conference with counsel and expert consultant per attorney instruction." (R. 408-1, Pls.' Mot. Ex. A at 5.)  The log entry lists the author only as "City of Chicago—Department of Human Resources" and does not list any recipient or creation date. (Id.)  This is insufficient to satisfy the basic elements of an attorney-client privilege claim.  *See Judson*, 529 F.3d at 388. |
| DHR_Temp_00000769 (R. 453-3 at 100-01) | This document is described as "notes on conference with counsel and expert consultant per attorney instruction." (R. 408-1, Pls.' Mot. Ex. A at 5.)  Notes are not communications, and nothing in these notes reveals the discussion of legal advice.  The basic elements of an attorney-client privilege claim are not satisfied.  *See Judson*, 529 F.3d at 388. |
| DHR_Temp_00001216 (R. 453-3 at 161-69) | This document is a draft of Dr. Tippins's September 30, 2014 letter regarding data collection and background information needed for the Project, which includes attorney Allan Slagel as a recipient.  The document is not privileged because legal advice is neither sought nor discussed, and "[m]erely communicating with a lawyer or copying a lawyer on an otherwise non-privileged communication, will not transform the non-privileged communication . . . into a privileged one." *Towne Place*, 284 F. Supp. 3d at 895. |
| PRIV_0282 (R. 453-4 at 1-3) | This document is an email chain initiated by outside counsel to schedule time with City officials to discuss Valtera's proposal.  Although the email is a communication between an attorney and client, "correspondence that merely notifies someone of scheduling matters, or which updates the recipient . . . do not seek or disclose legal |

| | |
|---|---|
| | advice and thus, are not protected by the attorney-client privilege." *Towne Place*, 284 F. Supp. at 894. |
| PRIV_0305 (R. 453-4 at 4) <br><br> PRIV_0312 (id. at 5) | These documents are described as "[n]otes created in anticipation of litigation re consulting expert's study." (R. 408-1, Pls.' Ex. A at 6-7.) Notes are not communications, and these notes do not record the discussion of legal advice. The basic elements of an attorney-client privilege claim are not satisfied. *See Judson*, 529 F.3d at 388. |
| PRIV_0723 (R. 453-4 at 185) | This document is a brief, internal email chain scheduling a conference call to discuss Valtera's preliminary recommendations. Several attorneys are copied as recipients. It is not privileged for two reasons. First, "[n]o one in the chain requests any legal advice from [the attorneys] and [they] never offer[ ] any." *Urb. 8*, 334 F.R.D. at 160-61. Second, "correspondence that merely notifies someone of scheduling matters, or which updates the recipient . . . do not seek or disclose legal advice and thus, are not protected by the attorney-client privilege." *Towne Place*, 284 F. Supp. at 894. |
| DHR_Temp_00000662 (R. 453-3 at 30-32) | This document is described as "[n]otes on expert consultant proposal per attorney instruction." (R. 408-1, Pls.' Mot. Ex. A at 22.) The document compares physical abilities testing options and does not reflect or discuss legal advice. Therefore, the basic elements of an attorney-client privilege claim are not satisfied. *See Judson*, 529 F.3d at 388. |

Finally, to the extent any of the documents reference the City's Law Department or could otherwise be interpreted as discussing attorney involvement in the Project, (see, e.g., R. 453-4 at 186 (PRIV_0733), 187 (PRIV_0740)), this court's *in camera* review confirms that such attorney involvement did not occur for the purpose of providing legal advice. While attorney legal advice about operational decisions regarding physical abilities testing is protected, *see Washtenaw*, 2020 WL 3977944, at *2-3, none of the documents reflects that the attorneys played such a role here. The "predominant purpose" of these Disputed Documents was to advance

the Project's goal of modifying the PPAT and training academy physical abilities tests. *See Towne Place*, 284 F. Supp. 3d at 893-94 (when evaluating assertions of attorney-client privilege, courts ask "whether the 'primary' or 'predominant purpose' of the communication is to render or solicit legal advice"); *Miller UK*, 17 F. Supp. 3d at 730 ("documents prepared for business purposes or for the purpose of obtaining advice on political, strategic, or policy issues do not receive protection").

## D.   Dr. Tippins

Finally, Plaintiffs ask the court to require that Dr. Tippins respond to two additional lines of deposition questioning regarding: (1) the reason "why CFD wanted to make changes to the PPAT in 2016," (R. 408, Pls.' Mot. at 14); and (2) what conversations she had with CFD regarding training problems, (id. at 15 (citing R. 408-7, Pls.' Mot. Ex. G at 94-95)).  The City asserts that the answers to these questions are protected by the Rule 26(b)(4)(D) non-testifying litigation consultant privilege.  The court disagrees.

Rule 26(b)(4)(D) provides that "a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."  Fed. R. Civ. P. 26(b)(4)(D).  The City bears the burden of demonstrating that it consulted with Dr. Tippins "in anticipation of litigation."  *See IQL-Riggig*, 2021 WL 1172654, at *5.  After closely examining "the total factual situation," *Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 128 F. Supp. 2d 1148, 1151 (N.D. Ill. 2001), the court finds that Dr. Tippins worked with Valtera on the Project for operational

purposes.  The City concedes this point.  "Valtera was actually retained to provide the City consultation services regarding the appropriate physical ability selection tools for CFD paramedics."  (R. 438, Def.'s Resp. at 15.)  The information before the court indicates that Valtera and Dr. Tippins were not hired to help the City prepare for "threatened and potential future litigation," (id.), but rather to change CFD policy and practice with regards to the PPAT and training academy physical abilities testing.  As such, "the circumstances do not show that [Dr. Tippins] was employed with [the prospect of litigation] in mind."  *White v. Electrolux N. Am., Inc.*, No. 13 CV 1617, 2014 WL 1365424, at *2 (N.D. Ill. April 7, 2014).

Dr. Tippins is ordered to answer Plaintiffs' additional questions that relate to the Project.  To the extent any other work by Valtera or Dr. Tippins involved helping the City prepare for litigation—a role not reflected in the material reviewed here but which the parties agree Valtera has played—facts or opinions learned by Dr. Tippins in the course of such litigation work fall squarely within the protections of Rule 26(b)(4)(D).  As to the first question Plaintiffs wish to pose, why the City wanted to make changes to the PPAT in 2016, it clearly relates to the Project and is unlikely to deviate into privileged terrain.  As to the second question, what conversations, if any, Dr. Tippins had with CFD regarding training problems, it is more open-ended and could lead to the wrongful disclosure of privileged information.  As a result, Plaintiffs may question Dr. Tippins only as to conversations she had with CFD regarding training problems in the context of her work on the Project.

## Conclusion

For the foregoing reasons, Plaintiffs' motion is granted in part and denied in part. The court denies Plaintiffs' motion to compel as to documents CHI_00811370 and CHI_00812086. The court further denies Plaintiffs' motion to compel as to the second full sentence on page three of PRIV_0389 and DHR_Temp_00000697 (the sentence beginning with "Representatives from . . . ."), which the City may redact. The court grants Plaintiffs' motion to compel as to all other documents listed in Plaintiffs' Ex. A. (See R. 408-1, Pls.' Mot. Ex. A.) Finally, the court grants Plaintiffs' motion to compel as to Dr. Tippins's deposition testimony, subject to the limitations included herein.

ENTER:

Young B. Kim
**United States Magistrate Judge**