UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JENNIFER LIVINGSTON, TAVI BURROUGHS, KENIA CHAVEZ, CHRISTINA VELASCO, KATHARINE LAZZARA, JESSICA MAPLES, SHANNON MARKEY, DONNA GRIFFIN, JAMIE SNEVELY, LISETTE VENEGAS, and MARY YOUNGREN,<br><br>  Plaintiffs,<br><br>   v.<br><br>CITY OF CHICAGO, a municipal corporation,<br><br>  Defendant. | No. 16 C 10156<br><br>Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiffs Jennifer Livingston, Tavi Burroughs, Kenia Chavez, Christina Velasco, Katharine Lazzara, Jessica Maples, Shannon Markey, Donna Griffin, Jamie Snevely, Lisette Venegas, and Mary Youngren are female paramedics who allege that Defendant City of Chicago discriminates against women in the hiring process for Chicago Fire Department ("CFD") paramedic positions. In preparation for summary judgment briefing, Plaintiffs filed a motion to exclude the testimony of Dr. Paul Davis, the City's expert witness. Because Dr. Davis' testimony is both reliable and relevant, the Court denies Plaintiffs' motion.

## BACKGROUND

Plaintiffs bring a disparate impact claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., alleging that the City used two physical tests—the Step Test and the Lifting and Moving Sequence Test (the "Tests")—to discharge women from the 2014/2015 CFD paramedic training classes. The Step Test required candidates to continuously step onto and off

of an eighteen-inch-high box to the beat of a metronome set to 112 beats per minute for two minutes while holding a twenty-five-pound dumbbell in each hand. The Lifting and Moving Sequence Test first required candidates, with a partner, to lift a stair chair carrying a 250-pound mannequin up three flights of stairs and then down three flights of stairs without allowing the stair chair to touch any surface other than the landings in between flights. The candidate then had to push the stair chair 100 feet and pull it 100 feet. Finally, the candidate had to lift a back board carrying the mannequin from the ground to a stretcher and then load the stretcher into an ambulance. To pass the test, the candidate had to complete these tasks within eight minutes. A higher percentage of women failed both the Step Test (25.9% of women vs. 5.1% of men) and the Lifting and Moving Sequence Test (17% of women vs. 0% of men).

"To prove a disparate-impact case, a plaintiff must show an adverse impact on employees with a protected characteristic like gender." *Ernst v. City of Chicago*, 837 F.3d 788, 796 (7th Cir. 2016). Once Plaintiffs make this showing, the burden shifts to the City to show that the Tests are "job related" and "consistent with business necessity." *Id.* (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)). The City seeks to rely on Dr. Davis' testimony to carry its burden. Dr. Davis served as a firefighter, EMT, and paramedic at a fire department in Maryland for thirteen years starting in 1966. Dr. Davis received his Ph.D. in exercise physiology from the University of Maryland in 1976 and established an occupational medicine practice in 1977, where he contracted with many public safety organizations. He became a fellow of the American College of Sports Medicine in 1981 and is currently the Founder, Director, and President of the First Responder Institute. In 2008, Dr. Davis co-authored a textbook titled *Hard Work: Defining Physical Standards for Demanding Jobs* with Dr. Brian Sharkey. He has provided many

consultations and expert opinions regarding the appropriate physical standards for arduous occupations in Title VII cases.

On June 10, 2021, Dr. Davis authored an expert report in this matter. In the report, Dr. Davis states that he bases his opinions on his expertise; the "reports, documents, depositions and interviews" listed in the report; and an inspection and site visit he conducted from June 6 through 8, 2021. Doc. 486-9 at 2. He opines that the Tests "are manifestly related to the paramedic job and consistent with CFD's operational need and business necessity to deliver emergency medical services to the people of the City of Chicago in a safe and effective manner." *Id.* at 4. Dr. Davis also opines that the Tests are "valid under the standards described in the *Uniform Guidelines* for Content Validity.[1]" *Id.* He asserts that a paramedic "candidate who does not possess adequate constructs of strength and fitness presents a risk of catastrophic failure to perform CPR, transport or containment." *Id.* at 3–4. Dr. Davis further contends that "[o]n the basis of [his] observation and experience, [he] know[s] that the daily metabolic costs for 24 hours [as a CFD paramedic] would likely approach . . . 3-4,000 kCal/day." *Id.* at 8.

Specifically, with respect to the Step Test, Dr. Davis opines that the metabolic demands of the test "did not exceed the physical demands of the job," *id.* at 9, and that "[a]erobic fitness as demonstrated by the successful completion of the step test is a valid predictor and representation of essential job functions," *id.* at 10. As to the Lifting and Moving Sequence Test, Dr. Davis opines that "the physical output required by the Lift and Move Test does not exceed the physical demands of the job," *id.* at 11, the test "is an excellent representation of an essential function, performed daily by scores of paramedics," *id.* at 10, and that the "grip strength . . . , full

---

[1] The E.E.O.C. Uniform Guidelines on Employee Selection Procedures (the "Guidelines") provide standards for validating employment tests under Title VII. 29 C.F.R. § 1607.1(B). According to the Guidelines, a test is "content valid" if the content of the test "is representative of important aspects of performance on the job." 29 C.F.R. § 1607.5(B).

joint mobility, balance, and the metabolic system" included in the test "combine[] to answer the question of job-related performance," *id.* Finally, Dr. Davis opines that failure of either the Step Test or the Lifting and Moving Sequence Test "correctly identifies candidates who will likely be unable to safely and properly perform all of the essential functions of the job." *Id.* at 11.

## LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert evidence. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Together, Rule 702 and *Daubert* provide that an expert's testimony is admissible if: (1) the expert is qualified, (2) the expert's methodology is reliable, and (3) the testimony is relevant, *i.e.*, it will help the trier of fact understand the evidence or determine a fact in issue. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017); *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). "The Rule 702 inquiry is 'a flexible one,'" and the Seventh Circuit grants "the district court wide latitude in performing its gate-keeping function." *Bielskis*, 663 F.3d at 894 (quoting *Daubert*, 509 U.S. at 594). "Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination" or the "presentation of contrary evidence." *Daubert*, 509 U.S. at 596; *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). The City bears the burden of proving that Dr. Davis' testimony is admissible by a preponderance of the evidence. *Gopalratnam*, 877 F.3d at 782.

## ANALYSIS

Plaintiffs do not challenge the admissibility of Dr. Davis' opinion based on his qualifications, so the Court does not address that step of the Rule 702 analysis. *See United States v. Jett*, 908 F.3d 252, 266 (7th Cir. 2018) ("District judges are not required to undertake each

4

step of the Rule 702 analysis when no party specifically requests it."). Rather, Plaintiffs challenge the reliability and relevance of Dr. Davis' opinion, which the Court addresses in turn.

## I. Reliability

Rule 702 sets forth three requirements for reliability: (1) the expert's testimony must be "based on sufficient facts or data," (2) the expert's testimony must be "the product of reliable principles and methods," and (3) the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d); *Smith v. Ill. Dep't of Transp.*, No. 15 C 2061, 2018 WL 3753439, at *13 (N.D. Ill. Aug. 8, 2018), *aff'd*, 936 F.3d 554 (7th Cir. 2019).

### A. Compliance with the Guidelines

Throughout their motion, Plaintiffs argue that the Court should exclude Dr. Davis' testimony because he failed to conduct a thorough validation study pursuant to the Guidelines. The City responds by asserting that showing that the Tests are job-related does not require a formal validation study pursuant to the Guidelines. To satisfy the Guidelines, employers must "rely upon criterion-related validity studies, content validity studies or construct validity studies, in accordance with the standards set forth in the technical standards" of the Guidelines. 29 C.F.R. § 1607.5(A). However, "[e]mployers are not required to support their physical-skills tests with formal validation studies" as described in the Guidelines. *Ernst*, 837 F.3d at 796; *see also Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 998 (1988) ("[E]mployers are not required, even when defending standardized or objective tests, to introduce formal 'validation studies' showing that particular criteria predict actual on-the-job performance."). Thus, because the law does not require the City to conduct a formal validation study pursuant to the Guidelines to meet its burden, Dr. Davis' purported failure to conduct such a study cannot be a basis upon which to exclude his testimony.

Plaintiffs also argue that the City fails to offer a legitimate reason for Dr. Davis' failure to conduct such a study. *See United States v. City of Chicago*, 573 F.2d 416, 427 (7th Cir. 1978) ("[C]ompliance with these Guidelines is generally required absent some showing that a cogent reason exists for non-compliance."). However, in his rebuttal report, Dr. Davis opines that a formal job task analysis ("JTA") pursuant to the Guidelines "would have limited utility in this case" because it "fails to adequately account for the public safety costs of a candidate being unable to complete the job under extreme, albeit routine, circumstances." Doc. 486-12 at 2. And while Plaintiffs correctly point out the City has conducted a formal validation study of the CFD paramedic position in the past, *see Ernst*, 837 F.3d at 796, that does not negate Dr. Davis' opinion that such a study was not appropriate to validate these Tests. Plaintiffs also point out that Dr. Davis purports to rely on the Guidelines by reciting them in his report in this case and has endorsed formal validation studies for other public safety jobs in the past, but these types of challenges to his methodology go toward the weight the trier of fact should give Dr. Davis' testimony, not to the admissibility of his testimony. *See Ernst v. City of Chicago*, 39 F. Supp. 3d 1005, 1011 (N.D. Ill. May 5, 2014) ("It cannot be that an expert, exercising one method early in his career, is forever estopped from employing any other method. . . . The thoroughness of Dr. McArdle's study of the paramedic job—reading about it versus observing it—goes to the weight of his testimony rather than its admissibility.").

**B.      Based on Sufficient Facts and Data**

Plaintiffs next contend that Dr. Davis' opinion solely relies on his expertise and subjective impressions of the Tests and the CFD paramedic job and thus it is not "based on sufficient and known facts." *Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*, No. 16-CV-565, 448 F. Supp. 3d 965, 2020 WL 1482137, at *4 (N.D. Ind. Mar. 24, 2020). However,

6

Dr. Davis includes objective facts and data in the list of sources upon which he relied in forming his opinion (*e.g.*, a detailed 2014 JTA conducted for the CFD paramedic position, Chicago Transit Authority ("CTA") data, data regarding citations for out of service elevator violations in Chicago, and Plaintiffs' answers to interrogatories). Dr. Davis also conducted a site visit at which he inspected CFD equipment, observed CFD paramedics working, visited CTA stations from which CFD paramedics receive regular calls for assistance, conducted interviews of CFD employees, and watched demonstrations of the Tests. Analysis of this information, combined with Dr. Davis' knowledge and experience in the area, certainly suffice to form an opinion on the job-relatedness of the Tests. *See Ernst*, 39 F. Supp. 3d at 1010–12 (admitting expert opinion regarding the validity of a physical ability test for the CFD paramedic position where the expert, an exercise physiologist with forty-five years of experience, reviewed a "detailed job analysis" of the position and linked his opinions "to what he has seen and experienced in his work in the field over the years"). Dr. Davis' opinion is not "based upon speculation, unsupported assumptions, or conclusory allegations," *Buscaglia v. United States*, 25 F.3d 530, 533 (7th Cir. 1994), but instead is based upon sufficient facts and data.

      Nonetheless, Plaintiffs argue that because Dr. Davis testified that these materials played no role in his assessment of the Tests, his opinion is unreliable. This argument involves a mischaracterization of Dr. Davis' testimony, however. Dr. Davis testified that the 2014 JTA "comports exactly with what -- the experiences [he's] had with hundreds if not thousands of similar calls," Doc. 486-2 at 10, and that it "was highly important to be there to observe that the Chicago Fire Department EMS performs the same functions that hundreds, in fact, thousands of fire departments across the country do," *id.* at 9. To the extent that Dr. Davis contradicted these statements, it was under the pressure of cross-examination, which is the appropriate method by

7

which to challenge the weight Dr. Davis placed on certain data and the thoroughness of his review of the CFD paramedic position. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact."); *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.").

      **C.**      **Product of Reliable Principles and Methods**

Plaintiffs argue that Dr. Davis does not base his opinions on any reliable method and instead, his testimony is "classic *ipse dixit*," Doc. 486 at 13, which is clearly inadmissible, *see Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) ("We have said over and over that an expert's *ipse dixit* is inadmissible."); *Manpower*, 732 F.3d at 806 (stating that expert opinions "connected to existing data 'only by the *ipse dixit* of the expert'" are "properly excluded under Rule 702" (citation omitted)). In response, the City contends that Dr. Davis bases his opinions on his knowledge and experience and the facts and data he observed, gathered, and received about the Tests. The Court agrees that, contrary to Plaintiffs' contention, Dr. Davis does not solely rely on his expertise to form his opinion.

As previously noted, in his report, Dr. Davis states that he bases his opinions on his expertise, the case-specific information listed in the report, and his inspection and site visit. Doc. 486-9 at 2. At his deposition, Dr. Davis testified that this analysis revealed that the CFD paramedic job is consistent with his experience and knowledge of the profession. Doc. 486-2 at 9–10. In his rebuttal report, in a section titled "My Life Experience and How it Helps Form My

8

Opinion," Dr. Davis provides specific examples to further explain how his experience helped inform his opinions on the validity of the Tests. Doc. 486-12 at 3. It is certainly permissible for Dr. Davis to rely on his expertise in these ways. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive specialized experience."); *Smith*, 215 F.3d at 718 ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." (citation omitted)); *Ernst*, 39 F. Supp. 3d at 1011–12 (admitting expert testimony where expert "did not simply offer his *ipse dixit*" but instead "linked his assertion to what he has seen and experienced in his work in the field over the years"). And because Dr. Davis connects his expertise to the facts and data in this case, his opinion is the product of reliable principles and methods, not *ipse dixit*.

Plaintiffs further argue that Dr. Davis' paramedic experience in Maryland took place over forty years ago and thus does not qualify him to opine on the validity of the Tests. However, as already described, Dr. Davis reviewed a detailed 2014 JTA of the CFD paramedic job and conducted a site visit at which he gathered information regarding the CFD paramedic job. He testified at his deposition that the CFD paramedic job was consistent with his experience in and knowledge of the profession. Doc. 486-2 at 9–10. Moreover, since his paramedic experience in Maryland, Dr. Davis received his Ph.D. in exercise physiology, contracted with many public safety organizations through his occupational medicine practice, co-authored a textbook regarding the appropriate physical standards for physically-demanding jobs, and has provided many consultations and expert opinions regarding the appropriate physical standards for arduous occupations in Title VII cases. Thus, Dr. Davis is certainly qualified to opine on the validity of the Tests. *See id.* at 1010 (noting "exercise physiology is the salient discipline for determining

9

the nature of a physical strength involved in various exercises, testing components, and training programs for physical tests" and admitting testimony of "exercise physiologist with over 45 years of experience in the field" to validate physical ability test for CFD paramedic position). To the extent Plaintiffs argue that the quality or remoteness of Dr. Davis' experience as a paramedic weakens his conclusions, such an argument goes to the weight of his testimony, not its admissibility. *See Gopalratnam*, 877 F.3d at 781 ("[A]n expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt." (citation omitted)); *Marcial v. Rush Univ. Med. Ctr.*, No. 16-cv-6109, 2018 WL 4237474, at *3 (N.D. Ill. Aug. 30, 2018) (stating "[t]o the extent Defendants believe that . . . the version of the facts on which Dr. Farmilant based his opinion is incomplete, vigorous cross-examination is the appropriate vehicle to address those problems").

Plaintiffs also argue that when pressed about the method underlying his opinion during his deposition, Dr. Davis repeatedly invoked his own experience and expertise instead of any facts or analysis. In particular, Plaintiffs focus on the fact that when pressed about the procedures he used to determine the Tests were valid, Dr. Davis responded: "I characterized this as duck validity. If it walks like a duck, quacks like a duck, it's probably a duck." Doc. 486-2 at 10. Plaintiffs also take issue with Dr. Davis' use of the word "common sense" in his deposition, *see, e.g.*, *id.* at 24 ("Yeah, it's called common sense."), but Dr. Davis clarified in his rebuttal report that "when [he] refer[s] to common sense, it is a sense developed through [his] experience," Doc. 486-12 at 3. "Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616. Indeed, as *Daubert* stressed, "[v]igorous

10

cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596. Thus, to the extent Plaintiffs argue that their cross-examination of Dr. Davis revealed weaknesses in his methodology, these arguments do not go to the admissibility of his testimony but rather to its weight.

### D. Reliably Applied the Facts of the Case

Plaintiffs next argue that Dr. Davis makes no effort to connect his opinions to specific facts about the Tests or the CFD paramedic job. In response, the City contends that Dr. Davis adequately explains how he applied his expertise to the facts and data he observed, gathered, and received about the Tests and the CFD paramedic job to reach his opinions. The Court must ensure that Dr. Davis' testimony "is based on a correct application of a reliable methodology." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). "The critical inquiry is whether there is a connection between the data employed and the opinion offered." *Manpower*, 732 F.3d at 806. Plaintiffs isolate certain statements made by Dr. Davis or specific features of the Tests to argue that Dr. Davis does not sufficiently connect the facts of the case to his opinions, but when taken as a whole, it is clear that Dr. Davis does.

Plaintiffs argue that while Dr. Davis purports to rely on the 2014 JTA of the CFD paramedic position and his site visit, he fails to offer specific information from either that would justify specific features of the Tests. However, throughout his expert report, Dr. Davis discusses both the general aspects of a paramedic job and the specifics of the CFD paramedic job. *Compare* Doc. 486-9 at 6 ("Paramedics must deal with elevators that are out of service, small, cramped stairways, and in some cases buildings that have been ravished by fire."), *with id.* at 6–8 (explaining that the many underground CTA and Metra stations without working elevators were

"[o]f particular interest" to him because they presented "pinch points, access and approaches that needed to be taken into consideration by the CFD paramedics"). Moreover, Dr. Davis explains that the "purpose of [his] site visit to Chicago was to relate to, and expand the discussion with ride-alongs, interviews and observations- with an eye to how a major municipality with 80 ambulances and over 600 paramedics copes with the thousands of demands for daily service." *Id.* at 6.

Plaintiffs further argue that the specific examples Dr. Davis provides from his experience as a paramedic have no connection to any specific features of the Tests. However, in his deposition and rebuttal report, Dr. Davis connected his experience to the CFD paramedic job and to the Tests. *See, e.g.*, Doc. 486-2 at 14 (explaining that CFD paramedics' experience of carrying patients up three flights of stairs "comport[ed] with [Dr. Davis'] similar experience where [he] ha[s] had to remove patients from a variety of places"); Doc. 486-12 at 4, 8 (describing that when he was a paramedic, he had to carry a 240-pound patient with one partner and noting that the 250-pound mannequin is justified by his experiences and Plaintiffs' experiences). And Dr. Davis consistently states that he bases his opinions regarding the validity of the Tests on his expertise in the field and his analysis of the CFD paramedic job. *See* Doc. 486-9 at 10 (basing opinion on the case-specific information he reviewed and "the aggregate of [his] profession's life work and experience"); Doc. 486-2 at 9–10 (explaining that he bases his opinions on his expertise and his analysis of the CFD paramedic position, which comported with his experience); Doc. 486-12 at 11 (basing rebuttal report on "a collection of personal experiences, professional research, observations and sworn testimony in [this case]"). Thus, Dr. Davis reliably applies his experience and knowledge to the facts of this case. *See Manpower*, 732 F.3d at 809 (stating that expert testimony is admissible if a "rational connection between the

data and the opinion" exists). To the extent Plaintiffs argue that Dr. Davis' conclusions lack the appropriate specificity or challenge the conclusions Dr. Davis reaches, such arguments are not bases upon which to exclude his testimony. *See Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

**II.     Relevance**

Finally, Plaintiffs argue that Dr. Davis' testimony is inadmissible because it is irrelevant. Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue'," which "goes primarily to relevance." *Daubert*, 509 U.S. at 591 (citation omitted). Under the relevancy determination, the Court is "limited to determining whether expert testimony is pertinent to an issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). Plaintiffs first contend that Dr. Davis merely offers general opinions regarding the responsibilities of a paramedic and that the job requires physical fitness, which are not facts at issue in this case. However, Plaintiffs mischaracterize Dr. Davis' testimony. As explained above, Dr. Davis bases his opinions on, and connects his expertise to, specific facts and data regarding the CFD paramedic position. And although he makes some general or basic statements in his report, *see, e.g.*, Doc. 486-9 at 9 ("There is no more fundamental movement than the act of knee and hip flexion for human locomotion."), these statements are made in connection with his opinion on the job-relatedness of the Tests, which is certainly not obvious to a layperson, *see Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) ("An expert must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury."). More importantly, Dr. Davis also provides complex opinions regarding the job-relatedness of the

13

Tests. *See, e.g.*, Doc. 486-9 at 8–9, 11 (opining that "the daily metabolic costs for 24 hours [as a CFD paramedic] would likely approach . . . 3-4,000 kCal/day" and that the physical demands of the Tests did "not exceed the physical demands of the job"). Thus, his testimony will certainly assist the trier of fact in understanding the evidence and determining facts at issue in the case.

Plaintiffs further contend that Dr. Davis' testimony is irrelevant because he bases it on the erroneous legal framework "that more is better for any job requiring physical exertion." Doc. 486 at 18. Plaintiffs argue that because the Seventh Circuit has made clear that physical tests must measure "the minimum acceptable level, not the maximum level," *Ernst*, 837 F.3d at 803, Dr. Davis' testimony to the contrary cannot assist the trier of fact, *see Noskowiak v. Bobst SA*, No. 04-C-0642, 2005 WL 2146073, at *5 (E.D. Wis. Sept. 2, 2005) (finding that an expert's references to incorrect legal standards "would likely mislead or confuse a trier of fact" and thus were irrelevant). However, again, Plaintiffs mischaracterize Dr. Davis' opinion. In his report, Dr. Davis opines that the Tests do "not exceed the physical demands of the job." Doc. 486-9 at 9, 11. In his rebuttal report, Dr. Davis asserts that he does "not say that candidates need to be able to perform more than the minimum requirements, as the plaintiffs' experts would like to cast [his] testimony. Rather, the minimum standard is simply higher than what plaintiffs' experts claim it to be." Doc. 486-12 at 5–6. He also opines that the Tests "do not approach 'supra-maximal' assessments." *Id.* at 9. Again, to the extent Dr. Davis contradicted himself or provided a different opinion on cross-examination, such arguments go to the weight of his testimony, not its admissibility. *See Stollings*, 725 F.3d at 765 ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony."). Plaintiffs also argue that Dr. Davis' testimony is irrelevant "because it is *nothing but* spouting his biased view of Title VII." Doc. 509 at 14. In support, Plaintiffs reference statements Dr. Davis

14

made outside of this case to contend that he has long-held the belief that "more is always better" for pre-employment physical ability tests. Doc. 486 at 19. However, this is also not an appropriate basis upon which to exclude Dr. Davis' testimony. *See Cage v. City of Chicago*, 979 F. Supp. 2d 787, 827 (N.D. Ill. 2013) ("[I]t is well-established that an expert's bias is not a proper basis to bar testimony under *Daubert*.").

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' motion to exclude Dr. Davis' testimony [478].

Dated: April 6, 2022

_____
SARA L. ELLIS
United States District Judge