**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Jennifer Livingston, et al., | Case No. 16 cv 10156 |
| *Plaintiffs*, | |
| v. | Hon. Sara L. Ellis |
| The City of Chicago, | Magistrate Judge Young B. Kim |
| *Defendant*. | |

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**INTRODUCTION** ..................................................................................................6

**FACTUAL BACKGROUND** ................................................................................8

**LEGAL STANDARD** ........................................................................................17

**ARGUMENT** .....................................................................................................17

I.   **Plaintiffs' Title VII intentional discrimination claims fail because the evidence does not allow a reasonable factfinder to conclude female Candidates were terminated based on their gender** ............................................................17

II.  **Plaintiffs Title VII Intentional Discrimination claims also fail when using the McDonell Douglas analysis because Plaintiffs' cannot establish a *prima facie* case and are unable to show pretext.** ..................................................26

    A.  Plaintiffs Failed to Meet their Employer's Legitimate Expectations ......... 27

        1. Certain Plaintiffs Failed to Meet Physical Testing Requirements ..............27

        2. The Academic Plaintiffs Failed to Meet Academic Requirements ...........28

    B.  Similarly situated male Candidates were not treated more favorably with respect to either the physical or academic assessments .................................................29

        1.  Male Candidates were not treated more favorably as to the physical testing ....................................................................................................29

        2.  Similarly situated male Candidates were not treated more favorably with respect to the Academic Testing ......................................................29

    C.  The City terminated Plaintiffs' employment for valid, non-discriminatory reasons, and Plaintiffs cannot demonstrate that their termination was pretextual.

        1.  Physical Tests ..............................................................................................31

        2.  Academic Tests ...........................................................................................32

III. **Summary Judgment Should Be Granted In the City's Favor to the Extent Plaintiffs Attempt to Prove their Claims Using "Pattern-or-Practice" Approach Under Title VII.** ......................................................................................34

IV.  **The Court Should Grant Summary Judgment on Count III Because Plaintiffs Have Not Provided Any Evidence of Intentional Discrimination in Violation of the Equal Protection Clause or 42 U.S.C. § 1983.** ..........................................37

    A.   Plaintiffs cannot demonstrate an underlying constitutional violation to support a *Monell* claim. ...........................................................................38

    B.   The City and CFD policies expressly prohibit gender discrimination. ......39

    C.   CFD does not maintain *de facto* policies of gender discrimination. ..............40

    D.   Final policymakers did not intentionally discriminate against Plaintiffs .....42

i

**V.** **Summary Judgment should be granted to the City on the Disparate Impact claims against Velasco, Burroughs, and Markey because they do not have standing to bring such claims.** ..................................................................43

**CONCLUSION**...................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Wright,*
  468 U.S. 737 (1984) ....................................................................................................................

*Alston v. City of Madison,*
  853 F.3d 901 (7th Cir. 2017) ......................................................................................................

*Auriemma v. Rice,*
  957 F.2d 397 (7th Cir. 1992) ......................................................................................................

*Babrocky v. Jewel Food Co.,*
  773 F.2d 857 (7th Cir. 1985) ......................................................................................................

*Bacon v. Honda of Am. Mfg.,*
  370 F.3d 565 (6th Cir. 2004) ......................................................................................................

*Bd. of Cnty. Comm'rs v. Brown,*
  520 U.S. 397 (1997) ....................................................................................................................

*Bloomenthal v. Lavelle,*
  614 F.2d 1139 (7th Cir. 1980) ....................................................................................................

*Bohen v. City of E. Chicago,*
  799 F.2d 1180 (7th Cir. 1986) ....................................................................................................

*Brummett v. Lee Enters., Inc.,*
  284 F.3d 742 (7th Cir. 2002) ......................................................................................................

*Carpenter v. Board of Regents of Univ. of Wis. Sys.,*
  728 F.2d 911 (7th Cir. 1984) ......................................................................................................

*Celestine v. Petroleos de Venezuella SA,*
  266 F.3d 343 (5th Cir. 2001), *abrogated on other grounds, Nat'l R.R. Passenger Corp. v.
  Morgan,* 536 U.S. 101 (2002) ....................................................................................................

*Celotex Corp v. Catrett,*
  477 U.S. 317 ................................................................................................................................

*Chi. Teachers Union v. Bd. of Educ.,*
  14 F.4th 650 (7th Cir. 2021) ......................................................................................................

*Chin v. Port Auth. of N.Y. & N.J.,*
  685 F.3d 135 (2d Cir. 2012) ......................................................................................................

*Coco v. Elmwood Care, Inc.,*
    128 F.3d 1177 (7th Cir. 1997) ................................................................................................................

*Cooper v. Fed. Rsrv. Bank of Richmond,*
    467 U.S. 867 (1984) ................................................................................................................

*Craik v. Minn. State Univ. Bd.,*
    731 F.2d 465 (8th Cir. 1984) ................................................................................................................

*Daniels v. United Parcel Serv., Inc.,*
    701 F.3d 620 (10th Cir. 2012) ................................................................................................................

*Davis v. Coca-Cola Bottling Co.,*
    516 F.3d 955 ................................................................................................................

*Davis v. Passman,*
    442 U.S. 228 (1979) ................................................................................................................

*de Lima Silva v. Wis. Dep't of Corr.,*
    917 F.3d 546 (7th Cir. 2019) ................................................................................................................

*Doe 1 v. City of Chicago,*
    No. 18 C 0354, 2020 WL 1166222 (N.D. Ill. Mar. 11, 2020) ................................................................

*Farrell v. Butler Univ.,*
    421 F.3d 609 (7th Cir. 2005) ................................................................................................................

*First Midwest Bank Guar. of Est. of LaPorta v. City of Chicago,*
    988 F.3d 978 (7th Cir. 2021) ................................................................................................................

*Gamble v. Fiat Chrysler Autos.,*
    993 F.3d 534 (7th Cir. 2021) ................................................................................................................

*Gilty v. Village of Oak Park,*
    919 F.2d 1247 (7th Cir. 1990) ................................................................................................................

*Godfrey v. City of Chicago,*
    973 F.Supp.2d 883 (N.D.Ill. Sept. 25, 3013) ................................................................................................................

*Godfrey v. City of Chicago,*
    No. 1:12-CV-08601 (N.D. Ill.) ................................................................................................................

*Gray v. Lacke,*
    885 F.2d 339 (7th Cir. 1989) ................................................................................................................

*Hankle-Sample v. City of Chicago,*
    No. 20 cv 1997, 2021 WL 4461557 (N.D. Ill. Sept. 29, 2021) ................................................................

*Harris v. City of Chicago,*
    665 F. Supp. 2d 935 (N.D. Ill. 2009) ................................................................................................................

*Hefley v. Vill. of Calumet Park*,
 239 F. App'x 276 (7th Cir. 2007) ..................................................................................................

*Hernandez v. Nielson*,
 2002 WL 31804788 (N.D. Ill. Dec.13, 2002) ...........................................................................

*Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*,
 804 F.3d 826 (7th Cir. 2015) ......................................................................................................

*Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*,
 988 F.3d 948 (7th Cir. 2021) .......................................................................................................

*Int'l Bhd. of Teamsters v. United States*,
 431 U.S. 324 (1977) ......................................................................................................................

*Jibson v. Ne. Ill. Reg'l Commuter R.R. Corp.*,
 No. 19 C 6773, 2020 WL 5365975 (N.D. Ill. Sept. 8, 2020) ...................................................

*Johnson v. Advocate Health & Hosps. Corp.*,
 892 F.3d 887 (7th Cir. 2018) .......................................................................................................

*Joll v. Valparaiso Cmty. Sch.*,
 953 F.3d 923 (7th Cir. 2020) .......................................................................................................

*Jones v. City of Chicago*,
 787 F.2d 200 (7th Cir. 1986) .......................................................................................................

*Jordan v. Summers*,
 205 F.3d 337 (7th Cir. 2000) .......................................................................................................

*King v. City of Chicago*,
 No. 02 C 2608, 2002 WL 31101273 (N.D. Ill. Sept. 19, 2002) ...............................................

*Kujawski v. Board of Comm'rs*,
 183 F.3d 734 (1999) ......................................................................................................................

*Lapre v. City of Chicago*,
 911 F.3d 424 (7th Cir. 2018) .......................................................................................................

*Latuszkin v. City of Chicago*,
 250 F.3d 502 (7th Cir. 2001) .......................................................................................................

*Lowery v. Circuit City Stores, Inc.*,
 158 F.3d 742 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999) ....................

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) ......................................................................................................................

*McCauley v. City of Chicago*,
 671 F.3d 611 (7th Cir. 2011) .......................................................................................................

*Melendez v. Illinois Bell Tel. Co.,*
    79 F.3d 661 (7th Cir. 1996)........................................................................................

*Monell v. Department of Social Services,*
    436 U.S. 658 (1978)..................................................................................................

*Montgomery v. Am. Airlines, Inc.,*
    626 F.3d 382 (7th Cir. 2010).....................................................................................

*Moore v. Ill. State Police,*
    249 F. Supp. 2d 999 (N.D. Ill. 2003)........................................................................

*Morgan v. Harris Tr. & Sav. Bank of Chi.,*
    867 F.2d 1023 (7th Cir. 1989) ...................................................................................

*Palka v. City of Chicago,*
    662 F.3d 428 (7th Cir. 2011).....................................................................................

*Palmer v. Marion Cnty.,*
    327 F.3d 588 (7th Cir. 2003).....................................................................................

*Paterakos v. City of Chicago,*
    No. 21 cv 52, 2021 WL 4635783 (N.D. Ill. Oct. 7, 2021)........................................

*Peele v. Country Mut. Ins.,*
    288 F.3d 319 (7th Cir. 2002).....................................................................................

*Petty v. City of Chicago,*
    754 F.3d 416 (7th Cir. 2014).....................................................................................

*Radic v. Chicago Transit Authority,*
    73 F.3d 159 (7th Cir. 1996).......................................................................................

*Rasche v. Vill. of Beecher,*
    336 F.3d 588 (7th Cir. 2003).....................................................................................

*Raytheon Co. v. Hernandez,*
    540 U.S. 44 (2003)....................................................................................................

*Rikas v. Babusch,*
    No. 13 cv 2069, 2014 WL 960788 (N.D. Ill. Mar. 12, 2014) ...................................

*Schuler v. PricewaterhouseCoopers, LLP,*
    739 F. Supp. 2d 1 (D.D.C. 2010)..............................................................................

*Semsroth v. City of Wichita,*
    304 F. App'x 707 (10th Cir. 2008).............................................................................

*Slaughter v. Winston & Strawn LLP,*
    No. 15 C 5851, 2015 WL 7077331 (N.D. Ill. Nov. 13, 2015) ..................................

*Stewart v. Henderson*,
    207 F.3d 374 (7th Cir. 2000) ............................................................................................

*Stockwell v. City of Harvey*,
    597 F.3d 895 (7th Cir. 2010) ............................................................................................

*Swanigan v. City of Chicago*,
    775 F.3d 953 (7th Cir. 2015) ............................................................................................

*Thomas v. City of Markham*,
    No. 16 CV 08107, 2017 WL 4340182 (N.D. Ill. Sept. 29, 2017) ....................................

*Thomas v. Cook Cnty. Sheriff's Dep't*,
    604 F.3d 293 (7th Cir. 2010) ............................................................................................

*Trautvetter v. Quick*,
    916 F.2d 1140 (7th Cir. 1990) ..........................................................................................

*Trigg v. Fort Wayne Comm. Schs.*,
    766 F.2d 299 (7th Cir. 1985) ............................................................................................

*Valentino v. Vill. of S. Chicago Heights*,
    575 F.3d 664 (7th Cir. 2009) ............................................................................................

*Vasich v. City of Chicago*,
    No. 1:11-CV-04843 (N.D. Ill.) ..........................................................................................

*Vela v. Vill. of Sauk Vill.*,
    218 F.3d 661 (7th Cir. 2000) ............................................................................................

*Waters v. City of Chicago*,
    580 F.3d 575 (7th Cir. 2009) ............................................................................................

*Watson v. Fort Worth Bank & Tr.*,
    487 U.S. 977 (1988) ..........................................................................................................

*Watson v. Ft. Worth Bank & Trust*,
    487 US 977 (1988) ............................................................................................................

*Williams v. Giant Food Inc.*,
    370 F.3d 423 (4th Cir. 2004) ............................................................................................

*Wragg v. Vill. of Thornton*,
    604 F.3d 464 (7th Cir. 2010) ............................................................................................

## Statutes

42 U.S.C. § 1983 ...................................................................................................................*passim*

42 U.S.C. § 2000e-6(a) ................................................................................................................

B. Schlei & P. Grossman, Employment Discrimination Law 1322 & n. 95 (2d ed. 1983) .................................................................................................................................................

Illinois Civil Rights Act .......................................................................................................................

**Other Authorities**

Fourteenth Amendment ........................................................................................................................

Federal Rule of Civil Procedure 56 .....................................................................................................

Federal Rule of Civil Procedure 56(a) .................................................................................................

https://www.chicago.gov/content/dam/city/depts/dhr/supp_info/HRpolicies/20 14_PERSONNEL_RULES-FINAL_2014_v3.pdf ...........................................................................

Defendant, the City of Chicago (the "City"), by its undersigned attorneys, submits this Memorandum of Law in Support of the City's Motion for Summary Judgment on Plaintiffs' Title VII disparate treatment claims (Count I); their 42 U.S.C. § 1983 *Monell* claim based on Equal Protection (Count III); their claim under the Illinois Civil Rights Act (Count IV); and, last, the Title VII disparate impact claims brought by Plaintiffs Velasco, Burroughs and Markey (Count II).

## INTRODUCTION

Plaintiffs were terminated from their probationary positions when they failed to meet graduation standards of the Chicago Fire Department Paramedic Training Academy (the "Academy"), even after an extended training program. Plaintiffs agree that they failed certain tests and did not meet the Academy's standards. Yet, Plaintiffs claim their failure was *designed* by the Chicago Fire Department ("CFD") as part of an orchestrated plan to eliminate women from the 2014-2015 paramedic Academy classes. According to Plaintiffs, CFD introduced two new physical tests in reaction to the increasing number of women entering the Academy, with the express intent of eliminating women from the uniformed ranks. Am. Compl. ¶¶ 27, 29. Plaintiffs' lawsuit sought to expose this scheme. After seven years of litigation, Plaintiffs' theory remains the same, yet they have developed no evidence to support it. Defendant will address the groups of Plaintiffs categorically, along with the legitimate reasons they did not graduate.

Contrary to Plaintiffs' representation, CFD made virtually no changes to the Academy's physical training program, aside from modifying one exercise. Given the stressful, safety-sensitive and fast-pace demands in the field, the CFD paramedic training program remained robust in 2014-2015, just as it had in previous years. Plaintiffs' claims focus on two assessments: the "Lift and Move" sequence and the "Step Test."  Yet, the Academy had used a version of those assessments since at least 2010.

1

Notably, CFD did implement one significant change to the 2014-2015 Academy classes that distinguished them from other Academies in the past: CFD shortened the length of the 2014-2015 Academies, due to an undisputed need to hire more paramedics on an expedited basis. Some trainees were unable to pass the physical assessments during the shortened duration of the Academy training, even though they satisfied other graduation requirements. CFD did not terminate these employees. Given the shortened length of the Academy classes, which afforded them less time for building endurance, CFD created a new extended training program exclusively for those trainees who failed the physical testing. During the extended program, trainees were paid for six weeks with the sole responsibility to train so that they could pass the physical graduation requirements. At the end of the extended program, they were re-tested, and many Candidates, including women, passed, graduated and then deployed into the field, just like their classmates. CFD created this extended program with one objective in mind: to ensure that the trainees who CFD graduated into the field were prepared and able to perform the job safely and effectively.

Of the eleven total Plaintiffs, five Plaintiffs failed the physical program during the Academy and participated in the extended program.[1] Even after the extended program, none of those five Plaintiffs were able to meet the physical testing standards, and were terminated on that basis, with the option to reapply. The remaining six Plaintiffs were disqualified prior to the extended training for individualized reasons, including academic failure and medical concerns.[2]

---

[1]     The five Plaintiffs who attended the extended program were Livingston, Chavez, Lazarra, Maples, and Snevely (*nee* Boswell).

[2]     Three Plaintiffs were terminated for academic reasons: Burroughs, Velasco (*nee* Guarino), and Markey. Two Plaintiffs Griffin (*nee* Ruch), and Youngren left the Academy due to injuries and one Plaintiff, Venegas, never took the physical tests in the first place due to medical disqualification.

Plaintiffs' intentional claims all fail for the same underlying reason: Plaintiffs cannot point to any evidence - direct, circumstantial, or otherwise - that the City terminated them solely because of their gender. Plaintiffs' intentional claims consist of the following: Title VII Disparate Treatment (Count I), §1983 Equal Protection/*Monell* (Count III), and the Illinois Civil Rights Act (Count IV). They cannot establish municipal liability pursuant to any of the three avenues under *Monell*. Finally, as to the non-intentional count of Title VII Disparate Impact, judgement should be rendered against three of the Plaintiffs because they were terminated on the basis of academics, and are without legal injury as to the two physical tests at issue in this case.[3]

## **FACTUAL BACKGROUND**[4]

### 1. **CFD Paramedic Position**

CFD paramedics provide emergency medical services, and deliver lifesaving care and medical treatment to those critically needing it. ¶6. They perform advanced lifesaving procedures, including cardiac, airway and trauma interventions in emergencies. ¶7. The welfare of the public and their co-workers, depend critically upon paramedics' physical fitness, stamina, and alertness. ¶18. For this reason, as stated in the July 2014 CFD Candidate Fire Paramedic Manual (the "2014 Manual"), CFD trainees are expected to maintain a high level of physical, mental, and psychological fitness. *Id.*

---

[3]  Defendant moves on all remaining intentional discrimination claims. Eleven Plaintiffs remain with Title VII Disparate Treatment claims (Count I), nine remain with § 1983 Equal Protection/*Monell* claims (Count III) and nine remain with ICRA claims (Count IV).

Ten Plaintiffs remain with Title VII Disparate Impact claims (Count II), and Defendant moves for summary judgment against three of those ten.

[4] The City hereby incorporates by reference the Joint Statement of Undisputed Facts, as well as the parties' Additional Joint Statement of Undisputed Facts, filed contemporaneously herewith pursuant to Judge Ellis' Standing Order, Federal Rule of Civil Procedure 56, and Local Rule 56.1(a)-(b). All Undisputed Facts will be referenced in the Memorandum by using the symbol ¶.

Unlike firefighters, paramedics are not responsible for fire suppression activities. Am. Compl ¶14. In other words, paramedics do not put out fires. *Id.* Firefighters and paramedics are vetted with entirely different pre-Academy testing and participate in separate training academies, which cover different material and have different grading scales. ¶¶24, 25, 28, 114, 156, 194. For example, where firefighters are trained based on a fire science curriculum, paramedic training is focused on Chicago streets and transportation, medical devices and advanced lifesaving interventions. ¶¶24-26, 114.

## 2. Overview of the Academy

Individuals hired into a CFD paramedic position start as probationary employees, and from day one, they train at the Academy to become CFD paramedics. ¶8, 9. During the Academy, these probationary employees are referred to as Candidate fire paramedics (hereinafter, "Candidates"). ¶13. For decades, CFD has required all its Candidates to participate in a training academy before they are permitted to respond to a member of the public with a medical emergency. ¶105.

Candidates attend the Academy full-time, and participate in physical training and courses of study on a continuous basis. ¶¶13, 40. Plaintiffs recognize that the Academy trains and assesses Candidates on the knowledge and skills required to serve as a paramedic. ¶¶14, 17. While in the 2014-2015 Academy, Candidates were trained and tested on the "Lift and Move" sequence and the Step Test. ¶¶41-43 The latter is a fitness exercise and the former is a skill set involving lifting and moving of patients. *Id.* In addition to physical training, Candidates attended academic classes and were tested and quizzed on the content. ¶¶13, 21. The 2014 Manual[5] set forth the physical and academic testing standards required for graduation and states that Candidates who fail to satisfy the standards are subject to termination. ¶107.

---

[5] Although CFD used the 2015 Manual for the Plaintiffs enrolled in the 2015 Academy classes , the relevant portions of the Manuals are substantially similar that for ease of reference the 2014 and 2015 Manuals will be referenced jointly herein as the "2014 Manual" or the "Manual."

### 3. 2014 – Operational Need to Hire More Paramedics

Starting in 2013 and through the 2014-2015 Academies, William Vogt served as the CFD Director of Training. ¶130. In 2014, CFD had an operational need to train and hire more paramedics. ¶44. CFD responded to the operational need by convening five separate paramedic training academies in a 10.5 month period between 2014 and 2015. ¶14.

To further increase the number of paramedics in the field in response to the need, the length of the Training Academy was shortened. Whereas prior Academy classes lasted up to three months, the initial 2014 Academy class lasted approximately six weeks. ¶44; *See* ECF No. 18-1, pp. 12-15, Velasco/Guarino EEOC Charge, ¶¶4, 5. The remaining Academy classes in 2014 and 2015 lasted between 6-8 weeks. ¶44. CFD was careful not to compromise any academic coursework during the truncated Academies. *Id.*

The 2014-2015 truncated Academy classes were referred to as the "Alphabet Classes," and each of the five classes was given a designated name, corresponding to the military alphabet (Alpha, Bravo, Charlie, Delta, Echo, Foxtrot). ¶14. The first of five Academy classes began August 1, 2014, with a roster of 51 males and eight females. ¶15. Plaintiffs Velasco, Livingston and Snevely were in the Alpha class; Plaintiffs Burroughs and Lazarra were in Bravo; Plaintiffs Markey and Maples were in Echo; and Plaintiffs Chavez, Youngren and Griffin were in Foxtrot. ¶¶49, 73, 82, 59, 79, 66, 85, 76, 91, 88, respectively.

### 4. CFD for the First Time Provides a Paid Extended Training Period

At the end of the truncated Academies, almost all of the Candidates passed the academic portion. ¶¶223, 28. Yet, despite satisfying the academic requirements, some of the Candidates were unable to complete the physical training program. ¶45. The 2014 Manual stated that Candidates who

could not complete the Lift and Move or the Physical Fitness Performance sequences[6] were subject to termination. ¶¶41, 107. Yet, CFD did not terminate the Candidates who failed the physical training. ¶45. Instead, CFD created an extended training program to provide additional opportunities for the Candidates to meet the physical graduation requirements outlined in the Manual. ¶45.

The newly created extended training program provided an additional six weeks of pay for the Candidates who failed the physical testing but otherwise completed the Academy requirements. ¶¶45, 94, 74, 77, 80, 83, 86. The Candidates were re-tested at the end of the extended program, and their only responsibility during those six weeks was to practice drills and conditioning exercises so they could pass the assessments and graduate from the Academy. ¶45. When re-tested, several Candidates who had previously failed, including a number of women, passed the physical tests, graduated and began responding to emergencies in the field. ¶46.

### 5. Plaintiffs are Unable to Complete the Physical Assessments

A total of six Plaintiffs (Burroughs, Chavez, Velasco, Maples, Griffin, Venegas and Youngren) did not participate in the extended training. ¶94. Of those six, three Plaintiffs (Velasco, Burroughs and Markey) were terminated prior to the extended training because they did not satisfy the academic graduation criteria. ¶¶28, 41, 95, 223. Two other Plaintiffs (Griffin and Youngren) attempted the "Move and Lift" and "Step" test, but were injured and took leave from the Academy before they were able to complete it. ¶90; Am. Compl., ¶51; ECF No. 602-1, ¶2. The City placed Griffin on medical leave and she remained employed until she was terminated approximately one year after her injury based on the City's medical leave policy. ¶¶88, 90; Am. Compl. ¶50 (showing Griffin was terminated on August 3, 2016). After Youngren's injury, she was placed on suspended assignment, and terminated in accordance with the City's suspended assignment policy. ECF No. 602-1], ¶2.

---

[6] The Step Test was part of the Physical Fitness Performance Sequence.

The final Plaintiff, Venegas, does not allege that she ever took the "Step Test" or "Lift and Move" sequence. See Am. Compl. ¶57. The facts show Venegas initially attended the Academy for approximately eight days, until Dr. William Wong, the CFD Medical Director, determined Venegas could not safely perform the essential functions of the paramedic position. ¶¶97, 183. The termination of Venegas was a unique circumstance. ¶184.

### 6. Training Manual – Training Academy

### A. The Physical Training Requirements.

As a key component of their claims, Plaintiffs allege the "Lift and Move" sequence and the "Step Test" were new, and implemented to target and eliminate the increasing number of women entering the Academy after the roll-out of the new PAT pre-hire test. ECF No. 259, Am. Compl. ¶¶27-29. Yet, the lifting assessments had been included in the Paramedic Manuals since 2008, and the Step Test since 2010. ¶¶137, 160.

#### (i) The Lift and Move Sequence and the Stair Chair Carry

The Lift and Move Test sequence consists of a three-part test, one of which is the Stair Chair Carry. ¶43. The remaining two parts of the Lift and Move sequence are the 100 foot stair chair push/pull and the mannequin dead lift/transfer and stretcher load. *See* Exhibit 1: 2014 Manual, App'x C, p. C-1.

The Stair Chair Carry component of the Lift and Move sequence requires the Candidate and a partner to carry a 250 pound mannequin on a specialized chair, up and down flights of stairs. ¶43. The step-by-step requirements for the Lift and Move test in the 2014 Manual are nearly identical to the step-by-step requirements in the 2012 Manual. *See* Exhibit 1: 2014 Manual, App'x C, p. C-1, *as compared to* Exhibit 3, 2012 Manual, p. 25. The only difference in the requirements was that the 2014 Manual clarified that the Candidate *may* rest the chair on the landing between two flights of stairs. *Id.*; *see also* ¶43.

7

### (ii) The Step Test

Different from the Lift and Move sequence, the Step Test was a component of the Physical Fitness Performance Sequence. ¶41. It required the Candidate to (a) hold a 25 pound weight in each hand, and (b) step up and down from an 18" platform (box) for two minutes, (c) to the beat of a metronome, without missing cadence for two beats. ¶42.

The Health and Fitness Coordinator ("Fitness Coordinator") included the Step Test as a physical fitness exercise. ¶¶149, 150. The only difference between the Step Test in 2014, as opposed to prior years, was the increase in the box height from 9" high to 18" high. ¶¶149, 160. The change was proposed by Fitness Coordinator in 2013 for fitness training. ¶149. When the Fitness Coordinator suggested the change, he did not do it with the intent to terminate people and he testified he did not want to flunk anyone. ¶¶149, 150. In addition to the Step Test, the other components of the Physical Fitness Performance Sequence included push-ups, bench squats, plank and the sit and reach. *See* Exhibit 1:  2014 Manual at App'x C, p. C-1.

It is undisputed that Plaintiffs Livingston, Chavez, Lazarra, Markey, Snevely and could not complete the Stair Chair Carry component of the Lift and Move sequence and/or the Step Test and were terminated based on their results. ¶¶45, 94. Plaintiffs Griffin and Youngren were injured during the Academy, and their terminations did not occur at the end of the Academy, but instead occurred pursuant to the respective medical leave and suspended assignment policies.  ¶¶185; ECF No. 602-1 ¶2.

### B.    The Academic Requirements in the Training Manual

Of the 219 Candidates completing the academic portion of the Alphabet classes, a total of five Candidates ended the Academy with failing grades: two men and three women. ¶223. The only females who failed the academic program were Plaintiffs, Velasco, Burroughs, and Markey, and they were

terminated on that basis. ¶¶*Id.*, 50, 60, 67. The remaining Plaintiffs who completed the academic portion all passed it the without issue. ¶¶74, 77, 80, 83, 86, 89, 92.

The Academic Requirements were divided into two sections: (1) a classroom section consisting of homework, assignments, quizzes, tests, and exams; and (2) practical skills assessments. ¶21. The content of the tests and the types of skills evaluated during the practical skills assessments were both related to the paramedic job. ¶27. The written tests gauged Candidates' knowledge of medical information, including as to heart monitors and infectious disease control; the locations of major Chicago streets, hospitals, landmarks; and CFD's written operational orders. ¶25. The practical skills assessments were divided into three components, based on type of medical procedure: (1) airway; (2) cardiac; and (3) trauma. ¶26. Candidates were tested on several skills within each component, such as a test within the cardiac component on how to assess slow heart rhythms, and a test within the airway component on how to perform intubation. ¶26. CFD Paramedics perform these skills when providing medical care to patients in the field. ¶¶7, 27.

With respect to the practical skills assessments, all Candidates initially take a baseline test, which is not incorporated into their academic average. ¶206. Instructors then train Candidates on the required skills, and thereafter, a second round of testing is conducted. *Id.* The second round is evaluated on a pass/fail basis, with a Candidate scoring either a 100% or a 0 on the assessment. ¶¶206, 116. The results of the second round are incorporated into the Candidate's academic average. *Id.* Candidates who failed the second round generally were offered to re-test in a "remediation" round to show they were able perform the skill; however, the remediation score was not incorporated into the Candidate's academic average. ¶206.

In addition to passing the skills assessments, Candidates were required to score an aggregate 80% or higher final average on tests and practical skills assessments to graduate from the Academy. ¶28. Pursuant to CFD practice, final averages between 79.5% and 79.9% rounded up to 80% such

that Candidates with a final average between 79.5% and 79.9% satisfied the Academic Requirements.[7]

¶29. Candidates received midterm and final progress reports, akin to report cards, which listed their

grades on the tests and practical skills assessments. ¶22.

Plaintiffs Velasco, Burroughs and Markey all received scores under 80% and, and were the

only three women with failing scores out of a total of fifty one women who completed the academic

portion of the Academy. ¶¶50, 60, 67 and 30, 31. The Academy training files of all 200+ Candidates

within the 2014-2015 Academy classes, including Plaintiffs, were produced in discovery and contained

the actual Scantron testing sheets, as well as individualized graded copies of the academic tests given.

*e.g.* Exh. 43, Plaintiff Markey's Training File.  The three Plaintiffs above do not dispute that their

overall average academic score was under 80%, and do not dispute that they failed the academic

portion of the Academy.  ¶¶28, 50, 60, 67.

Academy rules also required Candidates to complete forms known as "Form 2s" when they

failed tests or other coursework. ¶53.  In the Form 2s, the Candidates were required to explain why

they failed the particular test at issue and their plan to improve. *Id.*  The training files of Plaintiffs

Velasco, Burroughs and Markey contain numerous Form 2s. ¶¶54, 55, 62, 64, 69.

CFD used a computer program called Gradebook to enter and track Candidates' grades. ¶23.

Academy instructors entered grades into Gradebook manually, based on scores listed on the paper

Scantron scoresheet or on the face of the particular testing document. ¶¶*Id.*, 217. While there were

some human errors in transferring the grades from the paper scoresheets to the computerized tracking

program, the errors were immaterial to whether a Candidate passed or failed the academy, with the

exception of one male Candidate, Grant Guibourdanche, where two test scores were inaccurately

entered into the Gradebook system, resulting in a passing overall score. ¶¶112, 217, 218. Once Grant

---

[7]     For simplicity and consistency – this Memorandum will refer to the cut-off as 80% despite the
rounding practice.

Guibourdanche's scores were entered into the Gradebook computer system, they remained unchanged in all of his printed progress reports and in his class Gradebook, and there is no evidence that his scores were manipulated in the Gradebook program in any way. ¶216

Throughout the Academy, men failed certain tests and assignments at a greater rate than women. ¶222. For example, as recorded in the Gradebook program, eight male Candidates in the Alpha class failed at least one component of the Practical Skills Assessment, whereas, only two women scored as poorly. *Id.*

### 7. Certain Plaintiffs Successfully Complete the Academy and are Re-hired and Promoted

Starting in June of 2017, the City rehired six of the Plaintiffs (Livingston, Venegas, Maples, Chavez, Markey and Griffin) after each of them successfully completed the Academy and met the same requirements as all other CFD paramedics. ¶¶96-101. Five of the six rehired Plaintiffs remain actively working as a paramedic for CFD. ¶¶96-100. Since being rehired, Plaintiffs Livingston and Maples have been promoted to Paramedic in Charge. ¶¶96, 98.

### 8. The City's Anti-Discrimination Policies.

The City's Diversity and Equal Employment Opportunity Policy (the "EEO Policy"), states that the City "is an Equal Employment Opportunity employer ... committed to providing equal opportunity in its recruitment, hiring, promotions, and transfers, and in all other practices and decisions," in accordance with all applicable laws and ordinances prohibiting discrimination. ¶11.

On the Department level, the CFD's Anti-Discrimination General Order prohibits discrimination, harassment, and retaliation on the basis of sex and other protected classes. ¶10. It applies to all CFD employees and states that an employee may make complaints of discrimination and/or harassment through any of a number of channels including CFD's Equal Employment Opportunity Liaison, CFD supervisors, the City's Department of Human Resources, and through union grievances. ¶12.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986).

**ARGUMENT**

**I. Plaintiffs' Title VII intentional discrimination claims fail because the evidence does not allow a reasonable factfinder to conclude female Candidates were terminated based on their gender.**

Plaintiffs contend CFD introduced two new tests in 2014, the "Lifting and Moving Sequence" and the "Step Test" for the purpose of eliminating women from the Academy after their numbers began to increase upon the roll-out of a new pre-hire test. Am. Compl. ¶¶27-30. Plaintiffs cannot present evidence suggesting these tests were *newly* implemented, much less for the express purpose of eliminating women from the Academy.

First, the facts in this matter do not support Plaintiffs' theory that CFD implemented two new physical tests for the express purpose of discriminating against women. Regardless of whether Plaintiffs attempt to prove their individual claims through the *McDonell Douglas* burden shifting test, or otherwise, their disparate treatment claims fail. *See Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation,* 988 F.3d 948, 957-58 (7th Cir. 2021). The Seventh Circuit has explained that when a defendant moves for summary judgment on a Title VII disparate treatment claim, the "singular question" for the Court is whether the plaintiff has introduced evidence that would "permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (citation omitted). A disparate treatment claim brought under Title VII "focuses exclusively on the intent of the employer." *Morgan v. Harris Tr. & Sav. Bank of Chi.*, 867 F.2d 1023, 1027 (7th Cir. 1989) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 1002 (1988) (Blackmun, J., concurring)).

When evaluating a plaintiff's claim as a whole, the plaintiff still must identify "direct or circumstantial evidence that supports an inference of intentional discrimination." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) (citation omitted).

Indeed, the facts show that five of the Plaintiffs were terminated after they repeatedly failed customary training assessments, even after being given an additional chance in a paid extended program to train exclusively for - and pass - these tests. ¶¶94, 45. The Training Academy was established to prepare Candidates for the job of paramedic, and the physical assessments serve that purpose. ¶105. None of the evidence in this case demonstrates intentional gender discrimination, and Plaintiffs' disparate treatment claims therefore fail.

### A. The Graduation Standards are Stated in the Candidate Manual

Given the transparency of the testing standards in the Manual, Plaintiffs cannot show these tests were introduced to surprise the female Candidates in an attempt to eliminate them from the paramedic ranks. The testing standards were set forth in the 2014 Manual, which explicitly stated that Candidates may be terminated if they did not successfully complete the Lift and Move sequence, or the Step Test. ¶41. The tests and the warnings should have been no surprise, as similar versions of these same tests were required in prior Academies, as stated in the October 2012 Manual. *See* Exh. 3, 2012 Manual, p. 24, "Aerobic Step Test – Cardio Endurance"; and p. 25 "EMS Lifting & Moving Job Performance Assessment." In fact, both tests had been included in the Academy since, at least, 2010, so contrary to Plaintiffs' claim they were not created as part of a scheme in 2014. ¶137 (Lift and Move sequence as part of Academy since 2008), ¶160 (Step Test as part of Academy since 2010).

To be clear, CFD did not impose the tests upon Plaintiffs without prior preparation or practice. During the Academy, Plaintiffs and other Candidates engaged in physical training and conditioning, and practiced lifting, moving and carrying patients. ¶14. Plaintiff Velasco admitted that

when she trained off site, she had no problem completing the 250 pound Stair Chair Carry. ECF No. 18-1, pp. 12-15, Velasco/Guarino EEOC Charge, ¶¶4, 5.

Perhaps Plaintiffs are playing with semantics, and/or their theory may turn on the timing of an *update* to one of the tests, instead of the introduction of two *new* tests.[8] Yet, the Manuals demonstrate that there was no material difference in the Lift and Move sequence compared to prior years. If anything, the testing sequence became easier in the successive years. ¶43 (explicitly permitting Candidates to rest the Stair Chair on the landing). Further, as shown below, the circumstances surrounding the variation to the separate Step Test do not suggest any changes were made for the purpose of excluding women, and most importantly, no evidence exists establishing such an intent.

Turning to the Lift and Move sequence first, both the 2012 and 2014 Manuals contain step-by-step instructions for successful completion of the assessment. The only difference is a clarification with regard to the Stair Chair Carry in the 2014 Manual, specifically, noting Candidates are not disqualified for resting the chair on the landing during the Stair Chair Carry component. ¶43 (describing Stair Chair Carry in 2014 Manual) *as compared to* Exhibit 3: 2012 Manual, p. 25 (describing Stair Chair Carry in 2012 Manual).

Turning next to the Step Test, it was administered in both 2012 and 2014. ¶¶160, 42. While it increased in difficulty in 2014, as compared to 2012, no evidence suggests that the Fitness Coordinator modified the test because he wanted to eliminate women from the Academy. ¶149. In 2013, the Fitness Coordinator proposed increasing the height of the step-up box from 9" to 18", to increase the effectiveness of the conditioning exercise. ¶*Id*. Other material elements of the Step Test remained the same, including the weights, cadence requirements and timing. *Compare* ¶42 with ¶160; *also compare* the

---

[8] Their initial theory, which bases the discrimination on the "use of *new* physical tests" remains the operative theory in the Amended Complaint, which was filed four years after the initial Complaint. See ECF No. 259, ¶¶27-29.

"Aerobic Step Test – Cardio Endurance" in 2014 Manual, Exh. 1, App'x p. B-2 *versus* the "Aerobic Step Test – Cardio Endurance" in the 2012 Manual, Exh. 3, p. 24, respectively. Instead of seeking to terminate Candidates, the Fitness Coordinator testified he was focused on Candidates successfully completing the physical training program. ¶150. There is no evidence that the Fitness Coordinator revised the Step Test because he wanted to eliminate women from the Academy, nor is there any evidence that others directed him to change the Step Test, for that or any other purpose.

The timing of this update to the Step Test also contradicts the Plaintiffs' theory. To the extent Plaintiffs' *revised* theory relies on the Fitness Instructor proposing an *update* to the Step Test in response to the new standardized pre-hire test (the "PPAT") and the resultant increase of women in the Academy, the facts show otherwise. According to the Fitness Coordinator, the Step Test was introduced in 2013, before the City had even received the final report on the new pre-hire PPAT. ¶149, 193 (showing final report on PPAT submitted March 18, 2014). As such, the change to the Step Test could not have been implemented *in response* to the new pre-hire test or the consequences flowing therefrom. In other words, the pre-hire PPAT test (and its alleged resulting impact on the number of women) did not exist when the Step Test changed.

Additionally, according to Plaintiffs' chart identifying the pass rates of the Candidates on the Step Test, a total of nine men failed the Step Test. *See* Chart below ¶147 (showing 5.1% of 175 males failed the Step Test). Plaintiffs put much emphasis on the fact that in 2014, no men were *terminated* from the Academy for failing the physical requirements. Yet, the statement ignores the men who failed the test - and resigned - instead of waiting to be terminated. Plaintiffs do not claim that CFD ignored the test results of nine male Candidates and sent them to graduate. Nor could CFD control whether a Candidate who failed the testing requirements chooses to resign or not. Regardless of whether they were terminated or resigned, men failed the physical testing, too, and were not permitted to graduate.

**B.      CFD's Response to Candidates who Failed the Physical Testing Does Not Suggest Discrimination**

At the end of the Alphabet classes, it became clear to CFD that some Candidates were unable to complete the physical training program. ¶45. It makes logical sense that the physical training may have presented a greater challenge to the Candidates participating in the 2014-2015 Academy because of the deliberately shortened length of the classes. ¶44. In other words, because the Academy length was shorter, Candidates had less time at the Academy for fitness and skill preparation in advance of the assessments. CFD's reaction to the unique circumstances was reasonable. Consistent with its interest in ensuring Candidates were sufficiently prepared for the safety-sensitive, physically demanding position, CFD extended training program so that the struggling Candidates would have additional opportunities to pass the tests using the same standards met by those who graduated and were required for field work. This reasonable solution balanced the need to hire paramedics, with ensuring they were prepared to perform the job safely and effectively. Instead of terminating them when they failed the tests at the end of the Academy, CFD set the Candidates and CFD up for success by extending their training for an additional six weeks in order to build up the additional endurance to meet the graduation requirements. ¶45.

Certainly, had CFD wanted to target women, it would not have provided further opportunities to satisfy the requirements. Yet, many of the Candidates succeeded in passing the tests after completing the extra training program. ¶46. Further, Plaintiffs now contend they were injured during the physical training; yet, their physical ailments certainly could have contributed to, or made it impossible, for them to pass the tests. Four out of the five Plaintiffs who participated in the extended training were injured.[9] ¶145.

---

[9] Plaintiffs Livingston, Maples, Lazarra and Snevely now contend they were injured during the Academy.

The additional extent to which CFD invested in all Candidates, including women, undercuts their theory as well. Ten of the eleven female Plaintiffs occupied a slot in the Academy during the entire training, and five occupied a slot beyond the Academy. This represents a significant cost to the City, as CFD invested substantial time and resources identifying applicants who qualify for hire and then training them in the Academy. The Plaintiffs also were paid during their additional opportunity to train and succeed. ¶45. Had the City intended to discriminate against women, it would not have invested so heavily in their success.

### C.  No Evidence the Physical Assessments were Illegitimate

Plaintiffs attempt to show, on a practical level, that the physical tests were illegitimate on their face. Yet, this was not a situation where office workers or clerks were required to complete a battery of physical tests.  To the contrary, Plaintiffs readily admit that paramedics are required to lift, move and carry patients and equipment (including up and down stairs) in performing their duties. ¶14.

Plaintiffs heavily focus on the Stair Chair Carry component of the Lift and Move sequence, where the Candidate and a partner lift essentially a 250 pound mannequin up and down flights of stairs on a specialized chair. ¶43. This assessment simulates the medical rescue of a 250 pound individual by a two-person team in a multi-level apartment building or home. Paramedics in Chicago face that type of scenario, and the Plaintiffs who ultimately completed the Academy cannot deny that as a CFD paramedic, they have engaged in a similar Chair Carry to rescue an even heavier person.

This reasoning applies to the Step Test as well.  It was included as a part of the physical fitness performance testing (¶41), and requires a Candidate to step up and down from an 18" box continuously for two minutes while holding weights. ¶42. Plaintiffs acknowledge that fitness and stamina are important qualities when performing as a paramedic. ¶18. Ensuring such preparation particularly significant for new, entry-level Candidates, given the stamina required to triage one medical crisis, let alone a trauma scene where multiple people require immediate medical care.  Even a lay

17

person can appreciate the need for fitness and conditioning given that a delay in locating a patient could mean the difference between life and death.

Further, while union and other work rules may prevent CFD from testing and/or terminating an incumbent paramedic for lack of fitness or conditioning, that does not mean those qualities are unimportant to the job, or should be banned for vetting purposes where no such obstacles exist. Moreover, training and testing are particularly important for new paramedics who may not know how their minds and bodies would react to the stressful, taxing, life-and-death situations that veteran paramedics face every day.

Ultimately, while the concept of job-relatedness is a term of art and a critical component within the disparate *impact* analysis, it is not relevant to these disparate *treatment* claims. There is no evidence that the tests at issue were created or maintained with the specific intent to exclude women. Further, physical tests, like other training requirements, are not required to be scientifically "validated" for "job-relatedness" prior to their use. Whether the Lift and Move or Step Test were scientifically validated before implementation has no bearing on Plaintiffs' disparate treatment claims. *Watson v. Ft. Worth Bank & Trust*, 487 US 977, 998 (1988), *overruled on other grounds*. In the disparate impact context, once a plaintiff establishes a *prima facie* case, the defendant has the burden of persuasion to show the test is "job related." To be clear, no similar concept or standard applies in disparate treatment cases, and in this case the City has no burden to demonstrate job relatedness to defeat Plaintiffs' disparate treatment claims. Only where a plaintiff could prove that: an authoritative job-relatedness/validation study of the specific tests *existed prior* to the Alphabet classes, the study concluded that the that the tests were not job related, and the City was aware of the study prior to implementation, could the concept of "job-relatedness" ever be relevant to these disparate treatment claims. Despite Plaintiffs attempt to conflate concepts and play with semantics, the concept of job relatedness has no relevance in this claim, as none of the aforementioned prerequisites are met.

18

### D. Plaintiffs Narrative is Inconsistent with the Historical Timeline of Events

In their narrative, Plaintiffs speculate that after the former pre-hire test was replaced by the PPAT, the number of women entering the Academy noticeably increased, which (they speculate) led CFD to implement the discriminatory tests. Am. Compl. ¶¶27-30. As recognized by the Court, "what matters is whether the Academy instructors believed that too many women were actually part of the Academy and whether they then implemented discriminatory tests to eliminate them." Judge Ellis Memorandum, Opinion and Order, Dkt. 310, p. 3; Magistrate Judge Kim Minute Order, Dkt. 255.

Yet, the historical sequence of events shows that the Plaintiffs could not have experienced any purported discriminatory actions resulting from an increase in women Academy Candidates. Based on Plaintiffs' theory, the introduction of the PPAT caused an increase in women entering the Academy, which, in turn caused CFD to create new tests. Yet, Plaintiffs were the first Candidates to take the PPAT. ¶¶193, 194. Therefore, to the extent CFD took discriminatory action based on the increase in women Candidates, it would have to occur after the Plaintiffs attended the Academy. In other words, Plaintiffs themselves would have been that noticeable wave of women entering the Academy, and (pursuant to their theory) *Plaintiffs' presence* caused CPD to implement discriminatory testing against a future group of women.

Nor does the history or timing of other lawsuits raise an inference of discrimination. Plaintiffs point to the alleged discriminatory testing in the 2014 Academy as a continuation of the gender discrimination that was supposedly reflected in the *Ernst* case. In *Ernst*, a group of plaintiffs accused CFD of using pre-hiring tests to prevent women from entering the Academy. The history reflects a different story.

CFD fought the allegations in *Ernst* all the way to trial and won. On November 25, 2014 (with two Alphabet classes yet to enter the Academy), the *Ernst* jury rejected the plaintiffs' intentional discrimination claims and issued a defense verdict. ¶195. Thereafter, on April 13, 2015, the District

Court followed suit, concluding the *Ernst* plaintiffs failed to establish disparate impact. *Id.* Only in September of 2016, after Plaintiffs' extended Academy classes ended, did the Seventh Circuit vacate the jury verdict, remand for a new trial and reverse the disparate impact decision. *Id.* Ultimately, the *Ernst* plaintiffs voluntarily dismissed all the intentional claims of discrimination. Plaintiffs' reliance on *Ernst* is flawed.

There also were no gender-based comments or insults directed toward the Plaintiffs in this matter. Plaintiffs here did not testify that instructors or leadership made sexist or gender-based remarks. None of the 200+ Candidates in the Alphabet classes, including Plaintiffs, complained about any of the instructors with respect to gender-based issues. Nor did Plaintiffs identify any evidence of gender-based animus by the decision-makers in this case despite the extensive ESI discovery conducted. Nor can they point to any comments suggesting that the tests were implemented to eliminate women. There is no evidence of intentional discrimination.

Further, the alleged discriminatory acts listed in Plaintiffs' Amended Complaint and directed against non-Plaintiffs do not assist them in proving their intentional claims. For example, Plaintiffs raise concerns about adequate restroom and locker facilities during training, which allegedly affected women in the *Godfrey* litigation, but not the Plaintiffs here; inadequate sleeping quarters and restroom facilities in firehouses, which have no relation to this case; and an alleged feces incident not experienced by any Plaintiffs here. Further, Plaintiffs provide no evidence even with respect to ancillary events allegedly experienced by Plaintiffs, including Plaintiff Snevely's alleged discontinuation of breast feeding or speculating that an instructor was leering at her body instead of her form. These allegations are unsupported by the record. Even if they were, they cannot establish the intent required to effectively counter summary judgment on the claims in this matter.

Finally, Plaintiffs Venegas, Griffin and Youngren cannot show the unique circumstances of their terminations were based on gender discrimination. Moreover, Plaintiff Venegas never took the

two allegedly discriminatory tests which form the basis of Plaintiffs' disparate treatment claims; therefore, she could not have been injured by them. Instead, Venegas was disqualified from the Academy within the first few days after the Medical Director determined she could not perform the essential functions of the job. ¶¶97, 183. Plaintiff Venegas cannot present sufficient evidence that the Medical Director intentionally disqualified her from the Academy because of her gender, and as such, she cannot maintain a disparate treatment claim.

Similarly, Plaintiffs Griffin and Youngren did not finish the Academy, or attend the extended training program. Instead, they were put on medical leave and suspended assignment, respectively, and were terminated in accordance with those policies. Plaintiffs cannot show that their removal from the Academy and placement on medical leave or suspended assignment was made pursuant to any gender-based discriminatory motive. As such, their intentional Title VII discrimination claims fare no better than the failed claims of all other Plaintiffs.

## II. Plaintiffs Title VII Intentional Discrimination claims also fail when using the *McDonell Douglas* analysis because Plaintiffs' cannot establish a *prima facie* case and are unable to show pretext.

As described above, Plaintiffs cannot establish an inference of intentional discriminatory treatment when evaluating the evidence as a whole. The evidence is equally deficient when evaluating it through the *McDonell Douglas* framework. To establish a *prima facie* case of intentional discrimination under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must show that: (1) she belongs to a protected class; (2) she met her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *See Gamble v. Fiat Chrysler Autos.,* 993 F.3d 534, 537 (7th Cir. 2021). Once a plaintiff satisfies each element of a *prima facie* case, "the burden shifts to the employer to offer a nondiscriminatory motive, and if the employer does so, the burden shifts back to the plaintiff to show

that the employer's stated reason was a pretext." *Id.*[10]  Plaintiffs' individual disparate treatment claims

fail at all three stages of *McDonnell Douglas*.

## A. By failing to meet the graduation requirements, Plaintiffs did not satisfy CFD's legitimate, job-related expectations.

Plaintiffs cannot prove that they met CFD's legitimate expectations. Here, the Court's inquiry

into the legitimacy of CFD's expectations is limited.  Inquiry into an employer's legitimate expectations

concerns only an employer's "*bona fide* expectations, for it is no business of a court in a discrimination

case to decide whether an employer demands 'too much' of his workers."  *Coco v. Elmwood Care, Inc.*,

128 F.3d 1177, 1180 (7th Cir. 1997). The Court does not "second-guess an employer's policies that

are facially legitimate." *See Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir. 2002).

Ten of the Plaintiffs (Livingston, Burroughs, Chavez, Velasco, Lazarra, Maples, Markey,

Griffin, Snevely, and Youngren) were terminated because they failed facially neutral academic or

physical assessments in the training program. Three Plaintiffs (Burroughs, Velasco and Markey) failed

the academic requirements and were terminated on that basis; five Plaintiffs (Livingston, Chavez,

Lazarra, Maples and Snevely) were terminated because they failed physical assessments after extended

training; two more Plaintiffs (Griffin and Youngren) were terminated because the failed the physical

testing -- but went on leave prior to the extended training program, and the final Plaintiff (Venegas)

was terminated without ever taking the physical tests because the Medical Director determined her

physical condition prevented her from performing the essential functions of the position.

### 1.    Certain Plaintiffs Failed to Meet Physical Testing Requirements

Five Plaintiffs were terminated after they repeatedly failed the tests, even after being given

additional paid leave to train exclusively for these tests and pass them. ¶94. They do not dispute this,

---

[10] The City does not dispute that Plaintiffs satisfy the first and third prongs of the *McDonnell Douglas* test, *i.e.*, that they belong to a protected class, and that they suffered adverse employment actions.

nor can they reasonably argue the tests are illegitimate. Paramedics are required to carry patients and equipment up and down stairs in the course of their on-the-job duties. ¶14. Plaintiffs may contend that tests are too difficult because the mannequin is too heavy or that the staircase has too many steps. Yet, this argument amounts to no more than a dispute about whether the employer demands "too much" of its workers, which, according to the Seventh Circuit, is not an issue for the courts to decide. *Coco*, 128 F.3d at 1180.

This reasoning applies equally to the Step Test. Plaintiffs cannot demonstrate they met CFD's legitimate expectations because they failed the facially neutral, non-discriminatory physical tests. *See Hefley v. Vill. of Calumet Park*, 239 F. App'x 276, 278 (7th Cir. 2007) (plaintiff could not show that he met employer's legitimate expectations where he failed necessary tests that were required for his position); *Moore v. Ill. State Police*, 249 F. Supp. 2d 999, 1004 (N.D. Ill. 2003) (plaintiff could not demonstrate that he met employer's legitimate expectations where he passed some, but not all, of the required testing for his position). Therefore, Plaintiffs cannot make out a *prima facie* case of intentional discrimination, and the City is entitled to summary judgment.

### 2. The Academic Plaintiffs Failed to Meet Academic Requirements

Plaintiffs concede they were required to meet the Academic Requirements, and could be terminated from their jobs if they failed that portion of the Academy. ¶41. They agree that all Candidates were required to score an 80% final academic average to meet those Requirements. *Id.*; ¶¶28, 29. They also concede that the academic content was job related. ¶27. Plaintiffs Velasco, Burroughs and Markey did not meet the 80% threshold and were discharged accordingly. ¶¶ 50, 67, 60. No reasonable factfinder could conclude those Plaintiffs were discharged because of their sex. Therefore, summary judgment is proper.

**B. Similarly situated male Candidates were not treated more favorably with respect to either the physical or academic assessments**

### 1. Males Were Not Treated More Favorably in the Physical Testing

To survive summary judgment under *McDonnell Douglas*, Plaintiffs also must present evidence that similarly situated employees outside of their protected class were treated more favorably. The relevant inquiry is "whether the other employees' situations were similar enough to the plaintiffs' that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *de Lima Silva v. Wis. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) (internal quotation marks and citation omitted).

Plaintiffs contend they were terminated based on a failure to complete the Step and/or Lift and Move sequence. Under this framework, Plaintiffs must show that similarly situated male Candidates were treated more favorably with respect to the physical tests. The only proper comparators would be men who took the Move and Lift sequence and Step Test, and failed certain parts but nevertheless passed. However, Plaintiffs cannot identify a single male Candidate who received more favorable treatment with respect to the physical tests. *See Peele v. Country Mut. Ins.*, 288 F.3d 319, 331 (7th Cir. 2002) (where the co-worker identified by the plaintiff, while similarly situated, was not treated in a more favorable manner, a court "need not address any of the underlying allegations of disparate treatment."). For this additional reason, Plaintiffs cannot make out a *prima facie* showing of intentional discrimination, and the City is entitled to summary judgment.

### 2. Similarly Situated Male Candidates Were Not Treated More Favorably With Respect to the Academic Testing

Even though CFD terminated three Plaintiffs due to academics, Plaintiffs' Amended Complaint contains no allegations of disparate treatment with respect to the academic portion of the Academy. Therefore, there is no need to continue the *McDonell Douglas* intentional discrimination analysis as if it were a substantive discrimination claim.

Yet, Plaintiffs cannot establish this element of the *prima facie* case even if they had brought a discrimination claim based on their academic failure (which they did not). As part of their pretext argument, we suspect Plaintiffs may attempt to show wholesale fraud in the scoring of the academic portion of the Academy. The unfounded nature of this theory will be addressed further in the pretext section. To be sure, isolated errors occurred when the instructors transferred the scores from the testing documents to the computer system, which is not unexpected, considering the instructors transferred up to 20 scores for each of the 219 Candidates. ¶¶217, 218; *e.g.* Exh. 119, Final Progress Reports, which show the numerous scores for each Candidate. The only individual who materially benefitted from errors in transferring the scores was Grant Guibourdanche ("Grant"), who is not similarly situated to Plaintiffs.

First, Grant was assigned to a different Alphabet class, likely with different instructors. Grant was assigned to the Charlie Class. ¶¶14, 112. None of the Plaintiffs were assigned to either Charlie (or Delta). ¶¶ 49, 59, 66, 73, 76, 79, 82, 85, 88, 91. Plaintiffs have not identified Grant's instructor so there is no evidence of any crossover with Plaintiffs. Had Plaintiffs been assigned to the Charlie class, the same instructor could have made errors in transferring Plaintiffs scores, too. ¶¶217, 218. Plaintiffs certainly do not have evidence that the instructor incorporated different scores knowingly or on purpose. They have, however, shown that the Commander of Training did not intentionally or knowingly treat Grant more favorably. The Commander of Training was one of the primary individuals who entered the grades into the computer system, and he testified that he was unaware and could not explain the mistakes made in transferring Grant's grades. ¶¶113, 131, 133. Yet, the Commander also suggested human error as a reason for the inconsistencies, and Plaintiffs cannot identify any evidence to the contrary. ¶218.

**C. The City terminated Plaintiffs' employment for valid, non-discriminatory reasons, and Plaintiffs cannot demonstrate that their termination was pretextual.**

As Plaintiffs cannot satisfy their initial burden to show a *prima facie* case of intentional discrimination, the Court need not reach the second and third steps in the *McDonnell Douglas* test. *See Peele*, 288 F.3d at 327. But, even if they could, the City is still entitled to summary judgment for two reasons: (1) the City terminated Plaintiffs' employment for valid, non-discriminatory reasons; and (2) Plaintiffs' terminations were not pretext for intentional gender discrimination.

Plaintiffs have not, and cannot, provide any evidence that their terminations were pretext for intentional gender discrimination. For Title VII purposes, pretext is not established even if an employer's reasons for the adverse employment decision were mistaken, ill considered, or foolish, so long as an employer honestly believed those reasons. *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). In order to meet their burden at summary judgment, Plaintiffs must "show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent." *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010) (citation omitted). But the Court does not "sit as a super personnel department that reexamines an [employer's] business decision and reviews the propriety of the decision." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). As we now show, Plaintiffs do not meet this high burden.

**1. The Physical Tests**

As previously set out, CFD terminated five Plaintiffs' probationary employment as Candidates because they could not pass the physical tests, despite being given additional paid leave to train and pass them. Even if Plaintiffs could show that CFD's decision to maintain the physical testing requirement was "mistaken, ill considered, or foolish," this is still insufficient. *Id.* Plaintiffs have failed to offer any evidence that discriminatory intent motivated their terminations.

Plaintiffs, like all other applicants, took the same facially neutral skills and fitness tests required by the Manual. They cannot show that CFD feigned interest in a Candidate's ability to carry a heavy

individual with a partner up or down a stairway, and instead used the Lift and Move test for the exclusive purpose of eliminating women (regardless of their capability). Nor can they demonstrate that the City truly was disinterested in a paramedic's conditioning before entering the field.

Accordingly, CFD terminated Plaintiffs' employment for valid, non-discriminatory reasons, *i.e.*, their failure to meet the graduation requirements for physical testing as identified in the Manual. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 51-52 (2003) (under "the disparate-treatment framework . . . a neutral . . . policy is, by definition, a legitimate, nondiscriminatory reason."); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 396 (7th Cir. 2010) (finding the defendant provided a legitimate reason for adverse employment action against the plaintiff, namely his failure of a test that he was required to pass under the pertinent collective bargaining agreement).

Even assuming, *arguendo,* that Plaintiffs conceivably could show that the Physical Tests created a disparate impact - which the City denies and which the evidence does not establish - this does not support an inference of intentional discrimination. *See Chi. Teachers Union v. Bd. of Educ.*, 14 F.4th 650, 657-58 (7th Cir. 2021) (affirming dismissal of disparate treatment claim at summary judgment, even when the plaintiffs presented evidence that layoffs impacted black teachers in a "statistically significant way," because this evidence did not "reasonably lead to the inference that the [defendant] intentionally discriminated."). The use of the physical tests, standing alone, does not aid Plaintiffs' cause.

### 2. The Academic Tests

The City terminated three Plaintiffs because they failed the academic requirements for graduation. There is no evidence that the CFD caused Plaintiffs Velasco, Burroughs and Markey to fail academically or used their academic failures to cover up an improper motive. Taken to its logical conclusion, it assumes CFD created the academic program in part as a "smokescreen" so the amount of women terminated due to the physical testing would appear less significant.

On the one hand, Plaintiffs appear to argue that the academic program is a sham, yet they also stipulate that the courses cover the material that paramedics encounter in their jobs. ¶27. And if the City wanted to create a "smokescreen", this conspiracy would only cover three women, at the expense of two men. ¶32. In addition to terminating the three Plaintiffs, the City fired two men (Michael Klita and Jose Toledo) for failing the academic requirements. *Id.* All five were terminated for that same reason. In fact, Michael Klita and Plaintiff Markey had the exact same final grade, 77.6%, and Jose Toledo's score, 78.8%, was higher than any of the female Candidates who were terminated. *Id.*; ¶¶67, 60, 50. Gender had nothing to do with their terminations, and no reasonable jury could find it did.

Moreover, all forty-eight women in the Alphabet Classes besides Velasco, Burroughs, and Markey passed. ¶31, 50, 60, 67. No individual has personal knowledge that the academic testing was administered to women unfairly as compared to men. Plaintiff Velasco failed the academic portion of the Academy with a final academic average of 69.4%. ¶50. Velasco wrote and signed numerous Form 2s addressing the coursework she failed. ¶¶53, 55. As stated in her Training File, Velasco failed two out of the three Practical Skills assessments. ¶56. In response to her failing grades, Velasco's Training Instructor submitted multiple letters to the Director of Training, explaining that he had met with Velasco about her grades and had directed Velasco to "formulate a plan of action," including joining a study group, making flash cards and rewriting notes. ¶220.

Burroughs failed the academic portion of the Academy with a final academic average of 75.8%. ¶60. She failed multiple assignments, including two tests on General Orders. ¶64. As required, she submitted a number of Form 2s to the Academy, including one where she attributed her failing grades to lack of preparation. ¶*Id.*

Markey failed the academic portion of the Academy with a final academic average of 77.6%. ¶67. She failed a number of academic tests, including multiple "Streets" tests, one with a score of 50%. ¶¶69-71. In her Form 2, she notified the Academy that she failed one of the tests because she

was "unfamiliar with most of the trains in the City." ¶69. Markey also failed a General Orders exam as well as the Cardiac Strip Final Exam, where she misidentified four out of the ten heart monitor readings. ¶¶70, 71. During the Academy, Markey received a notice of academic probation, which she signed. ¶221. The notice explained her "academic performance does not meet the standard of this program" and "failure to meet the standard will result in the recommendation of termination." *Id.*

Plaintiffs challenge only the physical tests as being discriminatory – not the academic tests. See Am. Compl., Dkt. 259. By failing to challenge the academics, Plaintiffs cannot now claim the scoring is invalid. The Court in *Gilty v. Village of Oak Park*, 919 F.2d 1247 (7th Cir. 1990), was faced with similar circumstances. In *Gilty*, the plaintiff challenged one part of the performance evaluation as discriminatory, but did not raise concerns as other distinct sections of the evaluation. *Id.* In its evaluation, the Seventh Circuit explained:

> The problem, though, is that Gilty has challenged only the performance evaluation. By not challenging the written examination and the oral interview components, he has admitted that 70% of the promotional process is valid. Furthermore, the officer ranked second on the promotional list had a total score of 90.304/100, whereas Gilty had a total score of only 82.267/100. Thus, Gilty must be able to explain a shift of at least 8.038 points, all of which have to come from the performance evaluation. As in any tort case, statutory or otherwise, a plaintiff cannot win a discrimination case if the harm to him would have been the same whether or not the defendant had discriminated. (citations omitted).

Plaintiffs admit the content of the academic program is legitimate and covers discrete content paramedics face in the field. ¶¶17, 27. Without question, CFD has the authority to discharge Candidates who fail these assessments. Plaintiffs cannot demonstrate they passed the requirements, and have no evidence they failed because of intentional discrimination directed toward women.

## III. Summary judgment should be granted in the City's favor to the extent Plaintiffs attempt to assert "pattern-or-practice" under Title VII.

The City is entitled to summary judgment on Count I to the extent Plaintiffs, a group of 11 individuals, attempt to assert "pattern-or-practice" claims under Title VII. As a matter of law, pattern-or-practice suits are only available to the government and class-action plaintiffs. The Court is

constrained by Plaintiffs' Complaint, which asserts only individual claims. As a result, Plaintiffs cannot use the pattern and practice proof paradigm because "by their very nature," pattern and practice suits involve claims of class wide discrimination, and Plaintiffs "have stated only their individual claims, not a class action." *Babrocky v. Jewel Food Co.*, 773 F.2d 857, FN 2 (7th Cir. 1985).

Under Title VII, the U.S. Attorney General is authorized to file civil actions where there is "reasonable cause to believe that any person or group of persons is engaged in a *pattern or practice* of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described[.]" 42 U.S.C. § 2000e-6(a) (emphasis added). While Title VII vests the government with authority to bring pattern-or-practice suits, courts restrict private litigants from using the method of proving intentional discrimination announced in *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977), unless the lawsuit is brought as a class action. *See Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 876 n. 9 (1984).

The focus is different in an individual Title VII claim, where the relevant inquiry is the discriminatory intent of the decision-maker. The *Teamsters* approach, on the other hand, evaluates the "pattern and practice" evidence as a whole under a unique two-step burden shifting approach announced in that U.S. Supreme Court case.

Unlike government or class-action lawsuits, however, courts nationwide have uniformly held that private litigants *may not* use the two-step *Teamsters* burden-shifting approach.[11] The Seventh Circuit

---

[11] *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 149-50 (2d Cir. 2012); *Williams v. Giant Food Inc.*, 370 F.3d 423, 429-30 (4th Cir. 2004); *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355-56 (5th Cir. 2001), *abrogated on other grounds*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Bacon v. Honda of Am. Mfg.*, 370 F.3d 565, 575 (6th Cir. 2004); *Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 469-70 (8th Cir. 1984); *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 633 (10th Cir. 2012); *Semsroth v. City of Wichita*, 304 F. App'x 707, 716-17 (10th Cir. 2008); *Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 967 n.24, 969 n.30 (11th Cir. 2008); *see also Schuler v. PricewaterhouseCoopers, LLP*, 739 F. Supp. 2d 1, 6 n.2 (D.D.C. 2010) (collecting cases, and noting "[c]ourts in every other Circuit that has touched on this issue have indicated that an individual plaintiff cannot maintain a pattern and practice claim.").

has taken the same position. For example, in *Gilty*, when evaluating the permitted use of pattern and practice evidence, the court focused on whether the plaintiff filed the matter as an individual claim as opposed to a class action. 919 F.2d at 1252. Given the individual nature of the claim, the court concluded that the plaintiff's pattern and practice evidence "can only be collateral to evidence of specific discrimination against the actual plaintiff." *Id.* (internal citations and quotation omitted). The *Gilty* court also noted "'[p]attern-and-practice suits, by their very nature, involve claims of classwide discrimination.'" *Id.* (quoting B. Schlei & P. Grossman, Employment Discrimination Law 1322 & n. 95 (2d ed. 1983)).  In other words, without more, pattern and practice evidence is an insufficient substitute for individualized evidence, and the *Teamsters* approach cannot be used in individual cases.

Furthermore, courts within this District have consistently held that individual, non-class plaintiffs cannot maintain pattern-or-practice claims under Title VII. *See Doe 1 v. City of Chicago*, No. 18 C 0354, 2020 WL 1166222, at *3-4 (N.D. Ill. Mar. 11, 2020) ("the Court concludes that [individual] plaintiffs may not use the 'pattern or practice' method of proof as an independent method of establishing liability. 'Pattern or practice' allegations do not constitute a discrete claim; rather, they amount to a method of proving discrimination."); *Slaughter v. Winston & Strawn LLP*, No. 15 C 5851, 2015 WL 7077331, at *2 (N.D. Ill. Nov. 13, 2015) ("[T]o the extent that [the individual plaintiff] argues that she can pursue a pattern or practice claim, she has not shown that she has any private right of action to bring such a claim."); *King v. City of Chicago*, No. 02 C 2608, 2002 WL 31101273, at *2 (N.D. Ill. Sept. 19, 2002) ("First, the City is correct that only the EEOC, and not an individual, can bring a pattern and practice claim. [Citation]. Instead of a pattern and practice claim, an individual can bring a class action suit alleging the same types of violations.").

Throughout their Complaint, Plaintiffs repeatedly refer to the City and CFD's so-called patterns, policies, practices, and customs of discrimination. (*See* Dkt. 259, Am. Compl. ¶¶ 2, 6, 52.) However, it is undisputed that Plaintiffs are a group of 11 individuals. The government is not a party

31

to this action, and there are no class-wide claims at issue. Therefore, as a matter of law, the Plaintiffs cannot use the *Teamsters* burden-shifting framework to prove their claims.

**IV.     The Court should grant summary judgment on Count III because Plaintiffs have not provided evidence of intentional discrimination in violation of the Equal Protection Clause or 42 U.S.C. § 1983.**

The City is entitled to summary judgment on Count III, because Plaintiffs have not and cannot point to record evidence in support of their Section 1983 Equal Protection claim.[12] In accordance with *Monell v. Department of Social Services*, 436 U.S. 658 (1978), "[a] village or other municipality may be found liable under § 1983 when it violates constitutional rights via an official policy or custom." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010). To show the existence of "an official policy or custom, a plaintiff must show that [her] constitutional injury was caused 'by (1) the enforcement of an express policy of the [municipal entity], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority.'" *Id.* (quoting *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001)). A plaintiff must show the municipality's action was deliberate, and she must show a direct causal link between the action and the deprivation of her rights. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 397 (1997). "Absent proof that the injury in question was caused by an employee with final policymaking authority or by an express policy or established custom of the municipality, there can be no liability on the part of the municipality itself." *Palka v. City of Chicago*, 662 F.3d 428, 434 (7th Cir. 2011). Plaintiffs offer no

---

[12] Plaintiffs' *Monell* claims may not rely upon an alleged violation of Title VII but must instead show a violation of a constitutionally protected right. "Section 1983 provides a remedy for deprivation of constitutional rights. It supplies no remedy for violations of rights created by Title VII." *Trautvetter v. Quick*, 916 F.2d 1140, 1149 n.4 (7th Cir. 1990) (quotation omitted); *Gray v. Lacke*, 885 F.2d 339, 414 (7th Cir. 1989) (same); *see also Jibson v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 19 C 6773, 2020 WL 5365975, at *3 (N.D. Ill. Sept. 8, 2020) (same).

evidence in support of an equal protection violation under any of *Monell's* three prongs, and summary judgment should be granted in the City's favor.

**A. Plaintiffs cannot demonstrate an underlying constitutional violation to support their *Monell* claim.**

The Equal Protection Clause of the Fourteenth Amendment "prohibits intentional [invidious] discrimination based on membership in a particular class, including acts of employment discrimination." *Trigg v. Fort Wayne Comm. Schs.*, 766 F.2d 299, 300 (7th Cir. 1985) (citing *Davis v. Passman*, 442 U.S. 228, 234-35 (1979)); *see Bohen v. City of E. Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986) ("The core of any equal protection case is, of course, a showing of intentional discrimination."). To prevail on an equal protection claim, a plaintiff must establish not only that the defendant's actions had a "discriminatory effect," but also that the defendant was "motivated by a discriminatory purpose." *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017); *see Bloomenthal v. Lavelle*, 614 F.2d 1139, 1141 (7th Cir. 1980). Gender discrimination claims arising under the Equal Protection Clause and Section 1983 generally are evaluated under substantially the same framework as Title VII claims. *See Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 835 (7th Cir. 2015). To state a *Monell* claim for an equal protection violation, therefore, a plaintiff must demonstrate that the defendant "maintained a policy, custom, or practice of intentional discrimination against a class of persons to which [the plaintiff] belong[s]." *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

As previously discussed in connection with Plaintiffs' Title VII disparate treatment claims, (*see* §I, *supra*), Plaintiffs cannot demonstrate that CFD intentionally discriminated against them. As Plaintiffs' equal protection and disparate treatment claims are assessed under the same general framework, they offer no direct evidence or sufficient circumstantial evidence to make out a constitutional violation here. Without an underlying constitutional violation, Plaintiffs' *Monell* claims fail as well. *See, e.g, First Midwest Bank Guar. of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th

Cir. 2021); *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015); *Petty v. City of Chicago*, 754 F.3d 416, 424-25 (7th Cir. 2014). The City is entitled to summary judgment for this reason alone.

**B. The City and CFD policies expressly prohibit gender discrimination.**

The City and CFD do not have ordinances or express policies that authorize gender discrimination. To the contrary, the City's ordinances and policies, as well as the CFD General Orders forbid such conduct. First, discrimination is prohibited by City ordinance, which states "[n]o person shall directly or indirectly discriminate against any individual in hiring, classification, grading, discharge, discipline, compensation, or other term or condition of employment because of the individual's race, color, sex . . ." Municipal Code of Chicago, 6-10-030.

As to policies, the City's Diversity and Equal Employment Opportunity Policy (the "EEO Policy"), states that the City "is an Equal Employment Opportunity employer ... committed to providing equal opportunity in its recruitment, hiring, promotions, and transfers, and in all other practices and decisions," in accordance with all applicable laws and ordinances prohibiting discrimination. ¶11. Further, the EEO Officer is responsible for conducting training to ensure that all employees are aware of the Equal Employment Opportunity Policy, and to ensure that all Department Heads, Departmental Liaisons and Supervisors understand their role in implementing the policy and promoting a fair and inclusive workplace. ¶12.

On the Department level, CFD incorporates the City's anti-discrimination policies and principles in its own General Orders, which prohibit discrimination, harassment, and retaliation on the basis of sex and other protected classes. ¶10. The CFD Anti-Discrimination General Order, for example, applies to all CFD employees and states that an employee may make complaints of discrimination and/or harassment through any of a number of channels including CFD's Equal Employment Opportunity Liaison, CFD supervisors, the City's Department of Human Resources,

and through union grievances. *Id.* Given these well-defined policies, Plaintiffs cannot demonstrate an express policy of intentional discrimination.

### C. CFD does not maintain *de facto* policies of gender discrimination.

Plaintiffs' evidence also fails to show that the City has a *de facto* policy of discrimination against women. To demonstrate that their injuries were caused by a widespread practice or custom of sexual harassment and discrimination, Plaintiffs must show there was "some knowledge or awareness— actual or imputed—of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation." *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986); *see Brown*, 520 U.S. at 406–07 (a plaintiff challenging municipal action that is not "itself" violative of federal law must show that the action was taken with "deliberate indifference"); *Lapre v. City of Chicago*, 911 F.3d 424, 430, 434 (7th Cir. 2018) (same). The Seventh Circuit has refused to "adopt any bright line rules defining a 'widespread custom or practice.'" *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). "There is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability except that it must be more than one instance, or even three." *Id.* (quotation and citation omitted). But "a showing of isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature." *Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003).

In an attempt to show a *de facto* policy of sex discrimination, Plaintiffs point to the same examples cited in support of their disparate treatment claims. However, as previously discussed, these incidents are not indicative of intentional discrimination, (*see* § I, *supra*), and do not support municipal liability under Section 1983. *See McCauley*, 671 F.3d at 616 (*Monell* liability for alleged violation of the Equal Protection Clause requires demonstrating that a municipality maintained an official custom or policy of *intentional discrimination*). Even if these examples could support an intentional discrimination

claim under Title VII, which they cannot, these "isolated incidents" are still insufficient to establish municipal liability under *Monell. See Palmer*, 327 F.3d at 597.

Relying on *Godfrey*, *Vasich*, and *Ernst*, Plaintiffs allege that the City and CFD "have known for years . . . that CFD's physical testing unlawfully excludes women." (*See* Dkt. 259, Am. Compl. ¶ 64.) However, none of these cases put the City on notice of intentional discrimination and cannot support *Monell* liability here. As for *Godfrey* and *Vasich*, these cases ultimately were resolved through settlement, and without any admission of liability. *See Godfrey v. City of Chicago*, No. 1:12-CV-08601 (N.D. Ill.), Dkts. 197-98 (case resolved through mutual settlement); *Vasich v. City of Chicago*, No. 1:11-CV-04843 (N.D. Ill.), Dkts. 148, 176 (same). Therefore, they cannot support a widespread municipal practice of sex discrimination. *See Thomas v. City of Markham*, No. 16 CV 08107, 2017 WL 4340182, at *5 (N.D. Ill. Sept. 29, 2017) ("Similarly, here, two prior excessive force lawsuits fail to plausibly show that [the defendant] had the widespread and well-settled policies that Plaintiff claims."); *Rikas v. Babusch*, No. 13 cv 2069, 2014 WL 960788, at *3 (N.D. Ill. Mar. 12, 2014) (where lawsuits were settled without admission of liability, "the fact that prior lawsuits were filed against [the defendant] does not support [the plaintiff's] *Monell* claim nor does it evidence a widespread municipal practice."); *see also Hernandez v. Nielson*, 2002 WL 31804788, at *1 (N.D. Ill. Dec.13, 2002).

Further, when Plaintiffs were terminated for failing the physical tests, the jury in *Ernst* found that the City did not intentionally discriminate against female paramedics through the use of its pre-employment physical testing. ¶195. The City could not have been put on notice merely because one of its practices was challenged by allegations in a lawsuit, upheld by a jury, and only reversed on appeal years *after* Plaintiffs were terminated. *Id.* Moreover, there was never a finding that CFD intentionally discriminated against women, and while the Seventh Circuit determined there was disparate impact, that does not equate to disparate treatment. Thus, *Ernst* is also irrelevant to Plaintiffs' *Monell* claims in this case.

**D. Final policymakers did not intentionally discriminate against Plaintiffs.**

Finally, Plaintiffs cannot show that those with final policymaking authority intentionally discriminated against them. As alleged, Plaintiffs contend that "CFD commissioners, the CFD directors of training, and CFD personnel directors"—adopted, implemented, and ratified the decision to use the physical tests, despite being purportedly put on notice that these tests were "discriminatory and unlawful." (*See* Dkt. 259, Am. Compl. ¶¶ 63-64.) The law, on the other hand, establishes that the individuals listed by Plaintiffs do not have final policymaking authority for the purposes of *Monell* liability.

Determining whether a person has "policymaking authority is a question of state law and is to be decided by the court." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (citation omitted). In order to have final policymaking authority, "an official must possess '[r]esponsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'" *Rasche v. Vill. of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) (quoting *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992)).

According to the Municipal Code of the City of Chicago, the Chicago City Council has expressly delegated authority to the Commissioner of Human Resources to promulgate personnel rules, including disciplinary matters such as discharge. M.C.C. § 2-74-050; *See Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009) (City Council and Commissioner of Human Resources are the final policy makers for the City in the area of employment); *Hankle-Sample v. City of Chicago*, No. 20 cv 1997, 2021 WL 4461557 at *13 (N.D. Ill. Sept. 29, 2021) ("None of the individual agents named in the First Amended Complaint are final policymakers because none is the Commissioner of Human Resources nor are they members of the City Council"); *Paterakos v. City of Chicago*, No. 21 cv 52, 2021 WL 4635783, at *4 (N.D. Ill. Oct. 7, 2021) (Chicago City Council and the City's Commissioner of Human Resources are the final policymakers for employment decisions). On the specific issue of employment testing,

37

the City's Personnel Rules provide that "examinations *shall be prepared and conducted under the direction of the Commissioner of Human Resources*." Rule VI, Examinations.(emphasis added).[13]

The record contains no evidence the City's Commissioner of Human Resources played any role in the decision to terminate Plaintiffs. Nor is there evidence that as of 2014 and through 2015, the City Council or the Commissioner of Human Resources delegated final policy-making authority in the area of employee terminations or employee examinations to the CFD personnel identified on this motion. The lack of any such evidence warrants that summary judgment be entered in favor of the City. *See Vela v. Vill. of Sauk Vill.*, 218 F.3d 661, 665-66 (7th Cir. 2000) (addressing plaintiff's failure to demonstrate "that Illinois law grants final policy making authority to either of these officers nor any delegation of such authority").

The fact that certain CFD personnel had "authority to make administratively final decisions" does not transform them into a final policymaker for purposes of *Monell* liability. *Harris v. City of Chicago*, 665 F. Supp. 2d 935 (N.D. Ill. 2009), *citing Radic v. Chicago Transit Authority*, 73 F.3d 159, 161 (7th Cir. 1996)*; Kujawski v. Board of Comm'rs*, 183 F.3d 734, 740 (1999) (noting the "well-established principle that the mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority").

**V.    Summary Judgment should be granted to the City on the Disparate Impact claims against Velasco, Burroughs, and Markey because they do not have standing to bring such claims.**

Last, in Count II of Plaintiffs' Amended Complaint, ten of the eleven Plaintiffs assert a Title VII gender discrimination based on a disparate impact theory.  (Am. Compl., ECF No. 259, ¶56, 57). They assert they can prevail because they were terminated for failing to complete certain physical tests,

---

[13]https://www.chicago.gov/content/dam/city/depts/dhr/supp_info/HRpolicies/2014_PERSONNEL_RULES-FINAL_2014_v3.pdf   City of Chicago 2014 Personnel Rules

which they further assert created an adverse impact on women and lacked business necessity or job relatedness. Yet, three of the Plaintiffs who bring disparate impact claims were terminated for academic reasons. As such, they never would have graduated from the Academy regardless of the physical testing.

"In order to have standing to bring a disparate impact claim, a plaintiff must show she was personally injured by the defendant's alleged discriminatory practice." *Farrell v. Butler Univ.*, 421 F.3d 609 (7th Cir. 2005); *Godfrey v. City of Chicago*, 973 F.Supp.2d 883, 893-4 (N.D.Ill. Sept. 25, 3013). Even if disparate impact liability could be established (which the City highly contests and the evidence negates) as to the Step Test and Lift and Move sequence, the Academic Plaintiffs lack standing because they did not sustain a cognizable legal injury. In order for an individual plaintiff to have constitutional standing to bring a Title VII action, she must show that she was personally injured by the defendant's alleged discrimination and that his injury will likely be redressed by the requested relief. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992); *Allen v. Wright,* 468 U.S. 737, 751 (1984); *see also Carpenter v. Board of Regents of Univ. of Wis. Sys.,* 728 F.2d 911, 915 (7th Cir. 1984) (holding that plaintiff in disparate impact case must show injury resulted from policy alleged to have disparate impact). See also, *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1255 (7th Cir. 1990) (a plaintiff must show on a Title VII disparate impact claim that the discriminatory screening device was the cause of her termination).

Additionally, the Seventh Circuit relies on the principles of standing in requiring an individual bringing a disparate impact Title VII to establish the individual was qualified for the position sought. *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661 (7th Cir. 1996); *See also Gilty v. Village of Oak Park,* 919 F.2d 1247, 1255 (7th Cir. 1990) (reasoning that plaintiff "must establish that his individual circumstances entitle him to . . . relief."). "Absent direct evidence showing that a plaintiff was not hired or promoted

because of a discriminatory employment practice, we assume that an unqualified plaintiff was not hired or promoted for the obvious reason-- that he was unqualified." *Melendez*, 79 F.3d 661.

Plaintiffs concede they were required to meet the academic requirements, or risk termination. ¶ 41. They stipulate that they needed to score an 80% final academic average to meet those requirements. *Id.* They did not meet the 80% threshold and were discharged accordingly. ¶¶50, 60, 67. As such, Plaintiffs Velasco, Burroughs and Markey do not have standing to bring a disparate impact claim and, as such, summary judgment should be granted in Defendant's favor.

<u>**CONCLUSION**</u>

Based on the foregoing, the City respectfully requests that the Court grant this motion, dismiss Plaintiffs' Title VII disparate treatment claims; their §1983 Equal Protection *Monell* claims; the claims pursuant to the Illinois Civil Rights Act; as well as the Title VII disparate impact claims brought by Plaintiffs Burroughs, Velasco and Markey; and grant such other and further relief that this Court deems just, equitable, and necessary.

Respectfully submitted,

Corporation Counsel of the
**CITY OF CHICAGO**

/s/ V. Brette Bensinger
Special Assistant Corporation Counsel

Robert S. Shannon
Tom H. Luetkemeyer
V. Brette Bensinger
Amanda Tzivas
Hinshaw & Culbertson LLP
151 N. Franklin, Suite 2500
Chicago, IL 60606
312-704-3000