**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JENNIFER LIVINGSTON, et al.

                Plaintiffs,

vs.

CITY OF CHICAGO, a municipal corporation

                Defendant.

Case No. 16-C-10156

Judge Sara L. Ellis

Mag. Judge Young B. Kim

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON INTENTIONAL DISCRIMINATION CLAIMS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

FACTS ................................................................................................................................ 2

    I.   The Step Test is Absurd and Rigged Against Women ............................................. 2

    II.  The Lifting Sequence is Absurd and Rigged Against Women. ............................... 3

    III. Physical Testing and Terminations: CFD Only Fired Paramedics for Failing Physical Tests in 2014 and 2015, and It Only Fired Women for Failing the Tests ............................ 5

    IV. CFD Knew That These Were Bad, Sexist, Unvalidated Tests, and yet Chose to Use Them for the Purpose of Firing Women. ......................................................................... 7

    V.  CFD Chose to Fire Women Just as it Was Forced To Abandon Prior Discriminatory Tests and a "Historic" Wave of Women Entered the Department. ................................. 9

    VI. In Attempts to Mask Sex Discrimination, the CFD Employed Other Tactics to Terminate Qualified Women. These Tactics Constituted Pretexts for Sex Discrimination and Contributed to the Hostile Environment in the Academy. ................................. 10

    VII. CFD Manipulated Grades to Fire Women and Pass Men. Grade Manipulation was Both a Direct Form of Sex Discrimination and a Tactic Used to Mask Sex Discrimination Perpetrated Through Use of the Physical Tests ................................................................ 12

        A.   CFD Fired Velasco Because of her Sex and Because She Failed the Step Test and Lifting Sequence—Because of her Sex Again—Not for "Grades." ........................ 13

        B.   CFD Fired Burroughs Because of her Sex and Because She Failed the Step Test and Lifting Sequence—Because of her Sex Again—Not for "Grades." And the CFD Inflated the Grades of Men to Pass Them ............................................................. 15

        C.   CFD Fired Markey Because of her Sex and Because She Failed the Tests—Because of her Sex Again—Not for "Grades" in the Echo class. ......................................... 17

    VIII. Committed to Discrimination, the CFD Continued to Terminate Women in the 2015 Echo and Foxtrot Classes. ......................................................................... 17

**ARGUMENT** ...................................................................................................... **18**

I.  CFD Leadership Intentionally Chose to Make CFD's "DIY," Never-Validated Physical Tests Much Harder and Then Use Those Rigged Tests to Terminate Female Paramedics in 2014 and 2015 ................................................................................................... 20

    A.  CFD used biased tests to fire qualified women despite warnings that the tests were discriminatory and the City would be sued for discrimination ............................... 21

    B.  The tests are significantly biased against women and CFD used them to terminate paramedics knowing that it was only firing women. ............................................... 23

    C.  The physical tests are baseless and unrealistic, yet CFD rejected more fair, less discriminatory alternatives developed by its own employees .................................. 26

    D.  CFD not "coincidentally" changed these tests and used them to fire women at the very time a historic number of women entered the academy .................................. 28

    E.  The jury can recognize a pattern: the CFD used discriminatory physical tests to keep women out of uniformed positions over and over again including in 2014 and 2015 ....................................................................................................................... 32

    F.  CFD harassed and terminated women throughout 2014 and 2015. ......................... 33

II.  None of the City Arguments Preclude a Jury from Finding Discrimination. ................... 35

III.  CFD Fired Griffin and Youngren Because They were Women Who Failed the Discriminatory Physical Tests ......................................................................................... 38

IV.  CFD Fired Venegas Because of her Sex. The Alleged "Physical Assessment" Occurred After Abdellatif Removed her from Training Because of her Sex. And the "Physical Assessment" was a Pretext Used to Fire Venegas Because of her Sex ............................ 40

V.  CFD Fired Three Candidates for "Grades" Because They were Women, while Manipulating "Grade" Requirements to Let Men Pass and Work for CFD .................... 42

    A.  The City's Preferential Treatment of Men With Failing Academic Grades Is Strong Evidence Of Discrimination. .................................................................................... 43

    B.  A Jury Could Find Sex Discrimination Based on the City's Repeated Efforts to Manipulate Grades and Ignore the Candidate Manual. ........................................... 47

    C.  The City's Intentional Use of Discriminatory Physical Tests to Screen Out Women is Evidence that the Academic Failures were Motivated by Sex. ............................ 49

    D.  McDonnell Douglas Prima Facie Case. .................................................................... 51

VI. Intentional Discrimination can be Proven by Policy and Practice Evidence in a Multi-Plaintiff Case.................................................................................................... 52

VII. The City is Not Entitled to Summary Judgment on Plaintiffs' *Monell* Claim................ 54

    A.    Sex Discrimination Violates the Equal Protection Clause....................................... 54

    B.    Plaintiffs' Equal Protection Rights were Violated Via Official Policy or Custom... 54

**CONCLUSION** .......................................................................................................... **59**

# TABLE OF AUTHORITIES

Cases                                                                                                    Pages(s)

*Adams v. Ameritech Services, Inc.*,
   231 F.3d 414 (7th Cir. 2000) ...................................................................... 23, 24, 53

*Baines v. Walgreen Co.*,
   863 F.3d 656 (7th Cir. 2017) ................................................................................ 47

*Barner v. City of Harvey*,
   No. 95 C 3316, 1998 WL 664951 (N.D. Ill. Sept. 18, 1998) .................................. 24

*Bresnahan v. City of Chicago*,
   No. 18 C 1880, 2018 WL 4829597 (N.D. Ill. Oct. 4, 2018)..................................... 54

*Chicago Teachers Union, Local 1, Am. Fed'n of Teachers, AFL-CIO v.*
   *Bd. of Educ. of City of Chicago*,
   No. 12 C 10311, 2021 WL 1020991 (N.D. Ill. Mar. 17, 2021) .............................. 18, 23, 25, 36

*Coleman v. Donahoe*,
   667 F.3d 835 (7th Cir. 2012) ........................................................................... passim

*Davis v. Time Warner Cable of Se. Wis., L.P.*,
   651 F.3d 664 (7th Cir. 2011) ................................................................................ 30

*Downing v. Abbott Labs.*,
   No. 15 C 05921, 2019 WL 4213229 (N.D. Ill. Sept. 5, 2019) ................................ 47

*E.E.O.C. v. Chicago Miniature Lamp Works*,
   947 F.2d 292 (7th Cir. 1991) ................................................................................ 23

*E.E.O.C. v. Green JobWorks, LLC*,
   No. RDB-21-1743, 2022 WL 1213478 (D. Md. Apr. 25, 2022) ............................. 53

*Ernst v. City of Chicago*,
   837 F.3d 788 (7th Cir. 2016) ........................................................................... passim

*Ernst v. City of Chicago*,
   No. 08 C 4370, 2014 WL 7685404 (N.D. Ill. Feb. 25, 2014) ........................... passim

*Gantchar v. United Airlines, Inc.*,
   No. 93 C 1457, 1995 WL 137053 (N.D. Ill. Mar. 28, 1995)................................... 53

*Glisson v. Indiana Dep't of Corr.*,
   849 F.3d 372 (7th Cir. 2017) ............................................................................ 54, 57

*Gordon v. United Airlines, Inc.*,
  246 F.3d 878 (7th Cir. 2001) ................................................................. 47

*Hankle-Sample v. City of Chicago*,
  No. 20 C 1997, 2021 WL 4461557 (N.D. Ill. Sept. 29, 2021) ................................. 58

*Harris v. City of Chicago*,
  665 F. Supp. 2d 935 (N.D. Ill. 2009) ........................................................ 56

*Huff v. UARCO, Inc.*,
  122 F.3d 374 (7th Cir. 1997) ................................................................ 49

*Joll v. Valparaiso Cmty. Sch.*,
  953 F.3d 923 (7th Cir. 2020) ................................................. 18, 19, 35, 42

*Killinger v. Johnson*,
  389 F.3d 765 (7th Cir. 2004) ................................................................ 56

*Kujawski v. Bd. of Comm'rs of Bartholomew Cnty., Ind.*,
  183 F.3d 734 (7th Cir. 1999) ................................................................ 56

*Lumpkin v. Brown*,
  960 F. Supp. 1339 (N.D. Ill. 1997) ........................................................... 25

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ..................................................................... 32, 34

*Ortiz v. Werner Enterprises, Inc.*,
  834 F.3d 760 (7th Cir. 2016) ......................................................... 19, 35, 36

*Paterakos v. City of Chicago*,
  No. 21 C 52, 2021 WL 4635783 (N.D. Ill. Oct. 7, 2021) ....................................... 58

*Pather-Brunton v. Illinois Nurses Association*,
  No. 13 C 3936, 2015 WL 13707821 (N.D. Ill. Dec. 11, 2015) ................................... 40

*Peele v. Burch*,
  722 F.3d 956 (7th Cir. 2013) ................................................................ 30

*Peele v. Country Mut. Ins. Co.*,
  288 F.3d 319 (7th Cir. 2002) ............................................................ 20, 51

*Pers. Adm'r of Massachusetts v. Feeney*,
  442 U.S. 256 (1979) ......................................................................... 25

*Rudin v. Lincoln Land Cmty. Coll.*,
  420 F.3d 712 (7th Cir. 2005) ............................................................ 42, 52

v

*Salas v. Wisconsin Dep't of Corr.,*
  493 F.3d 913 (7th Cir. 2007) ............................................................... 54

*Schuster v. Lucent Techs., Inc.,*
  327 F.3d 569 (7th Cir. 2003) ............................................................... 52

*U.S. ex rel. Hamrick v. GlaxoSmithKline LLC,*
  814 F.3d 10 (1st Cir. 2016) ................................................................. 52

*United States v. Bd. of Sch. Com'rs of City of Indianapolis, Ind.,*
  573 F.2d 400 (7th Cir. 1978) ............................................................... 28

*United States v. City of New York*,
  717 F.3d 72 (2d Cir. 2013) ........................................................ 19, 33, 35

*United States v. Hinds County School Board,*
  417 F.2d 852 (5th Cir. 1969) ............................................................... 24

*Vasich v. City of Chicago*,
  No. 11 C 04843, 2013 WL 80372 (N.D. Ill. Jan. 7, 2013) ................... 23, 26, 28, 32

*Vodak v. City of Chicago*,
  639 F.3d 738 (7th Cir. 2011) ....................................................... 55, 58, 59

*Walsh v. New York City Hous. Auth.*,
  828 F.3d 70 (2d Cir. 2016) ................................................................. 33

*Waters v. City of Chicago*,
  580 F.3d 575 (7th Cir. 2009) ............................................................... 57

Rules

Fed. R. Civ. Pro. 56 ............................................................................... 38

## INTRODUCTION

In 2014 and 2015, the Chicago Fire Department ("CFD") targeted women to keep them out of paramedic jobs. The City of Chicago ("City") fired the eleven Plaintiffs not because they lacked ability—they are all paramedics who had just passed the City's professionally validated pre-hire physical assessment (the "PPAT")—but rather because they are women. CFD used invalid and absurd physical testing, sex-based harassment, rigged academic grades, and bogus medical physical assessments to terminate women. CFD leadership from the Fire Commissioner down to the lead instructors assumed that men could do the job but women could not, unless they proved otherwise by passing discriminatory tests. The City fired Plaintiffs despite warnings that its tests were invalid and despite years of prior litigation that dismantled the discriminatory pre-hire physical tests used to keep women out of CFD for decades.

Before CFD fired the first woman using its discriminatory tests, CFD employees and Plaintiffs' counsel warned that the tests were baseless and unlawful. SOF ¶¶140-141; DX 77. At the very highest levels, CFD knew the Step Test and Lifting Sequence were unvalidated and unrealistic and that the tests were failing women and only women. Yet in the face of glaring red flags, Commissioner Jose Santiago doubled down, firing women.

Once CFD committed to use the tests to fire women, it attempted to mask the tests' discriminatory effects by firing other women based on pretext. Academy supervisors blatantly rearranged and changed grades to pass men and fail women, in ways no City witness can defend or explain, and flagrantly ignored its own policies and procedures for running the academy, operating the medical division, and even terminating employees. Time and again, the outcome was the same: CFD fired qualified women—for failing the rigged tests, for "grades," for not lunging "low enough"—always because of their sex. In stark contrast, men were spared.

The constellation of circumstantial evidence in this case is overwhelming and more than sufficient to create a jury question about the reason CFD fired each of the eleven Plaintiffs. A jury could find that CFD intentionally used the tests, for the first time in history, for the purpose of firing women just as they entered the academy in "historic" numbers as a result of successful Title VII litigation. A jury could recognize intentional discrimination in CFD's decision to fire women purportedly for "grades" while sparing men with the same grades. And a jury could conclude that the CFD intentionally discriminated against women when it violated its own medical division policies, termination procedures, and academy policies to fire women.

At trial, the jury instruction will be whether Plaintiffs "prove by a preponderance of the evidence that Chicago 'intentionally created or used' the [physical] test[s] to 'exclude or reduce' the women hired as paramedics." *Ernst v. City of Chicago*, 837 F.3d 788, 792 (7th Cir. 2016); *id.* at 795 (directing this instruction be used on retrial to answer "the mandatory question: whether Chicago had an anti-female motivation for creating [or using] its skills test"). A jury could answer this question in the affirmative. The Court should deny in full the City's motion.

## FACTS

### I.    The Step Test is Absurd and Rigged Against Women.

The Step Test required a person to step up and down continuously on and off an 18" box holding a 25-pound dumbbell in each hand, for at least two minutes to a metronome at 112 beats per minute without missing cadence for two consecutive beats. SOF ¶42; PX 2 (Step Test video). The Step Test is far more difficult for women than men. SOF ¶¶147, 152. Sixty-seven percent (67%) of women did not pass in the first three attempts, which is ten times the rate of men (just 6.8% did not pass in the first three attempts). SOF ¶147 (Lundquist Expert Report at 24, Fig. 1).



Figure 1. Number of Attempts Needed to Pass the Step Test

The Step Test is harder for women in part because the 18" box is so unrealistically high. SOF ¶¶144, 152. Deputy Fire Commissioner Anthony Vasquez, the leader responsible for the Personnel Division, recognized in 2014 that it was "obvious" the test is harder for short people and that women are shorter on average. SOF ¶152. He thought the 18" box was too high and might be "extreme," and it troubled him. SOF ¶144.

In this lawsuit, **no** City employee has defended the Step Test as replicating any task or skill of a paramedic. It is "obvious" to any experienced paramedic, including CFD paramedics, that the Step Test does not replicate any paramedic job task. DX 81, Gallegos Dep. at 159-160, 184 (Step Test "more harmful than beneficial"); SOF ¶151. Patricia Wood, a commander of EMS training, thought the test was not "beneficial" and that the City has no legitimate need for it. SOF ¶161. Indeed, Commissioner Santiago personally told Donna Griffin that these academy tests were "not realistic" and would be changed. PX 3, Griffin Dep. at 279.

## II.  The Lifting Sequence is Absurd and Rigged Against Women.

The Lifting Sequence required a paramedic to ascend "three" flights of stairs carrying "a 250-pound mannequin" on a stair chair with a partner, then switch places and descend "three"

flights of stairs with the mannequin. SOF ¶¶43, 163. The stair chair was not allowed to touch any surface except the landing. *Id.* The paramedic was then required to complete two additional events all within eight (8:00) minutes, an arbitrary time limit. *Id*. The Lifting Sequence is much harder for women than for men. SOF ¶148. After three attempts women were still failing the Lifting Sequence at twenty times the rate of men (43.3% of women did not pass the test compared to just 1.8% of men). *Id.* (Lundquist Expert Report at 25, Fig. 2)



Figure 2. Number of Attempts Needed to Pass the Lifting & Moving Test

The Lifting Sequence was far more demanding than the CFD paramedic job. SOF ¶¶151, 165, 168; DX 81, Gallegos Dep. at 195-196; DX 61, Decl. of Dodero ¶¶12, 14-15. It was a physical gauntlet used to weed out women. SOF ¶¶136, 139, 148.

Although the candidate manual describes the test as carrying the loaded stair chair up and down "three" flights of stairs, the Lifting Sequence actually required paramedics to ascend five flights of stairs (60 steps). SOF ¶¶162-163. Instead of the "250-pound" simulated patient shaped and weighted like a real person, the City used half a simulated patient plus weights. SOF ¶164. Even then, the load often exceeded 250 pounds. DX 81, Gallegos Dep. at 188-190; DX 40, Velasco Dep. at 68-69; DX 42, Burroughs Dep. at 53.

CFD paramedics never carry a patient up three (3) flights of stairs, let alone five (5) flights. "We never go up three stories in our profession. One would be the max from a basement setting." DX 81, Gallegos Dep. at 195. "[I]n the 28 years that I've been doing this, I've never gone up more than one story." *Id.* at 196; DX 61, Decl. of Dodero at ¶¶2, 14 (has never carried a person up more than one flight of stairs alone with his partner in 17 years on the job). The City openly admits that the Lifting Sequence does not measure any minimum physical requirements of the job. SOF ¶151. The 8:00 minute time limit also does not measure any minimum required speed or skill. *Id.*[1]

The Step Test and Lifting Sequence were even dangerous to women. In 2014 and 2015, woman after woman was injured taking the Step Test or Lifting Sequence. SOF ¶145 (Krapil, Lazzara, Griffin, Livingston, Mazor, Snevely, and Maples); DX 6, Youngren Dep. at 232-233. These injuries ended the CFD paramedic careers of multiple women, including Lazzara and Youngren, who ruined their backs. DX 24, Lazarra Dep. at 54-55, 174; Youngren SOF [Dkt. 602-1] at ¶27; DX 6, Youngren Dep. 232-233; PX 26, Harmening Bresnahan Dep. at 96. In contrast, not a single man was injured by either test. SOF ¶146.

## III. Physical Testing and Terminations: CFD Only Fired Paramedics for Failing Physical Tests in 2014 and 2015, and It Only Fired Women for Failing the Tests.

CFD only used the Step Test and Lifting Sequence to fire women, and only in 2014 and 2015. SOF ¶¶139, 170-171. CFD makes much of the fact that some version of a step test and lifting test appears in prior candidate manuals. Memo. at 13-15. But those prior versions were not the same tests and, more to the point, CFD did not use them to fire anyone. SOF ¶¶42-43, 106, 160, 170. In 2008, candidates were not required to "pass" the physical performance sequence or lifting test described in the manual. DX 98, Chartrand Dep. at 30-33. Likewise, in 2009,

---

[1] These admissions will be dispositive on Plaintiffs' disparate impact claims. *Ernst*, 837 F.3d at 803 (to be lawful, physical test cutoff scores must be set at the "minimum acceptable level").

candidates did not actually need to pass any physical testing to complete the academy. DX 95, Canby Dep. at 18. The lifting test evolved from 2008 (when it included no stair chair and a 15:00 time limit, see DX 53 at CFD22989) to 2014 (including ascending flights of stairs with a loaded stair chair and 8:00 time limit, SOF ¶43), and previous versions of a step test used stairwells (2008, DX 53 at 27), and then later a 9" step (SOF ¶160), half the height of the 18" box.

Then, in the fall of 2013, just when a "historic" number of women entered the fire academy as a result of the *Vasich* Title VII litigation, CFD for the first time started to test an 18" box for the Step Test. SOF ¶¶149, 173. CFD officially implemented the 18" box during the March 2014 firefighter academy, which included 11 *Vasich* plaintiffs. *Id.* Instructor Darryl Johnson, who created the test, did not design the 18" Step Test to "asses" or fire anyone. SOF ¶150. He openly admits that the test has "nothing to do with" "job performance," and that "it didn't make any sense to him" to "flunk anyone." *Id*. And yet that is exactly what CFD brass did.

Once CFD doubled the box height to 18," women in the March 2014 fire class struggled to pass. DX 59, Bruno Decl. at ¶¶14-15. Though CFD did not dare to fire *Vasich* plaintiffs using its new-fangled test, Chief Vogt berated the women, publicly humiliated them, and complained that CFD had to "lower standards" because of them. *Id.* at ¶15. Chief Vogt was the Director of Training from 2013 through 2015, in charge of both the fire and paramedic academies. SOF ¶130. He oversaw the doubling of the box height to 18"; he personally humiliated the women using that box; and he later approved and oversaw its use in the paramedic academies to terminate women. SOF ¶149; DX 59, Bruno Decl. at ¶15; DX 52, Vogt Dep. at 143-144.

Before fall 2014, CFD had never fired any candidate for their performance on any version of a step or lifting test. SOF ¶170. In 2014 and 2015, CFD fired 11 women, the Plaintiffs,

who had not passed the Step Test.[2] CFD fired zero (0) men for failing the Step Test. SOF ¶139.

In 2014 and 2015, CFD fired eight women—and zero men—who failed the Lifting Sequence.[3]

CFD used the Step Test and Lifting Sequence to fire women even while allowing CFD

firefighters and paramedics to work for decades without any physical testing at all. SOF ¶172.

After 2015, CFD never fired another candidate (paramedic or firefighter) for failing any

version of a Step Test or Lifting Sequence. SOF ¶171. In fact, after 2015, CFD got rid of the Step

Test entirely and stopped using any version of the Lifting Sequence as a scored or timed test.

SOF ¶¶161, 169. Instead, candidates simply practice going up one (1) and down three (3) flights

of stairs with a partner carrying a 200-pound load. SOF ¶169.

### IV. CFD Knew That These were Bad, Sexist, Unvalidated Tests, and yet Chose to Use Them for the Purpose of Firing Women.

In 2014, top CFD leaders were intimately familiar with the requirements of Title VII and

the demands for lawful employment testing. SOF ¶154. Adrianne Bryant, the Deputy

Commissioner of Human Resources, had been aware of such tests discriminating against women

back to the 1990s and worked on validating more than 20 employment tests for the City. SOF

¶¶159, 190. Bryant was involved in the termination of each Plaintiff and spoke with Deputy

Commissioner Vasquez about his concerns about the tests. SOF ¶159. They knew employment

tests must be a valid measure of job qualifications and how to have them professionally

validated. SOF ¶154. Yet CFD used the baseless and unvalidated tests to fire women anyway.

---

[2] Livingston (SOF ¶75), Maples (SOF ¶87), Chavez (SOF ¶78), Griffin (SOF ¶90), Markey (SOF ¶72), Snevely (SOF ¶84), Lazzara (SOF ¶81), Youngren (SOF ¶93), Velasco (SOF ¶58), Burroughs (SOF ¶65), Venegas (DX 101, Venegas Dep. at 317).

[3] Maples (SOF ¶87), Chavez (SOF ¶78), Griffin (SOF ¶90), Markey (SOF ¶72), Snevely (SOF ¶84), Lazzara (SOF ¶81), Velasco (SOF ¶58), and Burroughs (SOF ¶65). Livingston and Youngren passed the Lifting Sequence, and Venegas did not attempt it. DX 101, Venegas Dep. at 317; SOF ¶¶75, 93.

Before CFD fired the first woman, in the fall of 2014, Vasquez specifically and repeatedly warned Commissioner Santiago about his concerns regarding the Step Test and Lifting Sequence. SOF ¶144. He was worried that the tests were too hard and "implemented internally without science" and that an invalid test could be challenged legally. *Id*. Vasquez was right. The Step Test and Lifting Sequence were "DIY" tests invented by instructors. SOF ¶157. The City never attempted to validate them before the 2014 academy classes. SOF ¶158. The tests are so bad that when the City later hired an IO psychologist, Dr. Nancy Tippins, to validate them she could not. SOF ¶¶109, 176, 175 ("we would have difficulty establishing that a step test was a simulation of a work task" … "the information that we collected is marginal"). The Step Test and Lifting Sequence served no legitimate purpose. SOF ¶176.

At the end of the Alpha class, before CFD fired the first woman, Santiago knew that only women, and no men, would be fired using the tests. SOF ¶¶138-140. On September 14, 2014, the night before the graduation ceremony, he even noted to himself the race and sex of the women being fired. SOF ¶140; DX 76, Sunday, 9/14/14, 7:52 p.m. Santiago email to himself (noting the gender/ race, e.g. "BF/WF," of failing candidates, five women and zero men; the names of the *Vasich*, *Godfrey*, and *Ernst* sex discrimination lawsuits; and the *Ernst* November 4 trial date). Further, this was no secret kept by Santiago. Chief Vogt and academy staff saw women struggling with the 18" Step Test throughout 2014. DX 59, Bruno Decl. at ¶15. And top brass knew only women were being fired. DX 76.

On September 15, 2014, before the Alpha women were fired, Plaintiffs' counsel contacted the City's in-house counsel, David Seery, and outside counsel in *Ernst*, *Vasich*, and *Godfrey* to warn that firing five (5) of the seven (7) Alpha class women using invalid tests was unlawful sex discrimination. SOF ¶141. The City marched forward with its terminations anyway. Rather than

ending use of the tests, CFD placed women on leave, forcing them to retake the tests over and over. This doubling down reflects CFD's stubborn refusal to end its discrimination, motivated by a sexist presumption that it would be "lowering standards." SOF ¶¶45, 139.

## V. CFD Chose to Fire Women Just as it was Forced to Abandon Prior Discriminatory Tests and a "Historic" Wave of Women Entered the Department.

Plaintiffs' terminations came on the heels of multiple lawsuits by women challenging discriminatory physical tests that kept them from working as CFD firefighters and paramedics. From 2000 to 2014, CFD used the discriminatory paramedic PAT—which failed 40% of female applicants and fewer than 2% of men—to keep women out. SOF ¶¶174, 189, 191. In *Ernst*, five women challenged the paramedic PAT as unlawful discrimination, and in the fall of 2014, they were on the verge of trial. SOF ¶¶192-195.[4] In 2014, in response to *Ernst*, CFD replaced the paramedic PAT with the new PPAT, which does not disproportionately fail women. SOF ¶174. In June 2014, CFD used the PPAT for the first time, and the first paramedics to pass the PPAT arrived in the academy for the August 1, 2014 Alpha class. SOF ¶¶14, 194; PX 28.

Similarly, CFD used a discriminatory firefighter PAT to stop women from working as firefighters from 1996 through 2012. SOF ¶¶197, 199. The firefighter PAT flunked 85% of women and just 9% of men. *Id.* Women sued the City over the firefighter PAT in the *Vasich* and *Godfrey* class action litigation. SOF ¶¶198, 205. To settle those cases, the CFD replaced the discriminatory firefighter PAT with the nationally recognized CPAT exam, a very rigorous test. In 2013, 2014, and 2015, under the *Vasich* and *Godfrey* settlements, CFD was forced to allow dozens of women into the 2013, 2014, and 2015 fire academy classes. SOF ¶¶173, 205. This was a "historic" wave of women, and to this day, Commissioner Santiago still remembers it. SOF

---

[4] Though the City prevailed initially at trial, the Seventh Circuit reversed the jury verdict because the key instruction the City insisted on using was erroneous. DX 112 (*Ernst* ECF Nos. 605, 645). The Seventh Circuit directed they entry of judgment in plaintiffs' favor because the PAT violated Title VII. *Id.*

¶173. At the end of 2012, just 72 women worked as firefighters in the entire department. *Id.*
Then, the November 2013 fire class included 19 women; another 11 women joined the March
2014 class; and 16 more entered the November 2014 and 2015 classes. SOF ¶¶173, 201, 205.

After years of using a 9" box, Instructor Johnson suggested doubling its height to 18" for
the Step Test in the November 2013 fire academy—just when the first *Vasich* plaintiffs showed up.
SOF ¶¶149, 173. Then, the same CFD leaders who witnessed this influx of women, the same who
dealt with the pending sex discrimination litigation, the same who had lost their discriminatory
pre-hire tests, made the decision in 2014 to target women *in* the paramedic academy to keep them
out of CFD jobs: (i) Santiago was Fire Commissioner (DX 31 at 46-47); (ii) Vasquez (who warned
against it) was over Personnel (SOF ¶159, DX 75 at 8-11); (iii) Vogt was Director of Training (SOF
¶130); (iv) Hudson was Commander of EMS training for both firefighters and paramedics
(firefighter training includes 3 months of EMT training run by the academy EMS team) (*Id.*; DX
17 at 73); (v) Abdellatif was lead instructor (DX 68 at 29-30); and (vi) Johnson was fitness
coordinator (SOF ¶150, DX 27 at 37-38). Many other instructors, too, cross the time period,
including witness Timothy Dodero. DX 61, Dodero Decl. at ¶5.

## VI.    In Attempts to Mask Sex Discrimination, the CFD Employed Other Tactics to Terminate Qualified Women. These Tactics Constituted Pretexts for Sex Discrimination and Contributed to the Hostile Environment in the Academy.

Throughout 2014 and 2015, CFD sought to cover up the discriminatory impact of the
Step Test and Lifting Sequence by terminating women failing the physical tests for other
purported reasons. In the medical division, Dr. Wong drove Kirsten Bain out of the Bravo class.
Instructors repeatedly sent Bain to the medical division even though she had no medical
problem. PX 7, Bain Decl. at ¶8. Wong demanded a medical assessment of Bain, with no stated
complaint or basis, and threatened to fire her and permanently bar her from CFD employment for

10

so much as a "paper cut" if she did not agree to resign. *Id.* at ¶¶18-19. After enduring hours of harassment, Bain resigned under duress. *Id.* at ¶20.

Similarly, instructors Abdellatif and Johnson pulled Plaintiff Lisette Venegas from fitness training and escorted her to medical for purported "improper form" on a lunge, even though men were doing lunges the same way and Venegas was not ill or injured. DX 101, Venegas Dep. at 308, 332-335. This conduct violated CFD policies providing that candidates may be sent to medical only when they are injured or ill. SOF ¶179. An "improper" lunge, if it even occurred, was not a legitimate basis to send Venegas to medical. DX 95, Canby Dep. at 55-57; DX 88, Wood Dep. at 145; DX 51, Chief Hroma Dep. at 275-276. Once there, Wong told her that she should quit. DX 101, Venegas Dep. at 342-343. When she refused, he lied to human resources, falsely stating that she resigned. *Id.* at 341-343 (Q: "Did you tell Dr. Wong that you were going to resign? A: No."); *Id.* at 348 ("I never said I wanted to resign."); DX 36, Wong Dep. at 210.

The next day, Wong purported to "revoke" Venegas' medical clearance after subjecting her to a made up "assessment" that is neither a standard evaluation nor job-related. DX 100; DX 36, Wong Dep. at 224-225. He required her to (1) lunge down to touch her knee to the floor, (2) squat, even though a squat is not part of the job, and (3) step into the back of an ambulance simulator with a deck 22" high without using her hands. DX 36, Wong Dep. at 222-224. No other candidate has ever been subjected to this assessment. *Id.* at 237-238. And the only purported "paramedic function" that Venegas allegedly could not perform was stepping onto the back of the ambulance simulator without using her hands. SOF ¶183. On that basis, which is neither legitimate nor non-discriminatory, Wong purported to "revoke" her medical clearance. DX 100.

Wong made the procedure up to get rid of Venegas. SOF ¶¶180, 184. He also made up the "assessment." Paramedics do not step into ambulances with no hands. DX 17, Hudson Dep. at

254; DX 61, Dodero Decl. at ¶17. CFD ambulances have handles, and CFD paramedics are instructed to use them. *Id.*; PX 21. CFD fired her, purportedly because she was "unable to complete training," even though no CFD employee can explain what training she was unable to complete. PX 9; DX 68, Abdellatif Dep. at 312 (no idea); DX 27, Johnson Dep. at 292 ("I have no idea."); DX 30, Bryant Dep. (head of HR) at 137 (same). CFD even forged Santiago's signature to terminate Venegas without informing him or getting his approval. DX 31, Santiago Dep. at 179, 182 ("I wasn't involved in this"); *Id.* at 177 ("it's not my signature").

To drive women out, CFD also harassed, berated, and humiliated women in the academy. Witnesses after witness report academy staff mistreating women through sex-based harassment and body-shaming. DX 2, Markey Dep. at 54; 179-180 (comments about appearance and physical fitness compared to the men); PX 7, Bain Decl. at ¶5; DX 42, Burroughs Dep. at 261 (mocked during up and overs); DX 59 Bruno Decl. at ¶¶6, 8; DX 50, Chavez Dep. at 49; DX 16, Youngren Dep. at 128-129. Chief Vogt, too, berated and humiliated female fire candidates who could not conquer the 18" box. DX 59, Bruno Decl. ¶15 ("If you can't do this, why are you even here?" "He looked at the group of women and said something like, 'You have an option. You can do the box that everyone has been doing or you can use the box that lowers standards.' We then had to pick which box to use with everyone else watching").

**VII.  CFD Manipulated Grades to Fire Women and Pass Men. Grade Manipulation was Both a Direct Form of Sex Discrimination and a Tactic Used to Mask Sex Discrimination Perpetrated Through Use of the Physical Tests.**

CFD used academic grades as an excuse to fire women, both to keep them from working for CFD and to cover up the number of women fired using the discriminatory tests, while manipulating grades to pass men. Like the physical tests, the candidate manual provides that the CFD "may" terminate candidates for having a final average grade below the specified threshold: 80% for paramedics and 75% for firefighters. SOF ¶¶28, 114. As with physical tests,

Commissioner Santiago set academic standards and decided whether to terminate candidates. SOF ¶¶136, 138. Throughout 2014 and 2015, CFD passed men with failing grades, manipulated grades to pass men, and used "grades" as a pretext to fire Plaintiffs Velasco, Burroughs, and Markey. SOF ¶¶50, 60, 67. These Plaintiffs were failing the Step Test and Lifting Sequence and in truth were terminated because of their sex. SOF ¶¶58, 65, 72.

### A. CFD Fired Velasco Because of her Sex and Because She Failed the Step Test and Lifting Sequence—Because of her Sex Again—Not for "Grades."

Velasco was in the August 1, 2014 Alpha class. SOF ¶49. CFD's purported reason for terminating her–academic failure–was suspicious from the start. SOF ¶115. Her September 4, 2014 midterm report (which she signed), states that Homework assignments would be weighted as 20% of her grade, quizzes would be weighted as 30%, and exams would be weighted as 50%. PX 10. Practical skills exams would be weighted as 0%, consistent with the candidate manual stating that they should be graded on a pass/fail basis. *See id.,* SOF ¶116. Velasco was one-half of a percentage point from passing on September 4, 2014. PX 10.

Six days later, on September 10, 2014, CFD generated an unsigned "final" grade report with the grade weights altered. DX 39. Now, final exams were worth 30%, but Velasco's best exam grade, "Streets Final Exam," was removed from that category. *Id.* The practical skills tests were no longer graded pass/fail, as described in the candidate manual. Instead, they were scored as a 0% or 100% and counted as 20% of the overall average. *Id.*

Even though Velasco completed all of her academic work on September 9, 2014, DX 39, and had allegedly failed, CFD had her continue reporting to the academy to retake and see if could pass the Lifting Sequence for two more days–on September 10 and again on September 11. PX 11. It was only after she failed the Lifting Sequence on September 11 that CFD told her and four other women–Jen Livingston, Jamie Snevely, Karen Bailey, and Quiana Williams–that they

13

would be terminated for failing the physical tests. SOF ¶103; DX 77. No one at CFD said anything to Velasco about her grades. SOF ¶¶103, 227; DX 40, Velasco Dep. at 154, 214, 225.

Then, after these women, through counsel, alerted CFD that the physical tests were illegal, discriminatory, and violated Title VII, CFD changed its story and told Velasco–for the first time–that it was firing her for a final grade below 80%. SOF ¶115; DX 40, Velasco Dep. at 225; DX 77. But her grade was not actually 69.4%. SOF ¶50. She passed the Trauma practical skills test but CFD put a 0% in her grades. DX 40, Velasco Dep. at 117-119. CFD also refused to provide her the retake opportunities that the candidate manual provides, even though it allowed a male candidate, Michael Klita, to retake a practical skills exam and gave him a grade of 100% when he passed. SOF ¶¶56, 117, 120; DX 40, Velasco Dep. at 117-118, 217-218.

In addition, the sex discrimination in the academy caused Velasco, Burroughs, and Markey to attain lower grades. All three Plaintiffs endured the daily sex-based harassment and abuse of academy personnel, were repeatedly subjected to the discriminatory physical tests, and were scorned when they failed. *Infra* at 50. All three women were at a significant disadvantage on the academic portion of the academy because they were forced to practice for the discriminatory physical tests at night and on the weekends, while men were able to study. DX 40, Velasco Dep at 132, 270; DX 2, Markey Dep. at 186; PX 25, Burroughs Decl. at ¶¶5, 13-15.[5]

Tellingly, on the same day Velasco should have graduated, September 15, 2014, CFD permitted two male fire candidates, Edenson Galindez and Jason Davis, to graduate with grades below the 75% academic threshold required of firefighters. SOF ¶114; PX 12.

---

[5] Plaintiff Jessica Maples likewise corroborates how the sexist hostility at the academy and the pressure of having to take and retake the physical tests negatively impacted women's grades. When she was enduring the harassment of the Echo class, Maples barely passed with a final grade of 80.2%. DX 47 at 144. When she was reinstated and attended the academy run by Commander Patricia Woods, she graduated number three in her class of 40. DX 94, Maples Dep. at 90-91. The reason she performed better was "100 percent directly related to the learning environment and staff." *Id.*

14

> B. *CFD Fired Burroughs Because of her Sex and Because She Failed the Step Test and Lifting Sequence—Because of her Sex Again—Not for "Grades." And the CFD Inflated the Grades of Men to Pass Them.*

At the end of the Bravo class four male paramedics were failing the academic standard after all assignments, quizzes, and tests had been completed and included in grades. SOF ¶212. Rather than fire these men, CFD reweighted the Bravo candidates' grades to pass men while still failing Burroughs. SOF ¶¶124-126. Matthew Maty and Stanley Czajkowski were men who finished the Bravo class with grades below 80%. SOF ¶212. If the grade requirement were real, then these men should have failed the academy just like Velasco and Burroughs. SOF ¶¶95, 115. However, three days after Abdellatif informed Chief Vogt about the failures, CFD decided to redo all of the grades. SOF ¶¶124-125, 212; DX 72 (Abdellatif to Vogt).

First, CFD reduced the "Exam" category to 20% of the grade average and made the "Final Exam" category 35% of the grade average. SOF ¶124. Additionally, it moved the Hazmat Awareness and Infectious Control assignments from the "Quiz" category to the more heavily weighted "Final Exam" category. SOF ¶125. It also moved the General Order Final Exam to the "Exam" category, and it moved the Streets Final Exam and System Entry Exam from the "Exam" category to the "Final Exam" category. *Id.* After the grades were rearranged and reweighted, Maty's final grade increased by 4.6%, and Czajkowki's final grade increased by 4.1%. *Id.* Maty and Czajkowski were given final averages above 80% only because of these changes. *Id.* CFD cannot explain how or why these grades changed around so dramatically in a few days at the end of the Bravo class and only for the Bravo class. SOF ¶132.

Meanwhile, CFD assigned Burroughs a final grade of 75.8% and did not reweigh the grades to benefit her. SOF ¶¶60, 128. Instead, CFD decided to add into her final grades three low homework scores from the start of the academy that were not included in midterm grades, while moving a high grade out of the homework category. *Compare* DX 41 at 47 with *id.* at 9; SOF

¶129. Those changes tanked her homework average from 87% to 23.3%. DX 41 at 9, 47. Two weeks before the end of the academy, Burroughs' grade average was 84.9%. *Id.* at 47. Then she passed an additional practical skills test, yet CFD gave her no credit for passing on the retake and left a 0% in her grades while doing the exact opposite with male Bravo candidate Michael Klita, who had his grade raised to 100% after passing his Trauma retake.[6] SOF ¶¶119-120. Had CFD given Burroughs credit for her retake, as it did with Klita and as the candidate manual provides, she would have finished with an assigned grade above 80%. SOF ¶¶117, 119. Nor did Burroughs ever "agree" that her grade was actually below 80%. DX 42, Burroughs Dep. at 220-222. Two weeks after receiving midterm grades of 84.9%, she was shocked to learn that her assigned final grade was under 80%. *Id*.

In the September 16, 2014 Charlie class, CFD again manipulated grades to pass Grant Guibourdanche, a male. SOF ¶112. When he scored a 24.5% on a "streets quiz," CFD gave him credit for a 64% in his final grades. *Id.* If Guibourdanche had been given his actual streets quiz score, he would have ended with an average below 80%. SOF ¶113. Likewise, when Guibourdanche scored a 78% on his "streets final," CFD gave him credit for a 95% in his final grades. SOF ¶112. If he had been given his actual streets final score, he would have ended the academy with an average below 80%. SOF ¶113. Instructors double checked grades before graduation to make sure that all of the grades on the scantron sheets matched the grades on the progress report. DX 17, Hudson Dep. at 171. CFD cannot explain how Guibourdanche's grades were inflated, not once, but twice in order to pass him. SOF ¶¶113, 131.

---

[6] Burroughs' midterm and final grade reports (DX 41 at 9 and 47) evidence CFD's grade manipulation. For example, the midterm report shows a score of 100% on her Trauma practical skills, which CFD changed to 0% in her final grades.

### C. *CFD Fired Markey Because of her Sex and Because She Failed the Tests— Because of her Sex Again—Not for "Grades" in the Echo class.*

When women were allegedly failing academics, CFD did not show them the same kind of favoritism shown to Maty, Czajkowski, and Guibourdanche. At the end of Echo, Markey was reported to be failing academics with an assigned score of 77%. SOF ¶67. This was one percentage point higher than Maty's initial final grade at the end of Bravo. DX 72 (reporting 76%). It was also two points higher than Guibourdanche's actual final average. DX 56. Nevertheless, CFD terminated Markey, refusing to re-weight her grades–like it did for Maty–or provide her extra points on tests or quizzes–like it did for Guibourdanche. SOF ¶127. Further, Markey had actually passed the Cardiac skills assessment, but was given a 0%, and had a true average over 80%. DX 2, Markey Dep. at 94. In addition, even if she had failed the Cardiac assessment, CFD violated its own candidate manual by refusing to allow her a retake. SOF ¶¶121-122. Had she been allowed credit for passing a retake of her Cardiac skills exam, like Klita, her assigned final grade would have been above 80%. DX 43 at 48.

Notably, when CFD finalized Markey's grades, it determined that her Hazmat Awareness score was as a 91.8% instead of an 81.8% as listed. SOF ¶68; DX 17, Hudson Dep. at 170-1714. It reduced her score during the double-checking process, unlike Guibourdanche whose two inflated grades inexplicably remained in his final progress report. SOF ¶¶112, 131, 216.

## VIII. Committed to Discrimination, the CFD Continued to Terminate Women in the 2015 Echo and Foxtrot Classes.

Once Commissioner Santiago committed CFD to discriminatory practices for the Alphabet classes, CFD persisted in that discrimination through the last 2015 class. The April 1, 2015 Echo class started just as the *Ernst* trial judge entered judgment for the City, and CFD again fired women using the discriminatory tests (Maples) and "grades" (Markey). SOF ¶¶66, 72, 85,

17

87, 195. The discrimination reached its pinnacle in the final June 16, 2015 Foxtrot class. SOF ¶14. This was the only majority-women class; it started with 10 women and 9 men. PX 30. Yet CFD only graduated 30% (3 of the 10) women at the end of the class, and just one more (Lisa Robinson) after administrative leave (PX 13). CFD got rid of an astonishing 60% of the women in the Foxtrot class. Youngren completed the academy but was not allowed to work as a paramedic because she failed the Step Test and then injured her back retaking the test after the academy was over (DX 6 Youngren Dep. at 232-233); Griffin was injured on the Lifting Sequence at the end of the academy (SOF ¶185); Chavez was fired for not passing the tests (SOF ¶78; DX 50, Chavez Dep. at 178-179); Venegas failed the Step Test and was then pulled from training and Wong "revoked" her medical clearance (DX 101, Venegas Dep. at 340-356; PX 9); after failing the Step Test, Cheryl McClinton quit at the same time (June 23, 2015, see PX 14); and Tiffany Earnest went on layup during the second week and never returned. PX 17. In contrast, CFD allowed 7 of the 9 men to graduate, and one of the men who didn't make it was a physician in his 60s who resigned on the second day. DX 101, Venegas Dep. at 249-50; PX 30; PX 6 (Tierney placed on suspended assignment); PX 18 (resigned 6/17/15).

## ARGUMENT

The issue of whether the City terminated each of the Plaintiffs because of her sex is hotly disputed, which means the City cannot win on summary judgment. The City "bears the initial burden of demonstrating that no genuine dispute of material fact exists." *Chicago Teachers Union, Local 1, Am. Fed'n of Teachers, AFL-CIO v. Bd. of Educ. of City of Chicago*, No. 12 C 10311, 2021 WL 1020991, at \*10 (N.D. Ill. Mar. 17, 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The maxims of summary judgment are familiar—no weighing the evidence, no credibility determinations, draw all non-speculative inferences in favor of the nonmovant." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 928 (7th Cir. 2020). "[Q]uestions of

subjective intent can rarely be decided by summary judgment." *United States v. City of New York*, 717 F.3d 72, 82 (2d Cir. 2013) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 816 (1982)). "[T]he court must try to focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Joll,* 953 F.3d at 928. The Seventh Circuit has discarded the difference between direct and indirect proof, holding that "all evidence belongs in a single pile." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). The "legal standard … is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected trait] caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself …" *Id.* at 765.

The jury question in this case on Plaintiffs' disparate treatment claims is —as the Seventh Circuit held in *Ernst* —whether Plaintiffs "prove[d] by a preponderance of the evidence that Chicago 'intentionally created or *used'* the skills test to 'exclude or *reduce*' the *women* hired as *paramedics*." *Ernst v. City of Chicago*, 837 F.3d 788, 792–93 (7th Cir. 2016) (emphasis added). In *Ernst*, Judge Norgle correctly held that the City's decision to use the PAT knowing of its adverse impact on women was sufficient to raise a jury question on discriminatory intent. *Ernst v. City of Chicago*, No. 08 C 4370, 2014 WL 7685404 (N.D. Ill. Feb. 25, 2014); *Ernst,* 837 F.3d at 795 (affirming that the record created a jury question on intent). Plaintiffs here present all of the evidence relied upon in *Ernst*—plus far more.

The City does not dispute that Plaintiffs are protected by Title VII, the Equal Protection Clause, and Illinois Civil Rights Act (as women) or that the City took adverse employment action

19

(terminations). Memo at 22, n.10. The motion only disputes causation.[7] But "all evidence" of discrimination, taken "as a whole," provides ample basis for a reasonable jury to conclude that the City terminated Plaintiffs based on sex.

I. **CFD Leadership Intentionally Chose to Make CFD's "DIY," Never-Validated Physical Tests Much Harder and Then Use Those Rigged Tests to Terminate Female Paramedics in 2014 and 2015.**

A constellation of evidence shows that CFD leadership, including Commissioner Santiago and Chief Vogt, used the invalid and discriminatory physical tests for the purpose of excluding women. The City admits that five Plaintiffs were fired for the test failures (Livingston, Chavez, Lazzara, Maples, and Snevely). Memo. at 22; SOF ¶¶75, 78, 81, 84, 87. Further, CFD refused to allow Griffin and Youngren, who completed all other academy standards, to work as CFD paramedics *only* because they had not passed one or both of the tests. Each of them was also severely injured taking one of the tests. Memo. at 22 (Griffin and Youngren "were terminated because the[y] failed the physical testing"); SOF ¶90; DX 6, Youngren Dep. at 197-199. Likewise, the City terminated the other four Plaintiffs for pretextual reasons because they are women who were *also* failing the discriminatory tests: Burroughs, Velasco, and Markey were purportedly fired for "grades." However, as discussed below, the evidence shows that they were fired because they are women, women who could not pass the physical tests used for the purpose of terminating women and, therefore, because of their sex. And the City terminated Venegas because of her sex, shortly after she failed the Step Test, when Instructor Abdellatif pulled her from physical training and ushered her to the Medical Division, where CFD purported to

---

[7] At times the City also frames the dispute as whether Plaintiffs were meeting the legitimate non-discriminatory expectations of the employer, the City. *E.g.* Memo at 26. But "where the expectations themselves are challenged as discriminatory," the second and fourth prong of *McDonnell Douglas* (to the extent the court considers the framework) collapse into one inquiry. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002).

"revoke" her medical clearance in violation of CFD policy. PX 23, score sheet; SOF ¶¶179-180; DX 101, Venegas Dep. at 313-314, 333-335; DX 100.

The City cannot secure summary judgment here when Plaintiffs can point to extensive evidence from which a jury *could* infer that the City's intent in using the physical tests was to exclude women. *See Ernst*, 837 F.3d at 792–93 (jury question is whether "Chicago 'intentionally created or used' the skills test to 'exclude or reduce' the women hired as paramedics.").

> A. *CFD used biased tests to fire qualified women despite warnings that the tests were discriminatory and the City would be sued for discrimination.*

The evidence here matches—and far exceeds—the record on which Judge Norgle correctly denied the City's motion for summary judgment on the *Ernst* disparate treatment claims. *Ernst*, 2014 WL 7685404; *Ernst*, 837 F.3d at 795. In *Ernst*, plaintiffs were qualified for the paramedic job because "they were each certified as paramedics by the State of Illinois and met the City's hiring requirements." *Id.* at *2. Here, Plaintiffs were similarly remarkable and qualified women. SOF ¶¶17, 19. They are all licensed paramedics and CFD only hired them after they passed the professionally developed and validated PPAT and obtained medical clearance. *Id.* They could do everything CFD demanded of them to work as a paramedic, *except* step up and down on an 18" box or take a dummy with weights of at least 250 pounds up five flights of stairs fast enough. Indeed, the Plaintiffs rehired by the CFD have flourished. Maples and Chavez were rehired in 2017, Venegas in 2018, and Livingston and Markey in 2019. SOF ¶¶96, 98-100. Maples and Livingston were quickly promoted to Paramedic in Charge, and Maples has received commendations. SOF ¶¶96, 98; DX 49, Maples Dep. at 257. Under new academy leadership, not one of these Plaintiffs had a problem with the physical aspects of the training academy. DX 88, Wood Dep. at 158-163; DX 95, Canby Dep. at 120-122, 124-125, 128-129.

In *Ernst,* "the chief of the Chicago Fire Department 'knew that many of those failing the tests were women," 2014 WL 7685404, at *2, and so too here. CFD knew that women struggled with the Step Test months before the Alpha class started, when women fire candidates could not complete the 18" Step Test. DX 59, Bruno Decl. at ¶¶14-15. Chief Vogt berated and humiliated them and complained that CFD had to "lower standards" for them, a sexist trope. *Id.* When CFD decided to fire paramedic candidates who failed the tests, Commissioner Santiago, Chief Vogt, and other CFD brass knew that all of the Alpha candidates who could not complete the tests were women. DX 76, memo from Vogt listing five women to be fired; DX 76, Santiago email.

In *Ernst,* the City knew "disparate impact was an element in discrimination claims," *id.* at *2, and likewise here, the City has decades of experience with testing and discrimination litigation. *Infra.* at 7-8. CFD knew the Step Test and Lifting Sequence were made up by CFD training staff and had not been validated. SOF ¶¶144, 157-158; *see also* DX 78 at CFD162496-97. Going further, here the City was specifically warned that these terminations discriminated against women and violated the law. SOF ¶¶141-142. The Deputy Commissioner over the Personnel Division specifically warned the Fire Commissioner that the tests were not validated and should not be used. SOF ¶144. The City fired the women anyway.

In *Ernst*, Adrianne Bryant admitted "discussion about the impact of the physical test upon women." *Id.* at *2. In this case, again, Bryant, Vasquez, Vogt, and Santiago all discussed problems with the tests including their impact on women. SOF ¶¶144, 152, 159, 166.

In *Ernst,* Judge Norgle relied on plaintiffs' own statements that the test favored men and was not necessary or job-related. *Id.* at *2. Here, in addition to the Plaintiffs' testimony, CFD's own employees and witnesses admit that the Step Test and Lifting Sequence do not test the ability to do the job and discriminate against women. *E.g.* SOF ¶¶150, 152, 161; DX 61 at ¶¶12-

16; DX 95, Canby Dep at 94-97. Even Commissioner Santiago admitted the tests are no good. PX 3, Griffin Dep. at 279. In short, Plaintiffs have identified far more evidence of intentional discrimination than Judge Norgle found in *Ernst* and the Seventh Circuit held was sufficient for the *Ernst* plaintiffs' intent claims to go to the jury. *See Ernst*, 837 F.3d at 795.

The *Ernst* decision is not an anomaly. In the CTU litigation challenging the school turnaround policy, this Court found a jury question about the Board's discriminatory intent where "[t]he Board also knew that the turnarounds and school closings … had a disproportionate impact on African American employees" and proceeded anyway, among other evidence. *See Chicago Teachers Union, Local 1,* 2021 WL 1020991, at *17. While knowledge of disparate impact alone is not the same as intent, "taken together with other anecdotal evidence, [it] supports an inference of intentional discrimination." *Id.*

### B. The tests are significantly biased against women and CFD used them to terminate paramedics knowing that it was only firing women.

A jury can find discrimination from the tests' significant bias against women, that CFD never used the tests to fire men, and that CFD decided to use the tests for terminations knowing that only women would be fired. SOF ¶¶139, 141, 147-148. While statistics are not typically sufficient *alone* to prove discrimination, "statistical evidence can be very useful … in disparate treatment employment discrimination cases." *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 423 (7th Cir. 2000) (reversing summary judgment for an employer based on statistical and other evidence of discrimination). On an intent claim, parties may "rely on the same statistical evidence as they did for the disparate impact claim," and "may establish a *prima facie* case through 'statistical evidence' …, buttressed by evidence of general policies or specific instances of discrimination." *Chicago Teachers Union, Local 1*, 2021 WL 1020991, at *16-17 (quoting *E.E.O.C. v. Chicago Miniature Lamp Works*, 947 F.2d 292, 297 (7th Cir. 1991)); *see Vasich v.*

*City of Chicago*, No. 11 C 04843, 2013 WL 80372, at *12 (N.D. Ill. Jan. 7, 2013) (refusing to dismiss disparate treatment claims given the "obvious statistical shortage of female firefighters long known to the City and a statistically significant difference in PAT passage rates").

Here, the numbers do not lie: the Step Test and Lifting Sequence are far harder for women, and the City used the tests to fire only women. On the first attempt, men passed the Step Test at four times (4x) the rate of women, and women ultimately failed at five times (5x) the rate of men. SOF ¶147. Likewise, 90% of men passed the Lifting Sequence on the first try, compared to just 30% of women, and ultimately **every** male candidate who ever attempted the Lifting Sequences passed it. SOF ¶148. While a disparity of "two standard deviations is normally enough to … giv[e] rise to a reasonable inference that the hiring was not [sex]-neutral," *Adams,* 231 F.3d at 424, here the statistical significance of the difference in passing rates is more than **five** standard deviations, or significant at the 0.00 level (p-value). With a fair test, that striking sex disparity would occur less once in 100,000 times. DX 37, Lundquist 6.10.23 Report at 2.

With the bias built into the tests, CFD used them to terminate female candidates one after another and *never* used them to terminate a male candidate. SOF ¶139. This "inexorable zero" raises a particular inference of discriminatory intent. "Zero is not just another number" it "speaks volumes and clearly supports an inference of discrimination." *Barner v. City of Harvey*, No. 95 C 3316, 1998 WL 664951, at *50 (N.D. Ill. Sept. 18, 1998) (denying summary judgment to the municipal employer). "[N]othing is as emphatic as zero…." *United States v. Hinds County School Board,* 417 F.2d 852, 858 (5th Cir. 1969). CFD argues that "men failed physical testing, too," *in some attempts*, but claims that men "resigned–instead of waiting to be terminated." Memo. at 15. Zero (0) men were fired for these tests, SOF ¶139, and there is no hint in any undisputed fact to support the rank speculation that some men resigned to avoid being fired.

The jarring gender gap was no surprise to CFD; to the contrary, a reasonable jury could conclude that CFD intended the outcome it achieved. In September 2014, at a critical moment at the end of the Alpha class, CFD was confronted with the choice to use, or not use, the Step Test and Lifting Sequence to fire paramedics. The tests' biases against women were apparent and known. Five (5) of the seven (7) women in Alpha had failed. SOF ¶140. Zero of the men had failed. SOF ¶140. Top brass knew this. Women had been struggling with the 18" box for months. SOF ¶152; DX 27, Johnson Dep. at 219; DX 59 at ¶¶14-15. CFD was warned not to proceed. And yet faced with a choice under its own policies and procedures, the City *chose* to use the tests to fire five Alpha class women and zero men. PX 1; SOF ¶¶136, 138, 140. The City did not use these tests with the *suspicion* that women might struggle, it actually knew the results and chose to use the tests to fire women with that knowledge. "[W]hen the adverse consequences of a [choice] upon an identifiable group are as inevitable as the gender-based consequences of [the policy at issue], a strong inference that the adverse effects were desired can reasonably be drawn." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 n.25 (1979); *see also Chicago Teachers Union, Local 1*, 2021 WL 1020991 at *17 (finding a jury question on intent where the employer knew its actions "had a disproportionate impact on African American employees"); *Lumpkin v. Brown*, 960 F. Supp. 1339, 1347 (N.D. Ill. 1997) (finding intentional age discrimination, in part, because favoring college graduates for promotion in a job that did not require a college degree "was naturally to be expected" to limit recruiting to young employees).

The City's choice, in context, is almost inexplicable, except as discrimination. In fall 2014, CFD was facing three Title VII lawsuits by women challenging discriminatory physical tests. SOF ¶154 (describing *Ernst, Vasich,* and *Godfrey*). Santiago sent a note to himself with the names of these cases the night before he barred the Alpha women from graduating. DX 76. The

City was gearing up for the November 4, 2014 *Ernst* trial, as Santiago also noted to himself. *Id.*; SOF ¶195. CFD was well aware of what it was doing when it chose—for the first time—to fire candidates, and only women, for failing physical tests in the academy. SOF ¶¶139, 170. It takes no leap of imagination for the jury to conclude that these made-up tests that discriminate perfectly (firing only women and no men) resulted from *intentional* discrimination.

C. *The physical tests are baseless and unrealistic, yet CFD rejected more fair, less discriminatory alternatives developed by its own employees.*

A jury can find discrimination where CFD's tests were baseless and invalid, not genuine screening tools, but rather artificial barriers that were used to keep women out of the job. In *Vasich*, Judge Tharp recognized that women could prove intentional discrimination from evidence that "the PAT [w]as a discriminatory device that *lacks a valid purpose*." 2013 WL 80372 at *12 (emphasis added). Judge Norgle likewise recognized that sexist intent could be found where the City's paramedic PAT was not necessary or job related. *Ernst*, 2014 WL 7685404, at *2. Similarly here, the Step Test and Lifting Sequence were not necessary or valid. CFD already had a national physical assessment for the paramedic job, the PPAT, that had just been professionally validated in the spring of 2014. SOF ¶174. All Plaintiffs passed that test before being hired. The City had no need or justification for any other physical test at all. PX 20, Weltman Dep. at 42-44. The inference of discrimination from shoddy tests is even greater here than in *Ernst, Vasich,* or *Godfrey.* Those tests had been professionally developed and validated by experts. SOF ¶¶189 (*Ernst*), 196 (*Vasich*), 203 (*Godfrey*). Those tests were used to screen applicants subjected to no prior testing. Here, the Step Test and Lifting Sequence were "DIY," invented by unqualified academy personnel, never validated by any competent professional, and used to fire women who had already passed the PPAT. SOF ¶¶17, 157-158.

26

The City's tests were not "legitimate," as it claims without citation to any evidence. Memo. at 23. That assertion is disputed, including with evidence from Plaintiffs' experts who testified that the tests are not valid. SOF ¶¶75-176; DX 37, Lundquist 6.10.2021 Report; DX 82, Weltman Report. Even the City's own witnesses will not endorse the tests. They are unrealistic: no CFD paramedic climbs up and down 18" steps, let alone to the beat of a metronome (SOF ¶¶150-151; DX 61, Dodero Decl. at ¶¶12, 16); no CFD paramedic carries a loaded stair chair up five flights of stairs with a single partner, and the City does not have in the record a *single* specific example of a time that ever happened. DX 61, Dodero Decl. at ¶¶13-15; DX 81, Gallegos Dep. at 195-196; DX 28, Porter 5/4/21 Dep. at 61:8-12. CFD paramedics with *decades* of collective experience testified that they have never had to do these things on the job. DX 81, Gallegos Dep. at 195-196; DX 61, Dodero Decl. at ¶¶12, 16. The City admits that the Step Test does not mimic any aspect of the paramedic job, and the two-minute time limit is made up. SOF ¶¶150-151; DX 27, Johnson Dep. at 193-194. Commissioner Santiago, Deputy Commissioner Vasquez, and witness after witness from CFD admit that both tests are flawed and unrealistic. SOF ¶¶144, 151, 166; DX 61, Dodero Decl. at ¶¶12, 16; PX 3, Griffin Dep. at 279.

Similarly, the tests were not "required" for the position of CFD paramedic. Memo. at 23. CFD never fired any candidate for failing similar tests before 2014; no policy required CFD to terminate candidates who failed them in 2014 or 2015; and CFD abandoned the tests after 2015. SOF ¶¶136, 170-171. These tests were not "legitimate expectations" of an employer. Memo. at 23. In *Hefley v. Village of Calumet Park*, 239 F. App'x 276, 278 (7th Cir. 2007), cited by the City, the pro se plaintiff failed a firearms test for police officers (repeatedly) and did not question the test, while in *Moore v. Illinois State Police*, 249 F. Supp. 2d 999, 1004 (N.D. Ill. 2003), the police officer candidate failed a driving test and again did not attack or question the test at issue. *Id.*

A jury could also consider that Santiago knowingly rejected the more realistic and less discriminatory alternative test that Chief Vogt developed. SOF ¶166. On October 4, 2014, before the City fired the first woman, Vogt proposed an alternative lifting test. *Id.*; DX 92, Vogt Email. The test included carrying a stair chair up one flight of stairs (like from a garden apartment), and down three flights (like leaving a 3-flat) using a 200 lbs. mannequin. *Id.* He developed it to match "real life situations." *Id.* He tested it. *Id.* He worked on appropriate cut scores (time limits). *Id.* He described it to Santiago as "more realistic" than the Lifting Sequence the City used to fire women. *Id.* Commander of EMS Training Curtis Hudson and Deputy Commissioner Vasquez agreed that the Vogt alternative would measure the requirements of the job. *Id.* Santiago could have adopted the alternative test, SOF ¶167*,* but he rejected it and insisted on firing women using the invalid, discriminatory tests, SOF ¶166. Discriminatory intent may be inferred where, as here, "the government ignored less [discriminatory] options which would have furthered its policies as effectively as the more [discriminatory] option it chose." *United States v. Bd. of Sch. Com'rs of City of Indianapolis, Ind.*, 573 F.2d 400, 413 (7th Cir. 1978). And the City can be liable for discrimination if "the test[s] [were] "selected *or* reaffirmed" to keep women out of the Fire Department." *Vasich*, 2013 WL 80372, at *11 (quoting *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)).

> ### D.  CFD not "coincidentally" changed these tests and used them to fire women at the very time a historic number of women entered the academy.

A reasonable jury could also find discriminatory intent from evidence of the timing of CFD's changes to the tests and its first use of the tests to fire women. "[S]uspicious timing . . . can sometimes raise an inference of a causal connection." *Coleman v. Donahoe*, 667 F.3d 835, 860–61 (7th Cir. 2012). *First*, CFD made the Step Test much harder, changing it from a 9" step (matching the height of a stair) to an 18" box *just when* an historic influx of women entered the

academy in the fall of 2013 as a result of the *Vasich* litigation. SOF ¶¶149, 173. Instructor Johnson claims the height of the box started to change in November 2013 because the 9" box was too easy, (DX 27, Johnson Dep. at 215), but CFD had been using the 9" box since 2010. SOF ¶160. It was only when Chief Vogt took over training and encountered a "historic" number of women in the academy in the fall of 2013 that CFD decided to double the height of the box. SOF ¶149; DX 27, Johnson Dep. at 214-15. Fall of 2013 was also the same time that CFD abandoned the discriminatory firefighter PAT that the *Vasich* (and later *Godfrey*) lawsuit challenged, to adopt the new CPAT pre-hire test for firefighters. SOF ¶¶199, 205.

The City tries to discount this evidence on the theory that academy training for firefighters and paramedics are artificially separate. Memo. at 4. The City's claim is false. Firefighter/EMT candidates spend three of their six months in the academy in EMT training, supervised by the same instructors and leaders that run the EMS paramedic academy. SOF ¶130; DX 17, Hudson Dep. at 73; DX 61, Dodero Decl. at ¶¶5, 7. Commander Hudson, Chief Vogt, Chief Hroma, Instructor Johnson, Lead Instructor Abdellatif, Deputy Commissioner Vasquez, and Commissioner Santiago and many academy instructors were involved with *both* the fire and paramedic academies. SOF ¶¶130, 138; DX 51, Hroma Dep. at 92; DX 27, Johnson Dep. at 28-30; DX 68, Abdellatif Dep. at 29; DX 75, Vasquez Dep. at 29-30. These are not distinct divisions. They are governed by largely the same policies and written standards. *Compare* DX 1 (2014 paramedic manual) *with* PX 22 (2013 firefighter manual).

*Second*, during the March 2014 firefighter class (the first to officially use the 18" box), Chief Vogt, Instructor Johnson, and others at CFD personally saw tough women (*Vasich* plaintiffs who had passed the rigorous CPAT to enter the fire academy) struggling and unable to complete the 18" Step Test. SOF ¶173; DX 27, Johnson Dep. at 219; DX 59, Bruno Decl. at

¶¶14-15. Vogt berated the women for forcing him to "lower" standards. DX 59 at ¶¶1 4-15. At that point, Deputy Commissioner Vasquez was already worried about the legitimacy and legality of the test. SOF ¶144. Yet knowing that women fire candidates were struggling to pass the 18" Step Test, Johnson and Vogt then proposed, and Santiago decided to add it to paramedic training. DX 27, Johnson Dep. at 226 (month or two before 8/1/14 class discussed using 18" box); DX 31, Santiago at 80-81; DX 52, Vogt Dep. at 142-143. A reasonable jury could conclude from this evidence that CFD's purpose in instituting the test was to fire women.

*Third*, CFD only started to fire women for the Step Test and Lifting Sequence in the August 2014 paramedic class. SOF ¶170. This just so happened to occur at the very same time CFD replaced an extremely discriminatory pre-hire test (the paramedic PAT that failed 40% of women) with the non-discriminatory PPAT. SOF ¶¶174, 189-194. The Alpha class was the first batch of candidates to take the PPAT instead of the discriminatory PAT, and CFD decided to start using the Step Test and Lifting Sequence to fire candidates in that class. SOF ¶¶170, 174, 193-194. "[E]ven if suspicious timing *alone* is not enough to create a triable issue in a particular case, suspicious timing remains 'an important evidentiary ally of the plaintiff.'" *Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013) (reversing summary judgment in large part on timing) (quoting *Davis v. Time Warner Cable of Se. Wis., L.P.,* 651 F.3d 664, 675 (7th Cir. 2011)).

The City tries to confuse the timing evidence by arguing that CFD could not have implemented a test in the August 2014 class in response to the makeup of that same class. Memo. at 19. But this ignores that the PPAT was administered in June 2014 (to the paramedics who would become the Alpha class). SOF ¶¶170, 174, 193-194; PX 28. Then in July 2014, Instructors Abdellatif and Johnson, Chief Vogt, and Santiago decided to change the height of the box to 18" for the paramedics. SOF ¶¶138, 149; DX 1 (July 2014 manual); DX 52, Vogt Dep. at 143-144;

DX 27, Johnson Dep. at 225-227. Then, during the paramedic academy, Santiago again decided to fire paramedics using the Step Test and Lifting Sequence. SOF ¶138. The terminations were not some preordained outcome dictated by a policy. The candidate manuals state only that a candidate "may" be terminated for physical or academic performance, and everyone agrees that "may" creates a choice, not a mandate. SOF ¶¶111, 138, 136 ("No City policy mandated that any candidate be fired for failing either test or for their grades."). Even during the academy, Chief Vogt asked Santiago directly what to do with candidates who fell below certain criteria in the manual. PX 1 (September 2014 email Vogt to Santiago about consequences). He had to ask because their terminations were not guaranteed or required. Only Commissioner Santiago could terminate a CFD employee, and he decided again and again to use these tests to fire women. SOF ¶138; PX 1 (Santiago email: "The Bar has been set, it will not be lowered").

Further, by October 1, 2014, the City's own testing expert Dr. Tippins was warning the City and expressing her "concern," in writing, that these tests had not "been validated and are [not] aligned with job requirements," and that "some of the training requirements are more closely related to physical fitness … than the physical ability to perform the Paramedic job." SOF ¶142. Yet the CFD fired Plaintiffs for the tests anyway.

A jury could conclude that CFD only doubled the height of the box and decided to use the tests to fire women when—and because—it was forced to abandon discriminatory pre-hire tests and women streamed into the academy. This series of events spanned just a few months, with all of the same CFD leadership in place, and there is no "bright-line numeric rule" about the inference to draw from timing evidence because "[d]eciding when the inference is appropriate cannot be resolved by a legal rule; the answer depends on context. … A jury, not a judge, should

31

decide whether the inference is appropriate." *Coleman*, 667 F.3d at 861 (quoting *Loudermilk v. Best Pallet Co.,* 636 F.3d 312, 315 (7th Cir. 2011)).

> ### E. The jury can recognize a pattern: the CFD used discriminatory physical tests to keep women out of uniformed positions over and over again including in 2014 and 2015.

CFD has a long history of using biased physical tests to exclude women from uniformed positions that a jury can recognize continued in 2014 and 2015. CFD's "history of similar discrimination" and "history of past discrimination" is "probative of the defendant's motives or intent." *Vasich*, 2013 WL 80372, at *11; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05 (1973) (intent can be inferred from a "general policy and practice with respect to minority employment"). As it has for decades, CFD plays to sexist stereotypes that demean women who enter male-dominated jobs: they are "too weak" for public safety jobs and their presence will force the employer to "lower standards." This bias is so strong that the City fires women assuming they "can't do the job" even in the face of objective evidence to the contrary: these women passed the City's own validated PPAT in order to enter the academy. SOF ¶¶17, 174.

For years, CFD used the paramedic PAT to keep 40% of women (and just 2% of men) out of the academy (from 2000 to 2014). SOF ¶191. During the same time, CFD used the firefighter PAT to keep 85% of women (and just 9% of men) out of the fire academy, leading to a firefighter workforce that was 95% male. SOF ¶¶135, 197. Women sued the City to get rid of both tests in *Ernst, Vasich*, and *Godfrey*. Though these cases settled before a jury found that the PATs were *intentional* sex discrimination, there is no dispute that: (i) CFD used the offending tests for years, (ii) they disproportionately excluded women, and (iii) CFD dropped and replaced them with new national tests much more fair to women just before and during 2014. SOF ¶¶193-194, 199. Moreover, the Seventh Circuit held that the paramedic PAT violated Title VII, *Ernst*, 837 F.3d at

805, and the firefighter PAT developed by the same consultant with the same methods would have fared no better. DX 114, Lundquist Decl. in *Godfrey*.

For decades, CFD's discriminatory tests excluded women from uniformed positions. The percent of women firefighters in the department stayed flat from 1996 through 2013, and even today is less than 5%, despite the hiring of dozens of *Vasich* and *Godfrey* plaintiffs. SOF ¶135. Likewise, the percent of paramedics who are women has barely budged: from 1996 to 2020 the percent of CFD paramedics who are women went from 27.9% to 28.3%. *Id.*; *see, e.g.*, *Ernst*, 2014 WL 7685404 at *2 (quoting *United States v. City of New York,* 717 F.3d 72, 91 (2d Cir. 2013)) (discriminatory intent to be assessed "in light of the history of low [female] hiring."); *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 76 (2d Cir. 2016) (reversing summary judgment for the City where women had historically been excluded from the position at issue).

*F.   CFD harassed and terminated women throughout 2014 and 2015.*

In addition to being fired based on sex, women in the 2014 and 2015 paramedic academies were subjected to sex-based harassment, including by instructors who made decisions related to physical testing and grades, manifesting hostility to the presence of women. During these classes, Instructor Abdellatif berated, humiliated, and body-shamed women candidates, including Markey, Burroughs, and Lazzara.[8] DX 2, Markey Dep. at 54, 179 (Abdellatif made comments about Markey's appearance and physical fitness compared to the men); DX 42, Burroughs Dep. at 261 (Abdellatif mocked her during up and overs); DX 24, Lazzara Dep. at 65-66. Instructors pulled Bain and Venegas from physical training and sent them to medical, leading to Venegas' termination and Bain's constructive discharge, but did not pull out the men who struggled in fitness training. *E.g.* DX 101, Venegas Tr. at 308-309, 332-335; PX 7, Bain Decl. at

---

[8] Commander Patricia Wood removed Abdellatif from his position as an academy instructor after the 2014-2015 classes, when she became commander of EMS training. DX 88, Wood Dep. at 73-74.

¶¶8, 20; DX 59, Bruno Decl. at ¶10. In the medical division, CFD badgered women to quit (Bain succumbed, Venegas did not). *Infra* at 10-12; PX 7, Bain Decl. at ¶20. CFD instructors stopped women during fitness runs and forced them into ambulances to go to the hospital when they were not injured. PX 7, Bain Decl. at ¶¶9-10; PX 25, Burroughs Decl. at ¶18. Male instructors stared at women during physical training and looked down their shorts. DX 23, Snevely Dep. at 72-73; DX 2, Markey Dep. at 54; 179. CFD used "grades" as a pretext to fire women who were failing those same physical tests, manipulating grades to pass men and fail women in ways the CFD still cannot explain, and graduating men from the academy while terminating women with the same grades. *Infra* at 12-17. From this constellation of evidence, a jury can recognize across domains that the CFD academies under Chief Vogt and Commissioner Santiago were hostile to women, driving them out through physical tests and otherwise. *See McDonnell Douglas Corp.*, 411 U.S. at 804–05 (intent can be inferred from "petitioner's general policy and practice").

The City highlights the administrative leave that it created after Plaintiffs' counsel sent a letter threatening litigation. Memo. at 16; DX 77. But the leave did not afford any benefit to Plaintiffs. Plaintiffs demanded that the City cease use of the tests for employment decisions because their use violates Title VII. Leave was not a remedy for discrimination. Instead, it exposed Plaintiffs to the dangerous, humiliating, and discriminatory tests over and over again. Women were even injured on leave retaking the tests. *E.g.* DX 6, Youngren Dep. at 232-233; DX 80 at 3. The City's decision to place Plaintiffs on leave after being threatened with legal action does not suggest either a non-biased motive or a desire to have women as paramedics. To the contrary, a jury could conclude that the leave manifested the City's discriminatory refusal to stop using tests that disproportionately excluded women and were not job related.

In sum, a jury here can "consider, among other things, whether ... the lack of job-relatedness of the [e]xams should have been apparent to the City and whether the City's use of the [e]xams, once their [sexually] disparate impact was known, proves, in light of the history of low [female] hiring, that the City used the [e]xams with the intent to discriminate." *Ernst*, 2014 WL 7685404 at *2 (quoting *United States v. City of New York.,* 717 F.3d 72, 91 (2d Cir. 2013)). Considering the evidence as a whole, "because there is at least *one* reasonable way to tell the story in favor of [Plaintiffs'] claim of sex discrimination, a jury rather than … judges must choose among them." *Joll.*, 953 F.3d at 935.

## II.  None of the City Arguments Preclude a Jury from Finding Discrimination.

Faced with so much evidence from which a jury could recognize the CFD's sexist motive, the City advances flawed legal arguments and impermissibly tries to disaggregate different types of proof. The Seventh Circuit prohibits this approach: "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766.

*First*, the City argues that summary judgment must be granted for lack of comparators, because no men were allowed to work as a CFD paramedic without passing the Step Test and Lifting Sequence in 2014 and 2015. Memo. at 24. The City asks this Court to commit the error that led to the Seventh Circuit's reversal of the *Ernst* jury instruction and verdict. In *Ernst*, the City likewise claimed that the jury question was whether the "City would have [fired] the Plaintiff had she been male but everything else had been the same." 837 F.3d at 795. The Seventh Circuit rejected that notion, holding that the correct jury instruction is whether plaintiffs "prove by a preponderance of the evidence that Chicago 'intentionally created or used' the skills test to 'exclude or reduce' the women hired as paramedics." *Id.* at 729. In other words, the jury question is whether CFD had an "anti-female" motivation for choosing in 2014 to modify and use the

physical tests, for the first time, to fire women and only women. *Id.* at 795. The fact that no men were allowed to work as a CFD paramedic without passing the Step Test and Lifting Sequence does not preclude a claim.

*Second,* the CFD claims that there "were no gender-based comments or insults directed toward the Plaintiffs … [o]r that instructors or leadership made sexist or gender-based remarks." Memo. at 20. Of course, only a "fabled employer … admits to firing an employee because of" discrimination. *Ortiz*, 834 F.3d at 765. The record does not need to "include evidence of any derogatory remarks or specific instances of … discrimination." *Chicago Teachers Union*, 2021 WL 1020991, at *17. Further, the City's argument, notably made without citation, is false. The record includes ample evidence of sex-based harassment by CFD instructors and leadership. *E.g.* DX 22, Livingston Dep. at 233; DX 2, Markey Dep. at 54, 179-181; DX 42, Burroughs Dep. at 261, 263-264; PX 7, Bain Decl. at ¶¶5-9; DX 101, Venegas Dep. at 275-276; DX 40, Velasco Dep. at 265-266; DX 24, Lazzara Dep. at 68-69, 129-130; DX 16, Youngren Dep. at 128-129; DX 23, Snevely Dep. at 38-39, 72-73; DX 59, Bruno Decl. at ¶¶8, 12-13, 15.

*Third*, the City seeks summary judgment from factual arguments that are pure speculation with no factual support, let alone undisputed evidence: The City claims without citation that the "shortened length of the Academy classes" was the reason for the "extended training" administrative leave. Memo at 2 (with no citation). The claim is risible given that the City began terminating the Alpha women and only changed the terminations to administrative leave when Plaintiffs threatened to sue. SOF ¶¶103, 141; PX 19. There is also no evidence that the tests were to "ensure" paramedics "were prepared and able to perform the job safely and effectively," or that was the reason for the administrative leave. Memo. at 2*;* SOF ¶¶150-151, 175-176. The City claims without evidence that the Lifting Sequence "simulate[d] the medical rescue" from "a

36

multi-level apartment building," Memo. at 17 (no citation), and that Plaintiffs "have engaged in a similar Chair Carry to rescue an even heavier person" than 250 pounds, *Id.* The City claims without citing evidence that the Step Test measures "the stamina required to triage" a medical crisis and or the "delay in locating a patient [that] could mean the difference between life and death." Memo. at 17-18 (no citation). To the contrary, CFD's own employees and multiple experts explain why the Lifting Sequence and Step Test do not measure skills or abilities required to be a paramedic. *E.g.* SOF ¶¶150-151, 175-176; DX 61, Dodero Decl. at ¶¶12-16; DX 81, Gallegos Dep. at 195; DX 28, Porter Dep. at 62; DX 82, Weltman Expert Report at 10-14.

Other examples of false and unsupported factual claims include: "union and other work rules **<u>may</u>** prevent CFD from testing and/or terminating an incumbent paramedic for lack of fitness." Memo at 18 (no citation because there is no evidence of any such work or union rule). "[N]ew paramedics … may not know how their minds and bodies would react to the stressful, taxing, life-and-death situations." *Id.* (no citation because candidates are not "new," they are all paramedics at the start of the academy, SOF ¶17.). Men "failed the test - and resigned - instead of waiting to be terminated." Memo. at 15 (no citation because there is no evidence that any man resigned to avoid termination). "[P]hysical training **<u>may have</u>** presented a greater challenge to the Candidates participating in the 2014-2015 Academy because of the deliberately shortened length of the classes." Memo. at 16 (no citation). The tests were not about "ensuring the [Plaintiffs] were prepared to perform the job safely and effectively." Memo at 16 (without citation because there is no evidence linking the tests to safety and the link to doing the job "effectively" is hotly disputed). Plaintiffs "physical ailments **<u>certainly could have</u>** contributed to, or made it impossible, for them to pass the tests." Memo. at 16 (without citation to evidence because Plaintiffs were injured *by* the tests, SOF ¶145, not failing from some prior injury).

This is not just sloppy drafting, but rather recklessness with the basic facts. There were six paramedic classes in 2014 and 2015, not "five separate" classes. Memo. at 5; SOF ¶14. It is not undisputed that "the physical assessments serve" the "purpose" of preparing "[c]andidates for the job of paramedic." Memo at 13 (citing SOF ¶105). The claim of intentional discrimination and the claim of disparate impact, based on the tests' lack of validity, are both grounded in extensive evidence that the tests served only to exclude women and not any legitimate purpose. SOF ¶¶139, 150-151. It is not true that "Venegas never took the physical tests in the first place," Memo. at 2, n.2, 20-21, she took the Step Test on June 15, 2015. PX 23. The City says repeatedly that "Youngren did not participate in the extended training," and that she "t[ook] leave from the Academy." *E.g.* Memo at 6. Youngren completed the academy except the Step Test and was in the extended training for four weeks. DX 6, Youngren Dep. at 197-198, 204; Youngren SOF at ¶¶31-32. When she retook the test during the extended training, she was stopped at 1 minute and 48 seconds and also suffered a severe back injury. DX 6, Youngren Dep. at 218-220, 224-227.

All of these and other unsupported arguments from the City's brief should be ignored and stricken. Fed. R. Civ. Pro. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citation to particular parts of materials in the record….").

## III. CFD Fired Griffin and Youngren Because They were Women Who Failed the Discriminatory Physical Tests.

The City makes the peculiar argument that "Griffin and Youngren were injured during the Academy, and their terminations … occurred pursuant to the respective medical leave and suspended assignment policies," Memo. at 8 (citing the complaint not facts), as if their experience and terminations had nothing to do with the tests. Not so. Youngren successfully completed the entire academy, including the Lifting Sequence, except the Step Test. Youngren SOF at ¶31. At the end of the academy, the *only* reason CFD did not permit her to go work as a

38

CFD paramedic is because she had not passed the Step Test. *Id.* During the administrative leave, she injured her back retaking the Step Test. Youngren SOF at ¶27; DX 6, Youngren Dep. 232-233; PX 26, Harmening Bresnahan Dep. at 96. Because of that injury, CFD placed her on suspended assignment and eventually fired her. *Id.*; Youngren SOF at ¶2; SOF ¶186. Twice over, the Step Test *caused* the CFD to terminate Youngren: (i) the Step Test stopped Youngren from graduating the academy and being assigned to an ambulance, and (ii) the Step Test injured Youngren's back, which led directly to her termination (and indeed the injury turned out to permanently end her chance of being a CFD paramedic). *Id.*; Youngren SOF at ¶¶27, 31.

Griffin likewise was meeting every requirement in the Foxtrot class, except passing the Step Test and Lifting Sequence. SOF ¶89 (reporting final grade); *Id.* ¶185 (August 3, 2015 injury). The *only* reason she did not finish and go work as a CFD paramedic is because she did not pass the Step Test and Lifting Sequence. SOF ¶90. In the last week of the academy class, Griffin was injured taking the Lifting Sequence, placed on medical leave and eventually fired when the leave for her injury ran out. SOF ¶¶145, 185; DX 28, Porter Dep. at 92-94. Twice over, the discriminatory physical tests *caused* CFD to terminate Griffin: (i) the Step Test and Lifting Sequence stopped her from graduating the academy, and (ii) the Lifting Sequence injured Griffin's back, which led directly to her termination. *Id.*; SOF ¶90. Griffin and Youngren were not fired just because of some non-discriminatory leave policy. The *cause* of their debilitating injuries and terminations was the discriminatory tests just as much as Livingston, Maples, Chavez, Lazzara, and Snevely.

IV.  **CFD Fired Venegas Because of her Sex. The Alleged "Physical Assessment" Occurred After Abdellatif Removed her from Training Because of her Sex. And the "Physical Assessment" was a Pretext Used to Fire Venegas Because of her Sex.**

Venegas likewise was terminated via physical test because she was a woman failing the discriminatory tests. Initially, the City's motion as to Venegas should be denied for failure to make factual or legal argument. The sum total of its argument is that Venegas allegedly "cannot show that the unique circumstances of [her] termination[] was based on gender . . . [because Dr. Wong] determined she could not perform the essential functions of the job." Memo. at 20-21. The City discussion spans a scant four sentences without legal citation. *Id.* This cannot provide the basis for summary judgment. "The Court is not obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Pather-Brunton v. Illinois Nurses Association*, No. 13 C 3936, 2015 WL 13707821, at *1 (N.D. Ill. Dec. 11, 2015) (citation omitted) (denying employer's motion for summary judgment for failure to make any legal argument beyond citation to *McDonnell Douglas*). "If the movant does not meet this burden [of production], the burden does not shift to the non-movant to oppose summary judgment." *Id.* The motion should be denied as to Venegas because the City has not met its burden.

Next, the City's *de minimis* factual assertions are not even true. The City claims that Venegas did not take the Step Test, Memo. at 2, n.2 and at 21, when she took the Step Test on June 17, 2015, and the City even deposed her about it. PX 23 (score sheet); DX 101, Venegas Dep. at 313. The City even had to resort to citing a paragraph of the complaint that is not even about Venegas, not any evidence or statement of fact. Memo. at 7 (citing only Am. Compl. ¶57). Also Dr. Wong did not "determine Venegas could not safely perform the "essential function**s**" of the paramedic position." Memo. at 21. It is undisputed that Dr. Wong identified *at most one* alleged essential function, "getting into the back of the ambulance at 22" height with no hands." SOF ¶183. But getting into an ambulance with no hands is not a function of the CFD paramedic

40

job; CFD instructs paramedics to always use a hand to safely enter the ambulance. DX 61, Dodero Decl. at ¶17; DX 17, Hudson Dep. at 254; DX 95, Canby Dep. at 127. No other candidate is ever assessed or required to do this. DX 36, Wong Dep. at 237-238.

Further, the evidence of sex discrimination in terminating Venegas is exceptionally strong. Days after she failed the Step Test, Venegas was pulled from physical training by Instructors Abdellatif and Johnson, who forced her to go to the medical division allegedly for improper form in doing a lunge, even though men in the class were doing a lunge the same way and were not pulled. DX 101, Venegas Dep. at 308, 332-334 (pulled out of training 6/22/15); PX 23 (failed step test on 6/17/15). *See Coleman*, 667 F.3d at 846 (holding that a jury can find discrimination when women are required to meet one standard and men are not fired for failing to meet the same standard).

Further, the form of a lunge is never a basis to send any candidate to medical. DX 95, Canby Dep. at 55-57; DX 88, Wood Dep. at 145; DX 51, Hroma Dep. at 275-276. Then Dr. Wong lied to human resources to say Venegas quit when she had not, and invented new "assessments" that had never been given to anyone else and were not based on the paramedic job. DX 36, Wong Dep. at 210, 237-238; DX 101, Venegas Dep. at 341-343, 348; DX 61, Dodero Decl. at ¶17. Dr. Wong had just medically cleared Venegas weeks before the class, PX 8 (clearing her even without the ability to "fully squat"), yet CFD claims to have "revoked" Venegas's medical clearance during an academy class even though the City *admits* that there is no policy or procedure to do so. SOF ¶180; DX 100 (revocation of clearance). Then the City terminated Venegas as "unable to complete training," but the City also has no idea what training Venegas was unable to complete. PX 9; *see supra* at 12 (compiling admissions). Then the City terminated Venegas without informing or getting approval from Commissioner Santiago, going

so far as to forge his signature. DX 31, Santiago Dep. at 177, 179, 182. The fact that an employer "did not follow its own internal procedures with respect to the hiring [or firing] process for the position also points to a discriminatory motivation." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005); *Joll*, 953 F.3d at 931 ("deviation from standard procedures also lends support to" the inference of discrimination).

In combination with Dr. Wong's treatment of Bain and Griffin, Abdullatif's treatment of women, and the other evidence of CFD's hostility to women, a jury could that CFD terminated Venegas with no basis because she is a woman, or to keep her "failing" performance off the Step Test records to cover up the discriminatory impact of that test, or any combination of both.

## V. CFD Fired Three Candidates for "Grades" Because They were Women, while Manipulating "Grade" Requirements to Let Men Pass and Work for CFD.

CFD also used grades as a pretextual excuse to fire women who were failing the physical tests in 2014 and 2015. The City argues that Plaintiffs "agree that all Candidates were required to score an 80%" final grade. Memo. at 23. However, this is not true. Women were required to meet the final score cutoff, while men were not. When men fell below the grade cutoff, the CFD arbitrarily added points to candidate grades, manipulated grade weights, or simply allowed the candidates to graduate anyway. SOF ¶¶112-114, 124-126, 131-132. When women purportedly fell below the cutoff (women who were failing the discriminatory physical tests), CFD chose to terminate their employment. SOF ¶¶115, 127-128. Nevertheless, the City moves for summary judgment on the claims of Velasco, Burroughs, and Markey arguing that no jury reasonably could find sex discrimination. The Court should reject the City's argument.

A. *The City's Preferential Treatment of Men With Failing Academic Grades Is Strong Evidence Of Discrimination.*

When an employer fires women because they fail to satisfy a particular academic standard but does not fire men who fail to meet the same academic standard, then that is sufficient evidence–standing alone–to withstand an employer's summary judgment. *See Coleman*, 667 F.3d at 846 ("All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination."). Here, a jury reasonably could conclude that the City fired women with "failing" academic scores seeking to avoid liability for its made-up physical tests and it wanted another justification to terminate women. Meanwhile, the City let men graduate who were failing academics.

**Guibourdanche:** Plaintiffs' claims withstand summary judgment based solely on how the City treated Grant Guibourdanche. He finished the academy with a score of 75.2%, but the CFD arbitrarily added points to two of his grades, so that his final academic average reached a barely passing score of 79.7%. SOF ¶112; DX 56, Impact of Grade Changes on Guibourdanche. CFD assigned Velasco, Burroughs, and Markey final grades below 80% and CFD never added points to their assigned final grades to let them graduate. SOF ¶¶60, 67, 115, 127-128.

It is no defense for the City to speculate that the CFD *may have* entered Guibourdanche's false inflated grades by mistake. Memo. at 10, 25, and 35 (claiming without evidence that "isolated errors occurred" or "there were some human errors"). A jury might conclude that it was a mistake, but it could also conclude that the so-called mistake was an intentional effort to allow a male to pass. The City offered no testimony that instructors entered Guibourdanche's inflated grades by mistake, not once but twice, and Hudson testified that group instructors always double checked the accuracy of grades before graduation. DX 17, Hudson Dep. at 170-171. The City

corrected one of Markey's grades after her instructor checked her scores, and it is reasonable to infer instructors checked Guibourdanche's grades too. *Id.*; SOF ¶68.[9]

Nor is it any defense that Guibourdanche was in the Charlie class, and that Velasco, Burroughs, and Markey were in the Alpha, Bravo, and Echo classes. Memo. at 23. All the Alphabet occurred within months of each other, with the same content, same 80% final academic average "rule", and supervised by Vogt, Hudson, and Abdellatif. SOF ¶¶14, 28, 24-26, 130, 133; DX 68, Abdellatif Dep. at 29-30. The City offers no meaningful distinction between any of the classes that would preclude a reasonable jury from considering all of the candidates together and concluding that the City inflated Guibourdanche's grades because he was a man and failed Velasco, Burroughs, and Markey because they are women. *See Coleman*, 667 F.3d at 846 ("Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way.")

**Maty and Czajkowski:** At the end of the Bravo class, on October 3, 2014, after the candidates completed all their tests, quizzes, and homework assignments, Maty and Czajkowski had grades listed below 80%. SOF ¶212. Maty had a 76%, and Czajkowski had a 78.7%. DX 72. Three days later, CFD re-weighted the grades and rearranged which assignments fell into each category. SOF ¶125. On October 6, 2014, after CFD changed the grade weights and categorization of assignments, Maty and Czajkowski were no longer failing. *Id.*

If the City was willing to reweight and change grades to pass male candidates, then it should have provided the same benefit to Velasco, Markey, and Burroughs. But they were

---

[9] The City once possessed evidence that could have shed light on whether and when Guibourdanche's grades were manipulated, but chose to destroy it. On a weekly basis, instructors had a printout of candidate grades. DX 81, Gallegos Dep. at 104-106; DX 61, Dodero Decl. ¶22. Instead of preserving the weekly grade printouts, as it should have with Velasco's and then Burroughs' EEOC charges pending, the City shredded the records and threw them away. *Id.*

women failing the physical tests, SOF ¶¶58, 65, 72, and CFD was calculating the relative test failure rates for men and women on the Step Test and Lifting Sequence to report to the EEOC. PX 4 (response to charge). The more women that CFD terminated through "grades" (or the medical division), the fewer women CFD had to admit to firing for the discriminatory tests.

**Firefighter/EMTs:** The City also passed male firefighter/EMT candidates who failed academics. Firefighters were required to obtain a grade average of 75%. SOF ¶114. At the very same time that Commissioner Santiago permitted two male firefighters, Galindez and Davis, to graduate with failing fire suppression grades of 68.55% and 72.58%, CFD terminated Guarino allegedly for her assigned academic score below 80%. SOF ¶¶114-115, 138; DX 58, Cover E-mail and Final Grade Report. Right after that, Santiago terminated Burroughs, and again a few months later, he terminated Markey, all allegedly for scores below 80%. SOF ¶¶127-128.

The City argues that firefighters are not similarly situated to paramedics regarding academic requirements, but a jury reasonably could disagree. "Whether a comparator is similarly situated is "usually a question for the fact-finder," and summary judgment is appropriate only when "no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Coleman*, 667 F.3d at 846–47. As with paramedics, Commissioner Santiago determined academy requirements and which firefighters graduated from the academy and which were fired. SOF ¶138. Firefighter candidates–like paramedic candidates–were required to satisfy a minimum academic percentage (75%) described in the same language as the paramedic manual, or else they "may" have been terminated. SOF ¶178; *compare* DX 1 (2014 paramedic manual) *with* PX 22 (2013 firefighter manual). *See also* DX 52, Vogt Dep. at 120; DX 64, Decl. of Hudson ¶¶7, 10, 23 (75% requirement). Indeed, the March 2014 fire class was in the academy at the same time as the Alpha paramedic class. PX 12 (graduation handout). Despite this clear-cut alleged

45

academic rule, the same to the letter as the rule Guarino allegedly violated, the CFD allowed Galindez and Davis to walk across the graduation stage the same day it denied Guarino that same experience. SOF ¶114; PX 12; DX 62 (Sept. 16, 2014 termination). Galindez and Davis were men. SOF ¶114. They failed. *Id.* They graduated to work for CFD. *Id.* The same time, Guarino allegedly "failed," but as a woman she was not allowed to work for CFD. SOF ¶115.

*Coleman* teaches that district courts should not be overly rigid in requiring similarly situated employees to have identical job titles. *Id.* at 851–52. If the employees were disciplined by the same decision maker, they were subject to the same work standards, and engaged in similar conduct, then a jury can permissibly conclude that the individuals are comparators. *Id.* at 847. Here, Vogt oversaw both the firefighter and paramedic academies, and Santiago decided the academy requirements and termination decisions. SOF ¶¶130, 138. *Coleman* also instructs that "a proposed comparator's position or rank may be important, but only *provided that the employer took these factors into account* when making the personnel decision in question." *Id.* at 849–50 (emphasis in the original). Here, the rank of the comparators is functionally the same; they were all candidates. SOF ¶¶1, 114. The City has offered no evidence that it permitted Davis and Galindez to graduate with failing academic scores because they were firefighters and fired the three plaintiffs because they were paramedics. To the contrary, firefighters were subject to the same standard as paramedics. SOF ¶¶28, 114.

The City also points to two individuals, Klita and Toledo, who it terminated for academic grades during this same Bravo class. It argues that because these two men were fired for grades, there is nothing suspicious about the terminations of Markey, Burroughs, and Velasco. Memo. at 28. The Court should reject this argument, however, because Klita and Toledo were apparently collateral damage. A jury reasonably could find that their grades were so far below the 80%

threshold that even CFD believed it would appear suspicious to allow them to graduate (or to do

so would have forced CFD to graduate Burroughs, too). The fact that the City could only save

two of the four men failing does not prevent a jury from finding discrimination against Markey,

Burroughs, and Velasco in this context. After all, nothing in the Title VII case law requires

Plaintiff to show that *all* similarly situated men were treated more favorably. *See Downing v.*

*Abbott Labs*, No. 15 C 05921, 2019 WL 4213229, at *13 (N.D. Ill. Sept. 5, 2019), aff'd, 48 F.4th

793 (7th Cir. 2022) (finding that a jury could conclude that employer discriminated against

plaintiff based on race and that employees who were also terminated were "collateral damage.").

### B. A Jury Could Find Sex Discrimination Based on the City's Repeated Efforts to Manipulate Grades and Ignore the Candidate Manual.

Further, a jury reasonably could conclude that academic scores were the City's made-up

reason to fire three women who were failing physical tests that the City knew were illegal. When

an employer arbitrarily applies employment standards to favor men over women, deviating from

standard procedures, a jury can infer sex discrimination. *See, e.g.*, *Baines v. Walgreen Co.*, 863

F.3d 656, 664 (7th Cir. 2017) (reversing summary judgment); *Coleman*, 667 F.3d at 858

(reversing summary judgment; explaining that selective enforcement of company policy can

establish pretext); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 891–92 (7th Cir. 2001) (same).

Here, the City repeatedly deviated from standard procedures to aid men and cheat

Plaintiffs when calculating academic scores. The CFD arbitrarily added points to Guibordanche's

test scores and changed grade weights and grade categories in the Bravo class to allow men to

pass. SOF ¶¶112-113, 124-126. At the same time, it denied Plaintiffs their actual grades and

graded them more harshly than the CFD policy in the paramedic manual permitted.

The Candidate Manuals require practical skills tests (i.e. Cardiac, Trauma, and Airway

skills tests) to be "pass/fail" with a chance to retake and pass the exam. SOF ¶116. Instead, with

47

no written policy or basis, CFD assigned grades to those exams of 0% or 100% as part of an academic average. *Id.* ¶134; *e.g.* DX 41 at 47. The City claims–contrary to the language in the manuals–that a practical skills "remediation score was not incorporated" into a final grade, Memo. at 9, but CFD gave male candidate Michael Klita the chance to retake the exams *for credit* and denied women the same chance. He failed the Trauma practical skills exam twice, retook it a third time, and received 100% credit for that third attempt. SOF ¶117. By contrast, Plaintiff Burroughs passed her Trauma exam on a retake and did not receive credit with a 100%, and Markey was only given two attempts to pass. SOF ¶¶119, 121-122. If Burroughs and Markey had been given that same 100% credit as Klita, their final averages would have been over 80%. SOF ¶¶119, DX 43, Markey File at 31.[10]

The City responds, incorrectly, that "Plaintiffs agree that they … did not meet the Academy's standards," Memo. at 1, and "do not dispute that their overall academic score was under 80%," Memo. at 10. In fact, Plaintiffs dispute both the legitimacy of the purported grade requirement (because the City did not hold men to that standard), and the accuracy of their final grades. For instance, Velasco passed the second practical skills assessment, and Instructor Gallegos told her so at the time. DX 40, Velasco Dep. at 117-119. Nevertheless, CFD gave her 0% credit for that assessment. DX 39. Burroughs had a passing 84.9% on the September 24 midterm, DX 41 at 47, and less than two weeks later, CFD added many new grades from August and early September that never appeared on the midterm report, and changed a 100% on the Airway test to a 0%, *id.* at 9. CFD failed Markey on her Cardiac exam and denied her the additional opportunity to pass per the manual. DX 2, Markey Dep. at 239-40; DX 1 at 30.

---

[10] Abdellatif, who handled grades, often rescored assignment, changed grades and weights, and threw out questions from grades. Candidate grades were neither reliable nor fair. DX 61, Dodero Decl. at ¶¶20-21.

CFD relies on certain Gradebook documents to claim that "there is no evidence that []
scores were manipulated." Memo. at 11. The evidence shows nothing of the sort. The documents
that CFD calls a "Gradebook Audit Report" consists of "back up[s] of the 2014/2015 paramedic
gradebook data." PX 24. The earliest backups were created in 2016 over a year after the
Alphabet classes were completed. *E.g.* DX 8, Bravo Grades Backups (all containing a Last
Modified Date of August 2016 or later); PX 27 (showing Last Modified Date). This shows
nothing about the grade changes during the academy, and there is no dispute that grades were
changed: the scores on the assignments do not match the scores given to Guibourdanche, for
example. SOF ¶112. Gradebooks provide no insight into whether grades changed before or after
they were entered into the gradebook software and the CFD destroyed the contemporaneous
records of grades from during the academy, see *supra* n.7.

The City's failure to follow its own procedures and its selective enforcement of the 80%
cutoff score, permit a jury to conclude that the City's purported reason for terminating Velasco,
Burroughs, and Markey was made up. The real reason they were fired was because of their sex.

### C. The City's Intentional Use of Discriminatory Physical Tests to Screen Out Women is Evidence that the Academic Failures were Motivated by Sex.

As detailed above, Plaintiffs point to a wealth of evidence that the CFD used the
discriminatory physical tests for the purpose of firing women, and that evidence is relevant to
show that the City was motivated by sex when it fired women for purported academics as well.
*See Huff v. UARCO, Inc.*, 122 F.3d 374, 386 (7th Cir. 1997) ("[E]vidence of the decisionmaker's
discriminatory motive regarding one employment decision may be used as evidence of that
decisionmaker's discriminatory motive in making a similar employment decision.") (internal
quotation omitted). Here, a jury reasonably could conclude from the City's discriminatory
behavior that it wanted to get rid of women and that the academic grades were another pretextual

way to make that happen. After all, the same individuals: Abdellatif, Hudson, Vogt, and Santiago fired women for the physical tests and allegedly for "grades." SOF ¶¶130, 138; DX 68, Abdellatif Dep. at 29-30; DX 31, Santiago Dep. at 46-47.

These are not unrelated issues. The strenuous and dangerous physical tests–which the City knew were unnecessary and not job related–gave women less time to study for academic requirements. DX 40, Velasco Dep. at 132-133, 139-141, 213; DX 2, Markey Dep. at 186-187, 106-109; PX 25, Burroughs Decl. ¶¶14-16; SOF ¶¶64, 142-144, 150-152, 175-176.

While they were spending more of their waking hours exercising at night and on the weekends to overcome those artificial hurdles and recover from injuries, they had less time than men to study. *Id.* As Velasco explained, "the males had a better advantage than us. When they were at home studying for all these tests, the females had to go out and practice physical abilities." DX 40, Velasco Dep at 132. Even during academy class hours, instructors degraded women about struggling on the physical tests, undermining their academic performance. *Id.* at 270. Markey testified similarly that "after multiple times of trying to get up those stairs and fail, I felt like I needed to build up my endurance and build up my strength. And I think it took away from a lot of my study time because now, I have to split my time in half to build up strength and do my studies." DX 2, Markey Dep. at 186. Academy instructors likewise belittled Burroughs, "screaming in each [of her] ears simultaneously," and taking the Step and Lifting Tests left her "bruised and berated." PX 25, Burroughs Decl. at ¶¶7, 14. From the physical tests her "arms hurt so badly during the last two weeks of the academy" that she "could hardly get dressed" and had to go home to put "bags of frozen peas taped to [her] arms all night." *Id.* ¶14. And under those conditions of harassment and excessive physical testing, a jury could find that sex discrimination

degraded their academic performance and drove all of the Plaintiffs, including Velasco, Burroughs, and Markey, out of the CFD.

When an employer intentionally erects unnecessary roadblocks to make it harder for women to succeed at work, that practice violates Title VII. Put otherwise, if the Plaintiffs demonstrate that the City created the physical tests to make it harder for women to pass the academy, and that those physical tests made it harder for women to pass academic requirements, then a jury could find in their favor. *See Ernst*, 837 F.3d at 795.

> D. *McDonnell Douglas Prima Facie Case.*

Though Plaintiffs Velasco, Burroughs, and Markey have offered ample evidence of discrimination under the controlling standard outlined in *Ortiz*, they can also establish discrimination under *McDonnell Douglas*. Plaintiffs are women, and CFD terminated their employment. SOF ¶1; Memo. at 10, 22. (admitting the first and third prongs of the *McDonnell Douglas* burden-shifting test). "When a plaintiff produces evidence sufficient that an employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated male . . . employees in a more favorable manner), the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a *prima facie* case, stave off summary judgment for the time being, and proceed to the pretext inquiry." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002).

Here, Plaintiffs have established a *prima facie* case based on how the City treated Guibourdanche, Maty, and Czajkowki. All three men had academic grades below 80%, and the CFD changed their grades or rearranged and reweighted grades to pass them. SOF ¶¶112-113, 124-126. Plaintiffs were similarly situated women, with grades allegedly below 80%, but the CFD never increased their grades, rearranged their grade weights, or counted their passing

remediation grades to let them graduate. SOF ¶¶115, 119, 121-122, 127-128. The City also simply let men, Galindez and Davis, graduate with grades below the "required" average at the same time it fired Plaintiffs as women with the same alleged deficiency. SOF ¶114.

This same evidence also shows pretext. *See Coleman*, 667 F.3d at 841 ("an employment discrimination plaintiff may demonstrate pretext by providing evidence that a similarly situated employee outside her protected class received more favorable treatment."). In addition, the City did not follow its own paramedic candidate manual when it refused to allow Plaintiffs to retake their practical skills exams for full credit. SOF ¶117. *See Rudin*, 420 F.3d at 723 ("an employer's failure to follow its own internal employment procedures can constitute evidence of pretext."); *U.S. ex rel. Hamrick v. GlaxoSmithKline LLC*, 814 F.3d 10, 22 (1st Cir. 2016) ("[D]eviations from standard procedures can give rise to an inference of pretext."). Further, the City provided shifting reasons for the terminations. First the CFD said Velasco was being fired for failing the bogus physical tests. SOF ¶103. Then after Plaintiffs threatened to sue, it claimed to fire her for academic reasons. SOF ¶115; DX 40, Velasco Dep. at 214; DX 77. *Schuster v. Lucent Techs., Inc.,* 327 F.3d 569, 577 (7th Cir. 2003) ("Shifting and inconsistent explanations can provide a basis for a finding of pretext.").

Whether through *Ortiz* or *McDonnell Douglass*, Plaintiffs Velasco, Burroughs, and Markey offer ample evidence from which a jury reasonably could conclude that the City fired them because of their sex.

## VI. Intentional Discrimination can be Proven by Policy and Practice Evidence in a Multi-Plaintiff Case.

The City also seeks summary judgment to the extent that Plaintiffs' Title VII claim is based on a "pattern-or-practice" theory. Memo. at 29-31. Initially, *Teamsters* pattern or practice proof is just "an evidentiary framework with which a plaintiff may prove discrimination," like

*McDonnell Douglas*, and "not a separate legal claim." *E.E.O.C. v. Green JobWorks, LLC*, No. RDB-21-1743, 2022 WL 1213478, at *6 (D. Md. Apr. 25, 2022). How Plaintiffs might later prove intentional discrimination is, at most, an issue for trial management and not a "claim" for the Court to decide now under Rule 56.

On the substance, the City cites cases that cast doubt on the availability of *Teamsters* proof in an individual case, but they cite no authority for the proposition that pattern or practice proof is foreclosed in multi-plaintiff cases like this one. Indeed, the Seventh Circuit endorsed the viability of a pattern or practice proof in a multi-plaintiff case. *See Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 422 (7th Cir. 2000) (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977)); *see also* Seventh Circuit Civil Jury Instruction No. 3.03 (PATTERN OR PRACTICE). The logic of pattern or practice evidence is just as strong in claims by multiple employees, whether or not the formal class procedures are used. A discriminatory hiring case with "32 plaintiffs," for example, is "a type of nonclass case where it is probably appropriate to apply pattern or practice rules." *Gantchar v. United Airlines, Inc.*, No. 93 C 1457, 1995 WL 137053, at *4 (N.D. Ill. Mar. 28, 1995).

To be sure, this multi-plaintiff case is about a pattern or practice of sex discrimination. The CFD has a long history of using physical testing to discriminate against women for nearly two decades. *See* discussion at 9-10, 32-33, *supra,* about the series of discriminatory physical tests that the CFD used to keep women out of the uniform ranks and that spawned *Vasich, Ernst, Godfrey,* and now this litigation. Even within 2014 and 2015, the experience of these eleven Plaintiffs along with the other evidence discussed above shows a pattern of the City discriminating against women, which goes to show that discrimination against women, particularly through physical testing, is the CFD's "standard operating procedure." *Adams*, 231

F.3d at 422 (quoting *Teamsters*, 431 U.S. at 336); *cf. Bresnahan v. City of Chicago*, No. 18 C

1880, 2018 WL 4829597, at *4 (N.D. Ill. Oct. 4, 2018) (a "widespread practice" alleged under

*Monell* with "allegations of discrimination" and just two examples). There is no basis to address

at summary judgment the "pattern and practice" method of presenting evidence, and the City is

not entitled to such judgment anyway.

**VII.    The City is Not Entitled to Summary Judgment on Plaintiffs' *Monell* Claim.**

The City argues that it is entitled to summary judgment on Plaintiffs' *Monell* claim

because they (1) cannot establish a violation of the constitution; and (2) cannot point to a

municipal policy that caused the violation. Both arguments lack merit.

**A.    *Sex Discrimination Violates the Equal Protection Clause.***

The City argues that Plaintiffs cannot make out a constitutional violation because they

cannot demonstrate intentional discrimination. This argument rises and falls on the same

arguments that the City advances on the Title VII claims, which the City adopts by reference.

Memo. at 33. For all the reasons described *supra*, a jury could conclude that the City

intentionally discriminated against Plaintiffs because of their sex, which violates the Equal

Protection Clause. *See Salas v. Wisconsin Dep't of Corr.,* 493 F.3d 913, 926 (7th Cir. 2007)

(Equal Protection employment claims follow the proof methods of Title VII).

**B.    *Plaintiffs' Equal Protection Rights were Violated Via Official Policy or Custom.***

Plaintiffs may premise *Monell* liability on (1) an express policy that, when enforced,

causes a constitutional violation; (2) a widespread practice that is so well-settled as to constitute

municipal policy; or (3) a constitutional injury caused by a person with final policymaking

authority for the action. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017).

Here, Plaintiffs' equal protection rights were violated by Commissioner Santiago, the City's final

policymaker for setting academy graduation requirements and by the CFD's widespread practice of sex discrimination against women through physical testing. SOF ¶138.

      1.   Santiago Was the Final Policymaker For Setting Academy Requirements.

To determine if an official is a final policymaker for *Monell* purposes, courts consider: (1) whether the official is constrained by policies of other officials or legislative bodies, (2) whether the official's decision on the issue is subject to meaningful review; and (3) whether the policy decision is within the official's grant of authority. *Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011). As the Seventh Circuit explained:

> [I]t doesn't matter what *form* the action of the responsible authority that injures the plaintiff takes. It might be an ordinance, a regulation, an executive policy, or an executive act (such as firing the plaintiff). The question is whether the … the decisionmaker—was at the apex of authority for the action in question.

*Id.* at 748. Commissioner Santiago was the final policymaker for setting academy graduation requirements and determining which probationary employees successfully completed academy training. SOF ¶138. Initially, the City Council expressly delegated him expansive policymaking authority over CFD: "The Fire commissioner . . . shall manage and control all matters and things pertaining to the Fire Department and all persons employed therein." M.C.C. 2-36-200.

As the City notes, the City Council has also delegated authority for making personnel rules to the City's HR Commissioner, whose Department (DHR) has set forth written Personnel Rules. *See* Memo. at 37-38 n.39 (citing 2014 Personnel Rules).[11] As the City fails to disclose, however, the Personnel Rules *further delegate* authority to department heads (e.g. Santiago) to set retention standards for probationary employees, including CFD candidates in the academy. *See* Rule IX at §2 (department head may discharge or discipline probationary employees, not

---

[11] City of Chicago Personnel Rules, Revised September 10, 2014, *available at* www.chicago.gov/content/dam/city/depts/dhr/supp_info/HRpolicies/2014_PERSONNEL_RULES-FINAL_2014_v3.pdf.

constrained by City HR Commissioner, no review); SOF ¶¶8-9 (candidates in the academy are probationary employees). The Personnel Rules also expressly delegate authority to Santiago to "prepare and conduct training programs that will effectively meet those needs which are unique to the operations of the department concerned." *Id.* at Rule XV. *See also* Rule XXI at §1(f). As authorized by these rules, Santiago set policy for successful completion of the academy by adopting the written Candidate Manual with the requirements for graduation, including the discriminatory tests. SOF ¶138. *See* PX 5, Stewart Dep. at 20-21. Santiago had final say, not subject to review, to adopt these requirements. SOF ¶138; DX 31, Santiago Dep. at 42-43, 81.

These are policymaking actions for *Monell* purposes because they "adopt rules for the conduct of government." *Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004). *See* PX 5, Stewart Dep at 20-21, 79 (manual is a policy document); DX 68 at 133 (manual has the rules and procedures for how the department operates the academy); ECF No. 602 at 1 (City asserting that the suspended assignment policy in the manual governed Youngren's "rights and obligations"); PX 29 at 4 (City telling EEOC that the manual is "CFD's policy on academic requirements"). They go well beyond exercising authority to make "administratively final" hiring and firing decisions, making the City's reliance on *Harris v. City of Chicago*, 665 F. Supp. 2d 935 (N.D. Ill. 2009) misplaced. *See also Kujawski v. Bd. of Comm'rs of Bartholomew Cnty., Ind.*, 183 F.3d 734, 739 (7th Cir. 1999) (denying summary judgment where the Board did not review official's personnel decisions, official was "in charge" of the department, and the official set employment policies). Santiago adopted and enforced academy graduation requirements. He was at the "apex of authority" for that function, and his actions subject the City to *Monell* liability.

2. The discrimination against women entering the CFD through physical testing was a widespread and well-settled practice.

The City is also liable for under *Monell* for well-established "custom" of discriminating against women seeking to work for the CFD through physical tests. *Glisson*, 849 F.3d at 379. For decades, the City has used extremely discriminatory and illegal physical tests to stop women from working as firefighters and paramedics. *See supra* 9-10, 32-33. The practice goes back to the 1990s and spawned decades of civil rights complaints and litigation. *E.g. Ernst* (2008); *Vasich* (2011); *Godfrey* (2012); *Livingston* (2016); SOF ¶154. The practice is so well-established, so notoriously open and obvious, especially after more than 15 years of litigation, that there is no credible claim that the City was not aware of it.

3. The City's Reliance on *Waters v. City of Chicago* is Misplaced.

The City's reliance on *Waters v. City of Chicago*, 580 F.3d 575 (7th Cir. 2009) is misplaced. *Waters* dealt with a City career service employee (not a probationary employee) who was fired from the City's Department of Transportation (DOT) for workplace violence. *Id.* at 581-82. The DOT department head was not a final policymaker because Waters was terminated for violating a City Personnel Rule (as opposed to rule set by the DOT head) and the City's Personnel Rule significantly constrained the head of DOT's actions. *Id.* at 582-83.

This case is very different. Santiago did not terminate Plaintiffs for violating a City Personnel Rule. Rather, Santiago set and enforced the academy requirements (for which he was the final policymaker) to fire Plaintiffs. In addition, Plaintiffs were probationary employees who, unlike Waters, did not enjoy the procedural protections of the Personnel Rules. Santiago decided to terminate Plaintiffs, SOF ¶138, on his own, without involvement of the City DHR, based on rules that he set. *E.g.* PX 16 (termination papers stating: "member did not complete standards of training"). Santiago's decisions were neither constrained nor reviewed by any other policy nor

57

official. SOF ¶138; DX 30, Bryant Dep. at 67 (on terminations "the fire commissioner is the end-all, be-all"); PX 5, Stewart Dep. at 19 ("no one can be terminated without the approval of a fire commissioner"); DX 31, Santiago Dep. at 42-43 (only person above Santiago in approval was the mayor, but the mayor was not involved in approving candidate manuals). He was truly at the "apex of authority" for the action in question.

Contrary to the City's suggestion, *Waters* does not stand for the proposition that the City Council and HR Commissioner are final policy makers for *all* employment matters. As the Seventh Circuit has counseled, "one can be an official policymaker in one domain but not in another." *Vodak*, 639 F.3d at 748; *see also id.* ("The question is whether … the decisionmaker … was at the apex of authority for the action in question … The qualification 'for the action in question' is vital.") (internal quotations and citations omitted). The City's reliance on *Hankle-Sample v. City of Chicago*, No. 20 C 1997, 2021 WL 4461557 (N.D. Ill. Sept. 29, 2021) and *Paterakos v. City of Chicago*, No. 21 C 52, 2021 WL 4635783 (N.D. Ill. Oct. 7, 2021) – two unpublished cases that cite *Waters* – is thus misplaced. Those cases involved the termination of permanent employees like Waters by individuals with no authority to set relevant policy.

4.   The Tests at Issue in This Case Were Not "Examinations."

The City also attempts to link the Step Test and Lifting Sequences to the City's DHR by claiming the tests are "examinations" described in Rule VI of Personnel Rules. Memo. at 38. However, a careful look reveals that these tests are not "examinations" under those Rules.

By its own terms, the "examinations" portion of Rule VI applies to "general employment and promotional examinations," Rule VI (§1), to get on "employment and promotional lists," Rule VII at §3. These are the pre-hire and pre-promotion tests to be placed on a hiring or promotion list. The Step Test and Lifting Sequences were never used for hiring or promotion. Plaintiffs were already City employees; they had passed pre-hire examinations and been hired

58

into probationary paramedic positions. SOF ¶¶1, 17. And Plaintiffs were not seeking promotions. Furthermore, "examinations" subject to the Personnel Rules must be validated and approved by DHR. Rule VI (incorporating the *Shakman* CFD Hiring Plan and its Appendix A requiring a job assessment and validation per EEOC guidelines).[12] The Step Test and Lifting Sequences were created, modified, adopted, and administered by CFD employees, not DHR or professionals. SOF ¶¶157-158. They were not "examinations" within or covered by Rule VI.

     5.   The City's Reliance on its Nondiscrimination Policies is Misplaced.

Finally, the City attempts to shield itself from liability by pointing to its written antidiscrimination policies. Memo. at 34. The Seventh Circuit rejected this argument in *Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011). There, although the Police Superintendent may have been constrained in broad terms by City ordinances, there was no ordinance restricting the Superintendent's authority about the mass arrests at issue. *Id.* at 748 (without a written policy on point, "[t]he City Council … has allowed [the Superintendent] to be sole policymaker in relation to the events at issue in this case."). No City nondiscrimination policy removed or curtailed Santiago's authority over the academy and its requirements.

## CONCLUSION

For the reasons stated, the Court should deny the motion for summary judgment in full.

Respectfully submitted,

/s/ *Charles D. Wysong*
Charles D. Wysong

---

[12] The City cites Rule VI, which in turn references the Chicago Fire Department Hiring Plan, which the City has not separately made part of the summary judgment record, but is a *Shakman* document available at www.chicago.gov/content/dam/city/depts/dhr/supp_info/HRpolicies/CFD_Hiring_Plan_with_apx.pdf.

Marni Willenson
marni@willensonlaw.com
WILLENSON LAW, LLC
3420 W. Armitage Ave.
Suite 200
Chicago, IL 60647
312.508.5380

Christopher J. Wilmes
cwilmes@hsplegal.com
Charlie D. Wysong
cwysong@hsplegal.com
Justin Tresnowski
jtresnowski@hsplegal.com
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 W. Madison St., Suite 4000
Chicago, IL 6060
312.580.0100

Attorneys for Plaintiffs

60