# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Jennifer Livingston, et al.,

*Plaintiffs*,

v.

The City of Chicago,

*Defendant.*

Case No. 16 cv 10156

Hon. Sara L. Ellis

Magistrate Judge Young B. Kim

# DEFENDANT CITY OF CHICAGO'S REPLY IN RESPONSE TO PLAINTIFFS' OPPOSITION TO <u>PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ...................................................................................................... iii

I.     Introduction ........................................................................................................ 1

II.    Overview of Plaintiffs' Arguments and the Lack of Evidence of Discriminatory Intent .................................................................................................................... 2

III.   The Standard ....................................................................................................... 4

IV.    There Was No Knowledge Of A Disparity, But Even If There Was, It Is Not The Same As An Intent to Discriminate ............................................................ 5

    a.     The tests were not "failing women and only women" ................................. 5

    b.     Both men and women were failing the physical tests when CFD decided to "use the tests to fire women." ........................................................ 7

    c.     The focus on the "terminations" at the end of the Alpha Class is false and misleading. ................................................................................. 8

    d.     The CFD could not have had knowledge that a change in the step test would create a disparity in pass rates. ............................................... 9

        i.     Plaintiff cannot show prior knowledge that an increase to the height of the step test would be more challenging for women ...... 9

        ii.    Johnson and Vogt had no knowledge that graduation would be contingent upon passing the physical tests. ............................... 10

    e.     Statistics on purported disparities compiled "after the fact" are not relevant to discriminatory intent ...................................................... 10

    f.     Comments made to the Commissioner about concerns with the tests do not support intentional gender discrimination ....................... 10

V.     Plaintiffs' Other Evidence Fails To Establish An Intent To Discriminate ........... 13

    a.     Evidence which may support a disparate impact claim is not probative of intent in this case. ............................................................................... 13

    b.     The allegations of harassment were not gender based. .............................. 16

    c.     Plaintiffs' "suspicious timing" arguments are specious. ........................... 19

    d.     Evidence of "Pattern and Practice" Does Not Apply. ............................... 21

    e.     Plaintiffs Cannot Identify Any Issues of Material Fact Sufficient to Defeat Summary Judgment on their Intentional Discrimination Claims .. 22

VI.    The Step and Lift Tests Were Not The Reason For The Separations Of Griffin and Youngren ......................................................................................... 25

VII.   Plaintiffs Velasco, Burroughs And Markey Have Not Raised Independent Claims Of Discrimination Based On Academics ............................................... 25

    a.     Plaintiffs' arguments about purported bias in the academic program are inconsequential. ................................................................................... 26

    b.     Plaintiffs identify no evidence of intentional "grade manipulation". ......... 27

|  | i. | Plaintiffs identify no evidence of manipulation as to the Coursework | 28 |

|  | ii. | Plaintiffs Identify No Evidence of Intentional Grade Manipulation with Respect to the Practicals | 30 |

| c. | Velasco's "Change of Story" argument is not well founded | 31 |

| d. | Plaintiffs Lack of "Study Time" Theory is not persuasive or grounded in fact | 32 |

| VIII. | Paramedic Candidates are Not Similarly Situated with Firefighter Paramedics | 33 |

| IX. | Plaintiffs Velasco, Burroughs and Markey Have Waived their Disparate Impact Claims | 36 |

| X. | To The Extent Plaintiff Venegas Alleges Intentional Discrimination Based On The Medical Division, Her Evidence Is Insufficient To Withstand Summary Judgment | 36 |

| XI. | Plaintiffs Do Not State Section 1983 Claims | 40 |

| A. | Plaintiffs Cannot Establish Intentional Discrimination. | 40 |

| B. | Plaintiffs Have Not Established *Monell* Liability | 40 |

| 1. | The CFD Commissioner was not the final policy maker. | 40 |

| 2. | There is no "widespread & well-settled practice" of discrimination at CFD | 46 |

| XII. | Conclusion | 47 |

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Ameritech Services, Inc.,*
231 F.3d 414 (7th Cir. 2000) ...................................................................................21, 22

*Alvarez v. Wexford Health Sources, Inc.,*
No. 13 C 703, 2016 U.S. Dist. LEXIS 167747 (N.D.Ill. Dec. 5, 2016) ............................ 3

*American Nurses Ass'n. v. Illinois,*
783 F.2d 716 (7th Cir. 1986) ....................................................................................... 5

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................................. 23

*Barner v. City of Harvey,*
No. 95 C 3316, 1998 WL 664951, 1998 U.S. District LEXIS 14937 (N.D. Ill. Sept.
18, 1998) ................................................................................................................. 6

*Brummett v. Lee Enters., Inc.,*
284 F.3d 742 (7th Cir. 2002) ..................................................................................... 13

*Chi. Teachers Union, Local 1 v. Bd. Of Educ. Of Chi.,*
2021 WL 1020991, 2021 U.S. Dist. Lexis 50177 (N.D. Ill. 2001)...................................... 6

*Coco v. Elmwood Care,*
128 F.3d 1177 (7th Cir. 1997) .................................................................................... 14

*Colbert v. City of Chicago,*
851 F.3d 649 (7th Cir. 2017) ..................................................................................... 25

*Coleman v. Donahoe,*
667 F.3d 835 (7th Cir. 2012) ..................................................................................... 35

*Downing v. Abbott Labs,*
2019 U.S. Dist. LEXIS 151544 (N.D. Ill. Sept. 5, 2019) ................................................. 32

*EEOC v. Consolidated Serv. Sys.,*
989 F.2d 233 (7th Cir. 1993) ...................................................................................... 5

*Fort Bend Cty. v. Davis,*
139 S.Ct. 1843 (2019) ............................................................................................... 37

*Gbur v. City of Harvey,*
835 F. Supp. 2d 600 (N.D. Ill. 2011).......................................................................33, 35

*Gilson v. Indiana Dept. of Corr.,*
   849 F.3d 372 (7th Cir. 2017) ................................................................................................ 46

*Gilty v. City of Oak Park,*
   919 F.2d 1247 (7th Cir. 1990) ............................................................................................ 21

*Goodman v. NSA, Inc.,*
   621 F.3d 651 (7th Cir. 2010) .................................................................................................. 4

*Int'l Brotherhood of Teamsters v. United States,*
   431 U.S. 324 (1977) .......................................................................................................... 6, 21

*Killinger v. Johnson,*
   389 F.3d 765 (7th Cir. 2004) .................................................................................. 40, 41, 44

*Kujawski v. Board of Commr's,*
   183 F.3d 734 (7th Cir. 1999) ............................................................................................... 44

*Lumpkin v. Brown,*
   960 F. Supp. 1339 (N.D. Ill. 1997) ........................................................................................ 6

*Pers. Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979) ................................................................................................................ 6

*Roberts v. McDonough,*
   No. 21 C 865, 2023 U.S. Dist. LEXIS 95093 (N.D. Ill. May 31, 2023)(Ellis) .................. 4

*Russell v. Chism,*
   No. 15-cv-560, 2017 U.S. Dist. LEXIS 129030 (N.D.Ill. Aug. 14, 2017) ....................... 36

*Sterk v. Redbox Automated Retail,*
   LLC, 770 F.3d 618 (7th Cir. 2014) ................................................................................. 4, 22

*Sweatt v. Union Pac. R.R. Co.,*
   796 F.3d 701 (7th Cir. 2015) .................................................................................................. 3

*United States v. Bd. of Sch. Com'rs of City of Indianapolis, Ind.,*
   573 F.2d 400 (7th Cir. 1978) ............................................................................................... 15

*United States v. Hinds County School Board,*
   417 F. 2d 852 (5th Cir. 1969) ................................................................................................ 6

*Vasich v. City of Chicago,*
   2013 U.S. Dist. LEXIS 1740 (N.D.Ill. Jan. 7, 2013) ..................................... 13, 17, 19, 47

*Vodak v. City of Chicago,*
   639 F.3d 738 (7th Cir. 2011) .......................................................................................... 41, 42

*Watson v. Fort Worth Bank & Tr.,*
   487 U.S. 977 (1988) .............................................................................................................. 12

*Weaver v. Champion Petfoods USA Inc.*,
    3 F.4th 927 (7th Cir. 2021) .................................................................................. 4

*West v. City of Hous.*,
    960 F.3d 736 (5th Cir. 2020) ............................................................................. 35

**Statutes**

210 ILCS 50/3.50 ............................................................................................................ 34

42 U. S. C. §2000e-5(b) ................................................................................................. 37

**Other Authorities**

First and Fourth Amendments ......................................................................................... 42

F.R.C.P. 23 ...................................................................................................................... 21

Rule XV ........................................................................................................................... 45

Rule XV § 1 ..................................................................................................................... 45

Rule XXI § 1 .................................................................................................................... 45

Rule XXI § 1(f) ................................................................................................................ 45

Rule § 1(g) ....................................................................................................................... 45

Defendant, the City of Chicago (the "City"), by attorneys, Hinshaw & Culbertson LLP, submits this Reply in Response to Plaintiffs' Opposition to Partial Summary Judgment.

## I. Introduction

Plaintiffs allege the City used two physical tests for the sole purpose of eliminating as many female paramedics as possible from the workforce. Resp. 1.[1] The Plaintiffs have only brought individual claims against the City, and as this Reply Memorandum demonstrates, the Plaintiffs have failed to come forward with sufficient evidence of intent to support their individual, disparate treatment claims.

In their Response Memorandum (the "Response"), Plaintiffs go to great lengths to salvage their intentional discrimination claims by making unsupported and conclusory statements, and in the process, omit critical facts, present easily discredited narratives and mischaracterize the evidence and the inferences that can be drawn from them. Lacking any evidence of actual bias, they resort to meaningless adjectives and phrases, such as the repetitive reference to a "constellation" of evidence for their intentional discrimination claims. Resp. 2, 20, 34. This Reply will highlight many of those issues. Plaintiffs also devoted over twenty pages to the academic issues, knowing that three of the Plaintiffs are vulnerable on this point as they were not removed from the training program as a result of the two physical tests, which are the focus of the Plaintiffs' Amended Complaint.

The City's motion demonstrates that gender bias did not cause the dismissal of any of the Plaintiffs from the paramedic training academy. The flaws in Plaintiffs' Response include legally deficient comparisons to non-similarly situated employees, conclusions that cannot be supported by the record, and distractions from the critical focus of the City's motion for summary judgment, which is whether there is sufficient evidence of intent specific to each Plaintiff. A careful review of the record shows that,

---

[1] The Plaintiffs' Response in Opposition to Summary Judgment, Dkt. 628, will be referenced herein as "Resp. ___".

despite Plaintiffs' bombastic rhetoric, they have failed to bring forward sufficient evidence of intentional discrimination specific to the reasons each of them failed the requirements of the training program.

Further, the Response contains several overt falsehoods which require a response. They go so far as to accuse the City of "shredding" documents when the evidence dispels any such suggestion. Resp. 44 n.9. For example, Plaintiffs state that "[i]nstead of preserving the weekly grade printouts … the City shredded the records and threw them away. " *Id.* The negative implication is dispelled with a review of the record. Instructor Gallegos explained that he would create his own personal spreadsheet of his Candidates'[2] progress, which he would print and share with them. JX 81 (Gallegos), 97:8-10; 101:17-19.[3] He further explained that the only reason he printed them was to show his Candidates – and afterwards he would shred them because "that was personal information." *Id.* 104:5-7; 104:17-24. There is no evidence that anyone at the City shredded grades as part of scheme to discriminate or hide what it was doing. The record instead demonstrates a perfectly reasonable explanation, which the Plaintiffs completely disregard. The omission is characteristic of Plaintiffs' approach throughout the Response.

## II. Overview of Plaintiffs' Arguments and the Lack of Evidence of Discriminatory Intent

Plaintiffs have multiple theories of how CFD conspired against women, yet none are supported by actual evidence. A review of the Plaintiffs' Response shows they ignored this Court's standing order and based nearly their entire Response on newly alleged facts that were not included in the 100+ facts Plaintiffs added to the Parties' Joint Statement of Facts.

https://www.ilnd.uscourts.gov/PrintContent.aspx?cmpid=818 (Judge Ellis' Standing Order on Summary Judgment).

---

[2] Paramedic candidates will be referenced herein as "Candidates." SOF 13.
[3] Reference to exhibits within the parties' Joint Statement of Undisputed Facts, Dkt. No. 604-1, will be referenced herein as "JX __." Exhibits introduced by Plaintiffs, Dkt. No. 628-1 through 628-30, will be referenced herein as "PX __" and Defendant's two supplements to Plaintiffs' exhibits will be referenced herein as "DefEx___".

While the non-moving party may respond by including additional disputed facts, "these additional facts must be genuinely disputed; the non-moving party may not use the response as an opportunity to sidestep the joint process." *Alvarez v. Wexford Health Sources, Inc.*, No. 13 C 703, 2016 U.S. Dist. LEXIS 167747 (N.D.Ill. Dec. 5, 2016), with procedures affirmed by *Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711-12 (7th Cir. 2015). Here, Plaintiffs either misrepresent the record when introducing new "facts" (see, for example, discussion on PX1, in section IV.b, *infra*), or assert new "facts" that are undisputed, or do both within the same statement (see, for example, discussion on gender-based harassment, in section V.b, *infra*). These additional citations to the record not included in the parties' Joint Statement of Uncontested Facts should be disregarded.

A review of Plaintiffs' alleged supporting material from the record demonstrates just how weak their claims are. Plaintiffs' theories include: 1) knowledge that only women failed the physical tests – yet, the undisputed facts show 5.1% of the men failed all six attempts at the Step Test[4]; 2) knowledge that only women were failing the physical tests when CFD decided to enforce the standards in the Manual[5]— yet, Plaintiffs' new exhibit shows that 3 of the 8 Candidates failing at that time were men; 3) knowledge that no men were terminated for failing the physical tests at the end of the Alpha class – yet, it is undisputed that no Plaintiffs were terminated solely for failing the physical tests at the end of the Alpha class; instead, those who failed the physical tests but otherwise satisfied the requirements were offered a six week extended program and additional opportunities to retake the test(s); 4) knowledge of statistics showing a disparity in Step and Lift test pass rates based on "attempts"– yet, plaintiffs cannot identify any record evidence that anyone had such knowledge prior to the start of the Alphabet classes; 5) knowledge of "warnings" that the tests were discriminatory – yet, other than the demand letter, none of

---

[4] The two physical tests at issue will be referenced herein as the Step Test and Lift Test (together the "Step and Lift" tests).
[5] The 2014 Paramedic Manual, JX 1, will be referenced herein as the "Manual."

the purported "warnings" mentioned any concern about gender or gender disparities (unlike *Ernst*); 6) challenge to the "purpose" of the Step and Lift tests - yet, the facts show the Step Test is used for cardio fitness and the Lift Test is intended to simulate transporting a patient up and down stairs; 7) rejection of a "more fair, less discriminatory" alternative test during the Academy – yet, there is no evidence that any alternative would have affected pas rates, or that any of the Plaintiffs could have passed an alternative test; 8) timing of the decision to increase the Step Test difficulty level – yet, Plaintiffs present no theory related to the paramedic academy as to this issue; and 9) allegations of gender-based harassment – yet, Plaintiffs cannot identify any gender-based comment; 10) pattern of prior discrimination – yet, this is not a class action and individualized evidence is lacking. Furthermore, there is no history or pattern of prior discrimination, as a jury found in favor of the CFD on the intentional discrimination claim in the *Ernst* case, and while the verdict was overturned based on a jury instruction, the plaintiffs dismissed the claim instead of re-trying it.

Further, Plaintiffs Velasco, Burroughs and Markey now allege discrimination based on the academic portion of the paramedic academy (the "Academy"), despite the absence of such claims in their Amended Complaint. Am. Compl., Dkt. 259. Plaintiffs Velasco, Burroughs and Markey also have failed to respond to Defendant's argument on their Title VII disparate impact claims, and therefore, those claims have been waived.

Plaintiffs' offered evidence is insufficient, and their failure to "use evidentiary tools" to identify "specific material facts that demonstrate a genuine dispute for trial" confirms that summary judgment is appropriate. See *Roberts v. McDonough*, No. 21 C 865, 2023 U.S. Dist. LEXIS 95093, at *7-8 (N.D. Ill. May 31, 2023)(Ellis), citing *Sterk v. Redbox Automated Retail*, LLC, 770 F.3d 618, 627 (7th Cir. 2014).

## III.  The Standard

The Seventh Circuit describes summary judgment as the "put up or shut up" moment in litigation. *Goodman v. NSA, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010)(citing cases).  In practice, this means the non-moving party must "marshal and present the court with the evidence she contends will prove her case.

4

And by evidence, we mean evidence on which a reasonable jury could rely." *Id.* It is the *evidence itself* that must convince a trier of fact to accept its version of events. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021)(emphasis added). Plaintiffs cannot make the required showing and the law does not permit these claims to proceed.

## IV. There was No Knowledge of a Disparity, But Even if There Were, it is Not the Same as an Intent to Discriminate

Plaintiffs simply cannot overcome the well-established principle aptly articulated by Judge Posner: "Knowledge of a disparity is not the same thing as an intent to cause or maintain it." *EEOC v. Consolidated Serv. Sys.*, 989 F.2d 233, 236 (7th Cir. 1993), *citing American Nurses Ass'n. v. Illinois*, 783 F.2d 716, 722 (7th Cir. 1986). This principle eliminates at least five categories of evidence upon which Plaintiffs rely. As explained in *Consolidated Services,* no inference of intentional discrimination can be drawn from knowledge of a disparity. *Id.* More to the point here, Plaintiffs are unable to identify evidence showing CFD even had knowledge of a disparity, much less an intent to cause it.

### a. The tests were *not* "failing women and only women"

Plaintiffs' contention that the tests "were failing women and only women" – and that CFD knew it - is demonstrably false based on the record. Resp. 1. Indeed, according to Plaintiffs' own expert, at least 5.1% of the males failed the Step Test. See chart at SOF 147 (Categorizing 5.1% of the men as "no pass" after the 6 attempts). To be clear, the undisputed fact shows that 5.1% of the male Candidates failed *all* attempts, not just some attempts. *Id.* Since they cannot dispute it, Plaintiffs attempt to distract by suggesting *Defendant* argued that males failed *in some attempts* of the physical testing. Resp. 24. Yet, in Defendant's opening brief, the City very clearly stated that "a total of nine men failed the Step Test," and referenced SOF 147 as "showing 5.1% of 175 males failed the Step Test." Mtn 15.[6]

---

[6] The City's Memorandum of Law in Support of Partial Summary Judgment (Dkt. No. 604) will be referred herein as "Mtn."

Instead of addressing the number of males who actually failed all six attempts at the Step Test, they again distract by focusing on the number of males actually *terminated* from the Academy. ("Zero (0) men were *fired* for these tests." Resp. 24 (emphasis added)).  Plaintiffs cannot credibly allege the tests were intended to exclusively eliminate women if they cannot address what happened to the 5.1% of men who also failed. It is Plaintiffs' burden to produce evidence of discrimination, and they have not shown the men who failed went on to work as paramedics.

Plaintiffs again resort to meaningless phrases and misapply the concept of the inexorable zero which was explained in *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). "The appellants' evidence is of the type that the Supreme Court has labeled the 'inexorable zero'--evidence that an employer in an area with a sizeable black population has never hired a single black employee--which, by itself, supports an inference of discrimination."  *Id.* at 342 n.23. Plaintiffs' authority does not support their theory.  *Barner v. City of Harvey*, No. 95 C 3316, 1998 WL 664951, 1998 U.S. District LEXIS 14937, at *159-168 (N.D. Ill. Sept. 18, 1998) (within two months of a white mayor taking office, 69 employees were terminated, all but one African-American, and employment in all city departments lost a substantial percentage of African American employees.); *United States v. Hinds County School Board*, 417 F. 2d 852 (5th Cir. 1969) (school integration case where, even after Supreme Court's Order of Desegregation, no white students ever attended traditional African-American); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) (state's veterans preference in hiring was inherently gender-biased because of the demographics of those who served, but there was no evidence the law was devised with the collateral goal of keeping women in stereotypical positions.); *Chi. Teachers Union, Local 1 v. Bd. Of Educ. Of Chi.*, 2021 WL 1020991, 2021 U.S. Dist. Lexis 50177 (N.D. Ill. 2001) (CPS's classification of dozens of schools as poorly-performing subject to a "turnaround program," resulting in an overhaul to the staff of predominately African American employees); *Lumpkin v. Brown*, 960 F. Supp. 1339 (N.D. Ill. 1997) (recruitment plan targeting college graduates and placing them in positions with a clear promotional path, but excluding older workers.).

Plaintiffs' inappropriate use of "inexorable zero" in a pejorative manner should not be overlooked. Over 60% of the men needed at least two tries to pass the Step Test, and some still failed. SOF 147. Plaintiffs ignore the 44 women who passed the Lift Test and the 43 women who passed the Step Test. SOF 147, 148, respectively. They disregard the female Candidates who graduated and became CFD paramedics. SOF 46. Numerous men did not pass any of their six attempts at the physical fitness tests. SOF 147. As for their status, Plaintiffs did not develop the record and their argument fails. There is simply no inexorable zero in this case and the Plaintiffs' resort to empty rhetoric is telling.

### b. Both men and women were failing the physical tests when CFD decided to "use the tests to fire women."

Plaintiffs fail in their attempt to support their allegation that the Commissioner intentionally "use[d] these tests to fire women." Resp. 31. Plaintiffs focus on Commissioner's decision to enforce the standards in the Manual as a condition of graduation. Resp. 31, PX1. They introduce a new exhibit in an attempt to show that the decision was motivated by gender animus. Instead, the exhibit defeats their argument, as it shows that when the Commissioner relayed the decision, nearly the same amount of men were failing the Step Test as women. PX1.

Plaintiffs' new exhibit (PX1) is an email exchange between the Commissioner and Chief Vogt just prior to the end of the first Academy class. *Id.* In the exchange, the Commissioner conveyed his decision to enforce the standards in the Manual, despite learning that a number of Candidates were failing those standards. (Chief Vogt states: "…what concerns me more are the 8 that are failing the physical requirements set by the Candidate manual…They have approximately 1 week to complete this requirement." The Commissioner responded, stating: "The bar has been set, it will not be lowered." PX1).

This email is important because, as Plaintiffs explained in their Response, terminating Candidates for failing the standards identified in the Manual was "not guaranteed or required." Resp. 31. Notably, in Vogt's email to the Commissioner, he listed the names of the eight Candidates failing the Step Test at the

time. PX1. Three of the Candidates in the email were men (Brian, Daniel and Sean), and the first two names on the list were Brian and Daniel. PX1. When the Commissioner allegedly decided to "use these tests to fire women" (Plaintiffs' characterization), the Commissioner had notice that nearly as many men would be "terminated" as well. Resp. 31. His objective could not have been to target women (PX1), and instead of supporting their theory, their new exhibit disproves it.

> ### c. The focus on the "terminations" at the end of the Alpha Class is false and misleading.

Plaintiffs continue to focus not on the actual number of test failures by women and men, but instead on the terminations purportedly made at the end of the Alpha class. ("…the City chose to use the tests to fire five Alpha class women and zero men." Resp. 25). They claim that "the City marched forward with its terminations…" Resp. 8. Yet, their narrative is contradicted by the record. None of the Plaintiffs who failed the physical tests (but passed the other requirements) were terminated at the end of Alpha. SOF 94, 82-84 (Snevely); 73-75 (Livingston). Instead, the Plaintiffs in Alpha who failed the physical tests (but passed academics) were invited to participate in a six week paid extended physical training program.[7] SOF 44, 45, 94, 82-84 (Snevely); 73-75 (Livingston). The extended program provided additional opportunities to train and pass the physical tests and graduate. SOF 45, 94. The extended program made sense because the Alphabet classes lasted only six to eight weeks, instead of three months like prior paramedic Academies. SOF 44, 45; JX 29 at ¶11.

Plaintiffs disregard the six week extended training period which was designed to assist them. SOF 45; JX 29 ¶11. Instead, they point to an email the Commissioner sent to himself the night before the Alpha class ended, which actually supports Defendant's position. Resp. 8. They assert: "[o]n September 14, 2014, the night before the graduation ceremony, he even noted to himself the race and sex of the

---

[7] The third Plaintiff in the Alpha Class (Velasco, *nee* Guarino) was not invited to the extended program because she failed the academic portion of the Academy. SOF 45, 49, 50, 95

women being fired." *Id.* Yet, as is undisputed, after the Commissioner's note to himself on the evening of September 14, 2014, Plaintiffs' terminations for the physical tests *did not* move forward. SOF 45, 94 82-84 (Snevely); 73-75 (Livingston).

The extended program proved successful for a number of Candidates throughout the 2014-15 Academies, including seven women who went on to pass those tests during the extended program and become CFD Paramedics. SOF 47. Plaintiffs also disregard that men took advantage of the extended training program, and two participated successfully. See JX 69, Hudson Decl. Para. 28, 30-32  Plaintiffs' focus on the end of Alpha class, and their disregard of the extended training period, results in a distorted and cynical spin on an otherwise generous effort to assist those experiencing difficulty in passing the physical tests.  SOF 45.

### d. The CFD could not have had knowledge that a change in the step test would create a disparity in pass rates.

#### i. Plaintiff cannot show prior knowledge that an increase to the height of the step test would be more challenging for women.

Plaintiffs must show that the revised Step Test was implemented for the purpose of eliminating women, yet they cannot even show knowledge of a disparity. *EEOC v. Consolidated Systems, supra.* According to Plaintiffs, Training Coordinator Johnson recommended using the higher Step Test in the July 2014 paramedic manual because he had seen women firefighters struggling with the 18" box for months in a separate firefighter academy. Resp. 25.  While Plaintiffs correctly cite to Johnson's testimony about some women having difficulty with the 18" step in the separate firefighter academy, they disregard Johnson's statement that "[w]e had guys that struggled, too, so it was on both parts."  When Johnson was asked, "who struggled more, men or women?", Johnson replied, "if you ask me, men struggled more because of flexibility." JX 27 (Johnson), 223:11-15. Plaintiffs also contend that Vogt personally saw "tough" women struggling, yet they do not even cite to Vogt's testimony to establish what he "personally" saw. Resp. 29. Plaintiffs' evidence in this regard is not admissible or informative.

### ii. Johnson and Vogt had no knowledge that graduation would be contingent upon passing the physical tests.

As of the adoption of the Manual (July 2014), Plaintiffs admit neither Vogt nor Johnson knew Candidates would be required to pass the physical tests in order to graduate. Resp. 31, JX 1 (Manual). Plaintiffs admit that the Commissioner did not relay this requirement until after the Academy already started. Resp. 31; PX 1 September 2014). As Plaintiffs highlight in their Response, terminating Candidates for failing the testing standards was not "guaranteed or required" by the Manual. Resp. 31. As such, the decision to use the more difficult Step Test (without knowledge of the graduation requirement) could not have been designed to eliminate women, as there was no indication that anyone would be eliminated based on their performance on this physical test. Resp. 31; PX 1; JX 1 (Manual).

### e. Statistics on purported disparities compiled "after the fact" are not relevant to discriminatory intent

Plaintiffs' intricate, "attempt-based" statistics do not support a finding of intentional discrimination because they were created by Plaintiffs' expert for this case and were not known by CFD when the decision was made to enforce the standards in the Manual, or when the Candidates were terminated after the extended program. See SOF 147, 148. Plaintiffs cannot show relevant knowledge of the statistical evidence on the part of the decision-makers at the relevant time. Moreover, Plaintiffs have presented no statistics based on prior years. They cannot and do not represent that CFD knew that women historically had challenges with the Lift Test or that only women struggled with the Step Test.

### f. Comments made to the Commissioner about concerns with the tests do not support intentional gender discrimination

The City was not "warned," either internally or from consultants, that these two portions of the physical testing discriminated against women. Yet, Plaintiffs misleadingly contend the "CFD used biased tests to fire qualified women despite warnings that the tests were discriminatory and the City would be sued for discrimination." Resp. 21 (Section A.). The only conceivable "warning" related to gender consists of the self-serving demand letter from Plaintiffs' counsel. SOF 141. JX 77.

Plaintiffs point to CFD Deputy Commissioner Vasquez's testimony, suggesting that he "warned" the Commissioner about the tests. ("Deputy Commissioner [Vasquez] specifically warned the Fire Commissioner that the tests were not validated and should not be used." Resp. 22). Despite the repeated references about "warnings" to the Commissioner throughout the Response, Plaintiffs rely mainly on one paragraph in the statement of facts for support. They cite to SOF 144, yet as shown below, SOF 144 does not reflect any gender-related discussions that could be relevant to the claims here. The Deputy Commissioner merely expressed his concern: 1) that the height of the Step Test might be extreme; and 2) about the reliability of the lifting test because it used partners, "and that the demand might be excessive for going up three flights of stairs." He expressed a concern the tests were "'implemented internally without science" and whether the test constituted "a valid test," such that it could be challenged legally. SOF 144. These comments regarding the tests do not support an intent to discriminate based on gender.

Next, Plaintiffs contend "Bryant, Vasquez, Vogt, and Santiago all discussed problems with the tests including their impact on women." Resp. 22. The record does not support Plaintiffs' position. Instead, the evidence cited by Plaintiffs shows Vasquez spoke to Bryant and Santiago, separately, about the tests. Resp. 22. In those communications, Vasquez raised a generalized concern with validation, but he did not discuss the impact of the tests on women or pass rates or gender differences. *Id.* SOF 159. As to Vogt, the paragraph cited addresses a modified lifting test, but does not reflect any discussion between or among Vogt and the others identified by Plaintiffs, nor does it even refer to the impact of the test on women. *Id.* SOF 166.

Plaintiffs focus much attention on test validation, and the degree of familiarity of CFD leaders with formal test validation and related studies. (Deputy Commissioners Bryant and Vasquez "knew employment tests must be a valid measure of job qualifications and how to have them professionally validated."), Resp. 7. However, this line of argument is based on a false premise. As established below, the law does not require a professional validation prior to using a test. It also does not require a

professional validation for a test to be considered "valid," and does not require a professional testing company to develop the test in order for it to be considered a "valid" test.

Comments about the legal requirements of test validation, including those expressed by individuals like Deputy Commissioner Vasquez, are not evidence of discriminatory intent. Plaintiffs' argument suggests "strict liability" – or an automatic showing of discriminatory intent whenever an entity does not solicit scientific validation of a training program. The Supreme Court rejects this position. *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 998, (1988) ("[E]mployers are not required, even when defending standardized or objective tests, to introduce formal 'validation studies' showing that particular criteria predict actual on-the-job performance."). No law requires an entity to secure a formal validation study before it may implement a training program. Deputy Commissioner Vasquez's comments about a formal validation do not suggest that CFD discriminated against women, nor do they suggest knowledge that the tests negatively impacted women.

Plaintiffs also use questions from an outside consultant in an attempt to show the "City was specifically warned that these terminations discriminated against women and violated the law." Resp. 22, referencing SOF 141-142.[8] In undisputed fact 142, the consultant raised concern about whether the tests "had been validated [pursuant to a validation study] and are aligned with job requirements." SOF 142. The outside consultant did not raise concerns about the impact on women. She did not reference gender at all, nor did she "warn" that the tests "discriminated against women" and "violated the law." *Id.* Instead, she noted that some of the testing requirements were "more closely related to physical fitness," which is exactly what the Manual envisioned. SOF 142; See also, JX 1, App'x B (Step Test). After a careful review of the record, the only "warning" of any potential unlawful conduct during the Alphabet classes was created by Plaintiffs' counsel in the form of a self-serving demand letter. SOF 141.

---

[8] SOF 141 is the demand letter.

## V. Plaintiffs' Other Evidence Fails to Establish an Intent to Discriminate

### a. Evidence which may support a disparate impact claim is not probative of intent in this case.

Despite the fact the City's motion is focused on the disparate treatment claim, Plaintiffs devote several pages of their Response to evidence which might support a claim of disparate impact. Resp. 26-28. The Plaintiffs suggest that "[a] jury can find discrimination where CFD's tests were baseless and invalid" and where the Commissioner "knowingly rejected the more realistic and less discriminatory alternative test …" Resp. 26, 28, respectively. While that may be relevant to a disparate impact claim, Plaintiffs have not shown how it is evidence of intent to discriminate. Plaintiffs also wrongly identify "job related[ness]" as a factor Judge Norgle considered when evaluating discriminatory intent in *Ernst*. Judge Norgle did not reference job relatedness in his opinion, as it is a term of art in disparate impact cases. Resp. 35. 2014 U.S. Dist. LEXIS 181270 (Feb. 25, 2014).

Moreover, Plaintiffs cite to one phrase in *Vasich* and distort the context and meaning to serve their narrative in this matter. In their Response, Plaintiffs claim the court identified "lack of a valid purpose" as an element that could prove intentional discrimination. Resp. 26. The court concluded nothing of the sort. Instead, the court described the plaintiffs' presentation of the *Vasich* test as a "discriminatory device that lacks a valid purpose," in order to highlight that the actual PAT, itself, was alleged to be discriminatory, as distinguished from *McReynolds II*, where the plaintiffs did not claim the "*retention program itself* was intentionally discriminatory." *Vasich v. City of Chicago*, 2013 U.S. Dist. LEXIS 1740, at *39 (N.D.Ill. Jan. 7, 2013)(emphasis in original). The court did not conclude that "women could prove intentional discrimination" with evidence that the test "lacks a valid purpose." Regardless, the Step and Lift tests serve a valid purpose, as described in the City's opening brief and below. Mtn. 12, 21, 24.

Plaintiffs also fail to respond to the caselaw from Defendant's opening brief which explains the limited nature inquiry into the "legitimacy" of an "employer's expectations" in the *prima facie* context. Mtn. 21, 22, 23. They ignore *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir. 2002), cited by

Defendant, which made clear that in connection with the *prima facie* inquiry, the court does not "second-guess an employer's policies that are facially legitimate." Mtn. 22. Not only do they ignore the context of Defendant's argument and conflate the disparate treatment and disparate impact standards, they claim Defendant's argument was made "without citation to any evidence." Resp. 27. That is untrue, as the City addressed the Lift Test in the context of the *prima facie* case, and cited SOF 14 as evidence that "Paramedics are required to carry patients and equipment up and down stairs in the course of their on-the-job duties. ¶14." Mtn. 22-23. Defendant's motion also addressed the employer's legitimate expectations with regard to the Step Test, as it states, "[The Step Test] was included as a part of the physical fitness performance testing (¶41), and requires a Candidate to step up and down from an 18" box continuously for two minutes while holding weights. ¶42. Plaintiffs acknowledge fitness and stamina are important qualities for a paramedic. ¶18." Mtn. 17. Plaintiffs may not like the rigorous physical tests, but this argument amounts to no more than a dispute about whether the employer demands "too much" of its workers, which, according to the Seventh Circuit, is not an issue for the courts to decide. *Coco v. Elmwood Care*, 128 F.3d 1177, 1180 (7th Cir. 1997).

Additionally, Plaintiffs criticize the Step Test because it does not mimic paramedic tasks, and argue the Lift Test is not job related because some paramedics have not encountered that particular challenge in the job. Resp. 7, 26. As noted above, the purpose of the Step Test was to ensure fitness and cardio endurance and not to mimic a particular paramedic task. SOF 149. As to the Lift Test, the Manual states that the test assesses "the candidate's ability to successfully convey patients at emergency scenes in a safe manner when ascension or descention is required." JX 1 (Manual), App'x C. The Lift Test is not compromised and rendered illegitimate just because a paramedic has not faced the exact scenario as the Lift Test in the field. Nor can Plaintiffs glean intent from their own self-serving subjective opinions that the tests are "shoddy." *See* Resp. 26. Those opinions prove nothing with respect to intent.

Much of the testimony on which Plaintiffs rely to criticize the tests is based on hindsight by those not involved with creating any of the physical fitness tests found in the Manual. For example, Plaintiffs

use the testimony of Patricia Wood, a commander of EMS training, and her "thought the test was not 'beneficial' and that the City has no legitimate need for it." Resp. at 3. To be clear, Patricia Wood became the commander of EMS training after the Alphabet classes. JX 88 (Wood), 56:18-24. Plaintiffs do not identify any involvement by her with respect to the implementation of the tests during the Alphabet classes, or that her opinions on the test were shared during the relevant time period. Her after-the-fact commentary is not evidence of real-time intent on the part of decision-makers.

Plaintiffs' argument that "CFD abandoned the tests after 2015" is wrong. Resp. 27. CPD did not abandon the tests; rather, a new leader chose to revise the program and maintained a modified Lift Test. SOF 161. Changes to the Manual and differences of opinion from new leadership are not evidence of intent sufficient to support a disparate treatment claim and do not create an issue of material fact.

Plaintiffs also invite the Court to assess the necessity of testing within the Academy, and insist no evaluation should be conducted because the Candidates have shown their competency at the pre-hire screening. Resp. 26. Plaintiffs allege that, despite the entry-level nature of the job and regardless of their performance during the Academy, CFD was required to dispatch them to an ambulance without further assessment. SOF 8 (entry level). This safety-sensitive position is demanding and the work depends on their physical fitness, stamina and alertness. SOF 18. Asking CFD to forego assessing Candidates' fitness during training, and hoping they all do well on the streets, could be viewed as negligence, if not more. The Plaintiffs can point to no law prohibiting assessments during training.

In a further attempt to label CFD's decisions as discriminatory, Plaintiffs point to the Manual for support that CFD was not required to enforce the testing standards. Resp. 12. Yet, the standards were published in that very Manual, including the requirements for the Lift and Step tests. SOF 41-43. The fact that the Commissioner used the discretion afforded to him in the Manual to enforce the training standards in 2014 is not evidence of intentional discrimination. SOF 111.

Plaintiffs also use another "disparate impact" concept, arguing the Commissioner knowingly rejected a less discriminatory alternative to the Lift Test. Resp. 28. Yet, the case they rely on is inapplicable

15

to the matter at hand. *United States v. Bd. of Sch. Com'rs of City of Indianapolis, Ind.*, 573 F.2d 400, 413 (7th Cir. 1978) (recognizing that in the school segregation context, the inquiry for "segretive purpose or intent" does not depend upon the motivation of individual decisionmakers). Even if Plaintiffs could borrow the elements of disparate impact in attempt to prove disparate treatment, it is of no consequence. Indeed, Plaintiffs fail to identify evidence showing the alternative Lift Test would have a "less discriminatory" impact. The record contains no evidence that the Plaintiffs would have passed the alternative Lift Test or that it would have affected the pass rates in general. This is their failure.

### b. The allegations of harassment were not gender based.

Close scrutiny reveals no gender-based harassment in the record despite the fact Plaintiffs Response devoted three separate sections addressing purported gender-based harassment. Resp. 12, 14, 33. Tellingly, Plaintiffs did not include any examples of gender-based comments in the parties' 228 statement of facts.[9] And they are unable to back up the generic contentions in their Response with any examples of derogatory comments or conduct aimed at women. Indeed, their Response contains generalized references to staff who "harassed, berated, and humiliated" women. Resp. 12. They then represent that "[w]itness after witness report academy staff mistreating women through sex-based harassment and body-shaming." *Id.* Instead, the evidence reveals that the instructors yelled at both men and women, correcting them on form, and treating them like cadets in a bootcamp environment, as is common for paramilitary organizations like the CFD. Plaintiffs even cite to Burroughs' testimony, where she explained, "it felt like boot camp sometimes, with instructors yelling and shouting, sometimes at the male candidates." Resp. 36, JX 42 (Burroughs), 263:3-12.

---

[9] When the City pointed out the lack of evidence, Plaintiffs faulted the City for failing to identify a citation for the absence of evidence. (Resp. at 36). "Further, the City's argument, notably made without citation, is false. The record includes ample evidence of sex-based harassment by CFD instructors and leadership." There is no such evidence.

16

As purported evidence of harassment, Plaintiff Markey asserts she was subject to "comments about appearance and physical fitness compared to the men." Resp. 12, JX 2 (Markey), 179:18-20. Yet, when pushed for examples during her deposition, instead of gender-based comments, she provided examples of performance-based criticism, testifying that she was "the only candidate that was pulled out of line or pulled out of cadence for our jumping jacks." JX 2 (Markey), 179-180:23. She further admitted that when she was pulled out of line, she "assumed that her form wasn't correct because she [instructor Bandsra] would pull me out of line and tell me it wasn't." JX 2 (Markey), 50:2-13. According to Markey, Bandstra was "wrong" in doing so because she was "hostile." JX 2 (Markey), 50:14-20.

Plaintiffs also assert Chief Vogt berated and humiliated females, but do not rely on any testimony from paramedics to support it. Resp. 12, 22. In fact, all Plaintiffs were asked about any harassment they experienced. Only Livingston identified Vogt and her claim was limited to a single alleged remark that had no connection to gender. ("Just keep going, keep going, it's not that hard." JX 22 (Livingston), 236-237:21-4). Instead, the information against Vogt come from a declaration from the named plaintiff in *Vasich*, who testified about her experience in the separate firefighter academy. Resp. 12, 22; SOF 198 (identifying Bruno).

They also rely on a declaration submitted by Candidate Bain, which states she was "body shamed and berated by instructors," without providing any indication about the meaning of "body shamed" or the comments that would give rise to the description. Resp. 12. Nor did she provide any specific information about how she was "berated" by instructors, or how it related to her gender. *Id.* Bain's declaration also asserts that she endured "degrading and sexist treatment," which consisted of instructors "forcing [me] to go to the hospital in an ambulance" when she denied having an injury. PX 7, Para 8.

They highlight Plaintiff Snevely's testimony where she explained that "it appeared" to her that one of the instructors "was looking down my shorts" while she was doing sit-ups. Resp. 34, JX 23 (Snevely), 72:14-16. She also explained that he stood at her feet during the exercises, when he "could have stood by my head" to evaluate her form. JX 23 (Snevely), 73:11-18. In addition to Sneveley's

17

supposition, they cite to Markey's deposition for support, yet it contains no corroborating testimony. Resp. 34.

Plaintiffs also cite numerous pages of testimony, but fail to identify any examples of gender-based conduct purportedly contained within the testimony. Resp. 12, 14, 33, 34, 36. The City checked them all, and in every instance, the testimony confirms they experienced no gender-based harassment or that the challenged conduct was directed toward both genders. For example, Plaintiffs cite Burroughs' testimony about a circumstance where Instructor Camper and a female instructor yelled at Burroughs when Burroughs "wasn't in coordination with everybody." Resp. 36; JX 42 (Burroughs) 263:22-264:10. Yet, Burroughs also admitted that Instructor Camper probably harassed both male and female candidates. *Id.* 264: 22:24.

They also generally cite to Livingston's testimony that the purported gender-based harassment consisted of someone "yelling at me in general, calling out my name. And I can't tell you exactly what it was." Resp. 36, JX 22 (Livingston), 233:3-14. They point to Venegas' deposition where she testified that the instructors were only screaming at the women. Yet they omit reference to her testimony shortly thereafter where she corrected herself, explaining that the instructors screamed at everybody. Resp. 36, JX 6 (Venegas), 276:1-11. Additionally, they attempt to rely on Plaintiff Chavez; yet, when she was asked whether she heard instructors say anything derogatory about being female, Chavez testified "I don't remember." JX 50 (Chavez), at 50:1-4.

As part of the alleged harassment, Plaintiff Venegas and Candidate Bain (a non-plaintiff) complain that women were targeted and removed from training, but no men who struggled were removed. Resp. 33. While Bain may not have seen a male removed from training after struggling with exercises, Plaintiffs Venegas and Snevely witnessed such incidents. JX 23 (Snevely), 37:20-23; 38:8-14 (testifying about a male Candidate who was sent to medical and "not seen again" after falling behind during training exercises). JX 101 (Venegas), 277:22-278:17 (identifying David B. as a male who was pulled from training when he was "unable to keep up.")

18

Plaintiffs' cited facts reveal only generalized statements by male and female instructors yelling at and belittling candidates, both male and female, in a boot camp environment. These generalized statements, which include subjective feelings, are not proof of the discriminatory intent of any of the decision makers in this case, and Plaintiffs' arguments on harassment should be disregarded, as the record does not contain any evidence of gender-based conduct.

### c. Plaintiffs' "suspicious timing" arguments are specious.

As supposed evidence of intent to discriminate against female Candidates, Plaintiffs focus on the Fall of 2013. Yet, the Fall of 2013 was when the height of the Step Test increased (to 18") for *firefighter* candidates, not paramedics. ("…[I]n the fall of 2013, just when a 'historic' number of women entered the fire academy as a result of the *Vasich* Title VII litigation, CFD for the first time started to test an 18" box for the Step Test.") Resp. 6; SOF 198 (the *Vasich* litigation was specific to firefighter applicants). Whatever inference they attempt to establish as to the firefighter academy does not cross over to the paramedic Academy simply because it is convenient for Plaintiffs' theory. The 18" Step Test was not used in the paramedic Academy until August of 2014. SOF 14, 149, 160. To be clear, Plaintiffs do not allege the height was increased in August 2014, in response to an increase in the number of women entering the paramedic academy. Resp. 9 (bottom), 29 (top). Essentially, Plaintiffs speculate that the CFD targeted female paramedics in 2014 to eliminate the so-called "wave" of females firefighters who entered a separate academy in 2013. Resp. 9, 29; SOF 200, 201. The timing reference to the separate firefighter academy (the Fall of 2013) does not support the alleged initiative to eliminate women from the 2014-2015 paramedic Academy classes. Attempting to overcome this problem, Plaintiffs argue the two academies are not distinct divisions. Resp. 29. Yet, paramedics were not part of the firefighter academy in 2013, or any other time. SOF 17, 173. They are separate (See the Comparator Argument, Section VIII, *Infra*).

In their argument about "suspicious timing," Plaintiffs attempt to delegitimize the CFD's decision to increase the height of the Step Test. Resp. 29. Yet, as the testimony in Plaintiffs' citation reflects,

Training Coordinator Johnson changed the box height because the 9" box was not providing the necessary cardiac output for conditioning purposes, which is the very purpose of the exercise. JX 27 (Johnson), 215: 17-24; JX 1, Manual, App'x B. Further undermining Plaintiffs theory is the evidence in the section above, demonstrating that male firefighters also struggled with the Step Test. (See Section IV.d(i), *Supra*).

Plaintiffs return focus on Chief Vogt, claiming he harbored a discriminatory animus, and intentionally interfered with the Step Test in order to reduce the number of women from the paramedic ranks. Resp. 29. They resort to their repeated claim that "[i]t was only when Chief Vogt took over training and encountered a 'historic' number of women in the academy in the fall of 2013 that CFD decided to double the height of the box." Resp. 29. The record provides no support for these assertions. The pages of Johnson's deposition cited by Plaintiffs show that Vogt's presence at the training academy made no difference to Johnson's decision to increase the height of the Step Test. (Q: But you didn't work on changing the box until Chief Vogt came along, right? A: I wouldn't say it was until he came along…He just happened to come along when I was changing it. JX 27 (Johnson), 215:10-14). Minimum review reveals the inadequacy of the record support for the exaggerations of the Plaintiffs.

Further undermining Plaintiffs theory is the fact that the Lift Test, which Plaintiffs also allege was intentionally used to remove women, actually became easier at the same time the Step Test became more difficult. Indeed, the 2012 Manual (covering the preceding paramedic Academy) required Candidates to complete the Lift Test without any accommodations, such as the option to rest the chair on the landing. JX 6 (2012 Manual) at 25. That rule changed with the Alphabet class. In the 2014 Manual, when performing the Lift Test, Candidates were allowed to rest the chair on the landing in between floors. JX 1 (2014 Manual) at App'x C. Defendant raised this issue in its opening brief, yet it was ignored by Plaintiffs. Mtn. 14. As shown here (and discussed in the opening brief), the 2014 changes to the tests did not make them uniformly more difficult. Mtn. 14. One test became markedly easier. Plaintiffs cannot

explain how their speculation about the timeline shows discriminatory intent, when, at a purportedly critical point, the CFD decided to make one of the two "discriminatory" tests substantially easier.

Plaintiffs employ a strawman argument to suggest the timing shows discriminatory intent because those decisions were made after a new PPAT entrance test was implemented "and women streamed into the academy." Plaintiffs have not even established evidence of the premise of their argument, as there is no evidence that the new PPAT test resulted in an increase in women to the Academy, much less that CFD knew about it in advance of its decision to increase the Step Test difficulty or when it decided to enforce the standards in the Manual. Nor is there evidence that CFD was "forced" to implement the new PPAT. For one, CFD retained a consultant to identify and a new PPAT in 2012, when the *Ernst* case was still moving through the court. SOF 34, 35. There is no support to Plaintiffs' argument that CFD was forced to abandon the PAT at any time, much less prior to the implementation of the new test.

### d. Evidence of "Pattern and Practice" Does Not Apply.

Plaintiffs miss the point of the City's position on the use of pattern and practice evidence. Each Plaintiff lacks sufficient evidence of intentional discrimination with respect to the employment decisions specific to each of them. Mtn. 38. First, Plaintiffs did not bring a class claim under F.R.C.P. 23, and the EEOC has not brought a claim of systemic discrimination against the City on behalf of a group of individuals. The key point is that even if such generalized pattern and practice evidence existed, it would be merely collateral. Any such evidence would not be sufficient to save the intentional discrimination claims of any of these Plaintiffs, as they lack the necessary evidence of intent with respect to the particular employment decision directed against them. The Court must look for evidence of intentional discrimination directed at each Plaintiff. *Gilty v. City of Oak Park*, 919 F.2d 1247 (7th Cir. 1990).

Plaintiffs focus instead on a diversion, and debate whether pattern and practice is a form of evidence or an independent claim. Resp. 59-60. A survey of caselaw discussing such evidence reveals much dicta where the phrase "pattern and practice" is sometimes referred to as a form of evidence and sometimes as a claim. Plaintiffs never address the points that, without more, pattern and practice evidence

is an insufficient substitute for individualized evidence, and that the *Teamsters* approach is not appropriate for individual cases.

Plaintiffs also ignore *Gilty,* which is the key Seventh Circuit case on point and relied upon by the City in its Memorandum of Law.  Mtn. 29, 31, 39. Given the individual nature of the claim, the court concluded in *Gilty* that the plaintiff's pattern and practice evidence "can only be collateral to evidence of specific discrimination against the actual plaintiff." *Id.* (internal citations and quotation omitted). Plaintiffs' individual claims are not saved by reference to generalized evidence which the Plaintiffs claim supports a pattern and practice of discrimination.  There must be evidence of intentional discrimination directed at each individual Plaintiff.

Plaintiffs rely on *Adams v. Ameritech Services, Inc.*, 231 F.3d 414 (7th Cir. 2000) for the proposition the Seventh Circuit has "endorsed the viability of a pattern or practice proof in a multi-plaintiff case." Resp. 23, 24, 53. That is another overstatement.  The plaintiffs in *Adams* brought a variety of claims, including disparate impact, individual disparate treatment, and other challenges to a reduction in force, which included, according to the court in *Adams*, pattern and practice claims. *Id.* at 422. Of course, regardless of whether it is a theory or a claim, pattern and practice evidence is relevant in a pattern and practice claim. However, pattern and practice evidence, standing alone, is never a substitute for individualized evidence that discrimination motivated an employment decision in an individual discrimination claim.

### e. Plaintiffs Cannot Identify Any Issues of Material Fact Sufficient to Defeat Summary Judgment on their Intentional Discrimination Claims.

The City so far has established in a painstaking way the flaws in Plaintiff's factual arguments. Yet, in their argument (Resp. 42-45), Plaintiffs take issue with the way Defendant organizes the evidence, suggesting that Defendant's critical review of the alleged supporting material is impermissible under *Ortiz.* Defendant's Motion directly addressed the *Ortiz,* approach. Resp. 35  Even under *Ortiz,* it still remains Plaintiffs' burden to identify the "specific material facts that demonstrate a genuine dispute for trial."

22

*Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). To be sure, the lack of comparator evidence is relevant to the strength of their case whether using the *McDonell Douglas* framework or *Ortiz.* The City also never suggested that the lack of comparators is the only consideration the Court should make on summary judgment. Furthermore, despite Plaintiffs' contention, Defendant has not advocated for the use of the jury instruction from *Ernst.* Resp. 36.

Curiously and not without some measure of irony, Plaintiffs accuse the City of seeking summary judgment "from factual arguments that are pure speculation…" Resp. 36. For example, Plaintiffs wrongly insist there is no evidence showing that the extended program was created over concern about the "shortened length of the Academy classes." *Id.* The shortened academy is the exact reason outlined in CFD's answer to interrogatory 11 (JX 29), and the purpose of the academy is also relayed in SOF 17, and in the same interrogatory response 11. As stated in its interrogatory response, at the operative time (2014-2015), CFD had an "operational and contractual need to hire and train paramedic candidates for deployment on ambulances" and, in turn, CFD "shortened the Alphabet Classes from 12 weeks to approximately six to eight weeks." JX 29, ¶11. The response further states, "[u]pon perceiving a possible connection between the six to eight week-length of the Alphabet Classes and successful completion of the physical assessments in the Academy," CFD began evaluating alternatives to "its existing paramedic training program" that would reduce the number of those unable to meet graduation requirements "while also ensuring candidates were prepared to work as probationary paramedics on ambulances, transporting patients." The response further states Defendant determined that "it would offer male and female paramedic candidates in the Alphabet Classes the opportunity to continue to train with CFD physical trainers for an additional six weeks while receiving full pay and benefits, provided they met all criteria for graduating from the Academy except passing the Step Test and/or the Lifting and Moving Sequence. During the additional six weeks of paid training, the paramedic candidates trained for and attempted to pass the Step Test and/or the Lifting and Moving Sequence." JX 29 at ¶11.

23

Plaintiffs accuse Defendant of using "pure speculation" when it noted the particular importance of training and testing as to "new paramedics, who may not know how their minds and bodies would react to stressful, taxing and life-and-death situations that veteran paramedics face every day." Resp. 37. When challenging this contention, Plaintiffs cite SOF 17, insisting that paramedics did not need training because they were paramedics at the start of the academy. To the contrary, SOF 17 states that Candidates enter the paramedic training academy as "candidate paramedics," and the paramedic academy "includes activities that train and test candidates on the knowledge and skills" required to serve as actual paramedics.

Plaintiffs also accuse the defense of "recklessness with basic facts." That reference appears to relate to some common-sense statements, such as those the Plaintiffs identify on p. 37 of their Response, however, none are material. Resp. 38. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

Further, Plaintiffs challenge Defendant's contention that Venegas did not participate in the Step Test. Resp. 40. This, too, is irrelevant, as Plaintiffs do not now contend that Venegas was terminated for failing the tests; they instead contends Venegas was terminated when Dr. Wong "'revoked' her medical clearance." Resp. 18. Further, the record reflects Venegas did not even start the Step Test, which requires Candidates to step up and down from a box for two minutes. PX 23. Her scoresheet shows a time of 0.0, without making one step. Yet, regardless of whether she did or did not "take" the Step Test, it is not material to the reason she was terminated. JX 101 (Venegas) 319:7-11.

Next, Plaintiffs' criticize the defense for stating that Youngren participated in the extended program when she did not. Resp. 38. Whether Youngren participated in the extended program is immaterial for summary judgment. Moreover, the statements of fact agreed to by Plaintiffs (and former defense counsel) omit Youngren from the list of Candidates who participated in the extended program. SOF 94. The main point is that Youngren and Griffin are different from the other Candidates because they were removed from training pursuant to the "Suspended Assignment" policy (post-injury). Their

24

injuries prevented them from continued participation in training, and from the remaining time afforded to non-injured Candidates to take and pass the tests. Mtn. 8, 21.

## VI.  The Step and Lift Tests Were Not The Reason For The Separations of Griffin and Youngren.

Plaintiffs sidestep Defendant's argument as to Griffin and Youngren. As explained by Defendant, both of those Plaintiffs were removed from training due to injury. Mtn. 8, 21. Once they were removed from training, their employment status then was governed by the medical leave/suspended assignment policy. They no longer could take part in the additional and extended opportunities afforded to non-injured Candidates. But for their injuries, Griffin and Youngren could have participated in the remaining extended training sessions, with the same opportunities to pass the tests as the other Candidates, including the other male Candidates. SOF 45, 46, 47, 94, 95. Whether Youngren and Griffin left the training due to injuries that may or may not have occurred while they took the tests is of no consequence.  They were unable to participate in the available remaining training and their tenure was controlled by the Suspended Leave policy. SOF 90; YSOF 2, 3.[10]

## VII.    Plaintiffs Velasco, Burroughs And Markey Have Not Raised Independent Claims of Discrimination Based On Academics.

In their Response, three Plaintiffs (Velasco, Burroughs and Markey) now contend they were terminated based on a discriminatory academic program, not because they failed Step and Lift Tests. (Resp. 51, attempting to establish a *prima facie* case of discrimination based on academics, stating: "Here, Plaintiffs have established a *prima facie* case based on how the City treated Guibourdanche, Maty, and Czajkowki. All three men had academic grades below 80%...").  Yet, in their current pleading, Plaintiffs Velasco, Burroughs and Markey do not claim that they were terminated for failing academics, nor do they

---

[10] Citations to the Statement of Facts from the separate Partial Summary Judgment filing against Plaintiff Youngren (based on an affirmative defense) is referenced here in as "YSOF __". Dkt. No. 602-1.

even mention academics in their Amended Complaint. Am. Compl. Dkt. 259. Instead, they contend that the City intentionally used the Step and Lift tests in order to remove as many women from the workforce as possible. Plaintiffs may not use the Response to the City's motion to amend their complaint, and the arguments about academics should be disregarded. Am. Compl., Dkt. 259. *See Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017).

### a. Plaintiffs' arguments about purported bias in the academic program are inconsequential.

Plaintiffs offer one unsupported argument in the event the Court rejects their new claim. As an alternative to the purported discrimination claim based on academics, they fashion a new "pretext" argument. They speculate that they were terminated based on the physical tests, but that the City blamed it on academics in order to avoid EEOC reporting obligations. Resp. 45. Specifically, they contend (without support) that the City was required to report the results of the physical tests to the EEOC. Resp. 45. In order to avoid reporting, they contend the City "made up" academic failure as the reason Velasco, Burroughs and Markey were terminated. Resp. 45. Plaintiffs offer no support for this theory in the Statement of Facts. Instead, they offer a new exhibit consisting of the City's 14 page Position Statement to the EEOC, which says nothing of EEOC test reporting requirements. There is no support in the record that reporting to the EEOC had any impact on decision-making affecting the Plaintiffs. To the extent Plaintiffs' claim they were terminated based on the physical tests, they cannot reasonably argue that academics was just a pretext to avoid EEOC reporting requirements. The Court should disregard this entire line of argument.

Notably, Plaintiffs do not attempt to use purported evidence of "gender bias" in academics to support their intentional discrimination claim based on the physical tests. Instead, sticking with their "new" claim, they assert that the evidence of discriminatory intent from the Step and Lift tests can be used as support for their unpled discrimination claim based on academics. ("The City's intentional use of discriminatory physical tests … is evidence that the academic failures were motivated by sex" Resp. 49,

Section C). Yet, Plaintiffs are unable to delegitimize the academic program. To put the spurious nature of their contention in perspective, of the 200+ Candidates in the Alphabet classes, five were terminated for failing academics: 2 men (Mr. Klita and Mr. Toledo) and 3 women (Plaintiffs Velasco, Burroughs and Markey) SOF 32, 50, 60, 67, 95, 115. According to Plaintiffs, Messrs. Klita and Toledo were "collateral damage." In other words, the City had to find some men to discharge, so they picked them even though their grades in fact supported termination. SOF 32; Resp. 53. This is nothing but speculation, unsupported by any facts in the record.

The Plaintiffs attempt to show the academic program is a "sham" – yet they admit that the content of the Coursework and Practicals is related to the paramedic position. SOF 27. And the City, in its motion for summary judgment, has shown that three of the Plaintiffs failed the academic portion of the Academy and that is why they were dismissed. Mtn. 8-10, 22-29.

Still, Plaintiffs claim CFD "arbitrarily added points to candidate grades, manipulated grade weights, or simply allowed the candidates to graduate anyway." Resp. 42. While the Plaintiffs offer examples purporting to support their conclusions, a careful analysis of the evidence refutes each one of them. Plaintiffs allegations can be categorized in three main groups: manipulating grades; 'chang[ing] their story' on Velasco's termination; and compromising the amount of time female Candidates can dedicate to studying academics. Resp. 12-13, 49-50. Not one of these arguments is supported by facts. Unfortunately, Plaintiffs dedicate over 20 pages to this argument, and for each false or misleading statement made by Plaintiffs, Defendant must explain and prove the inaccuracy.

### b. Plaintiffs identify no evidence of intentional "grade manipulation".

Plaintiffs rely on "grade manipulation" as their principal argument, and use a broad brush to try to discredit the entire program. Resp. 12-18. The academic section is separated into two parts: the written part (with homework, quizzes and tests)("Coursework"), and the practical skills assessments, where Candidates are graded live, in real time, by instructors ("Practicals"). SOF 21, 25, 26. The Manual states that Candidate may be terminated if they score below an 80%. SOF 41.

### i. Plaintiffs identify no evidence of manipulation as to the Coursework.

As shown below, Plaintiffs rely on a simple transcription mistake as evidence that grades were manipulated. Plaintiffs challenge Defendant's representation that "there is no evidence that the scores were manipulated." Resp. 49. Yet, they present no evidence of any intentional "manipulation". In Defendant's Motion, the City relied on SOF 216 to show it did not "manipulate" grades, and that once entered into the Gradebook system, the grades remained the same for Plaintiffs' three main male Candidates whose grades were allegedly manipulated. (Guiboudanche, Maty and Czajakoski). Mtn. 10-11.

Rather than address this undisputed fact, Plaintiffs attribute arguments to Defendant that it never made, and introduce a new exhibit purportedly relied upon by the City. Specifically, they contend the CFD relied on what Plaintiffs call a "Gradebook Audit Report" as a defense to "manipulation" claims. Resp. 49. CFD does not rely on any such document. Instead, it was Plaintiffs who introduced this "Gradebook Audit Report" as a new exhibit with their Response. Resp. at 49, referencing PX24. Ultimately, Plaintiffs are left with the two errors in transferring Guibourdanche's grades from the hard copies to the Gradebook program, stating: "…there is no dispute that grades were changed: the scores on the assignments do not match the scores given to Guibourdanche, for example." Resp. 49  The Gradebook Audit Report is a ruse and Plaintiffs cannot show how a mistake in recording grades for one Candidate becomes intentional manipulation.

Of the 200+ Candidates who completed the academic portion of the Academy, the evidence shows only one Candidate (Guibourdanche) should have failed the written portion but instead "passed" (SOF 112), and from this Plaintiffs find evidence of intent.  However, in that single instance, two written test scores were mis-recorded when they were transferred from the hard-copy scoresheets to the computerized gradebook (Streets Quiz 3 recorded as 64.5% instead of 24.5%; Streets final recorded as 83% instead of a 78%). SOF 112. There is no evidence that this was the result of anything but a simple mistake, and certainly no evidence that this was done intentionally to disfavor women. SOF 217, 218.

28

To be clear, Plaintiffs do not dispute the accuracy of their grades in the *written* Coursework portion of the academic testing, including Markey's failure on a number of exams, including one where she scored a 50%. SOF 70, 71. This is significant because the hard copies of each Candidate file has been produced in this case – containing each testing document with the Candidates' handwritten responses, along with the score sheets, quizzes and other assignments, as well as the score sheets for the Practicals. The scores from the hard copies were then manually transferred to the Gradebook computer program. SOF 23. Instead of arguing their scores are inaccurate, they complain CFD did not give them extra points they did not earn. SOF 127-129.

Next, Plaintiffs allege "Grade Manipulation" at the end of the Bravo class, where CFD decided to 'redo' all of the grades in order to pass men while failing women. Resp. 15. To support their argument, Plaintiffs highlight an email and spreadsheet from October 3, 2014, that lists the eight Candidates (four men, four women) who were purportedly failing at the end of the class ("10/3 Email"). JX 72, SOF 211, 212, 213. Ultimately, five of those eight Candidates graduated from Bravo with passing scores. (two men and three women). *Id.* In claiming gender bias, Plaintiffs focus on the change in status of the two men (Maty and Czjakowski), ignoring that the status of three women also changed from failing to passing. As such, any alleged "manipulation" benefitted women to a greater degree than men. Importantly, Plaintiffs ignore the logical explanation for the discrepancy between the 10/3 Email and the actual Candidates who failed: the 10/3 Email simply did not contain all of the grades. SOF 213. As the training coordinator explained, he would need to rely on the grades from the Gradebook program for an accurate account of the Candidates' final grades. SOF 213. This is yet another example of when the record is reviewed carefully, the evidence supports the defense.

Plaintiffs also raise concerns that their overall average score changed from the mid-term progress report (with tests yet to be taken) to the final progress report. ("[A]fter receiving her midterm grades of 84.9%, [Burroughs] was shocked to learn that her assigned final grade was under 80%"). Resp. 16. Despite Burroughs' "shock", Plaintiffs failed to mention that she later failed two final exams (68% on

the general orders final, and 66.6% on the streets final exam). JX 41 page 8, CFD387; JX 41 page 47, at CFD426. Plaintiffs make a similar argument with Velasco ("she was .1 of a percentage point from passing at the mid-term, yet she received a final score below 80%"). Resp. 14-15. This is not evidence of grade manipulation, but it is evidence of scoring where the two Plaintiffs failed to meet the grade cut-off.

While Plaintiffs do not contend that their written test scores were inaccurate, they question why errors were caught with respect to Markey, and not with respect to male Candidate Guibourdanche. Resp. 17, 43-44. Yet, Markey's correction did not result in an overall change from passing to failing, and the error with Guibourdanche is not evidence of intentionally targeting women or a sham system. SOF 68.

> ### ii. Plaintiffs Identify No Evidence of Intentional Grade Manipulation with Respect to the Practicals.

With respect to the "Practicals", Plaintiffs allege the CFD did not follow the procedures in the Manual. Resp. 47. They point specifically to the section on grading, which states that the Practicals are to be scored on a Pass/Fail basis, and argue the CFD's practice of recording a score of 100% (pass) or 0% (fail) somehow violated the Pass/Fail grading requirement. Resp. 48. Then, Plaintiffs attempt to create an alternative scoring procedure, ignoring the undisputed procedure identified by the Commander. Yet, as stated in Hudson's testimony, after the practice round, Candidates who pass one of the Practicals receive a 100% for that particular evaluation, and those who fail receive a 0% for that evaluation. *Id.* A Candidate's score will not change as a result of any "retake." Indeed, where Candidates fail a Practical (0%), their score for that Practical remains a 0% even if they "retake" the Practical to show they have mastered the skill. SOF 116 ("a candidate received zero if he/she missed something critical on a practical skills test, even if the candidate later passed the exam on retake").

They argue Markey and Velasco were unable to retake their Practical exam after failing certain components during the "scored" round. Markey: Resp. 48, 17; Velasco: Resp. 14. Yet, they ignore that their score on the particular Practical components would remain a 0% even if they were to pass them on the re-take. SOF 116. Given Markey failed the cardiac Practical, CFD properly factored in her 0% score,

which put her overall average at 77.6 , below the required 80%. JX 43 at 31. Given Velasco failed both the trauma and cardiac Practicals, CFD properly factored in the 0% scores, which put her overall average at a 69.4%, below the required 80%. SOF 56. No retry would have raised their scores.

Also, there is no evidence that any Candidate in the Echo class was given the opportunity to retake the Practicals. JX 2 (Markey), 239:1-240:6. As to Velasco, she raised a specific challenge to the Trauma Practical, claiming that she passed the scored round of the Trauma Practical - and the instructor "told her so at the time" - yet, CFD still scored her as a "0". Resp. 48 and 14. The scoresheets are available for all testing, including the Practicals. The instructor who signed her Trauma scoresheets indicated she failed, commenting "needs more practice on landmarks." JX 16, CFD42.

Plaintiffs also focus on male Candidate Klita, alleging his failing score on the Practicals was intentionally manipulated to a "pass." Resp. 14, 48. First, Klita was one of the two men who failed the entire academic section, so any changes were not material. SOF 32. Still, the undisputed facts show his scores on the Practical components were merely "flipped" and the overall score for the section remained the same. When Klita's Trauma component score increased (0% to 100%), his Airway score decreased (100% to 0%). SOF 207. A similar switch happened with Burroughs. Her trauma component score decreased from a 100% to a 0% when her Airway component score increased from 0% to 100%. JX 41 at CFD426 (midterm) and CFD387 (final). Despite the switch, the overall scores in the Practical section for each Candidate remained at a 66.7% consistently. Klita: JX 21 at CFD73486 – 87; Burroughs: JX 41 at CFD426 (midterm) and CFD387 (final).

### c. Velasco's "Change of Story" argument is not well founded.

Despite claiming (for the first time) in the Response that Velasco was terminated based on the biased academic system, Plaintiffs also allege that academics was not the actual reason for her termination. Plaintiffs allege that CFD 'changed its story' with respect to Velasco's termination. Resp. 14. Plaintiffs claim CFD terminated Velasco because she failed the physical tests (not because of academics), and changed its reasoning to academics after it received the attorney demand letter on September 15, 2014.

31

Resp. 52. To be clear, on September 14, 2014, (the day before the demand letter was authored), CFD issued a memo identifying candidates proposed for termination due to the physical tests. SOF 40. With respect to Velasco, the memo also indicated she would not graduate because "she had an academic average below the required 80%". SOF 50, 58, JX 76, p. 1. Therefore, there was no 'story' to change. Because of her academic failure, Velasco was terminated at that point. She was not invited to the extended physical training program like the other Alpha candidates who passed the academics but failed the physical tests. SOF 103.

Plaintiffs question why Velasco reported to the Academy for the physical tests on September 11, 2014, even though she took her last academic test the day before. Resp. 13-14. They contend CFD should have known she failed academics as of September 9, 2014, and since she still returned for physical testing thereafter, academics could not be the reason for her termination.[11] Resp. 13-14. Commander Hudson explained that she returned "[b]ecause she's still in the academy. We don't - - it's not our job to determine if she's going to be terminated or not." JX 17, Hudson Dep. at 123. There is no rule that a Candidate who has failed the physical part is prohibited from finishing the academic section, and vice versa.

### d. Plaintiffs Lack of "Study Time" Theory is not persuasive or grounded in fact.

Plaintiffs argue that the strenuous physical tests gave women less time to study for academic requirements. They say the women were spending more time exercising at night and on the weekends to overcome the artificial physical hurdles and recover from injuries, and had less time than men to study. Resp. 50. However, there is no evidence suggesting that men were not also training for the physical tests. A more than surface analysis of the academic issues reveals no intent to discriminate on the basis of gender, and Plaintiffs cannot show pretext with respect to the three women who failed the academic requirements of the Academy.

---

[11] Plaintiff indicates Velasco took the final academic test on September 9, but it was actually given September 10.

In support of their position, Plaintiffs cite *Downing v. Abbott Labs*, 2019 U.S. Dist. LEXIS 151544 (N.D. Ill. Sept. 5, 2019). In that case, the plaintiff alleged that her employer eliminated her position and terminated three other employees with her same title to "cover-up" her discriminatory discharge. The court found it was possible to conclude that the employer's reason (cost savings) was a "scam" where there was evidence of a scheme to remove the plaintiff, and the employer moved to create new, similar positions in their place and immediately re-hired one of the employees. *Id.* at *35. *Downing* presents specific facts not present in our case.

### VIII.     Paramedic Candidates are Not Similarly Situated with Firefighter Paramedics

As demonstrated by the record, Candidate paramedics are not similarly situated to candidate firefighters, and Plaintiffs' attempt to treat them as "comparators" for academic testing is unsupportable. Resp. 12, 14, 45-46. They also impermissibly co-mingle the experiences of candidate firefighters with those of Candidate paramedics, using purported harassment in the firefighter academy, firefighter hiring statistics and firefighter lawsuits as evidence of intentional discrimination toward female Candidate paramedics Resp. 9-14, 29-30. Arguments based on firefighters should be disregarded.

In order to present probative, comparative evidence, reference must be made to similarly situated individuals, who are comparable in all material respects. *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 629 (N.D. Ill. 2011). In determining whether an individual is similarly situated, the relevant factors are whether the individual: (1) had the same position or same description; (2) was subject to the same standards; (3) was subordinate to the same supervisor; and (4) had comparable experience, education, and other qualifications. *Gbur,* 835 F. Supp. 2d at 62.  The application of these factors shows that firefighters are not proper comparators to paramedics.

Candidate paramedics attend an entirely separate academy from candidate firefighters, each with its unique hiring standards and prerequisites, including different pre-hire certification requirements and different entrance exams. SOF 17, 19-21, 41, 114, 156.  Furthermore, Candidate paramedics study different material than firefighters, use a different grading scale, have a different reporting structure in

33

the field, and require different state certifications to operate in their respective positions, as further detailed below. *Id.*

Candidate firefighters and Candidate paramedics train for two entirely different positions, with different job responsibilities, as further detailed below. The definition of a paramedic, as stated in the Illinois Emergency Medical Services (EMS) Systems Act is "a person who has successfully completed a course in advanced life support care as approved by the Department [of Public Health], is licensed by the Department in accordance with standards prescribed by this Act and rules adopted by the Department pursuant to this Act, and practices within an Advanced Life Support EMS System." 210 ILCS 50/3.50. By contrast, the City of Chicago defines a "firefighter" as someone "who provides first aid to patients, uses the hose lines to deliver water to extinguish fires, makes hydrants, performs searches for victims and other physical work during an emergency. Also does the station cleaning and maintenance during daily station activities."[12]

Paramedics and firefighters attend different academies with different manuals identifying different course work and standards. SOF 13, 17, 19-21, 41, 114; JX 1; PX 22. Firefighter candidates train on fire suppression and attend fire science classes with specialized fire suppression training instructors. SOF 114; JX 33 at 13. The firefighter coursework is substantively different from the paramedic coursework, and the grading standards are different, as well, with firefighters required to obtain a 75% average score, and paramedics required to score an 80% on different tests. SOF 17, 19-21, 41, 114. The candidate firefighter manual requires candidate firefighters to pass the Office of State Fire Marshall's written and practical skills examinations for Basic Operations Firefighter, which is not required for Candidate paramedics. PX 22 (2013 Firefighter Manual). Instead, paramedic Candidates are required to

---

[12]
https://www.chicago.gov/city/en/depts/cfd/supp_info/cfd_definitions.html#:~:text=Firefighter%20%2D%20The%20member%20who%20provides,maintenance%20during%20daily%20station%20activities

have already earned an EMT-P license before entering the academy. SOF 17. They must also meet all the state-wide continuing education specifically required for Illinois paramedics. *Id.* As explained by Plaintiff Maples, a firefighter "obviously does fire suppression and those kind of tasks," and is otherwise trained to "provide some sort of level of care until [paramedics] arrive on scene." JX 49 (Maples), 111:16-112:2; 112:4-21. In the field, the reporting structure is different, with Paramedics in Charge supervising paramedics, not firefighters. SOF 96.

The material differences in the essential job duties of a firefighter and paramedic establish that firefighter/EMTs are not similarly situated to Plaintiffs as a matter of law. *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 629 (N.D. Ill. 2011) (held detectives were not similarly situated to patrol officers, as it is a different job title and the positions did not have comparable duties or responsibilities); *West v. City of Hous.*, 960 F.3d 736, 741 (5th Cir. 2020) (affirmed summary judgment for employer in Title VII case, as American-American female paramedic engineer/operator paramedic failed to show that the white male fire suppression engineer/operator were similarly situated where they did not share the same job or responsibilities.)

Plaintiffs rely on *Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012), when arguing firefighters and paramedics are similarly situated. Resp. 46. *Coleman* is distinguishable as it compared two employees in the disciplinary context who were accused of violating the same policy, engaging in similar conduct, with the same decision-maker who did not consider their differing rank or positions in the decision. *Coleman*, 667 F.3d at 847-850. Here, discipline is not involved; rather, it is the evaluation of candidates *based on* the particular position for which they are training, with different scoring requirements (75% v. 80%) and curricula (fire suppression v. advanced life support), different Manuals and different instructors. That both groups happened to be candidates "in training" does not make them similarly situated for evaluation purposes within their respective academies.

### IX. Plaintiffs Velasco, Burroughs and Markey Have Waived their Disparate Impact Claims

In Defendant's opening motion for summary judgment, it argued that Plaintiffs Velasco, Burroughs and Markey lack standing to bring a Title VII disparate impact claim based on the physical tests. Mtn. 38-40, Am. Compl., Dkt. 259, ¶57. Defendant explained that these Plaintiffs do not have standing because they are unable to establish an injury based on the physical tests. Mtn. 39. As Defendant argued in its Motion, Plaintiffs failed the academic program and were terminated on that basis. *Id.* As such, they would not have graduated from the Academy regardless of their performance on the physical tests. *Id.* Therefore, they cannot establish injury based on the physical tests. Nor can they establish that they were qualified for the position sought, another requirement for standing as noted by Defendant in the Motion. *Id.* 39-40. In their filing, Plaintiffs Velasco, Burroughs and Markey failed to respond to Defendant's Title VII disparate impact arguments, and therefore, they have waived those claims. *Russell v. Chism*, No. 15-cv-560, 2017 U.S. Dist. LEXIS 129030 (N.D.Ill. Aug. 14, 2017) ("a party opposing summary judgment waives claims to which it fails to respond on summary judgment.") Summary judgment should be granted to Defendant as to the Title VII disparate impact claims of Plaintiffs Velasco, Burroughs and Markey.

### X. To The Extent Plaintiff Venegas Alleges Intentional Discrimination Based On The Medical Division, Her Evidence Is Insufficient To Withstand Summary Judgment

The claim raised by Plaintiff Venegas is different from the claim raised by the other Plaintiffs in the case. Venegas does not claim she was terminated as a result of her performance on the Step or Lift, but instead claims CFD used an "ad hoc" lunge procedure to disqualify her based on her gender. Am. Compl., Dkt. No. 259, ¶48. Yet, the undisputed facts show the Medical Director determined she could not perform the essential functions of the job, and as a result, she was not permitted to complete the Academy. SOF 183. There is no evidence that the Medical Director's determination was based on his intent to remove her from the Academy because she is a woman or to remove women generally.

Likely knowing she cannot maintain a claim based on discriminatory intent of the Medical Director, she now alleges she was terminated based on a physical test. ("Venegas likewise was terminated

36

via physical test because she was a woman failing the discriminatory tests.") Resp. 40. Yet, Venegas, unlike the other Plaintiffs, never asserted a claim based on the Step or Lift tests. Am. Compl., Dkt. No. 259, ¶48. She also has not asserted that she ever took the Step or Lift Tests. Unlike all other Plaintiffs, she did not allege in the Amended Complaint or in the Joint Statement of Facts that she took the tests. When CFD's interrogatories asked her to list all of the assessments she took in connection with her employment, she omitted the Step and Lift tests, whereas all of other Plaintiffs identified those tests. DefEx 1, ¶4. In her deposition, Venegas testified did not remember whether she even started the Step Test. She did not remember if she even took one step. JX 101 (Venegas), 314:14-16. The test sheet does not reflect that she even started the Step Test. It is marked as a 0.00 for her time. PX 23. During her deposition, she admits she was *not* terminated as a result of her performance on either test. JX 101 (Venegas), 319:16-18. She now attempts to rehabilitate those fatal admissions.

We never can tell for certain what constitutes her claim as Venegas never filed her own EEOC charge. However, we know it cannot be based on the Step and Lift tests because she conceded that she was not terminated on that basis. JX 101 (Venegas), 314:14-16. She would have to succeed or fail based on the other Plaintiffs' evidence, but she cannot get past her admission that she was not terminated based on the tests, and Venegas' claim should be rejected on this basis alone. "Title VII directs that a 'charge . . . shall be filed' with the EEOC 'by or on behalf of a person claiming to be aggrieved…" *Fort Bend Cty. v. Davis,* 139 S.Ct. 1843, 1846 (2019); 42 U. S. C. §2000e-5(b). The charges in this case do not support Venegas' claim.

Further, Plaintiff Venegas presents no evidence from which a reasonable jury could contend Dr. Wong's decision was based on his animus against women. Instead, the undisputed evidence shows that Dr. Wong used an individualized assessment to determine that Venegas could not safely perform the essential duties of a paramedic Candidate in the Academy. SOF 183.

Somehow, Plaintiffs come to the conclusion "the evidence of sex discrimination in terminating Venegas is exceptionally strong." Resp. 41 Yet, none is included in the Joint Statement of Material Facts.

37

She relies on new evidence to support a theory of "phantom" comparators, claiming "men in the class were doing a lunge the same way and were not pulled [from training]." Resp. 41. This is the extent of her evidence: "I'm getting yelled at for not doing a proper push up or for not doing a proper lunge, but [the males] are doing the exact same thing…" JX 101 (Venegas), 308:15-20. Yet, she was unable to identify any male who was "doing the exact same thing" to support her position. JX 101 (Venegas), 308:15-309:6 Furthermore, Plaintiff Snevely, who was in a different class from Venegas, testified that the instructors in Alpha were screaming at a male who was falling behind on exercises and the "next thing I know he was escorted back to the room." JX 23 (Snevely), 38: 2-14. SOF 82. She testified he was sent to medical and she never saw him again. JX 23 (Snevely), 37:20-23. Plaintiff Venegas herself identified a male Candidate who was pulled from training when he was "unable to keep up." JX 101 (Venegas), 277:22-278:17.

Venegas omits key testimony form Dr. Wong on this issue. Dr. Wong testified about the fitness for duty and return to work process. He explained that he evaluates Candidates for "return to work" when their performance may be indicative of a medical issue. JX 36 (Dr. Wong), 206: 6-11. He also made clear that his work with Venegas was not a re-evaluation of medical clearance for the Academy; it was a determination if she could safely and effectively return to work. JX 36 (Dr. Wong), 209:11-15; 226:15-20; 232:12-13; 64:15-19. Dr. Wong understood his responsibility, explaining that when Candidates are sent to him, CFD is "counting on me to do my medical assessment through history taking, physical examination, to determine whether there is a medical problem or not." JX 36 (Dr. Wong), 206: 6-11. It is undisputed Venegas could not perform the essential functions of the job, as determined by the Medical Director. SOF 183. Plaintiffs argue that it was - "at most" - one essential function. Resp. 40. Whether it was one function or six functions, the Medical Director made his assessment. *Id.*

They go so far as to call Dr. Wong a "liar," regarding alleged comments he made to Human Resources about Venegas' intent to resign. Resp. 41. Yet, it is Venegas who trips on her own testimony, claiming she overheard Dr. Wong inform Human Resources about her resignation, but then

acknowledges she could not hear Dr. Wong's discussion with Human Resources. (Dr. Wong and the woman in HR spoke "but I didn't hear what was spoken.") JX 101 (Venegas), 342:4-7. More to the point, whether Venegas initially wanted to resign is of no consequence; Venegas did not return because in Dr. Wong's medical judgement, she could not safely and effectively perform the job. JX 101 (Dr. Wong), 64:15-19, 226:18-20. The attacks on Dr. Wong are unfounded.

Most importantly, Plaintiffs ignore the actual notes taken by Dr. Wong and the addendum he typed on the same day. DefEx 2, CFD56578-81; JX 101 (Dr. Wong), 235:7-24. They chose not to include them as part of their 30 new exhibits. Focusing on the 22 inch platform, Dr. Wong's explains that he "used a 22 inch platform to assess the ability of the patient to step up and raise herself onto the raised platform." DefEx 2, CFD56580. His notes reflect the following observations:

> Similar to the 17" platform, the patient was not able to raise herself onto the platform without hands....The patient then attempted to raise herself onto the platform while using her right hand to hold the vertical bar frame. The patient was observed to tilt leftward … and she was unable to attain enough amplitude and momentum to raise herself onto the 22 inch platform. The patient failed two attempts to raise herself onto the 22" platform using her right hand to support her.

> Finally, the patient attempted to raise herself onto the 22" platform using both hands. Although she was able to pull herself onto the 22' platform, the patient almost lost balance and started to fall backwards but caught herself before she fell.

His notes also reflect that she was "mobid[ly] obese" and was "unable to perform lunge [with] knee touching floor" and that she was "unable to squat without significant use of torso function." DefEx. 2, CFD56578. In making the assessment, Dr. Wong testified that he wanted to evaluate "her limitations and what extent she had mobility difficulties" and that he also "wanted to see functionally getting in and out of the ambulance with and without carrying things…I wanted to see the what the extent of the limitations were." JX 101 (Dr. Wong), 224:16-225:3. There is simply no evidence that his evaluation was motivated by anti-female animus.

Venegas finally alleges Dr. Wong also purportedly discriminated against two other women. Resp. 18. Yet, Plaintiffs include no such discrimination in the statement of facts. Instead, they present a new

exhibit, a declaration from paramedic Bain, that has nothing to do with Venegas. Resp. 10 Yet, the hyperbole in their argument is similar, insisting "Dr. Wong drove Kristin Bain out of the Bravo class…" and that he subjected her to "hours of harassment" – and "demanded" a medical assessment (after instructors referred her for one).  Neither the declaration, nor any other evidence, supports this empty rhetoric. Their unsupported criticisms and inaccurate, out of context descriptions of the assessment are not adequate substitutes for evidence.

### XI. Plaintiffs Do Not State Section 1983 Claims

#### A. **Plaintiffs Cannot Establish Intentional Discrimination**.

The parties agree that Section 1983 claims require a finding of intentional discrimination. Dkt. Resp. 61; Mtn. 42. This is adequately covered in the City's discussion of Plaintiffs' Title VII claims above. Plaintiffs misstate the legal standard for *Monell* by conflating the standards for Section 1983 Equal Protection claims against individuals with the legal standard for a *Monell* claim against a municipality.

#### B. **Plaintiffs Have Not Established *Monell* Liability.**

Plaintiffs do not rely on the first *Monell* test because there is no express policy of the City that caused their alleged constitutional violation. To the contrary, the City's "express policy" as stated in the Municipal Code and Personnel Rules prohibits all forms of discrimination. SOF 11. CFD has incorporated the equal employment opportunity policy promulgated by City Council and the Department of Human Rights. SOF 11; JX 4, pp; 1-18 (General Order 18-008).

##### 1. **The CFD Commissioner was not the final policy maker**.

While the CFD Commissioner has administrative and operational oversight on training and adopting the Department of Personnel's probationary policy, he does not "possess responsibility for making law or setting policy, that is, authority to adopt rules for the conduct of government." *Killinger v. Johnson,* 389 F.3d 765, 771 (7th Cir. 2004) (cites omitted). "The mere authority to implement pre-existing rules is not the authority to set policy." *Killinger,* at 771. According to Plaintiffs, the Commissioner of the CFD is the final decision-maker with regard to the violation of their constitution rights because he

approved the Manual, thus setting graduation requirements that included the Step and Lift Tests, and signed off on the terminations of probationary employees, including some of the Plaintiffs. Resp. 628, pp. 61-62.

In *Killinger,* the town of Port Bryon held an annual festival in which local businesses participated, including G's Riverfront café ("G's") owned by the Killingers. 389 F.3d at 767-768. The Mayor and Police Chief of Port Byron required adults to wear wristbands to guard against underage drinking. *Id.* Local police questioned an underage boy drinking a beer and he admitted to having bought it from G's. *Id.* at 768. The Mayor and the Police Chief shut G's down for the night without issuing a written order. *Id.* G's later was fined and had its liquor license suspended for three days. *Id.*

The plaintiffs in *Killinger* alleged that either the Police Chief or Mayor "held final policymaking authority with respect to the challenged actions." *Id.* at 771. The Court disagreed. While G's was shut down for the night, which lead to a fine and suspension, it was the Illinois General Assembly that promulgated the Liquor Act along with procedures that allowed temporary closings, license suspensions and fines. *Id.* "Because the mayor does not hold final policymaking authority to establish procedural rules (because the State held that authority), the town was not liable for his actions. *Id.* at 772. *Killinger* is instructive on the application of *Monell* with respect to who is a final decision-maker and how that decision should be made. There, the state legislature passed the Liquor Act, the Mayor and Police Chief implemented it, and the plaintiffs alleged a wrongful action under the law based on what the Mayor and the Police Chief did. Here, the Commissioner of Fire oversaw the creation of a training manual and signed off on probationary employee discharges based on rules established by City Council and its designee, the Department of Human Resources.

The analysis in this case should end with *Killinger,* but the City will address the authority on which Plaintiffs base their theory, including *Vodak v. City of Chicago,* 639 F.3d 738 (7th Cir. 2011). That case involved a demonstration in response to Iraq war. *Id.* at 740. The protesters intended to march and spoke with CPD to try to determine a route. *Id.* at 741. Despite these conversations, no formal plan or route

41

was determined, and this led to confusion among the protesters on the day of the event and inability for sworn personnel to be heard when giving orders. *Id.* at 741. CPD ultimately arrested 900 people that, unfortunately, included uninvolved citizens going about their daily lives. *Id.* at 744. The plaintiffs there alleged violations of the First and Fourth Amendments. *Id.* at 740. The Court considered City Council's permitting ordinance and CPD's practice allowing permit-less demonstrations. Unlike the present case, the City Council delegated to the CPD Superintendent general management and control of the department with "full and complete authority to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the Police Board. *Id.* at 748. According to the Seventh Circuit, the Superintendent "makes policy for demonstrations that get out of hand. His possession of this policymaking authority is consistent with" Illinois law and Chicago ordinances. *Id.* The CPD Superintendent's authority over controlling mass demonstrations (with evidence that he was involved in the decisions to direct and ultimately arrest protesters) was enough to consider him the final policymaker under *Monell* and a sufficient basis to return the case to the district court. *Id.* at 750-751.

The CPD is a special entity all together, and the Fire Commissioner did not have the same authority. That key fact distinguishes *Vodak* as valid authority in this matter. While the City Council delegated powers and authority to the Department of Human Resources to set policy, rules and regulations for most of the workforce of the City of Chicago (M.C.C.2-74), the City Council explicitly stated that the Human Resources ordinance did not apply to the police board or to the "selection, powers or duties of the superintendent of police." M.C.C. 2-74-130. Under Chapter 2-84 of the Code, the City Council delegated to the Superintendent of Police certain powers and duties from department organization to appointments, promotions, transfers and disciplinary actions to development of an annual budget to exercising further powers "as may be conferred by the Mayor." M.C.C. 2-84-050. As stated in the Code, the CPD Superintendent "shall have full and complete authority to administer the

Department…in a manner consistent with the ordinances of the City, the laws of the state, and the rules and regulations of the Police Board." M.C.C. 2-84-020-040.

In *Vodak*, the Seventh Circuit found that CPD was the City when it came to responding to a demonstration, issuing directives, some which did not reach protesters, and the difficulties the police had controlling them. While the City disagreed with that decision then (and still does), the Seventh Circuit started at the right place: with City Council's promulgation of the Municipal Code and powers granted to the CPD Superintendent.

The analysis for this case must begin from that same starting gate -- the Municipal Code. The City Council created all City departments, including the two that are most relevant here: Chapter 2-36 creating the Fire Department and Chapter 2-74 creating the Department of Human Resources[13]. In the former, the City Council created the fire department headed by the Commissioner of Fire. M.C.C. 2-36-110. The Fire Commissioner "shall enforce the fire regulations of this Code and shall "manage and control all matters and things pertaining to the Fire Department and all persons employed therein." M.C.C. 2-36-200. The Fire Commissioner does not create or administer comprehensive human resources policy for his/her department or any other, however. The City Council instead conferred that authority to the Department of Human Resources ("DHR"). M.C.C. 2-74.

The DHR exists to "establish a system of personnel administration that meets the social, economic, and program needs of the people of the City of Chicago." M.C.C. 2-74-010. The Commissioner of Human Resources is "responsible for the general management and control of the department of human resources in a manner consistent with the ordinances of the city, the laws of the state, and the rules of the department." M.C.C. 2-74-020. The City Council also delegated to the Commissioner of Human Resources the power and duty to promulgate human resources rules for

---

[13] https://codelibrary.amlegal.com/codes/chicago/latest/chicago_il/0-0-0-2595372 contains the Chicago Municipal Code.

municipal employees. M.C.C. 2-74-050 (1) to (15). These powers include but are not limited to the power and duty to create rules on "the recruitment and selection of persons in career service on the basis of their relative fitness, and job-related selection procedures" and the establishment of eligibility lists for hiring throughout the city. M.C.C. 2-74-050 (3)-(4). The Commissioner of Human Resources is specifically tasked with creating rules on probationary periods, setting disciplinary rules governing disciplinary measures, including discharge; the development and operation of programs to improve work effectiveness, including training; and establishing procedures for the review of discipline issued to career service personnel. M.C.C. 2-74-050 (7), (12)-(14). Department heads, such as the Fire Commissioner, must seek technical advice and consulting services from the DHR when developing job related screening methods. M.C.C. 2-74-150; See also M.C.C. § 2-74-050 (1) through (15) and 2-74-020 (1) through (11) for additional information on City Council's grant of powers and duties to the Commissioner of Human Resources &. DHR's Personnel Rules.[14]

The Plaintiffs' reference to *Kujawski v. Board of Commr's,* 183 F.3d 734 (7th Cir. 1999) also is misplaced. There, the Court affirmed the "well-established principle that the mere unreviewed discretion to make hiring and firing decisions does not amount to policy-making authority. There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire." *Id.* at 739. On the record before it, the Seventh Circuit determined there was a genuine question of fact as to whether the County Board had delegated, as a matter of custom, final policy making to Chief Probationary Officer over a staff of probation officers. *Id.*

This case is more like *Killinger*, but even more like *Waters v. City of Chicago—because it deals with the same employer and some of the same personnel rules.* The City discussed this case in its opening brief and will

---

[14]

www.chicago.gov/content/dam/city/depts/dhr/supp_info/HRpolicies/2014_PERSONNEL_RULES-FINAL_2014_v3.pdf

only summarize it in this Reply. There, the Chicago Department of Transportation (CDOT) terminated the plaintiff for misconduct, even though he had made complaints to the media about alleged requests for political support. 580 F.3d 575, 577 (7th Cir. 2009). His termination was recommended by Deputy Commissioner to the CDOT Commissioner to Law and back to the Commissioner for final approval.[15] *Id.* at 577-579.

The plaintiff in *Waters* attempted to establish that the Department CVommissioner was a policy-maker, not just a decision maker. In support of this position, he cited the personnel rules, including Personnel Rule XXI § 1 on certain authority given to department heads relative to employment matters. *Waters,* 580 F.3d at 581-582. The Court disagreed with plaintiff's analysis. This personnel rule addressed the "authority to implement existing personnel policy; [but] does not grant department heads the authority to set personnel policy for the City. That policy is already embodied in the Personnel Rules themselves." 580 F.3d at 582.

The same rationale applies here. Personnel Rule XV nor XXI § 1(f) (that Plaintiffs cite) is not an official delegation of authority by the City Council or the Commissioner of Human Resources to CFD management to set employment policy for the City or the CFD. Personnel Rule XV § 1 allows department heads to identify training needs and prepare and conduct training programs that will meet those needs unique to his/her department. This rule is not a grant of policy-making authority. It should also be read with § 2 that expressly states that it is the Commissioner of Human Resources who ensures that overall training programs provide a proper balance between training and the need to improve employee effectiveness and career development.

---

[15] Like this case, there was testimony from one of the CDOT foremen that "nothing happened in the Bureau of Bridges without [Deputy Commissioner] Kaderbek's involvement." 580 F.3d at 577; Comp. SOF ¶ 138 "if a termination decision was made, the fire commissioner made it."

Rule XXI § 1(f) provides that the head of personnel administration for each department is responsible for the development and implementation of training programs. Again, this is not the delegation of "policy-making" authority and should also be read in conjunction with Rule § 1(g) that requires the head of personnel administration for each department to "cooperate with the Department of Human Resources for technical personnel matters, including but not limited to, "job-related selection procedures."

Plaintiffs inappropriately conflate the management and administration responsibilities within the CFD with the ultimate policy-making authority of the City. The latter rests with the City Council. Any delegation that flows from that body is found in the Municipal Code. City Council-delegated powers and duties for the creation of human resources policy rests exclusively with the DHR. Approving a training manual with or without physical fitness tests and signing off on the probationary employee termination forms for a handful of Plaintiffs is *not policy-making,* nor do any of the Plaintiffs' cases stand for that proposition.

### 2. There is no "widespread & well-settled practice" of discrimination at CFD

Plaintiffs again resort to hyperbole with their claim their equal protection rights were violated through a "notoriously" wide-spread practice that is so well-established as to constitute a municipal policy. *Gilson v. Indiana Dept. of Corr.,* 849 F.3d 372, 379 (7th Cir. 2017) (cite omitted). There are significant flaws in this argument, starting first with the varying experiences among the eleven Plaintiffs. Two were injured on the Step Test and were placed on Suspended Assignment with the terms of the Suspended Assignment Policy governing their return. One was not medically cleared to return to work by the Medical Director. Three others did not pass the academic portion, and five more did not pass one or both of the tests challenged in this case. This is no "widespread" or "well-settled practice" practice of discrimination against women in the Academy, including with respect to the challenged physical tests, as more women passed the tests when offered a specially-created extended training program to permit Candidate paramedics to better condition and train not just for the tests, but for the physical aspects of the job. If

a person cannot help lift or move a 250 pound dummy, how can he or she lift or move a 250 person? While Plaintiffs want to call these tests discriminatory because some could not pass them, it does not make it so, and it certainly does not establish an intentional practice of discrimination.

The prior litigation cited by Plaintiffs does not save their claims either. None of the cases Plaintiffs identify held that there was intentional discrimination at the Fire Academy. Several of those matters were resolved without admission of liability while another included a jury ruling for the City. Mtn. 45; SOF 195-205. Plaintiffs have no viable claim based on constitutional violations under Section 1983.

**XII.      Conclusion**

Based on the foregoing, no reasonable jury could find in favor of Plaintiffs on their claims of gender discrimination, whether pursuant to Title VII – disparate treatment; §1983 Equal Protection under *Monell*; the Illinois Civil Rights Act; or Title VII disparate impact claims brought by Plaintiffs Burroughs, Velasco and Markey.

WHEREFORE, Defendant, City of Chicago, respectfully requests this Honorable Court grant its Motion for Summary Judgment and enter judgment in favor of the City and against Plaintiffs for all intentional discrimination counts as well as the Title VII disparate impact claims brought by Plaintiffs Burroughs, Velasco and Markey.

Respectfully submitted,

Corporation Counsel of the
**CITY OF CHICAGO**

/s/ V. Brette Bensinger
Special Assistant Corporation Counsel

Attorneys for Defendant, City of Chicago
Robert T. Shannon
Tom H. Luetkemeyer
V. Brette Bensinger
Hinshaw & Culbertson LLP
151 N. Franklin St., Suite 2500
Chicago, IL 60606