**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JENNIFER LIVINGSTON, et al.    )
    )
        Plaintiffs,    )
    )    No. 16 C 10156
    v.    )
    )    Judge Sara L. Ellis
CITY OF CHICAGO, a municipal corporation  )
    )
        Defendant.    )

## OPINION AND ORDER

Plaintiffs Jennifer Livingston, Tavi Burroughs, Kenia Chavez, Christina Velasco, Katharine Lazzara, Jessica Maples, Shannon Markey, Donna Griffin, Jamie Snevely, Lisette Venegas, and Mary Youngren sued Defendant City of Chicago for gender discrimination for using allegedly sexually discriminatory physical exams at the Chicago Fire Department ("CFD") Paramedic Academy to terminate Plaintiffs. Plaintiffs claim that, in doing so, the City violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Illinois Civil Rights Act ("ICRA"), 740 Ill. Comp. Stat. 23/5. Plaintiffs also assert violations of their equal protection rights under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978). The City moves for summary judgment as to all Plaintiffs on their disparate treatment, *Monell*, and ICRA claims and only as to Burroughs, Velasco, and Markey on their disparate impact claim. The City also moves for partial summary judgment against Youngren for failing to mitigate her damages.

Because Plaintiffs have provided sufficient facts to create a material dispute of fact as to their disparate treatment and disparate impact claims, the Court denies the City's motion for summary judgment. Similarly, because Plaintiffs present evidence that Commissioner Santiago

was a policymaker in relation to Plaintiffs' termination, the Court denies the City's motion for summary judgment as to Plaintiffs' *Monell* claim. Finally, the Cout denies the City's partial motion for summary judgment as to Youngren because the City's offer to process did not constitute an unconditional job offer that cut off Youngren's backpay.

**BACKGROUND**[1]

## I.    The Academy

The application process for becoming a fire paramedic with CFD includes several steps. To be eligible to apply, an individual must obtain a valid Illinois EMT-P license, CPR certification, and Advanced Cardiac Life Support certification. Once an individual has submitted her application, she must wait to be called for processing. Processing requires an applicant to meet all outstanding continuing education requirements for Illinois paramedics, complete a pre-hire physical abilities test, and complete CFD's medical clearance process. Once an applicant has been processed, she becomes eligible to enroll in the Candidate Fire Paramedic Training Program (the "Academy") as a candidate paramedic. Candidate paramedics serve a nine-month probationary period that begins on their first day of the Academy.

The Academy requires candidate paramedics to pursue a full-time course of study that includes both academic and physical components. Academically, a candidate paramedic takes courses about certain medical devices and information, the EMS regional procedures, locations of major Chicago streets, hospitals, and landmarks, and CFD's written operational orders. CFD evaluates a candidate paramedic's knowledge through written tests, quizzes, final exams, practical skills assessments, and other graded activity. Candidate paramedics receive updates on

---

[1] The Court derives the facts set forth in this section from the statements of fact submitted by the parties. *See* Doc. 604-1 (as to all plaintiffs); Doc. 602-1 (as to Youngren). The Court takes these facts in the light most favorable to Plaintiffs, the non-movants. *See Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013).

their academic progress through midterm and final progress reports. CFD manually enters grades for candidate paramedics in a computer program called Gradebook, which tracks and stores candidate paramedics' grades. Failure or inability to maintain an overall grade average of 80% or better may result in the candidate paramedic's termination from the Academy. Between 2014 and 2015, forty-eight of the fifty-one female candidate paramedics who completed the academic component of the Academy received total grade averages of 80% or above.

Candidate paramedics must also pass the Academy's physical requirements, which in 2014 and 2015 included the Step Test and the Lifting Sequence. Neither test had been validated when CFD implemented it for the Academy.[2] The Step Test required candidate paramedics to "(1) hold a 25-lb dumbbell in each hand during examination, without placing them on the ground or resting them on any surface; (2) step up onto, and down from, a platform or step eighteen inches in height, continuously for not less than two minutes; (3) at 112 beats per minute; and (4) without missing cadence for two consecutive beats." Doc. 604-1 ¶ 42. Between 2010 and 2013, the box height for the Step Test was nine inches. Following a proposal from Darryl Johnson, an Academy instructor, CFD increased the box height to eighteen inches and incorporated that adjustment in its 2014 Candidate Manual.[3] Johnson testified that the Step Test had "nothing to do with [a candidate paramedic's] job performance," but also was not designed to "flunk anyone" or to terminate a candidate paramedic's employment. *Id.* ¶ 150. Johnson instead testified that he included the Step Test as part of the Academy training for "fitness

---

[2] Validation, when used to discuss on-the-job testing, refers to a determination of whether "particular criteria predict on-the-job performance." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 998 (1988) (discussing the use of validation studies in employment cases).

[3] Before using the eighteen-inch boxes for candidate paramedics, CFD implemented the eighteen-inch box height for candidate firefighters in March 2014.

training for self improvement." *Id.* Female candidate paramedics failed the Step Test at higher rates than their male counterparts.

The Lifting Sequence consisted of three parts, including a stair chair carry, which candidates had to complete in eight minutes. The stair chair carry required candidates to go up and down flights of stairs carrying a chair that held a 250-pound mannequin. As the test had been implemented from 2010 to 2013, if the chair touched any surface, the candidate paramedic failed the test. However, in 2014, CFD changed the Lifting Sequence to allow for the chair to touch the landing surface without resulting in the candidate paramedic's failure. Women failed the Lifting Sequence at higher rates than men.

The 2008–2015 versions of the CFD Paramedic Candidate Manuals stated that CFD may terminate candidates' employment if they failed to meet either the academic or physical requirements listed in the manual, meaning that CFD retained discretion whether to terminate or not terminate the candidate. Commissioner Jose Santiago approved a CFD candidate's termination. Before 2014, the City had not fired any candidate paramedic for failing the Step Test or Lifting Sequence. Between 2014 and 2015, the City only terminated women for the stated reason of not passing the Step Test or Lifting Sequence.

In 2012, the City hired Dr. Nancy Tippins, a testing expert, to evaluate a new pre-hire test for paramedics, the Paramedic Physical Abilities Test ("PPAT"). As part of her role, Dr. Tippins conducted an extensive job analysis of the CFD paramedic position. During her engagement, Dr. Tippins wrote a letter to the City on October 4, 2014, which discussed additional research she needed to complete to make appropriate changes to the paramedic hiring physical test (the "PAT"). In that same letter, Dr. Tippins raised concerns regarding the training standards used by CFD for paramedics, specifically whether the "training standards" had "been validated and are

aligned with job requirements." *Id.* ¶ 142. She also expressed her belief that "some of the training requirements more closely related to physical fitness . . . than the physical ability to perform the Paramedic job." *Id.* In 2015, CFD hired Dr. Tippins to examine the broader relationship between the physical ability standards used for pre-employment selection, the standards used to pass the Academy physical evaluation procedures, and the standards used in the functional capacity evaluation to determine return-to-work status for paramedics who had been injured or had other health concerns during the course of their employment. At no point during her employment with CFD did Dr. Tippins validate the Step Test or Lifting Sequence as they were used at the Academy during 2014 and 2015. Dr. Tippins testified that she would not recommend using either the Step Test or the Lifting Sequence in the Academy. *Id.* ¶ 176.

Former CFD Deputy Commissioner of Administrative Services Anthony Vasquez, the fire chief overseeing CFD's Personnel Division, also had concerns relating to the Step Test and Lifting Sequence. He testified that he believed the Step Test might be "extreme" and that an eighteen-inch box was too high. *Id.* ¶ 144. He testified that he thought three flights of stairs may be excessive for the Lifting Sequence. *Id.* He expressed concern that both tests had been "implemented internally without science." *Id.* Commissioner Vasquez testified that he conveyed his concerns about the tests to Commissioner Jose Santiago before any candidate was fired for failing the tests. *Id.* Commissioner Vasquez also shared his concerns about the validation of the Step Test and Lifting Sequence with Adrienne Bryant, the CFD Deputy Commissioner of Human Resources and one of the individuals involved with the validation of physical tests for CFD. *Id.* ¶ 159.

After 2015, the City stopped using the Step Test. While the City still used the Lifting Sequence after 2015, it did not allow failure of the Lifting Sequence to serve as a basis for

terminating a candidate paramedic. CFD also reduced the weight of the mannequin used in the Lifting Sequence to 200 pounds.

## II.    The Alphabet Classes

Plaintiffs all enrolled in the Academy as candidate paramedics between 2014 and 2015. The Academy enrolled six classes of candidate paramedics between 2014 and 2015, which are collectively referred to the "Alphabet Classes." The Alpha class started on August 1, 2014 and included Livingston, Snevely, and Velasco. The Bravo class started on August 18, 2014 and included Lazzara and Burroughs. The Charlie class started on September 16, 2014. The Delta class started on December 16, 2014. The Echo class started on April 1, 2015 and included Markey and Maples. The Foxtrot class started on June 16, 2015 and included Chavez, Griffin, Venegas, and Youngren. The Alphabet Classes underwent a condensed Academy program, lasting six to eight weeks instead of the traditional three months. CFD expedited the Academy program for the Alphabet Classes given its need to train and hire more fire paramedics. CFD permitted some candidate paramedics in the Alphabet Classes who had failed the Step Test or the Lifting Sequence to receive a paid, six-week extended training program and the opportunity to retake the failed tests. At least seven female candidates passed the Step Test or Lifting Sequence after participating in the extended training program.

## III.   Plaintiffs' Terminations from the Academy in 2014–2015

Livingston, Maples, Lazzara, Chavez, and Snevely all received final academic grades above 80%, but they failed both the Step Test and Lifting Sequence. All five candidates

participated in the six-week extended training program but still did not pass the Step Test or Lifting Sequence. CFD then terminated their employment.

Griffin also received a final academic grade of at least 80%, but she suffered an injury during the Lifting Sequence while at the Academy and subsequently did not complete the Step Test or Lifting Sequence. Because of her injury, CFD placed Griffin on medical leave and terminated her employment when her medical leave ended.

Youngren also received a final academic grade of at least 80%. Youngren failed to complete the Step Test on September 10, 2015. The following day, Youngren experienced serious back pain. The City placed Youngren on suspended assignment due to her back injury.

Velasco, Burroughs, and Markey all received final academic grades under the 80% threshold—Velasco received a final grade of 69.4%; Burroughs received a final grade of 75.8%; and Markey received a final grade of 77.6%. Velasco, Burroughs, and Markey also all failed both the Step Test and the Lifting Sequence. CFD terminated Velasco, Burroughs, and Markey at the end of the Academy. CFD did not provide Velasco, Burroughs, or Markey the option to participate in the six-week extended program.

Venegas' termination was a "unique circumstance." *Id.* ¶ 184. Venegas' employment as a candidate paramedic ended on June 24, 2015, approximately a week after entering the Academy. There is no CFD policy or procedure to review the medical clearance of a candidate after they are hired and during the Academy. Nonetheless, Venegas was evaluated by Dr. William Wong, the former CFD Medical director, after she began the Academy. During Dr. Wong's evaluation, Venegas failed to get into the back of an ambulance with a step that was twenty-two inches high without using her hands. *Id.* ¶ 183.[4] Because she failed Dr. Wong's

---

[4] CFD Instructor Timothy Dodero stated in his declaration that, "[i]n the academy, we instruct candidates to use a hand for 'three points of contact' when climbing into an ambulance." Doc. 606-61 ¶17.

evaluation, Dr. Wong expected Venegas to go on medical leave and told her she could return for a later Academy class. *Id.* ¶ 181. The City did not place Venegas on medical leave or suspended assignment. *Id.*

The parties dispute whether Venegas took the Step Test while she was at the Academy in June 2015. A physical assessment evaluation form dated June 17, 2015 states that Venegas failed the Step Test and received a time of ":00." Doc. 628-24. Venegas testified that she did not recall if she "did even one step up on the step test." Doc. 606-101 at 314.

## IV.     Rehiring of Plaintiffs

### A.      Plaintiffs Currently Working for CFD as Paramedics

Between 2017 and 2019, the City negotiated Term Sheets as part of settlement discussions with Livingston, Venegas, Maples, and Chavez, which permitted them to return to the Academy. After successfully completing the Academy, Livingston, Venegas, Maples, and Chavez became paramedics for CFD. All four women still work as paramedics for CFD.

In 2019, the City rehired Markey off of a general hiring list and she reenlisted in the Academy. After Markey successfully completed the Academy, CFD hired her as a paramedic.

### B.      Plaintiffs Not Currently Working for CFD as Paramedics[5]

In 2019, the City negotiated a Term Sheet during settlement discussions with Griffin for her to join the April 2019 Academy class. Griffin did not complete the Academy in April 2019. Griffin contests her removal from the Academy in a related lawsuit, *Griffin v. City of Chicago*, No. 19 C 8135 (N.D. Ill.).

---

[5] The parties do not provide additional information about any rehiring processes relating to Burroughs, Velasco, Lazzara, or Snevely.

In 2016, while on suspended assignment due to the back injury she suffered at the Academy, Youngren began working for Trace Ambulance. In March 2017, the City offered Youngren the option to process for the position of paramedic candidate, the same position she held when she had been placed on suspended assignment. The letter informing Youngren of the offer to process disclaimed that it was "not an offer or guarantee of employment" and instructed Youngren "do not terminate your current employment." Doc. 602-1 ¶ 35. The offer did not relate to then ongoing settlement discussions in this case. Youngren's counsel responded to CFD's offer to process on March 8, 2017, and Youngren reported for processing at the Academy as requested on March 13, 2017. To process, meaning to reenter the Academy, Youngren would have needed to take and pass a drug test, a background check, the PPAT, and a medical examination. Youngren did not continue processing after she reported on March 13 because she learned she would have to complete the Academy and she did not believe she could physically complete the Academy requirements given her back injury. She did not ask for any accommodations when she reported for processing on March 13.

On March 27, 2017, the City responded to the March 8 email from Youngren's counsel, conveying to them that while Youngren would need to satisfy CFD's hiring prerequisites, she would not need to pass the Step Test or Lifting Sequence at the Academy. Doc. 607-22 at 2. The City also instructed Youngren to contact Adrianne Bryant, CFD's former Deputy Commissioner, if she wanted to continue being processed. Youngren did not continue processing after receiving this information.

On September 4, 2018, Youngren informed CFD through an amended Rule 26(a)(1) disclosure in this case that she sought reinstatement to CFD. A week later, Youngren informed the City that she believed her back injury would prevent her from doing the job of a CFD

9

paramedic. The City responded two months later, advising Youngren that it would engage with her in the interactive process concerning reasonable accommodations she may need to complete the Academy and perform the job of a CFD paramedic. The City represents that Youngren did not avail herself of that accommodation process. Doc. 616 at 4.

## V.    Related Lawsuits

Plaintiffs brought this lawsuit on the heels of several other Title VII lawsuits against the City based on the City's use of physical tests that allegedly had an adverse impact on women who applied to CFD positions. The City knew about the legal requirements that employment tests must be valid in the fall 2014 due in part to the litigation described below:

The *Ernst v. City of Chicago* litigation (No. 08 C 4370) challenged the use of the PAT. The *Ernst* plaintiffs sued because 40% of female paramedic applicants failed the PAT, while less than 2% of male paramedic applicants did. While the case was ongoing, the City hired Dr. Tippins to validate a new pre-hire test, the PPAT, which then replaced the PAT. The City subsequently used the validated PPAT test to hire candidate paramedics in 2014 and 2015. While the jury found for the defendants in *Ernst* after a trial in November 2014, the Seventh Circuit ordered the trial judge to enter judgment for the plaintiffs on the disparate impact claim, finding that the City failed to show a "connection between real job skills and tested job skills," *Ernst v. City of Chi.*, 837 F.3d 788, 805 (7th Cir. 2016), and remanded for a new trial on plaintiffs' disparate treatment claims, finding that the jury received an incorrect instruction on disparate treatment, *id.* at 795.

The *Vasich v. City of Chicago* litigation (No. 11 C 4843) challenged the use of the firefighter hiring physical tests (the "firefighter PAT"). Following a settlement in August 2013, the City agreed to stop using the firefighter PAT and adopt a new test, the CPAT. The firefighter

10

academy subsequently had a "historic" number of female candidates in their November 2013 and March 2014 classes.  Doc. 604-1 ¶ 200.

The *Godfrey v. City of Chicago* litigation (No. 12 C 8601) also challenged the use of the firefighter PAT to discriminate against women who had been processed for a spot with the academy following another lawsuit, *Lewis v. City of Chicago* (No. 98 C 5596).  The *Lewis* plaintiffs sued the City for using a written hiring test for firefighters that discriminated against African Americans.  As part of the *Lewis* settlement, the City processed 111 *Lewis* class members to join the firefighter academy.  In doing so, the City used the firefighter PAT, which barred 63 of the 67 women applicants from being hired, who then brought suit in *Godfrey* challenging the PAT.  The *Godfrey* litigation settled in March 2015.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record.  Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).  The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018).  In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627

(7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle*, 719 F.3d at 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

Plaintiffs assert that the City, through CFD, discriminated against them by using the Step Test and Lifting Sequence to terminate their candidacies at the Academy. They bring two sets of claims. First, Plaintiffs allege gender discrimination, in violation of Title VII and the ICRA, pursuing both disparate treatment and disparate impact theories. Second, Plaintiffs allege that the City violated their equal protection rights in violation of 42 U.S.C. § 1983 and *Monell*. The City has moved for summary judgment on all Plaintiffs' Title VII disparate treatment claims and ICRA claims, as well as on Velasco's, Burroughs', and Markey's Title VII disparate impact claims.[6] The City also has moved for summary judgment on Plaintiffs' *Monell* claims and with respect to Youngren's alleged failure to mitigate her damages. The Court analyzes these arguments in turn.

---

[6] The City does not distinguish the grounds for summary judgment between Plaintiffs' Title VII claims and ICRA claims. Because the ICRA modeled itself after federal civil rights law, *see Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 889 (N.D. Ill. 2015), the Court will consider Defendants' arguments to apply to both Title VII and ICRA. *See Cary v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 19 C 03014, 2020 WL 1330654, at *4 (N.D. Ill. Mar. 22, 2020) ("[B]ecause the [ICRA] is patterned after Title VI of the Civil Rights Act of 1964, courts look to federal civil-rights statutes to guide the interpretation of the [ICRA].").

12

## I.     Gender Discrimination Claims

Title VII prohibits an employer from discriminating against an employee based on a person's race, color, religion, sex or national origin.  42 U.S.C. § 2000e-2(a).  "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')."  *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).  Under a disparate treatment theory, the plaintiff must prove "that an employer had a discriminatory motive for taking a job-related action."  *Ernst*, 837 F.3d at 794.  "Under a disparate impact theory, by contrast, an employer may be liable for 'facially neutral practices that, in fact, are discriminatory in operation,' regardless of intent."  *Chi. Tchrs. Union, Loc. 1 v. Bd. of Educ. of City of Chi.*, 419 F. Supp. 3d 1038, 1044 (N.D. Ill. 2020) (quoting *Ricci*, 557 U.S. at 577–78), *aff'd sub nom. Chi. Tchrs. Union v. Bd. of Educ. of City of Chi.*, 14 F.4th 650 (7th Cir. 2021).  Plaintiffs proceed under both disparate treatment and disparate impact theories.

For either theory, Plaintiffs must present direct or circumstantial evidence to show that "the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected characteristic] caused the discharge or other adverse employment action."  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Carson v. Lake Cnty., Ind.*, 865 F.3d 526, 533 (7th Cir. 2017) ("However the plaintiff chooses to proceed, at the summary judgment stage the Court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of her [sex].").

### A.     Disparate Treatment

The City seeks summary judgment on Plaintiffs' disparate treatment claim for two reasons—first, that Plaintiffs, as individuals, cannot assert a pattern or practice theory of intentional discrimination; and second, that Plaintiffs fail to establish causation.

### 1.     Use of Pattern or Practice Evidence

The City first argues that Plaintiffs' disparate treatment claim fails to the extent it employs the "pattern and practice" framework provided by *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), because the Seventh Circuit does not recognize a pattern and practice disparate treatment claim for individuals.  Pattern or practice claims provide a "means of proving intentional discrimination that is distinct from a disparate impact case, where the plaintiff need not make any showing of the employer's intent."  *Puffer*, 675 F.3d at 717 (citation omitted).  Under a pattern or practice theory, plaintiffs must prove that discrimination "was the company's standard operating procedure—the regular rather than the unusual practice."  *Teamsters*, 431 U.S. at 336.

Recent cases from the Seventh Circuit confirm the City's position that an individual, as opposed to a class, cannot assert a traditional pattern or practice claim because she must present "evidence of specific discrimination against herself."  *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014).  That does not prevent the Court from considering statistical evidence when evaluating a disparate treatment claim, however, as long as Plaintiffs also present evidence of specific discrimination against them.  *See Barnes-Staples v. Carnahan*, 88 F.4th 712, 719 (7th Cir. 2023) ("[D]ata alone cannot get [Plaintiffs] over the hump, as it must be coupled with other evidence, which does most of the work." (citations omitted); *Doe 1 v. City of Chi.*, No. 18 C 3054, 2020 WL 1166222, at *4 (N.D. Ill. Mar. 11, 2020) ("Even though Plaintiffs cannot pursue

14

their disparate treatment claim solely on the basis of a pattern or practice theory, pattern or practice evidence 'may be highly relevant to an individual disparate treatment claim.'" (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012)); *Rummery v. Ill. Bell Tel. Co.*, No. 97 C 6516, 2000 WL 343469, at *12 (N.D. Ill. Mar. 30, 2000) (determining that statistical evidence plaintiff sought to use to support a pattern or practice claim "should instead be analyzed as part of his individual disparate treatment claim" because "courts should evaluate pattern or practice evidence differently in a case brought by an individual plaintiff, as opposed to a class"), *aff'd*, 250 F.3d 553 (7th Cir. 2001); *cf. Ernst*, 837 F.3d at 795 (noting that in *Matthews*, the statistical evidence did not support a disparate treatment claim because the plaintiff had no other evidence of discrimination against her specifically).

Because Plaintiffs have not sought to solely rely on pattern and practice evidence in support of their disparate treatment theory, but instead have provided evidence of individual discrimination, the Court finds it appropriate to consider this evidence in connection with determining whether their disparate treatment theory may go to a jury.

### 2. Causation

The City also challenges Plaintiffs' disparate treatment claim, claiming that Plaintiffs cannot establish that CFD intended to use the Step Test and Lifting Sequence to discriminate against female candidate paramedics. Plaintiffs respond that they have produced sufficient evidence from which a jury could find causation. To establish a disparate treatment claim, Plaintiffs must show the City acted with discriminatory motive or intent.[7] *See Puffer v. Allstate*

---

[7] In its motion, the City analyzes Plaintiffs' disparate treatment claims under the *McDonnell Douglas* burden shifting framework. Though it can be a helpful tool for organizing and analyzing evidence, it is not the exclusive means to do so, *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017), and Plaintiffs chose not to use it in their argument. Because the Court finds it more effective in this case to consider the evidence overall, it does not use the *McDonnell Douglas* framework in this

*Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012) ("[D]ifferential treatment claims, also known as disparate treatment claims, require plaintiffs to prove discriminatory motive or intent."). The Seventh Circuit has identified "three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020).

First, Plaintiffs provide evidence that the Step Test and Lifting Sequence did not serve any legitimate professional or safety requirement. *See Ernst*, 837 F.3d at 795 (finding that plaintiffs presented a proper disparate treatment claim when they argued "there was no legitimate professional or safety need for Chicago to implement [a] particular skills test"). Plaintiffs point to testimony from several former City employees and the City's testing expert, Dr. Tippins, to emphasize that the tests did not reflect the job requirements of a paramedic. Testimony from Johnson, who suggested changing the Step Test from a nine-inch box to an eighteen-inch box, underscores that the tests did not evaluate job preparedness. Plaintiffs present evidence that Johnson did not contemplate that the Step Test would provide a basis to terminate a candidate paramedic, and that he intended it as a fitness exercise. Vasquez, who oversaw the Personnel Division, raised concerns regarding the difficulty of having candidate paramedics climb three flights of stairs for the Lifting Sequence and the extremity of the Step Test. Vasquez testified his concern stemmed from using tests had been "implemented internally without science." Doc. 604-1 ¶ 144. Plaintiffs also provide evidence that Vasquez flagged his concerns with Commissioner

---

case. *See Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 997 (7th Cir. 2020) (applying *Ortiz* instead of *McDonnell Douglas* where the plaintiff sought review under *Ortiz*).

Santiago before the Alphabet Classes began. Finally, Dr. Tippins, who as part of her job to validate pre-hire physical tests for paramedics considered the job requirements of CFD paramedics, wrote an October 2014 letter that questioned whether the training standards—the Step Test and Lifting Sequence—had been validated and aligned with job requirements. This evidence creates a question of fact as to whether the tests served a legitimate professional or safety need for either the Step Test or Lifting Sequence. *See Ernst*, 837 F.3d at 795.

Plaintiffs also present circumstantial evidence that they claim reflects the City's intent to use the Step Test and Lifting Sequence to discriminate against women. First, Plaintiffs argue that the timing of the changes made to the Step Tests and Lifting Sequence support finding intentional discrimination. Evidence of suspicious timing can support a finding of causation, so long as Plaintiffs present additional evidence to corroborate the inference. *See Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) ("Suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment."); *cf. Malkowski v. Cleveland Corp.*, No. 18 C 5829, 2021 WL 5769534, at *15 (N.D. Ill. Dec. 6, 2021) ("Suspicious timing isn't always enough, but suspicious-timing-plus can get a plaintiff over the summary judgment hurdle."). The City challenges Plaintiffs' timing argument, stating that the Step Test and Lifting Sequence had been used in some form since at least 2010, so their continued use with the Alphabet Classes could not indicate an intent to discriminate. However, the version of the test that Plaintiffs challenge first appeared in the Academy in 2014. Plaintiffs assert that change parallels the introduction of a "historic" number of women in the CFD candidate firefighter class, in November 2013 when nineteen women from the *Vasich* class first entered the firefighter academy after passing the new firefighter PPAT. Doc. 604-1 ¶¶ 173, 199.

Following suit, in early March 2014, CFD also replaced the PAT exam for its paramedic applicants with the PPAT.  While the PAT had failed 40% of women, the PPAT "did not disproportionately exclude women from working as [] CFD paramedic[s]."  *Id.* ¶ 194.  And in August 2014, CFD used the eighteen-inch box for the Step Test for the first time at the paramedic Academy.  Such evidence, coupled with the testimony presented questioning the purpose of the exams to show paramedic readiness, could lead a jury to reasonably draw the conclusion that the changes to the test occurred in correlation to the changing demographic of the Academy classes.

However, as the City argues, the changes to the Lifting Sequence for the Alphabet Classes arguably made the test easier because candidates could place the chair down briefly where they could not before.  *Compare* Doc. 606-3 at CFD0000023101 *with* Doc. 604-1 ¶ 43.  It was not until October 2014, after several of the Alphabet Classes had already started, when Chief William Vogt, CFD's Director of Training for both the Paramedic and Firefighter Academies, suggested changing the Lifting Sequence to reduce the number of stair flights the candidates needed to climb.  Doc. 604-1 ¶ 166.  This distinction does not destroy Plaintiffs' disparate treatment claim because every plaintiff's termination occurred at least in part because she failed the Step Test.

Finally, Plaintiffs present statistical evidence collected and analyzed by their expert.  *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 559 (7th Cir. 2001) (acknowledging that statistical evidence can be used to establish disparate treatment when "accompanied by other evidence").  Specifically, Plaintiffs note men had a five times greater success rate on the Step Test on their first try than women.  Doc. 604-1 ¶ 147.  Similarly, men passed the Lifting Sequence at a rate three times that of women on the first try.  *Id.* ¶ 148.  The statistical evidence bolsters Plaintiffs'

18

arguments that the Step Test and Lifting Sequence hindered female candidate paramedics at the Academy.  While the City argues that men also failed the Step Test and Lifting Sequence, the parties do not dispute the critical fact that CFD only terminated women who failed those tests.  To proceed to trial, Plaintiffs need only show that a material dispute of fact exists that the City implemented the changed tests with the intent to keep women from becoming paramedics.  *See Ernst*, 837 F.3d at 795 (finding plaintiffs had the burden "of proving that Chicago was motivated by anti-female bias, when Chicago created the entrance exam that caused these plaintiffs not to be hired.").  And, as stated above, Plaintiffs have provided sufficient evidence to meet that burden.

The City nonetheless argues that Plaintiffs' claims must fail because Plaintiffs did not meet the graduation requirements of the Academy, and so CFD remained within their rights to terminate them.  This argument sounds in pretext.  Importantly, when Plaintiffs "[do] not rely solely on *McDonnell Douglas*, [they] may survive summary judgment even without evidence that the employer's explanation is dishonest." *Joll*, 953 F.3d at 933.  However, the Court finds it appropriate to address pretext here because Plaintiffs must show "the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected characteristic] caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.  Plaintiffs have produced enough evidence to proceed on their claims, at least for the Plaintiffs who met every other graduation standard except for passing the Step Test or Lifting Sequence,[8] because, as

---

[8] As the City identifies in their motion, those Plaintiffs were Livingston, Maples, Lazzara, Chavez, and Snevely.  The City recognizes that Griffin and Youngren "were terminated because they failed physical testing" but attempts to distinguish them from Livingston, Maples, Lazzara, Chavez, and Snevely because Griffin and Youngren suffered injuries and could not participate in the extended training program. *See* Doc. 604 at 31.  However, Griffin and Youngren only needed to participate in the extended training program because they failed the Step Test and Lifting Sequence during the Academy like Livingston, Maples, Lazzara, Chavez, and Snevely.  Accordingly, Griffin and Youngren have also presented sufficient evidence to establish a question of fact as to the intent behind their terminations.

discussed already, these Plaintiffs have presented sufficient evidence to challenge the legitimacy of those examinations and to raise a question of fact as to CFD's discriminatory attitude toward its female paramedic candidates. But the City argues that the situation is different for Burroughs, Velasco, and Markey, whom the City asserts CFD terminated because they failed the academic portion of the Academy, and Venegas, whom the City asserts CFD terminated because she failed a medical examination while at the Academy. The Court thus turns to these unique arguments.

### a.    Burroughs, Velasco, and Markey

Plaintiffs argue that the City's position that it fired Burroughs, Velasco, and Markey for poor grades was pretext for firing more women who were also failing the physical tests. Plaintiffs argue that CFD treated men differently by inflating failing men's grades to help them graduate where they failed to do that for women. To make their point, Plaintiffs identify a comparator, Grant Guibourdanche, a male paramedic candidate in the Charlie class whose scores on his assignments did not align with the final scores he received on the projects. For example, Guibourdanche's streets final exam scantron reveals he answered 78% of the questions correctly but received an additional 5 points to increase his score to 83%. Doc. 604-1 ¶ 112. Had he not received those additional points, he would have fallen below the 80% threshold. Further, CFD's Commander of EMS Training, Curtis Hudson, could not explain the changes to Guibordanche's grades. Plaintiffs contrast these additional points received by Guibourdanche to the lack of additional points received by Velasco, Burroughs, and Markey.

A similarly situated employee "must be directly comparable to the plaintiff in all material respects." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009) (citations omitted). "In general, a plaintiff who believes another individual is similarly situated must at least show that this comparator (1) dealt with the same supervisor, (2) was subject to the same

standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014). The City distinguishes Guibourdanche from Velasco, Burroughs, and Markey by asserting that he participated in a different Alphabet Class from the three plaintiffs. However, the distinction in classes does not change the supervisors governing the Academy. The parties agree that Vogt served as CFD Director of Training from October 2013 to Spring 2015, which spans the timing of the Alphabet Classes. Additionally, the parties agree that Curtis Hudson and Aref Abdellatif primarily entered the candidate grades into gradebook software throughout the duration of the Alphabet Classes. Accordingly, the supervisors with power over the academic grades of the paramedic candidates remained the same. There is also no evidence that the standards changed between the various Alphabet Classes with respect to the requirement to achieve an 80% minimum to pass the academic component of the Academy. Given the evidence discussed above, Plaintiffs have presented sufficient evidence to call their academic scores and the City's alleged reason for their termination into question. *See, e.g.*, *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012) (finding that "selective enforcement [of a policy] was enough to create a genuine issue of fact as to whether [Defendant's] asserted reason for terminating [Plaintiff] was pretextual.").

### b. Venegas

The City seeks to distinguish Venegas from the other ten Plaintiffs, arguing that she cannot show disparate treatment for two reasons: first, that she did not take the Step Test at all, and second, that CFD terminated her after Dr. Wong determined that Venegas could not perform the essential functions of the paramedic position. Plaintiffs contest the City's recounting of Venegas' Academy termination and assert that she did take and fail the Step Test, pointing to a

21

score sheet from June 17, 2015 reflecting that Venegas received a "fail" for the Step Test and that her time was 0:00. Doc. 628-24. The City relies on testimony from Venegas' deposition that she did not recall if she "did even one step up on the step test." Doc. 606-101 at 314. This testimony does not establish that Venegas did not take the Step Test; it simply states that she did not recall whether she completed a step up during the test. At best, her testimony creates a question of fact as to whether she started the Step Test, the resolution of which must be left to a jury.

The City also argues that Venegas' termination following her evaluation by Dr. Wong demonstrates that her gender did not cause her termination. Like arguments made by Burroughs, Velasco, and Markey with respect to their academic evaluations, Venegas challenges Dr. Wong's medical evaluation as pretextual. First, Venegas highlights that the disqualifying task that Venegas could not perform—stepping into the back of an ambulance with a twenty-two inch step without using her hands—contradicts instructions paramedics receive in the field. *See* Doc. 606-61 ¶ 17 ("In the academy, we instruct candidates to use a hand for 'three points of contact' when climbing into an ambulance."). Venegas points to evidence that the City deviated from its normal procedures by reviewing her medical clearance once she had started the Academy, even though "there is no CFD policy or procedure to review the medical clearance of a candidate after they are hired and during the academy." Doc. 604-1 ¶ 180. Further, Venegas challenges her termination paperwork, citing testimony from Commissioner Santiago that he did not sign her termination forms and that he was not involved in her termination. Yet, Commissioner Santiago provided the final sign off on any termination of the candidates. Failure to follow "[an organization's] own internal procedures with respect to the hiring process for the position [] points to a discriminatory motivation." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723

22

(7th Cir. 2005).  Venegas has presented sufficient evidence questioning the validity and purpose of her examination by Dr. Wong to raise a question of material fact for the jury.  While the City argues that Dr. Wong's evaluation was not a reassessment of Venegas' medical clearance, but instead a "return to work evaluation," which Dr. Wong testified he conducts when a candidate has been ill or injured, *see* Doc. 606-36 at 64–65, 226–227, the City simply raises a question of fact as to the purpose of Dr. Wong's examination, which a jury must resolve.

Therefore, considering Plaintiffs' evidence together, as *Ortiz* instructs the Court to do, a reasonable jury could conclude that the City had discriminatory intent when it implemented the Step Test and the Lifting Sequence.  *See Ernst*, 837 F.3d at 795 (finding the plaintiffs presented enough evidence of a proper disparate treatment claim where they argued "that Chicago created a new standard operating procedure, with the specific intention of reducing or removing women from among its new paramedic hires.  They do not rely on generalized claims of statistical bias against women; instead, they argue that there was no legitimate professional or safety need for Chicago to implement this particular skills test.").

## B.     Disparate Impact

Under a disparate impact theory, "an employer may be liable for facially neutral practices that, in fact, are 'discriminatory in operation,' regardless of intent." *Chi. Tchrs. Union, Loc. 1*, 419 F. Supp. 3d at 1044 (citations omitted).  Plaintiffs must identify "the specific employment practices that are allegedly responsible for any observed statistical disparities." *Puffer*, 675 F.3d at 717.  Plaintiffs must then establish causation by "offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.*  The City does not challenge most of Plaintiffs' disparate impact claim.  Indeed, the parties agree that "the City only

23

terminated women for the stated reason of not passing the Step Test or Lifting Test." Doc. 604-1 ¶ 139. The City instead moves for summary judgment on the disparate impact claim against Velasco, Burroughs, and Markey on the ground that they do not have standing to bring the claim.

"To have standing to bring a disparate impact claim, a plaintiff must show that she was personally injured by the defendant's alleged discriminatory practice." *Farrell v. Butler Univ.*, 421 F.3d 609, 617 (7th Cir. 2005); *see also Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996) (without evidence that the plaintiff "was not hired or promoted because of a discriminatory employment practice," the Court "assume[s] that an unqualified plaintiff was not hired or promoted for the obvious reason-that [she] was unqualified"). The City asserts that Velasco, Burroughs, and Markey do not have standing to raise a disparate impact claim because the City had a separate reason for terminating their candidacies—their failure to pass the academic tests. Plaintiffs counter by stating that the decision to terminate Velasco, Burroughs, and Markey for academic failure provides further proof that the City discriminated against women by pointing to evidence to suggest that the City tampered with grades to help failing men pass and to fail passing women.[9] For the reasons provided above in the Court's discussion of Plaintiffs' disparate treatment claims, the Court finds that Velasco, Burroughs, and Markey have presented sufficient evidence to raise a material question of fact that their academic scores served

---

[9] To the extent that Plaintiffs seek to rely on evidence of the City's academic tampering as an independent theory of gender discrimination, they cannot do so. *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 814 (7th Cir. 2011) (dismissing a retaliation claim when, for the first time in response to a summary judgment motion, the plaintiff raised a new and independent basis for his retaliation claim). Velasco, Burroughs, and Markey did not allege any facts in the first amended complaint, despite the long pendency of this litigation, to provide notice that they would rely on academic tampering as opposed to the Step Test or Lifting Sequence to support their discriminatory intent claim. An academic tampering claim is "not a mere adjustment in the legal theory of the case . . . ; it [is] a major alteration of 'what the claim is' and the 'grounds upon which it rests.'" *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008) (finding a change in theory from discrimination based on HIV to discrimination based on AIDS was improper), *as amended on denial of reh'g and reh'g en banc*, 554 F.3d 1102 (7th Cir. 2009).

as pretext for their termination, and so the Court denies the City's motion for summary judgment as to their ability to pursue a disparate impact claim.

## II.      Equal Protection under *Monell*

Plaintiffs bring a claim under § 1983 and *Monell* against the City for violation of their equal protection rights.  As a municipal entity, the City cannot be held liable for the conduct of its employees under a theory of *respondeat superior*.  *See Monell*, 436 U.S. at 694.  Rather, "claims may be brought against municipalities and other local governmental entities for actions by its employees only if those actions were taken pursuant to an unconstitutional policy or custom."  *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1071 (7th Cir. 2012); *see also Glisson v. Ind. Dep't of Corr.,* 849 F.3d 372, 379 (7th Cir. 2017) ("A person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government.  Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice." (citation omitted) (internal quotation marks omitted)).  The policy or practice "must be the direct cause or moving force behind the constitutional violation."  *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation omitted) (internal quotation marks omitted).  To show an unconstitutional policy or practice, Plaintiffs must provide evidence of one of the following: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority."  *Est. of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005).  Plaintiffs rely only on the second and third prongs—that the City had a widespread practice of discriminating against women and that Commissioner Santiago, a person

with final policymaking authority, violated their equal protection rights—to establish their *Monell* claim.[10]

### A.    Underlying Violation

The City first challenges Plaintiffs' *Monell* claim by arguing that Plaintiffs failed to show a constitutional deprivation.  In doing so, the City recycles its arguments challenging Plaintiffs' disparate treatment claim—namely that Plaintiffs have not presented evidence that CFD acted with a discriminatory purpose.  *See Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017) ("To prove an equal-protection claim, [Plaintiffs] must show that the program had a discriminatory effect and that the defendants were motivated by a discriminatory purpose." (citation omitted) (internal quotation marks omitted)).  Failure to present evidence from which a reasonable jury could conclude that Plaintiffs suffered a constitutional injury causes a *Monell* claim to fail.  *See, e.g.*, *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (noting that where plaintiff fails to establish deprivation of a constitutional right, *Monell* claims also fail). However, as discussed above, Plaintiffs have presented sufficient evidence to establish a material issue of fact as to whether the City acted with discriminatory intent and had a discriminatory effect.

### B.    Widespread Practice

Next, the City argues that the evidence does not reveal a widespread practice of discrimination.  To establish a claim of a widespread practice, a plaintiff must show: "(1) a widespread policy or custom, (2) deliberate indifference, and (3) causation."  *Brown v. City of Chi.*, 633 F. Supp. 3d 1122, 1175 (N.D. Ill. 2022).  Plaintiffs "must demonstrate that there is a policy at issue rather than a random event," which can "take the form of an implicit policy or a

---

[10] Because Plaintiffs do not make any arguments that the City had an express policy of discrimination, the Court need not address the City's arguments on this prong.

gap in expressed policies" or "a series of violations to lay the premise of deliberate indifference." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citations omitted). "To be widespread a practice must be so permanent and well-settled that it constitutes a custom and practice with the force of law even though it was not authorized by written law express policy." *Brown*, 633 F. Supp. 3d at 1175 (citation omitted).

The only evidence that Plaintiffs present to support their widespread policy theory is the prior lawsuits female firefighter and paramedic candidates filed against the City for use of discriminatory physical tests. This evidence is insufficient because "[a] lawsuit is an allegation. So pointing to other lawsuits simply establishes that other people have made accusations against [the City]." *Arquero v. Dart*, 587 F. Supp. 3d 721, 730 (N.D. Ill. 2022). Because the *Vasich* and *Godfrey* lawsuits resulted in settlements, not findings of liability, the lawsuits only establish that other women have accused the City of gender discrimination. *See Rikas v. Babusch*, No. 13 CV 2069, 2014 WL 960788, at *3 (N.D. Ill. Mar. 12, 2014) ("Moreover, each suit was ultimately settled and there was no finding of liability. Thus, the fact that prior lawsuits were filed against Babusch does not support Rikas' *Monell* claim nor does it evidence a widespread municipal practice."). Meanwhile, as Defendants assert, *Ernst* could not provide evidence of a widespread practice because it was contemporaneous with the suit here. *Id.* (finding that lawsuits that are "contemporaneous with the allegations in this action . . . do not support an inference that [defendant] knew or should have known of [plaintiff's] history"). Without presenting any other evidence to support their widespread policy theory, Plaintiffs fail to create a question of material fact as to whether the City had a widespread practice of discrimination against women. *See Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It

is not the court's responsibility to research the law and construct the parties' arguments for them.").

### C.  Final Policymaker

Finally, the City argues Plaintiffs cannot rely on *Monell*'s third prong because Plaintiffs incorrectly identified the policymakers with respect to the gender discrimination policy. Plaintiffs argue that Commissioner Santiago had final policymaking authority.  According to the City, the correct individual setting the hiring policies, the City's Commissioner of Human Resources, did not have any role in deciding to terminate Plaintiffs.  "In order to have final policymaking authority, an official must possess '[r]esponsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'"  *Rasche v. Village of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) (quoting *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992)).  Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority.  *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 737 (7th Cir. 1999).  Courts look at "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority" to determine if someone constitutes an official policymaker.  *Mitchell v. Vill. of Dixmoor*, No. 20 C 436, 2021 WL 3603625, at *5 (N.D. Ill. Aug. 13, 2021).  And, importantly, "the question is whether the plaintiff has identified the decisionmaker responsible for establishing final policy with respect to the subject matter in question."  *Snyder v. King*, 745 F.3d 242, 249 (7th Cir. 2014) (citation omitted) (finding the local voter registration boards are not policymakers because they "simply do not make an independent policy judgment"); *Valentino v. Vill. of S. Chicago*

*Heights*, 575 F.3d 664, 676 (7th Cir. 2009) ("Our inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker in a particular area, or on a particular issue.") (citation omitted).  Here, the policy in question is the use of the failed Step Test or Lifting Sequence to terminate a candidate paramedic's job.

Plaintiffs point to the City's Personnel Rules[11], and particularly Rule XV governing training and career development, to assert that these Rules delegated policymaking power over candidate paramedics' employment to Commissioner Santiago.  Rule XV confirms that the responsibility "to prepare and conduct training programs that will effectively meet those needs which are unique to the operations of the department concerned" has been delegated to Commissioner Santiago.  Personnel Rules, Rule XV Section 1.  Indeed, the parties agree that Commissioner Santiago made the final decision regarding training requirements when adopting CFD candidate manuals and physical tests.

The parties dispute, however, whether the Personnel Rules delegate authority to Commissioner Santiago to terminate candidate paramedics for failure to comply with the candidate manuals or the physical tests he implemented.  The parties agree that Commissioner Santiago had discretion to terminate each plaintiff.  Doc. 604-1 ¶ 138.  However, retaining unreviewed discretion over whether to hire or fire someone does not constitute policymaking authority; instead "there must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire."  *Valentino*, 575 F.3d at 676.  Plaintiffs look to Rule XXI Section 1, which governs "Responsibility of Heads of Departments for Personnel Administration."  However, the Seventh Circuit has already addressed Rule XXI Section 1 specifically and found that it "does not grant department heads the authority to set

---

[11] The Personnel Rules applicable in 2014 are available at https://www.chicago.gov/content/dam/city/depts/dhr/supp_info/HRpolicies/2014_PERSONNEL_RULES-FINAL_2014_v3.pdf.

personnel policy for the city," but instead that its "title and text indicate that it grants department heads the authority to implement the existing personnel policy." *Waters v. City of Chi.*, 580 F.3d 575, 582 (7th Cir. 2009). Accordingly, Rule XXI Section 1 does not provide a basis to establish that Commissioner Santiago was a final policymaker.

Plaintiffs find more success in Rule IX Section 2. Rule IX Section 2 provides that "[a] department head may discharge an employee during the probationary period and should notify the Commissioner of Human Resources in writing." Personnel Policy, Rule IX Section 2. Candidate paramedics serve a nine-month probationary period, starting on their first day of training at the Academy, deeming them probationary employees subject to Rule IX. Importantly, "[f]ailure of the department head to provide notification to the Department of Human Resources shall not affect the termination." *Id.* Because Rule IX does not require a change in outcome if a department head fails to inform the Department of Human Resources of a termination of a probationary employee, Rule IX suggests that Commissioner Santiago's decisions as to the probationary employees at the Academy were not subject to meaningful review from any other policymaker. *See Valentino*, 575 F.3d at 678 (failure to provide instances of the Village's "meaningful oversight of Mayor Owen's decisionmaking process or meaningful[] [review of] his termination decisions" indicated that Mayor Owen was the final policymaker for terminations).

The Court, accordingly, grants the City's motion for summary judgment as to Plaintiffs' *Monell* claim to the extent that Plaintiffs rely on the existence of a widespread policy. However, the Court permits Plaintiffs to pursue their *Monell* claim on the theory that they suffered a constitutional injury caused by a person with final policymaking authority because Plaintiffs have presented sufficient evidence to allow the inference that Commissioner Santiago had final policymaking authority over the termination of candidate paramedics.

30

### III.    Youngren's Alleged Failure to Mitigate

City has also moved for partial summary judgment against Youngren, alleging she failed to mitigate her damages by rejecting the City's offer of employment and therefore she cannot receive back pay.  A plaintiff seeking back pay for violation of Title VII has a duty to reasonably mitigate her damages.  *See Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989).  To satisfy the duty to mitigate, a plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position," but she "cannot just leave the labor force after being wrongfully discharged in the hope of someday being made whole by a judgment."  *Stragapede v. City of Evanston*, 125 F. Supp. 3d 818, 824 (N.D. Ill. 2015).  A plaintiff's reasonable rejection of an offer of instatement does not constitute a failure to mitigate damages.  *Ernst v. City of Chi.*, No. 08 C 4370, 2018 WL 6725866, at *11 (N.D. Ill. Dec. 21, 2018).

Relevant to the City's motion is the Supreme Court's guidance for when a defendant offers to rehire a plaintiff: "when a claimant rejects the offer of the job he originally sought, as supplemented by a right to full court-ordered compensation, his choice can be taken as establishing that he considers the ongoing injury he has suffered at the hands of the defendant to have been ended by the availability of better opportunities elsewhere."  *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 238–39 (1982).  The Court will toll "the ongoing accrual of backpay liability . . . when a Title VII claimant rejects the job he originally sought."  *Id.*  However, the opportunity for re-hiring must be "unconditional" to cut off a claim for back pay.  *Id.* at 232.

Here, the City sent Youngren an offer to process at the Academy.  In that offer, the City explicitly noted "this is not an offer or guarantee of employment," and instructed Youngren "do not terminate your current employment."  Doc. 602-1 ¶ 35.  The *Ernst* court found that the same exact language undermined finding that the offer constituted a job offer triggering a cut off to

31

back pay. *Ernst*, 2018 WL 6725866, at *13 ("The 2014 offers to process, by their own terms, were not job offers" where they included language stating "THIS IS NOT AN OFFER OR GUARANTEE OF EMPLOYMENT").[12] Further, the City appears to agree that the offer did not constitute a job offer, but instead an invitation to continue processing. *See* Doc. 616 at 3, n. 1 ("This was an invitation only, not yet a formal offer of reinstatement."). The City does not put forward any other potential communication constituting a job offer to Youngren. On that ground alone, the Court finds that *Ford Motor* did not require Youngren to accept the City's offer to continue processing.[13]

Despite acknowledging that the invitation to process did not constitute a job offer, the City contends that providing an offer to Youngren was sufficient under *Ford Motor* because Youngren was not entitled to be placed in a better position than she would have held before the alleged discriminatory act. The City's argument fails for two reasons. First, Youngren held the status of candidate paramedic at the time the City terminated her as she had already enrolled in the Academy. Offering her to process, which did not guarantee her a spot in the Academy, does not equate to the position she held at the time of her termination. Second, even if the offer to process could be interpreted as a job offer, the offer was conditional. The parties agreed that the offer to process required Youngren to pass a drug test, a background check, PPAT, and a medical examination. Doc. 602-1 ¶ 36. These prerequisites "controlled [Youngren's] ability to obtain employment" and underscore that the offer was conditional. *Ernst*, 2018 WL 6725866, at *14.

---

[12] The City seeks to distinguish *Ernst*, noting that the court relied on the fact that the parties had stipulated that "but for the discrimination, each Plaintiff would have been hired as a firefighter paramedic." However, the *Ernst* court did not rely on that stipulation but instead on the language of the offers themselves to determine that the offers to process did not constitute job offers at all. Accordingly, that apparent distinction does not prevent the Court from relying on *Ernst.*

[13] The Court notes that the parties agree that Youngren showed initial interest to continue to process by appearing on the date requested with the relevant documentation to begin to process.

Youngren has no duty to accept a conditional offer. *See Ford Motor Co.*, 458 U.S. at 232. Because the City's offer to process at the Academy was at best a conditional job offer, the Court need not discuss whether Youngren's rejection of the offer was reasonable. The Court denies the City's motion for summary judgment as to Youngren's alleged failure to mitigate damages.

## CONCLUSION

For the foregoing reasons, the Court denies the City's motion for summary judgment as to the intentional discrimination claims [604]. The Court grants the City's motion for summary judgment as to Plaintiffs' *Monell* claim to the extent Plaintiffs rely on a widespread policy or practice but denies it as to Plaintiffs' claim that they suffered a constitutional injury at the hands of a final policymaker. The Court also denies the City's motion for partial summary judgement as to Youngren [616].

Dated: January 22, 2024

_____
SARA L. ELLIS
United States District Judge